UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

HEIDI BECKER, MEDEA BENJAMIN, PHIL
DONAHUE, MARK DUNLEA, ANNE
GOEKE, ELIZABETH HORTON SCHEFF,
RALPH NADER, JAMES O'KEEFE, SUSAN
SARANDON, NADER 2000 PRIMARY
COMMITTEE, INC., ASSOCIATION OF
STATE GREEN PARTIES and GREEN
PARTY USA,

              Plaintiffs,

    v.

FEDERAL ELECTION COMMISSION,

              Defendant.

Civil Action
No.  00-cv-11192 MLW

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR PRELIMINARY INJUNCTION

The plaintiffs seek to enjoin the Federal Election Commission ("FEC") from

enforcing or implementing, or relying in any way upon, the unlawful provisions in 11

C.F.R. §§ 110.13 and 114.4(f) ("Debate Regulations") that permit corporations to sponsor

federal candidate debates.

This case is of enormous and immediate public interest.  Since the Tillman Act of

1907, federal law has prohibited corporations from making contributions or expenditures

in connection with campaigns for federal office.  The FEC's unlawful Debate

Regulations have allowed business corporations to make unlimited contributions in the

millions of dollars in connection with federal elections in direct contravention of that

century-old prohibition.  Plaintiffs seek this Court's immediate intervention to prevent this continued flow of illegal corporate money during the current presidential campaign season.

### Background.

The FEC's unlawful Debate Regulations allow corporations to make illegal contributions to support partisan political campaign activity that lies at the core of the electoral process: presidential debates that showcase the candidates of the two major parties.  The plaintiffs who have brought this suit represent a wide range of citizens who are aggrieved by the use of vast sums of corporate money to sponsor partisan presidential debates under the cover of the FEC's Regulations.  They include Ralph Nader, the leading third-party candidate for the presidency; his campaign; national and state political party organizations promoting Mr. Nader's campaign; and voters who support his candidacy or are currently undecided.  They seek to vindicate an essential precept of federal election law:  that corporations may not use their vast financial resources to tilt the electoral playing field.

In November 1985, the respective chairmen of the Democratic and Republican National Committees, Paul G. Kirk, Jr. and Frank J. Fahrenkopf, Jr., agreed that the two major parties would work together to sponsor presidential debates.  They proposed to replace the debates previously sponsored by the League of Women Voters with "nationally televised joint appearances conducted between the presidential and vice-presidential nominees of the two major political parties during general election campaigns."  Jamin B. Raskin, *The Debate Gerrymander*, 77 TEX. L. REV. 1943, 1982, n.

175 (June 1999), *quoting* "Joint Memorandum of Agreement of Presidential Candidate Joint Appearances" (Nov. 26, 1985) (on file with the Texas Law Review).

Fifteen months later, the Democratic and Republican Parties jointly announced the incorporation of the Commission on Presidential Debates ("CPD"), an organization controlled by the Democratic and Republican National Committees. They declared that the CPD is a "bipartisan" organization formed to implement joint sponsorship of general election debates by the national Democratic and Republican Committees "between their respective nominees." *Id.*, n. 178, *quoting* "News from the Democratic and Republican National Committees" (Feb. 18, 1987) (on file with the Texas Law Review).

The CPD staged all of the presidential debates in 1988, 1992 and 1996 and the CPD is expected to stage all of the presidential debates this year. Affidavit of Theresa Amato ¶ 11. The first debate is scheduled for October 3, 2000 in Boston. The CPD's debates do not include all ballot-qualified presidential candidates.

Under the unlawful cover of the FEC's Debate Regulations, the CPD has solicited and raised millions of dollars from for-profit corporations to help it stage its presidential debates. In the past two presidential elections, corporate sponsors of the CPD's debates have included Anheuser-Busch, AT&T, Atlantic Richfield, Ford Motor Company, IBM, J.P. Morgan & Co. and Philip Morris Companies, Inc. Amato Aff. ¶ 12.

On January 6, 2000, the CPD announced that Anheuser-Busch will serve as one of the national financial sponsors for its 2000 presidential debates, as well as the sole national financial sponsor of the CPD's scheduled October 17, 2000, presidential debate

in St. Louis, Missouri.  Amato Aff. ¶ 13.  Anheuser-Busch will reportedly pay $550,000 to underwrite the upcoming St. Louis debate.  *Id.*[1]

These debates are highly partisan events.  They serve as major political advertisements for the candidates invited to participate.  The CPD's debates are nationally televised and watched by tens of millions of American voters.  Amato Aff. ¶ 14.  In fact, the CPD's debates have been the only nationally televised presidential debates in the last three general elections.

As third party presidential candidate Ross Perot proved in 1992, an appearance in the CPD/corporate-sponsored presidential debates contributes dramatically to the legitimacy and potential success of a candidate's campaign.  Prior to the first 1992 CPD presidential debate, Mr. Perot received 7% of the public's support in national polls.  Amato Aff. ¶ 15.  Following the debates, Mr. Perot received roughly 19% of the popular vote in the general election.  *Id.*  As Mr. Perot's experience demonstrated, these presidential debates are the major forum for campaign communication with the American electorate and confer a distinct imprimatur of legitimacy and electability upon the participants.  As such, corporate sponsorship of the debates amounts to a direct and substantial contribution to those candidates who are allowed to participate.

## Argument.

The plaintiffs are entitled to a preliminary injunction because they have shown that (1) they are likely to succeed on the merits of their claim; (2) they will suffer

---

[1]     Notably, on Friday June 14, 2000, before this lawsuit was filed, the CPD had posted on its website a list of the sponsors of its 2000 debates.  As of Tuesday June 20, 2000, the day after this suit was filed, that list had been removed.  Amato Aff. ¶ 13.

irreparable harm in the absence of the requested injunction; (3) the balance of equities favors the grant of an injunction; and (4) the public interest would be served by an injunction. *Cablevision of Boston, Inc.* v. *Public Improvement Comm'n of the City of Boston*, 184 F.3d 88, 95 (1st Cir. 1999); *Philip Morris, Inc.* v. *Harshbarger*, 159 F.3d 670, 673 (1st Cir. 1998).

## I.   THE PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS BECAUSE THE FEC'S DEBATE REGULATIONS ARE IN EXCESS OF STATUTORY AUTHORITY.

### A.   The Debate Regulations Are Inconsistent With The Plain Terms Of FECA.

The Federal Election Campaign Act ("FECA") unambiguously provides that it is unlawful for "any corporation whatever … to make a contribution or expenditure in connection with any [federal] election." 2 U.S.C. § 441b(a). When it imposed this ban, Congress provided no exception of any kind for corporate contributions or expenditures in connection with candidate debates. Rather, Congress underscored its long-standing concern about the impact of corporate money on federal elections by restricting the direct use of corporate funds to *internal* communications or "nonpartisan registration and get-out-the-vote campaigns" aimed at the corporation's own stockholders and management. 2 U.S.C. § 441b(b)(2)(A) & (B).[2] FECA provides no authority for the use of corporate funds to underwrite the most *public* events that occur during an election cycle: candidate debates. The FEC's Debate Regulations should therefore be declared to be in excess of

---

[2]      Section 441b(b)(2)(C) allows corporations to make expenditures for separate segregated funds to be used for political purposes. This third exemption is not pertinent to the issues before the Court, which involve the use of corporate funds drawn from their general treasuries.

the FEC's statutory authority or otherwise not in accordance with law, and set aside

under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 706(2)(A) & (C).[3]

The FEC has attempted to create a "safe harbor" for limitless corporate

sponsorship of federal candidate debates that cannot be found anywhere on the map

drawn by Congress.  The FEC's Debate Regulations provide that a nonprofit corporation

"may stage candidate debates."  11 CFR § 110.13(a).  When it does so, according to the

FEC's regulations, the staging organization not only may "use its own funds," but also

may "accept funds donated by corporations" to defray the costs of staging the debates.

11 CFR § 114.4(f)(1).  Completing the circle, the Debate Regulations provide that "[a]

corporation ... may donate funds" to a qualified debate staging organization.  11 CFR

§ 114.4(f)(3).  The Debate Regulations impose no limits on the amounts of corporate

money that may be used to stage candidate debates.[4]

If a debate meets the FEC's loose regulatory standards laid out in 11 CFR

§ 110.13, the funds used by a non-profit corporation staging the debate have been deemed

by the FEC to be exempt from the "contributions" and "expenditures" regulated by

FECA.  *See* 11 CFR §§ 100.7(b)(21) & 100.8(b)(23) (exempting "funds used to

---

[3]      When former presidential candidate Ross Perot challenged the Debate Regulations as *ultra vires* in 1996, the United States Court of Appeals for the District of Columbia Circuit left open the question of whether the FEC lacked the authority to promulgate 11 C.F.R. §§ 110.13 and 114.4(f), inviting a suit, such as this one, under the APA.  *See Perot* v. *Federal Election Comm'n.*, 97 F.3d 553, 560 (D.C. Cir. 1996) (an action challenging regulations implementing FECA "should be brought under the judicial review provisions of the [APA]").  Because Mr. Perot's claim was not properly brought under the APA, the D.C. Circuit remanded the claim to the district court for dismissal without prejudice.  *Id.* at 561.

[4]      A copy of the Debate Regulations — found at 11 CFR §§ 110.13 and 114.4(f) — is attached to this brief at Tab A.

defray costs in staging candidate debates"). The Congressional definitions of both "contributions" and "expenditures" in FECA, in contrast, do *not* exempt funds used for candidate debates. *See* 2 U.S.C. §§ 431(8)(B) ("contribution") & 431(9)(B) ("expenditure"). The FEC's regulations also purport to exempt from the corporate "contributions" and "expenditures" proscribed by § 441b(a) "any activity which is specifically permitted by part 14" of the FEC's regulations, which authorizes corporate donations to debate staging organizations. *See* 11 CFR §§ 114.1(a)(2)(x), 114.2(b) & 114.4(f)(3). This exemption is flatly inconsistent with the tightly restricted use of corporate funds permitted by § 441b(b$_A$2).

The FEC has itself recognized that absent the regulatory "safe harbor" it has attempted to create, the donation of corporate funds to a debate staging organization – and the staging organization's use of its own corporate money – would constitute a prohibited contribution to every candidate participating in the debate. The FEC's own General Counsel concluded on this basis that there was reason to believe that the CPD had violated § 441b(a) in 1996. The General Counsel reasoned that because the selection criteria used by the CPD to determine who could participate in the 1996 presidential debates did not comply with 11 CFR § 110.13(c), "CPD [was] not entitled to the protection of the safe harbor created by 11 CFR §§ 100.7(b)(21) and 110.13(c)." General Counsel's First Report, *In the Matter of Commission on Presidential Debates*, MURs 4451 and 4473 (Feb. 25, 1998) at 21.[5] While the FEC itself rejected the view that CPD's selection criteria were unlawful, the FEC accepted an essential premise of the General

---

[5]   A copy of the FEC General Counsel's First Report is attached to this brief at Tab B.

Counsel's analysis – that absent compliance with the Debate Regulations, corporate funding of candidate debates would be a "contribution" to the participating candidates regulated by FECA. The FEC acknowledged:

> If a corporation staged a debate that was <u>not</u> in accordance with 11 CFR § 110.13, then staging the debate would not be an activity "specifically permitted" by 11 CFR § 100.7(b), but instead would constitute a contribution to any participating candidate under the Commission's regulations.

FEC Statement of Reasons, *In the Matter of Commission on Presidential Debates* (April 6, 1998) at 4.[6]

The central question before the Court is whether FECA authorized the FEC to create a "safe harbor" for corporate donations in its Debate Regulations. The answer is "no." FECA's proscription of the use of corporate money "in connection with" federal elections does not provide *any* exception for the use of corporate funds to stage federal candidate debates. Because the Debate Regulations conflict with the explicit language of § 441b(a) and find no legislative justification elsewhere, they should be vacated. *See Chevron* v. *Natural Resources Defense Council*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress").

**B.     The FEC's Justification For Its Rule Has No Merit.**

In the past, the FEC has claimed that the donation of corporate funds to underwrite candidate debates is permitted by FECA because Congress exempted funds used for "nonpartisan activity designed to encourage individuals to vote or to register to

---

[6]     A copy of the FEC's Statement of Reasons is attached to this brief at Tab C.

vote" from the general definition of "expenditure" in the statute. *See* 2 U.S.C.

§ 431(9)(B)(ii).[7]  When it promulgated the Debate Regulations, the FEC asserted that

Congress had thus expressed an intent in FECA "to permit corporations and labor

organizations to participate in nonpartisan activity aimed at voter participation where that

activity was undertaken in conjunction with a nonpartisan nonprofit organization." 44

Fed. Reg. 76734, 76736 (Dec. 27, 1979).  This principle cannot be found anywhere in

FECA itself.  In fact, when Congress legislated more specific rules governing the use of

*corporate* funds, it narrowed this exemption to "nonpartisan registration and get-out-the-

vote campaigns" aimed at the corporation's own "shareholders and executive or

administrative personnel and their families." 2 U.S.C. § 441b(b)(2).  Because "it is a

basic principle of statutory construction that a specific statute... controls over a general

provision... particularly when the two are interrelated and closely positioned," the narrow

exemption set out in § 441b(b)(2), rather than the broad exemption in § 431(a)(B)(ii),

should be controlling on the issue of corporate expenditures for get-out-the-vote

activities. *See HCSC-Laundry* v. *United States*, 450 U.S. 1, 6 (1981) (holding that a

general exemption in the federal income tax statute was not applicable to the plaintiff

hospital services organization because the income tax statute also set out specific

exemptions relating to hospital service organizations and the plaintiff did not meet the

criteria of the specific exemption, even though the plaintiff had met the criteria of the

general exemption).

---

[7]  Congress did not, however, exempt such activity from its definition of "contribution." *See* 2 U.S.C. § 431(8).  Instead, by referencing § 441b(b) in that definition, the only *corporate* contributions Congress chose to exempt are those made in connection with activities aimed at a corporation's own "shareholders and executive or administrative personnel and their families," not at the general public. 2 U.S.C. § 431(8)(B)(vi).

By its terms, FECA does not authorize the use of corporate money for *public* voter registration and get-out-the-vote activities even if they are nonpartisan. The FEC points, however, to legislative history that suggests an intent, nowhere reflected in the language of the statute, that the limiting language of § 441b(b)(2) be read together with the general exemption in § 431(9)(B)(ii):

> to permit corporations to take part in nonpartisan registration and get-out-the-vote activities that are not restricted to stockholders and executive or administrative personnel, if such activities are jointly sponsored by the corporation and an organization that does not endorse candidates and are conducted by that organization.

44 Fed. Reg. 76735, quoting H.R. Rep. No. 1057, 94th Cong., 2d Sess. 63-64 (1976).[8] The FEC divines from this legislative history the astounding proposition that FECA somehow expressly indicates an intent to allow corporations to contribute limitless funds to nonpartisan nonprofit organizations for use in "nonpartisan activity aimed at encouraging voter participation." 44 Fed. Reg. 76736. The discontinuity between the words Congress used and the legislative history the FEC relies upon should give the Court pause. As Justice Scalia has pointedly observed, "[w]e are governed by laws, not by the intentions of legislators. . . . If one were to search for an interpretive technique that, on the whole, was more likely to confuse than to clarify, one could hardly find a more promising candidate than legislative history." *Conroy* v. *Aniskoff*, 507 U.S. 511, 518-19 (1993) (Scalia, J., concurring).

Notably, the FEC has not claimed that FECA itself – or even its legislative history – expresses an intent to allow corporate funds to be used for *candidate debates*. Instead,

---

[8]     The legislative history refers to §§ 301(f)(4)(B) and 321(b)(2)(B) of FECA, which have been subsequently recodified as §§ 431(9)(B)(ii) and 441b(b)(2).

the FEC simply proclaims that "[t]he educational purpose of nonpartisan public candidate debates is *similar* to the purpose underlying nonpartisan voter registration and get-out-the-vote campaigns." (emphasis added). 44 Fed. Reg. 76734. On the basis of this alleged "similarity," the FEC claims legal authority for its Debate Regulations.

Even if candidate debates may "stimulate voter interest and hence 'encourage individuals to register to vote or to vote,'" as the FEC asserts, 44 Fed. Reg. 76736, they cannot fairly be characterized as "designed to encourage individuals to vote or to register to vote," within the meaning of 2 U.S.C. § 431(9)(B)(ii). The Conference Committee Report that the FEC has relied upon gives as its example of get-out-the-vote activities "assisting eligible voters to register and to get to the polls." H.R. Rep. No. 1057, 9th Cong., 2d Sess. 63 (1976). That is a far cry from sponsoring a nationally-televised debate. The FEC has not pointed to any reference to corporate funding of candidate debates in the Committee Report or elsewhere in FECA's legislative history.

More importantly, the Debate Regulations do not provide that the debates will be "nonpartisan" within the meaning of FECA. The FEC has simply asserted that by restricting staging organizations to certain *nonprofit* corporations, it has provided "sufficient safeguards to insure nonpartisanship." 44 Fed. Reg. at 76736. This claim has no foundation. The Supreme Court has recognized that nonprofits receiving money from corporations can "serve as a conduit for the type of direct spending that creates a threat to the political market place." *Austin* v. *Michigan Chamber of Commerce*, 494 U.S. 652, 664 (1990). In *Austin*, the Court held that greater restrictions could be placed on the Michigan Chamber of Commerce's right to make political contributions than could be placed on nonprofits that did not receive corporate money. *Id.* The Court explicitly

contrasted the Chamber of Commerce, which received more than 75% of its funding from

business corporations, with nonprofits that received no money from corporations. *Id.*

The Debate Regulations fail to recognize this important distinction and thus do not

provide adequate safeguards of nonpartisanship.[9]

By comparison, in its statement of justifications for the Debate Regulations, the

FEC recited:

> It is the Commission's belief that sufficient safeguards as to
> nonpartisanship of debates staged by broadcasters are set forth in the
> Communications Act, most particularly 47 U.S.C. § 315.

44 Fed. Reg. 76735.  In contrast to the FEC's own Regulations, however, § 315 mandates

"equal opportunities" for all "*legally qualified*" candidates.[10]  The Debate Regulations

contain no comparable guaranty that candidate debates will be nonpartisan.  In fact,

recent presidential and vice-presidential debates have been controlled by the CPD, an

avowedly *bipartisan*, not *nonpartisan*, organization created to promote the interests of the

two major political parties, that will stage the debates this fall.  The Federal Courts have

recognized that "nonpartisan" and "bipartisan" are separate and distinct concepts.  *See,*

*e.g.*, *Rigby* v. *Roadway Exp., Inc.*, 680 F.2d 342, 344 (5th Cir. 1982) ("The Teamsters

grievance panel is *bipartisan*, rather than tripartite or *nonpartisan*") (emphasis added);

*see also Fulani* v. *Brady*, 935 F.2d 1324, 1336-37 (D.C. Cir. 1991) (Mikva, C.J.,

---

[9]     Although *Austin* involved state election laws, federal courts have looked to it for guidance in
interpreting analogous provisions in FECA.  *See, e.g.*, *Mariani* v. *United States*, 2000 WL 637394, *10-11
(3rd Cir. 2000) (*en banc*).

[10]     The FEC itself took this position in 1976 when it required the League of Women Voters to include
all legally qualified candidates in the League's debates.  Raskin, *The Debate Gerrymander*, 77 TEX L. REV.
at 1992.  It was only when the FEC later adopted its Debate Regulations that the agency abandoned its
standard of nonpartisanship.

dissenting) (arguing that plaintiff's claim that CPD was bipartisan rather than nonpartisan

should be heard because government "must not abandon its posture of nonpartisanship").

The CPD cannot credibly claim to be nonpartisan, and its central role in the presidential

debates – fostered by corporate contributions – shows that the FEC's Debate Regulations

cannot be reconciled with FECA. The FEC's purported justification for its Debate

Regulations must be rejected, and the Regulations set aside.

### C.    Vacating The Debate Regulations Will Further The Fundamental Goals of FECA.

The prohibition of corporate contributions in connection with campaigns for

federal office is a major pillar of FECA's statutory protection of the legitimacy of the

electoral system. *See United States* v. *International Union United Auto., Aircraft and*

*Agric. Implement Workers of America, (UAW-CIO)*, 352 U.S. 567, 570 (1957). In *FEC*

v. *Massachusetts Citizens for Life*, 479 U.S. 238 (1986) ("*MCFL*"), the Supreme Court

"adopted the 'underlying theory' of FECA" that corporations should not be permitted to

divert their general treasuries "to political purposes." *Austin,* 494 U.S. at 670-71

(Brennan, J., concurring) (discussing *MCFL*). When reviewing both FECA and

analogous state laws, the Supreme Court has consistently recognized "the compelling

governmental interest in preventing corruption [which] support[s] the restriction of the

influence of political war chests funneled through the corporate form." *Austin*, 494 U.S.

at 659 (quoting *FEC* v. *National Conservative Political Action Committee*, 470 U.S. 480,

500-501 (1985) ("NCPAC")); *see also FEC* v. *National Right to Work Committee*, 459

U.S. 197, 209-10 (1982) ("NRWC") (FECA "reflects a legislative judgment that the

special characteristics of the corporate structure require particularly careful regulation,"

indeed "it is the potential for [disproportionate political] influence that demands

regulation"). By permitting limitless corporate funding of candidate debates, the FEC's

Debate Regulations clearly violate this bedrock principle.

A consistent line of Supreme Court cases has recognized that "state-created

advantages" – such as "limited liability, perpetual life, and favorable treatment of the

accumulation and distribution of assets" – "not only allow corporations to play a

dominant role in the Nation's economy, but also permit them to use 'resources amassed

in the economic marketplace' to obtain 'an unfair advantage in the political

marketplace.'" *Austin*, 494 U.S. at 658-59 (quoting *MCFL*, 479 U.S. at 257); *see also*

*Mariani v. U.S.*, 212 F.3d 761, 2000 WL 637394 at *10-11 (3rd Cir. 2000) (*en banc*);

*Clifton* v. *FEC*, 114 F.3d 1309, 1312 (1st Cir. 1997); *Kentucky Right to Life, Inc.* v.

*Terry*, 108 F.3d 637, 645-46 (6th Cir. 1997); *Athens Lumber Co., Inc* v. *FEC*, 718 F.2d

363, 363 (11th Cir. 1983) (*en banc*). The Supreme Court has explained why the political

advantage of corporations is unfair:

> The resources in the treasury of a business corporation . . . are not an
> indication of popular support for the corporation's political ideas. They
> reflect instead the economically motivated decisions of investors and
> customers. The availability of these resources may make a corporation a
> formidable political presence, even though the power of the corporation
> may be no reflection of the power of its ideas.

*MCFL*, 479 U.S. at 258; *see also Austin*, 494 U.S. at 659.

In carving out an extremely narrow exception to the prohibitions on corporate

funding carried forward by FECA, the *MCFL* Court enumerated three "essential"

characteristics that a non-profit corporation must possess in order to be exempted from

§ 441b's ban on corporate expenditures. *MCFL*, 479 U.S. at 263-64 (formed to promote

political ideas; without shareholders or members with claims to corporate assets; and

independent from business interests); *see also Austin*, 494 U.S. at 661-62. The non-profit

"staging" organizations authorized by the Debate Regulations clearly lack the most important of these essential characteristics, namely "independence from the influence of business corporations." *Austin*, 494 U.S. 664. The Court allowed partisan spending by MCFL, a non-profit corporation, only because it could not "serv[e] as [a] condui[t] for the type of direct spending that creates a threat to the political marketplace." MCFL 479 U.S. at 264. In striking contrast, the FEC's Debate Regulations allow business corporations to circumvent the prohibitions of § 441b by "funneling money through" an organization such as the CPD, which "serve[s] as a conduit for corporate political spending." *Austin*, 494 U.S. at 664. Notably, in prior litigation, the FEC has taken the position that only an absolute policy against accepting contributions from business corporations and labor unions would guarantee that a non-profit group would not abuse the corporate form in partisan political spending – a position upheld by the Courts of Appeals in this and other circuits. *Faucher v. FEC*, 743 F. Supp. 64, 69 (D. Me. 1990), *aff'd*, 928 F.2d 468 (1st Cir.), *cert. denied*, 502 U.S. 820 (1991); *see also FEC v. NRA Political Victory Fund*, 778 F. Supp. 62, 64 (D.D.C. 1991), *rev'd on other grounds*, 6 F.3d 821 (D.C. Cir. 1993), *cert. dismissed*, 513 U.S. 88 (1994).

**D.     The First Circuit Has Not Hesitated To Strike Down FEC Regulations That Are In Excess Of The FEC's Authority Under FECA.**

The First Circuit has not shied away from the task of invalidating FEC regulations that are unauthorized by or conflict with FECA. *See, e.g.*, *Clifton*, 114 F.3d 1309; *Faucher*, 928 F.2d 468. In *Faucher*, the First Circuit struck down an FEC regulation governing the publication of voter guides by corporations because the regulation prohibited issue advocacy. *Id.* at 472. The First Circuit reasoned that the Supreme Court, in *Buckley* v. *Valeo*, had held that FECA does not prohibit issue advocacy. *Id.* at 470.

Thus, the First Circuit held that 11 C.F.R. § 114.4(b)(5), which allowed corporations to publish voter guides only if they did not take a position on *issues*, was invalid because it violated 2 U.S.C. § 441b as interpreted by the *Buckley* Court. *Id.* at 472.

Similarly, in *Clifton*, the First Circuit struck down FEC regulations dealing with voter guides and voting record publications. 114 F.3d at 1312. The FEC regulations barred all non-written contact with candidates regarding both the preparation and distribution of voter guides and their contents. *Id.* Thus, a corporation preparing a voter guide could not even telephone a candidate to ask what the candidate's position on a particular issue was. The First Circuit held that this rule improperly exceeded the scope of FECA's ban on corporate "contributions" or "expenditures." *Id.*

The First Circuit has observed that in implementing FECA, "[t]he FEC can construe terms but it cannot rewrite the dictionary." *Id.* That is, unfortunately, what the FEC has tried to do in justifying its Debate Regulations. This Court should determine, as a matter of law, that the FEC's Debate Regulations are unauthorized by FECA and therefore must be set aside under the APA.

## II.   THE PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE UNLAWFUL DEBATE REGULATIONS REMAIN IN FORCE.

### A.   The Potential Corruption And Actual Distortion Of The Electoral Process Allowed By The Debate Regulations Will Cause Imminent, Irreparable Harm To All Plaintiffs.

If the FEC's Debate Regulations are allowed to stand through the upcoming election cycle, the illegal infusion of corporate money into partisan electoral activity will directly and substantially harm each plaintiff in this suit. By allowing corporate sponsorship of presidential debates the FEC has opened the spigot of partisan corporate spending that FECA was designed to close. The injuries that flow from abrogation of a

prophylactic measure such as § 441b are self-evident.  Major-party candidates will benefit from what amounts to hours of prime-time, corporate-sponsored television advertising.  This will tilt the electoral playing field to the detriment of independent and third party candidates, their parties, their supporters, and undecided voters who need access to the full range of electoral discourse.  Illegal funds already pledged to support the fall debates raise the immediate possibility and perception of disproportionate influence and corruption.  The prospect of likely exclusion from the debates, as discussed in numerous recent news reports, already harms candidates like Mr. Nader, who are pre-judged as marginal, non-competitive, and unelectable.[11]

For over nine decades, Congress has forbidden corporate spending in connection with campaigns for federal office specifically to prevent grave injury to voters, political parties, the political process, and the integrity of government itself.  Echoing Congress' assessment of the injury caused by partisan corporate spending, the Supreme Court has decried the "corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas."  *Austin*, 494 U.S. at 660; *see also NCPAC*, 470 U.S. at 500 (affirming "a congressional determination of the need for a prophylactic rule where the evil of potential corruption had long been recognized").  The Supreme Court has also observed that

> In our tradition, candidate debates are of exceptional significance in the electoral process.  "It is of particular importance that candidates have the

---

[11]     *See, e.g.,* Laura Meckler, Associated Press, *Debating Who Gets To Debate*, N.Y. TIMES, June 22, 2000, at A9; David M. Shribman, *Debates Invite Trouble Early*, THE BOSTON GLOBE, June 27, 2000, at A5; *Presidential Candidate Nader Vows to Fight for Environment, Education, Health Care*, Cable News Network (Posted June 24, 2000) <www.cnn.com/2000/ALLPOLITICS/stories/06/24/nader.green.party>.

> opportunity to make their views known so that the electorate may
> intelligently evaluate the candidate's personal qualities and their positions
> on vital public issues before choosing them on election day." . . .
> Deliberation on the positions and qualifications of candidates is integral to
> our system of government, and electoral speech may have its most
> profound and widespread impact when it is disseminated through televised
> debates.  A majority of the population cites television as its primary source
> of election information, and debates are regarded as the only occasion
> during a campaign when the attention of a large portion of the American
> public is focused on the election, as well as the only campaign information
> format which potentially offers sufficient time to explore issues and
> policies in depth in a *neutral* forum.

*Arkansas Educational Television Comm'n. v. Forbes*, 523 U.S. 666, 675-676 (1998)

(citations omitted and emphasis added).  The FEC's illegal Debate Regulations harm all

plaintiffs by allowing corporate money to degrade the neutrality of the debates and the

political process, tilt the electoral playing field, and introduce the corrosive appearance of

corruption into this country's most important election.

Harms to the fairness and integrity of an election cannot be remedied after the

election has passed.  *See Council of Alternative Political Parties* v. *Hooks*, 121 F.3d 876,

883 (3rd Cir. 1997) (in a ballot access case, holding that "[i]f the plaintiffs lack an

adequate *opportunity* to gain placement on the ballot in this year's election, this

infringement on their rights cannot be alleviated after the election") (emphasis added);

*Griffin v. Burns*, 570 F.2d 1065 (1st Cir. 1978); *Devine v. Rhode Island,* 827 F. Supp. 852

(D.R.I. 1993); *see also Lucas v. Townsend*, 486 U.S. 1301 (1988) (individual Justice

grants injunction barring bond referendum election).  If this Court does not provide swift

relief, plaintiffs' injuries will be irreparable because the campaign season will be over.

The imminent harms caused by the FEC's illegal Debate Regulations warrant immediate

preliminary injunctive relief.

**B.    Ralph Nader, His Supporters, The Green Parties, And Their Members Will Suffer Irreparable Harm If The Injunction Is Not Granted.**

In addition to the general corruption and distortion of the political process referenced above, the use of illegal corporate contributions to pay for the debates will cause irreparable harm to Ralph Nader, his supporters, the supporters of the Green Parties, and the Green Parties themselves. These plaintiffs have a right to run and support a campaign for public office in an atmosphere that is free from the distorting influence of partisan corporate contributions. *Hooks*, 121 F.3d at 883 ("Plaintiffs' voting and associational rights are burdened by their inability to nominate, support and vote for candidates who represent their beliefs"). The Green Parties and their members have a right to engage in party building activities and communicate with the electorate free from the disproportionate influence of partisan, corporate-sponsored advertising. By allowing corporate money to distort the electoral process, the FEC assists corporations and the major parties in stifling the voice of alternative parties and stunting the opportunities of alternative candidates such as Mr. Nader.

Inclusion in the CPD/corporate-sponsored debates confers a decisive imprimatur of electability and acceptability on the invitees. Amato Aff. ¶ 14-15. Because the CPD/corporate-sponsored debates exclude all but select candidates, those events inevitably amount to powerful advertising on behalf of the invited candidates. Amato Aff. ¶ 16; Affidavit of James O'Keefe ¶ 5. Candidates who are not invited to participate would have to spend many millions of dollars to secure comparable television advertising; achieving the same imprimatur of "objective" electability, if possible, would cost untold millions more. Amato Aff. ¶ 16.

The FEC's Debate Regulations have also helped the CPD debates to become the only game in town. The illegal presence of corporate money cements the exclusive sponsorship position occupied by the CPD to the detriment of other forums of presidential debate. Alternative debate sponsors are directly discouraged by the cost of mounting and televising alternative debates in "competition" with the debates already staged with substantial corporate support. Amato Aff. ¶ 7. In sum, the FEC's Debate Regulations have allowed corporate money to usurp and fortify the primary forum of presidential campaign information, providing select candidates a direct financial benefit in the form of prolonged, prime-time national television exposure. This benefit to major party debate participants erects a huge financial barrier in the path of independent and third-party candidates.

"[A] burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment." *Anderson v. Celebrezze*, 460 U.S. 780, 793-794 (1983); *see also Brown* v. *Hartlage*, 456 U.S. 45, 53 (1982) ("[First Amendment] guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office") (*quoting Monitor Patriot Co.* v. *Roy*, 401 U.S. 265, 271-72 (1971)). The FEC's Debate Regulations allow corporate money to sponsor prominent campaign activity on behalf of the major parties, thereby placing a substantial burden on Mr. Nader and other independent candidates to find an alternate forum to communicate their views.[12] The

---

[12]    In a recent Supreme Court decision, Justice Breyer discussed the importance of democratizing the "influence that money may bring to bear upon the electoral process" and of providing an equally effective voice to all citizens. *Nixon* v. *Shrink Missouri Government*, 120 S.Ct. 897, 911 (2000) (upholding the constitutionality of Missouri's campaign contribution limits) (Breyer, J., concurring).

Supreme Court has long recognized the "real and appreciable impact on the exercise of the franchise" that voters face under an electoral system which disfavors certain candidates on the basis of wealth. *Bullock* v. *Carter*, 405 U.S. 134, 144 (1972) (invalidating candidate filing fees); *Lubin* v. *Panish*, 415 U.S. 709 (1974) (same). By allowing direct corporate spending on partisan activities, the FEC exacerbates the considerable, exclusionary damage that aggregations of corporate wealth visit upon the electoral process. To the extent that Mr. Nader cannot afford to mount alternative debates and advertisements in order to spread his competing electoral message, the FEC's Debate Regulations substantially injure his and his supporters' rights to mount a campaign for public office on an even playing field.

For over three decades, the U.S. Supreme Court "has recognized the constitutional right of citizens to create and develop new political parties"—a right "derive[d] from the First and Fourteenth Amendments." *Norman* v. *Reed*, 502 U.S. 279, 288 (1992) (citing *Anderson*, 460 U.S. at 794); *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U.S. 173, 184 (1979); *Williams* v. *Rhodes*, 393 U.S. 23, 30-31 (1968)). "The independent expression of a political party's views is 'core' First Amendment activity no less than is the independent expression of individuals, candidates, or other political committees." *Colorado Republican Federal Campaign Comm'n* v. *FEC*, 518 U.S. 604, 609 (1996) (plurality opinion). The right to "broaden the base of public participation in and support for its activities" is a core element of any party's associational rights. *Tashjian* v. *Republican Party of Connecticut*, 479 U.S. 208, 214 (1986). The Supreme Court has also noted that "the primary values of the First Amendment . . . are served when election campaigns are not monopolized by the existing political parties." *Anderson*, 460 U.S. at

794. The FEC's Debate Regulations, which allow corporate money to sponsor powerful advertisements for the two major-party candidates, place a heavy and unequal burden on the plaintiff Green Parties that will make it harder for them to build the Green Party and gain support for Green Party candidates such as Mr. Nader. Because of the FEC's regulations, Nader and the Green Parties will have no hope of preventing the Democratic and Republican parties from monopolizing the presidential campaign. *Anderson*, 460 U.S. at 794.

Lastly, if Mr. Nader is invited to join in the debates, he will be forced into an untenable Hobson's choice: either he participates in an event funded by illegal corporate contributions, or he passes up his best opportunity to communicate with the American public. Given Mr. Nader's personal and party-platform commitment to fighting corporate fraud, waste, and abuse, he would in effect be forced to violate his own platform in order to communicate that platform to the electorate. Amato Aff. ¶ 18. The FEC's debate regulations thus substantially impair Mr. Nader's and his supporters' First and Fourteenth Amendment rights.

### C.   Undecided Voters Will Suffer Irreparable Harm If The Injunction Is Not Granted.

In addition to the general corruption and distortion of the political process referenced above, the use of illegal corporate contributions to pay for the debates will cause particular irreparable harm to Heidi Becker and other undecided voters. Affidavit of Heidi Becker Aff. ¶¶ 3-6. In order to make a responsible, fully informed choice in the upcoming presidential election, Ms. Becker and other undecided voters must have a secure opportunity to evaluate *all* presidential candidates in an atmosphere that is free from the disproportionate influence of illegal corporate contributions. By allowing

corporate money to support partisan activity, the FEC assists the Democratic and Republican parties in tilting the electoral playing field to the detriment of third-party and independent candidates, depriving Ms. Becker and others like her of an unbiased opportunity to consider alternative candidates.

In addition to seriously undermining plaintiff Becker's access to information about alternatives candidates, the FEC's illegal Debate Regulations substantially harm undecided voters by allowing the primary forum for candidate communication to be infused with corrosive sums of corporate money. This marriage of politics and corporate wealth, which introduces the potential for and appearance of corruption, erodes the public's willingness to participate in politics. Becker Aff. ¶ 5; *see also* O'Keefe Aff. ¶ 5. Affirming the importance of preventing actual or perceived corruption in federal elections, the U.S. Supreme Court recently observed that the *perception* of corruption "inherent in a regime of large individual financial contributions" could "jeopardize the willingness of voters to take part in democratic governance." *Nixon* v. *Shrink Missouri Government*, 120 S.Ct. 897, 905 (2000) (upholding the constitutionality of Missouri's campaign contribution limits); *see also C.S.C. v. Letter Carriers*, 413 U.S. 548, 565 (1973) (avoiding the appearance of improper influence is "critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent"). Regardless of the extent to which corporate sponsors directly influence the form and composition of the presidential debates, the open spigot of corporate funding gives the subtle but undeniable appearance of powerful corporate influence. Undecided voters like plaintiff Becker have been and will be harmed by the FEC's Debate Regulations because

they authorize corporate influence over political campaigns to the detriment of the individual voter.

The FEC's illegal Debate Regulations also threaten the exercise of plaintiff Becker's fundamental rights. The Supreme Court has repeatedly recognized that the First Amendment protects the right to receive as well as the right to disseminate information and ideas. *First Nat'l Bank of Boston* v. *Bellotti*, 435 U.S. at 792; *Virginia Bd. of Pharmacy* v. *Virginia Consumer Council*, 425 U.S. 748, 757 (1976); *Kleindienst* v. *Mandel*, 408 U.S. 753, 762 (1972). This right is even stronger when the speech in question is political speech.

> [T]he First Amendment is not in its primary and most significant aspect a grant by the Constitution to the citizens of individual rights of self-expression but on the contrary reflects the total retention by the people as sovereign to themselves of the right to free and open debate of political questions....

*Mandel* v. *Mitchell*, 325 F.Supp. 620, 631-32 (E.D.N.Y. 1971), *rev'd on other grounds*, 408 U.S. 753 (1972); *see also CBS, Inc.* v. *Federal Communications Comm'n*, 629 F.2d 1, 24 (D.C. Cir. 1980) ("The public's right to be informed is nowhere stronger than in the area of elections. And, no speech is more protected than political speech"); Meiklejohn, *The First Amendment is an Absolute*, 1961 SUP. CT. REV. 245, 255, *quoted in Hynes* v. *Mayor and Council of Borough of Oradell*, 425 U.S. 610, 627-28 (1976) (Brennan, J., concurring in part).

By setting up a system that condones and encourages corporate sponsorship of candidate debates, the FEC violates the plaintiffs' First Amendment "right to hear" vital political discussion free from the taint of the disproportionate influence of illegal corporate-sponsored advertising. When such a deprivation of a constitutional right is the

subject of a preliminary injunction, there is a general presumption that no further showing

of irreparable injury is necessary. *Maceira* v. *Pagan*, 649 F.2d 8, 18 (1st Cir. 1981) ("It

is well established that the loss of First Amendment freedoms constitutes irreparable

injury"); 11 Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2948.1

at 161 (1995) ("When an alleged deprivation of a constitutional right is involved, most

courts hold that no further showing of irreparable injury is necessary").

## III.   THE PUBLIC INTEREST WILL BE SERVED BY THE ISSUANCE OF AN INJUNCTION.

The public has an interest in eliminating the corrosive and distorting influence of

corporate money.  In a free, democratic society, it is critical that the electoral playing

field not be tilted by aggregations of wealth. *Austin*, 494 U.S. at 652.  Justice Holmes

declared that "the ultimate good desired is better reached by free trade in ideas … the best

test of truth is the power of the thought to get itself accepted in the competition of the

market…." *Abrams* v. *United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting).

The FEC's Debate Regulations, which allow illegal corporate contributions to support

partisan political activity in the form of debates, ensure that the "trade in ideas" will not

take place in a competitive market.  The regulations are thus incompatible with our

"profound national commitment to the principle that debate on public issues should be

uninhibited, robust and wide-open …." *New York Times Co.* v. *Sullivan*, 376 U.S. 254,

270 (1964).  The First Amendment was designed to secure "the widest possible

dissemination of information from diverse and antagonistic sources…," *Associated Press*

v. *United States*, 326 U.S. 1, 20 (1945), and to "assure unfettered interchange of ideas for

the bringing about of political and social changes desired by the people." *Roth* v. *United

States*, 354 U.S. 476, 484 (1957).  An electoral process that is contaminated by the

influence of illegal corporate contributions can hardly be said to embrace the ideal of an "unfettered interchange of ideas."

The public interest "clearly favors the protection of constitutional rights, including the voting and associational rights of alternative political parties, their candidates and their political supporters." *Hooks*, 121 F.3d at 883.  In the present case, the public interest is also burdened by the way in which the debate regulations all but preclude "the possibility of independent or alternative party candidates emerging in response to disaffection with the nominees of the major parties." *Id.* at 880, *citing Anderson*.  The Court should issue the requested injunction to protect these public interests.

## IV.   A BALANCING OF THE HARMS WEIGHS DECISIVELY IN FAVOR OF THE PLAINTIFFS.

There are no countervailing harms of any weight to be balanced by the Court. The FEC does not have any statutory authority to continue to enforce, implement or rely upon its unlawful Debate Regulations.  Similarly, corporations do not have any right under federal law to make illegal contributions in connection with a federal election, nor does the CPD have any right to solicit and receive such contributions.  The requested injunction will prevent the FEC from continuing to allow the CPD and its corporate sponsors to violate federal law.  There is no legally-cognizable harm that can result from such an injunction.

**Conclusion.**

For the foregoing reasons, the Court should grant plaintiffs' motion for a

preliminary injunction.

By their attorneys,

_John C Bonifaz_
John C. Bonifaz (BBO #562478)
Gregory G. Luke (BBO #600204)*
NATIONAL VOTING RIGHTS INSTITUTE
294 Washington Street, Suite 713
Boston, MA 02108
(617) 368-9100

_Scott P. Lewis_
Scott P. Lewis (BBO #298740)
PALMER & DODGE LLP
One Beacon Street
Boston, MA 02108-3190
(617) 573-0100

Of counsel:
Jamin B. Raskin
Professor of Law
American University
Washington College of Law
4801 Massachusetts Avenue, NW
Washington, D.C. 20016
(202) 274-4011

Dated: June 29, 2000

CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the above document to be
served on the defendant by U.S. Postal Service express mail for
overnight delivery on June 29, 2000.

---

* Mr. Luke's application for admission to the bar of this Court is currently pending.

Exhibit A

## § 110.12 Candidate appearances on public educational institution premises.

(a) *Rental of facilities at usual and normal charge.* Any unincorporated public educational institution exempt from federal taxation under 26 U.S.C. 115, such as a school, college or university, may make its facilities available to any candidate or political committee in the ordinary course of business and at the usual and normal charge. In this event, the requirements of paragraph (b) of this section are not applicable.

(b) *Use of facilities at no charge or at less than the usual and normal charge.* An unincorporated public educational institution exempt from federal taxation under 26 U.S.C. 115, such as a school, college or university, may sponsor appearances by candidates, candidates' representatives or representatives of political parties at which such individuals address or meet the institution's academic community or the general public (whichever is invited) on the educational institution's premises at no charge or at less than the usual and normal charge, if:

(1) The educational institution makes reasonable efforts to ensure that the appearances constitute speeches, question and answer sessions, or similar communications in an academic setting, and makes reasonable efforts to ensure that the appearances are not conducted as campaign rallies or events; and

(2) The educational institution does not, in conjunction with the appearance, expressly advocate the election or defeat of any clearly identified candidate(s) or candidates of a clearly identified political party, and does not favor any one candidate or political party over any other in allowing such appearances.

[60 FR 64273, Dec. 14, 1995]

## § 110.13 Candidate debates.

(a) *Staging organizations.* (1) Nonprofit organizations described in 26 U.S.C. 501 (c)(3) or (c)(4) and which do not endorse, support, or oppose political candidates or political parties may stage candidate debates in accordance with this section and 11 CFR 114.4(f).

(2) Broadcasters (including a cable television operator, programmer or producer), *bona fide* newspapers, magazines and other periodical publications may stage candidate debates in accordance with this section and 11 CFR 114.4(f), provided that they are not owned or controlled by a political party, political committee or candidate. In addition, broadcasters (including a cable television operator, programmer or producer), *bona fide* newspapers, magazines and other periodical publications, acting as press entities, may also cover or carry candidate debates in accordance with 11 CFR 100.7 and 100.8.

(b) *Debate structure.* The structure of debates staged in accordance with this section and 11 CFR 114.4(f) is left to the discretion of the staging organizations(s), provided that:

(1) Such debates include at least two candidates; and

(2) The staging organization(s) does not structure the debates to promote or advance one candidate over another.

(c) *Criteria for candidate selection.* For all debates, staging organization(s) must use pre-established objective criteria to determine which candidates may participate in a debate. For general election debates, staging organizations(s) shall not use nomination by a particular political party as the sole objective criterion to determine whether to include a candidate in a debate. For debates held prior to a primary election, caucus or convention, staging organizations may restrict candidate participation to candidates seeking the nomination of one party, and need not stage a debate for candidates seeking the nomination of any other political party or independent candidates.

[61 FR 18051, Apr. 24, 1996; 61 FR 24533, May 15, 1996]

## § 110.14 Contributions to and expenditures by delegates and delegate committees.

(a) *Scope.* This section sets forth the prohibitions, limitations and reporting requirements under the Act applicable to all levels of a delegate selection process.

(b) *Definitions*—(1) *Delegate.* Delegate means an individual who becomes or seeks to become a delegate, as defined

or labor organization who ry to administer the meeting, ruests of the corporation or ization who are being honking or participating in the representatives of the news

candidate, candidate's rep- or party representative contributions to his or her r party, or ask that con- o the separate segregated corporation or labor organized for his or her cam- ty. The incidental solicitasons outside the corpora- or organization's restricted ay be present at the meetnitted by this section will lation of 11 CFR part 114. te's representative or party ve (other than an officer, other representative of a or official, member or em- labor organization) or the may accept contributions ng or after the appearance ing, convention or other the corporation or labor or-

rporation or labor organi- uggest that members of its ass contribute to the party committee, but the col- ntributions by any officer, ther representative of the or labor organization be- or after the appearance meeting, is an example of facilitation of contribu- 1 CFR 114.2(f).

rporation or labor orga- nits more than one can- e same office, or more didate's representative or ntative, to address its re- s, and permits the news er or carry an appearance date or candidate's rep- date or candidate's rep- on or labor organization rmit the news media to y the appearances by the te(s) for that office, or ndidates' representatives resentatives. If the cor- bor organization permits ve of the news media to

cover or carry a candidate or candidate's representative or party representative appearance, the corporation or labor organization shall provide all other representatives of the news media with equal access for covering or carrying that appearance. Equal access is provided by—

(A) Providing advance information regarding the appearance to the representatives of the news media whom the corporation or labor organization customarily contacts and other representatives of the news media upon request; and

(B) Allowing all representatives of the news media to cover or carry the appearance, through the use of pooling arrangements if necessary.

(3) *Phone banks.* A corporation or a labor organization may establish and operate phone banks to communicate with its restricted class, urging them to register and/or vote for a particular candidate or candidates, or to register with a particular political party.

(4) *Registration and get-out-the-vote drives.* A corporation or a labor organization may conduct registration and get-out-the-vote drives aimed at its restricted class. Registration and get-out-the-vote drives include providing transportation to the place of registration and to the polls. Such drives may include communications containing express advocacy, such as urging individuals to register with a particular party or to vote for a particular candidate or candidates. Information and other assistance regarding registering or voting, including transportation and other services offered, shall not be withheld or refused on the basis of support for or opposition to particular political candidates, or a particular political party.

[60 FR 64275, Dec. 14, 1995]

### §114.5  Disbursements for communications beyond the restricted class in connection with a Federal election.

(a) *General.* A corporation or labor organization may communicate beyond the restricted class in accordance with this section. Any communications which a corporation or labor organization make to the general public under paragraph (c) of this section may also be made to the corporation's or labor organization's restricted class

and to other employees and their families. Communications which a corporation or labor organization may make only to its employees (including its restricted class) and their families, but not to the general public, are found in paragraph (b) of this section. Communications which a corporation or labor organization may make only to its restricted class are found at 11 CFR 114.3. The activities permitted under paragraphs (b) and (c) of this section may involve election-related coordination with candidates and political committees only to the extent permitted by this section. See 11 CFR 109.1 and 114.2(c) regarding independent expenditures and coordination with candidates. Incorporated membership organizations, incorporated trade associations, incorporated cooperatives and corporations without capital stock will be treated as corporations for the purpose of making communications beyond the restricted class under this section.

(b) *Communications by a corporation or labor organization to employees beyond its restricted class*—(1) *Candidate and party appearances on corporate premises or at a meeting, convention or other function.* Corporations may permit candidates, candidates' representatives or representatives of political parties on corporate premises or at a meeting, convention, or other function of the corporation to address or meet its restricted class and other employees of the corporation and their families, in accordance with the conditions set forth in paragraphs (b)(1)(i) through (b)(1)(viii) of this section. Other guests of the corporation who are being honored or speaking or participating in the event and representatives of the news media may be present. A corporation may bar all candidates, candidates' representatives and representatives of political parties from addressing or meeting its restricted class and other employees of the corporation and their families on corporate premises or at any meeting, convention or other function of the corporation.

(i) If a candidate for the House or Senate or a candidate's representative is permitted to address or meet employees, all candidates for that seat

159

who request to appear must be given a similar opportunity to appear;

(ii) If a Presidential or Vice Presidential candidate or candidate's representative is permitted to address or meet employees, all candidates for that office who are seeking the nomination or election, and who meet pre-established objective criteria under 11 CFR 110.13(c), and who request to appear must be given a similar opportunity to appear;

(iii) If representatives of a political party are permitted to address or meet employees, representatives of all political parties which had a candidate or candidates on the ballot in the last general election or which are actively engaged in placing or will have a candidate or candidates on the ballot in the next general election and who request to appear must be given a similar opportunity to appear;

(iv) The candidate's representative or party representative (other than an officer, director or other representative of a corporation) or the candidate, may ask for contributions to his or her campaign or party, or ask that contributions to the separate segregated fund of the corporation be designated for his or her campaign or party. The candidate, candidate's representative or party representative shall not accept contributions before, during or after the appearance while at the meeting, convention or other function of the corporation, but may leave campaign materials or envelopes for members of the audience. A corporation, its restricted class, or other employees of the corporation or its separate segregated fund shall not, either orally or in writing, solicit or direct or control contributions by members of the audience to any candidate or party in conjunction with any appearance by any candidate or party representative under this section, and shall not facilitate the making of contributions to any such candidate or party (see 11 CFR 114.2(f));

(v) A corporation or its separate segregated fund shall not, in conjunction with any candidate, candidate representative or party representative appearance under this section, expressly advocate the election or defeat of any

clearly identified candidate(s) or candidates of a clearly identified political party and shall not promote or encourage express advocacy by employees;

(vi) No candidate, candidate's representative or party representative shall be provided with more time or a substantially better location than other candidates, candidates' representatives or party representatives who appear, unless the corporation is able to demonstrate that it is clearly impractical to provide all candidates, candidates' representatives and party representatives with similar times or locations;

(vii) Coordination with each candidate, candidate's agent, and candidate's authorized committee(s) may include discussions of the structure, format and timing of the candidate appearance and the candidate's positions on issues, but shall not include discussions of the candidate's plans, projects, or needs relating to the campaign; and

(viii) Representatives of the news media may be allowed to be present during a candidate, candidate representative or party representative appearance under this section, in accordance with the procedures set forth at 11 CFR 114.3(c)(2)(iv).

(2) *Candidate and party appearances on labor organization premises or at a meeting, convention or other function.* A labor organization may permit candidates, candidates' representatives or representatives of political parties on the labor organization's premises or at a meeting, convention, or other function of the labor organization to address or meet its restricted class and other employees of the labor organization, and their families, in accordance with the conditions set forth in paragraphs (b)(1) (i) through (iii), (vi) through (viii), and paragraphs (b)(2) (i) and (ii) of this section. Other guests of the labor organization who are being honored or speaking or participating in the event and representatives of the news media may be present. A labor organization may bar all candidates, candidates' representatives and representatives of political parties from addressing or meeting its restricted class and

other employee tion and their ganization's p ing, conventi the labor orga

(i) The cand party represer ficial, membe organization) ask for contril paign or part tions to the se the labor org for his or her candidate, ca or party repr cept contribu after the appea ing, conventio the labor orga campaign mai members of tl member, or en zation or its s shall, either c licit or direct by members candidate or under this sect tate the mak any such can CFR 114.2(f).

(ii) A labor rate segregate junction with representative section, expre tion or defeat candidate(s), a encourage exj members or em

(c) *Communic labor organizati* (1) *General.* A ganization ma: tions describe through (c)(5) general public. cludes anyone poration's or : stricted class. graph (c) of th vent a qualifie under 11 CFR express advoca tion made to t paragraphs (c) this section.

identified candidate(s) or can-
of a clearly identified political
id shall not promote or encour-
ess advocacy by employees;

o candidate, candidate's rep-
ive or party representative
provided with more time or a
cially better location than
candidates, candidates' rep-
ives or party representatives
bear, unless the corporation is
demonstrate that it is clearly
ical to provide all candidates,
ces' representatives and party
tatives with similar times or
s;

Coordination with each can-
candidate's agent, and can-
authorized committee(s) may
discussions of the structure,
and timing of the candidate ap-
s, but shall not include discus-
the candidate's plans, projects,
relating to the campaign; and
Representatives of the news
may be allowed to be present
a candidate, candidate rep-
ive or party representative in
e under this section, in accord-
h the procedures set forth at 11
.3(c)(2)(iv).

*didate and party appearances on
ianization premises or at a meet-
ention or other function.* A labor
ation may permit candidates,
es' representatives or rep-
ives of political parties on the
ganization's premises or at a
, convention, or other function
abor organization to address or
restricted class and other em-
of the labor organization, and
milies, in accordance with the
es set forth in paragraphs
) through (iii), (vi) through
d paragraphs (b)(2) (i) and (ii)
section. Other guests of the
ganization who are being hon-
speaking or participating in the
nd representatives of the news
may be present. A labor organi-
may bar all candidates, can-
representatives and represent-
f political parties from address-
meeting its restricted class and

other employees of the labor organiza-
tion and their families on the labor or-
ganization's premises or at any meet-
ing, convention or other function of
the labor organization.

(i) The candidate's representative or
party representative (other than an of-
ficial, member or employee of a labor
organization) or the candidate, may
ask for contributions to his or her cam-
paign or party, or ask that contribu-
tions to the separate segregated fund of
the labor organization be designated
for his or her campaign or party. The
candidate, candidate's representative
or party representative shall not ac-
cept contributions before, during or
after the appearance while at the meet-
ing, convention or other function of
the labor organization, but may leave
campaign materials or envelopes for
members of the audience. No official,
member, or employee of a labor organi-
zation or its separate segregated fund
shall, either orally or in writing, so-
licit or direct or control contributions
by members of the audience to any
candidate or party representative
under this section, and shall not facili-
tate the making of contributions to
any such candidate or party. See 11
CFR 114.2(f).

(ii) A labor organization or its sepa-
rate segregated fund shall not, in con-
junction with any candidate or party
representative appearance under this
section, expressly advocate the elec-
tion or defeat of any clearly identified
candidate(s), and shall not promote or
encourage express advocacy by its
members or employees.

(c) *Communications by a corporation or
labor organization to the general public*—
(1) *General.* A corporation or labor or-
ganization may make the communica-
tions described in paragraphs (c)(2)
through (c)(5) of this section to the
general public. The general public in-
cludes anyone who is not in the cor-
poration's or labor organization's re-
stricted class. The provisions of para-
graph (c) of this section shall not pre-
vent a qualified nonprofit corporation
under 11 CFR 114.10(c) from including
express advocacy in any communica-
tion made to the general public under
paragraphs (c)(2) through (c)(5)(i) of
this section.

(2) *Registration and voting communica-
tions.* A corporation or labor organiza-
tion may make registration and get-
out-the vote communications to the
general public, provided that the com-
munications do not expressly advocate
the election or defeat of any clearly
identified candidate(s) or candidates of
a clearly identified political party. The
preparation and distribution for reg-
istration and get-out-the-vote commu-
nications shall not be coordinated with
any candidate(s) or political party. A
corporation or labor organization may
make communications permitted under
this section through posters, bill-
boards, broadcasting media, news-
papers, newsletter, brochures, or simi-
lar means of communication with the
general public.

(3) *Official registration and voting in-
formation.* (i) A corporation or labor or-
ganization may distribute to the gen-
eral public, or reprint in whole and dis-
tribute to the general public, any reg-
istration or voting information, such
as instructional materials, which has
been produced by the official election
administrators.

(ii) A corporation or labor organiza-
tion may distribute official registra-
tion-by-mail forms to the general pub-
lic. A corporation or labor organization
may distribute absentee ballots to the
general public if permitted by the ap-
plicable State law.

(iii) A corporation or labor organiza-
tion may donate funds to State or local
government agencies responsible for
the administration of elections to help
defray the costs of printing or distrib-
uting registration or voting informa-
tion and forms.

(iv) The corporation or labor organi-
zation shall not, in connection with
any such distribution, expressly advo-
cate the election or defeat of any clear-
ly identified candidate(s) or candidates
of a clearly identified political party
and shall not encourage registration
with any particular political party.

(v) The reproduction and distribution
of registration or voting information
and forms shall not be coordinated
with any candidate(s) or political
party.

(4) *Voting records.* A corporation or
labor organization may prepare and
distribute to the general public the

voting records of Members of Congress, provided that the voting record and all communications distributed with it do not expressly advocate the election or defeat of any clearly identified candidate, clearly identified group of candidates or candidates of a clearly identified political party. The decision on content and the distribution of voting records shall not be coordinated with any candidate, group of candidates or political party.

(5) *Voter guides.* A corporation or labor organization may prepare and distribute to the general public voter guides consisting of two or more candidates' positions on campaign issues, including voter guides obtained from a nonprofit organization which is described in 26 U.S.C. 501 (c)(3) or (c)(4), provided that the voter guides comply with either paragraph (c)(5)(i) or (c)(5)(ii) (A) through (E) of this section. The sponsor may include in the voter guide biographical information on each candidate, such as education, employment positions, offices held, and community involvement.

(i) The corporation or labor organization shall not contact or in any other way act in cooperation, coordination, or consultation with or at the request or suggestion of the candidates, the candidates' committees or agents regarding the preparation, contents and distribution of the voter guide, and no portion of the voter guide may expressly advocate the election or defeat of one or more clearly identified candidate(s) or candidates of any clearly identified political party.

(ii) (A) The corporation or labor organization shall not contact or in any other way act in cooperation, coordination, or consultation with or at the request or suggestion of the candidates, the candidates' committees or agents regarding the preparation, contents and distribution of the voter guide, except that questions may be directed in writing to the candidates included in the voter guide and the candidates may respond in writing;

(B) All of the candidates for a particular seat or office shall be provided an equal opportunity to respond, except that in the case of Presidential and Vice Presidential candidates the corporation or labor organization may

choose to direct the questions only to those candidates who—

(1) Are seeking the nomination of a particular political party in a contested primary election; or

(2) Appear on the general election ballot in the state(s) where the voter guide is distributed or appear on the general election ballot in enough states to win a majority of the electoral votes;

(C) No candidate may receive greater prominence in the voter guide than other participating candidates, or substantially more space for responses;

(D) The voter guide and its accompanying materials shall not contain an electioneering message; and

(E) The voter guide and its accompanying materials shall not score or rate the candidates' responses in such a way as to convey an electioneering message.

(6) *Endorsements.* A corporation or labor organization may endorse a candidate and may communicate the endorsement to its restricted class through the publications described in 11 CFR 114.3(c)(1) or during a candidate appearance under 11 CFR 114.3(c)(2), provided that no more than a de minimis number of copies of the publication which includes the endorsement are circulated beyond the restricted class. The corporation or labor organization may publicly announce the endorsement and state the reasons therefor, in accordance with the conditions set forth in paragraphs (c)(6) (i) and (ii) of this section. The Internal Revenue Code and regulations promulgated thereunder should be consulted regarding restrictions or prohibitions on endorsements by nonprofit corporations described in 26 U.S.C. 501(c)(3).

(i) The public announcement of the endorsement may be made through a press release and press conference. Disbursements for the press release and press conference shall be de minimis. The disbursements shall be considered de minimis if the press release and notice of the press conference is distributed only to the representatives of the news media that the corporation or labor organization customarily contacts when issuing non-political press releases or holding press conferences for other purposes.

(ii) The public endorsement may be communicated with the candidate, the candidate's agents or the candidate's committee(s).

(7) *Candidate and party educational institutions—use of facilities at less than the usual and normal charge.* Any incorporated educational institution exempt from federal taxation under 26 U.S.C. 501, such as a school, college or university may make its facilities available to any candidate or political party in the ordinary course of business, at the usual and normal charge. In that event, the recordkeeping of (c)(7)(ii) of this section is applicable.

(ii) *Use of facilities at less than the usual and normal charge.* An incorporated educational institution exempt from federal taxation under 26 U.S.C. 501, such as a school, college or university may sponsor appearances by candidates' representatives representatives which such institution, the institution or the general public is invited) on the premises at no charge or at less than the usual and normal charge if—

(A) The institution makes reasonable efforts to ensure that the speeches, questions or similar academic setting efforts to ensure that the events are not conducted or events; and

(B) The education does not, in conjunction with the appearance, express advocate the election or defeat of a clearly identified candidate(s) or clearly identified political party or favor any one candidate or party over another in its appearances.

(d) *Registration and get-out-the-vote drives.* A corporation may sponsor a registration and get-out-the-vote drive which are aimed at its restricted class in accordance ...

oose to direct the questions only to
ose candidates who—

(1) Are seeking the nomination of a
rticular political party in a con-
sted primary election; or

(2) Appear on the general election
llot in the state(s) where the voter
ide is distributed or appear on the
neral election ballot in enough states
win a majority of the electoral
tes:

(C) No candidate may receive greater
ominence in the voter guide than
her participating candidates, or sub-
antially more space for responses;

(D) The voter guide and its accom-
nying materials shall not contain an
ctioneering message; and

(E) The voter guide and its accom-
nying materials shall not score or
te the candidates' responses in such a
y as to convey an electioneering
ssage.

5) *Endorsements.* A corporation or
or organization may endorse a can-
ate and may communicate the en-
rsement to its restricted class
ough the publications described in
CFR 114.3(c)(1) or during a candidate
pearance under 11 CFR 114.3(c)(2),
vided that no more than a de mini-
s number of copies of the publication
ich includes the endorsement are
culated beyond the restricted class.
e corporation or labor organization
y publicly announce the endorse-
nt and state the reasons therefor, in
ordance with the conditions set
h in paragraphs (c)(6) (i) and (ii) of
s section. The Internal Revenue
e and regulations promulgated
reunder should be consulted regard-
restrictions or prohibitions on en-
sements by nonprofit corporations
cribed in 26 U.S.C. 501(c)(3).

) The public announcement of the
rsement may be made through a
s release and press conference. Dis-
s release for the press release and
s conference shall be de minimis.
disbursements shall be considered
nimis if the press release and no-
of the press conference is distrib-
only to the representatives of the
s media that the corporation or
r organization customarily con-
s when issuing non-political press
ases or holding press conferences
ther purposes.

(ii) The public announcement of the
endorsement may not be coordinated
with the candidate, the candidate's
agents or the candidate's authorized
committee(s).

(7) *Candidate appearances on edu-
cational institution premises—(i) Rental
of facilities at usual and normal charge.*
Any incorporated nonprofit edu-
cational institution exempt from fed-
eral taxation under 26 U.S.C. 501(c)(3),
such as a school, college or university,
may make its facilities available to
any candidate or political committee
in the ordinary course of business and
at the usual and normal charge. In this
event, the requirements of paragraph
(c)(7)(ii) of this section are not applica-
ble.

(ii) *Use of facilities at no charge or at
less than the usual and normal charge.*
An incorporated nonprofit educational
institution exempt from federal tax-
ation under 26 U.S.C. 501(c)(3), such as
a school, college or university, may
sponsor appearances by candidates,
candidates' representatives or rep-
resentatives of political parties at
which such individuals address or meet
the institution's academic community
or the general public (whichever is in-
vited) on the educational institution's
premises at no charge or at less than
the usual and normal charge, if:

(A) The educational institution
makes reasonable efforts to ensure
that the appearances constitute
speeches, question and answer sessions,
or similar communications in an aca-
demic setting, and makes reasonable
efforts to ensure that the appearances
are not conducted as campaign rallies
or events; and

(B) The educational institution does
not, in conjunction with the appear-
ance, expressly advocate the election
or defeat of any clearly identified can-
didate(s) or candidates of a clearly
identified political party, and does not
favor any one candidate or political
party over any other in allowing such
appearances.

(d) *Registration and get-out-the-vote
drives.* A corporation or labor organiza-
tion may support or conduct voter reg-
istration and get-out-the-vote drives
which are aimed at employees outside
its restricted class and the general pub-
lic in accordance with the conditions

set forth in paragraphs (d)(1) through
(d)(6) of this section. Registration and
get-out-the-vote drives include provid-
ing transportation to the polls or to
the place of registration.

(1) The corporation or labor organiza-
tion shall not make any communica-
tion expressly advocating the election
or defeat of any clearly identified can-
didate(s) or candidates of a clearly
identified political party as part of the
voter registration or get-out-the-vote
drive.

(2) The registration or get-out-the-
vote drive shall not be coordinated
with any candidate(s) or political
party.

(3) The registration drive shall not be
directed primarily to individuals pre-
viously registered with, or intending to
register with, the political party fa-
vored by the corporation or labor orga-
nization. The get-out-the-vote drive
shall not be directed primarily to indi-
viduals currently registered with the
political party favored by the corpora-
tion or labor organization.

(4) These services shall be made
available without regard to the voter's
political preference. Information and
other assistance regarding registering
or voting, including transportation and
other services offered, shall not be
withheld or refused on the basis of sup-
port for or opposition to particular
candidates or a particular political
party.

(5) Individuals conducting the reg-
istration or get-out-the-vote drive
shall not be paid on the basis of the
number of individuals registered or
transported who support one or more
particular candidates or political
party.

(6) The corporation or labor organiza-
tion shall notify those receiving infor-
mation or assistance of the require-
ments of paragraph (d)(4) of this sec-
tion. The notification shall be made in
writing at the time of the registration
or get-out-the-vote drive.

(e) *Incorporated membership organiza-
tions, incorporated trade associations, in-
corporated cooperatives and corporations
without capital stock.* An incorporated
membership organization, incorporated
trade association, incorporated cooper-
ative or corporation without capital

stock may permit candidates, candidates' representatives or representatives of political parties to address or meet members and employees of the organization, and their families, on the organization's premises or at a meeting, convention or other function of the organization, in accordance with the conditions set forth in paragraphs (b)(1) (i) through (viii) of this section.

(f) *Candidate debates.* (1) A nonprofit organization described in 11 CFR 110.13(a)(1) may use its own funds and may accept funds donated by corporations or labor organizations under paragraph (f)(3) of this section to defray costs incurred in staging candidate debates held in accordance with 11 CFR 110.13.

(2) A broadcaster (including a cable television operator, programmer or producer), *bona fide* newspaper, magazine or other periodical publication may use its own funds to defray costs incurred in staging public candidate debates held in accordance with 11 CFR 110.13.

(3) A corporation or labor organization may donate funds to nonprofit organizations qualified under 11 CFR 110.13(a)(1) to stage candidate debates held in accordance with 11 CFR 110.13 and 114.4(f).

[60 FR 64276, Dec. 14, 1995, as amended at 61 FR 18051, Apr. 24, 1996]

## § 114.5 Separate segregated funds.

(a) *Voluntary contributions to a separate segregated fund.* (1) A separate segregated fund is prohibited from making a contribution or expenditure by utilizing money or anything of value secured by physical force, job discrimination, financial reprisals, or the threat of force, job discrimination, or financial reprisal; or by dues, fees, or other monies required as a condition of membership in a labor organization or as a condition of employment or by monies obtained in any commercial transaction. For purposes of this section, fees or monies paid as a condition of acquiring or retaining membership or employment are monies required as a condition of membership or employment even though they are refundable upon request of the payor.

(2) A guideline for contributions may be suggested by a corporation or a

labor organization, or the separate segregated fund of either, provided the person soliciting or the solicitation informs the persons being solicited—

(i) That the guidelines are merely suggestions; and

(ii) That an individual is free to contribute more or less than the guidelines suggest and the corporation or labor organization will not favor or disadvantage anyone by reason of the amount of their contribution or their decision not to contribute.

A corporation or labor organization or the separate segregated fund of either may not enforce any guideline for contributions.

(3) Any person soliciting an employee or member for a contribution to a separate segregated fund must inform such employee or member of the political purposes of the fund at the time of the solicitation.

(4) Any persons soliciting an employee or member for a contribution to a separate segregated fund must inform the employee or member at the time of such solicitation of his or her right to refuse to so contribute without any reprisal.

(5) Any written solicitation for a contribution to a separate segregated fund which is addressed to an employee or member must contain statements which comply with the requirements of paragraphs (a) (3) and (4) of this section, and if a guideline is suggested, statements which comply with the requirements of paragraph (a)(2) of this section.

(b) *Use of treasury monies.* Corporations, labor organizations, membership organizations, cooperatives, or corporations without capital stock may use general treasury monies, including monies obtained in commercial transactions and dues monies or membership fees, for the establishment, administration, and solicitation of contributions to its separate segregated fund. A corporation, labor organization, membership organization, cooperative, or corporation without capital stock may not use the establishment, administration, and solicitation process as a means of exchanging treasury monies for voluntary contributions.

(1) A contributor may not be paid for his or her contribution through a

tonus, expense acc of direct or indirect

(2) A corporation. membership organi or corporation wi may, subject to t U.S.C. 3005 and c United States Cod other fundraising volves a prize, so lo mits and the prize ately valuable. D other types of ente be used as fundra using raffles or en funds, a reasonabl for the separate s imburse the corpo nization for costs third of the money

(3) If the sepa pays any solicitat trative expense fr which expense co administrative ex ing agent, the col imburse the sepa no later than 30 c expense was paid regated fund.

(c) *Membership funds.* (1) A sepa established by a ganization, men cooperative, or capital stock ma who contribute a separate segrega *members* of its sel so long as—

(i) The fund a all amounts, sub of part 110;

(ii) Subject to this section, no given in return membership;

(iii) The fund status for intan allowing memb candidates to w tribute.

(2) The fact regated fund of o ganization, me cooperative, or capital stock is not provide the ganization, me

Exhibit B

# FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463

FEB 6   4 21 PM '98

## FIRST GENERAL COUNSEL'S REPORT

# SENSITIVE

**MUR 4451**
DATE COMPLAINT FILED:     September 6, 1996
DATE OF NOTIFICATION:     September 13, 1996
DATE ACTIVATED:           April 15, 1997

STAFF MEMBERS:            J. Duane Pugh Jr.
                         Susan L. Kay

**MUR 4473**
DATE COMPLAINT FILED:     September 20, 1996
DATE OF NOTIFICATION:     September 26, 1996
DATE ACTIVATED:           April 15, 1997

STAFF MEMBERS:            J. Duane Pugh Jr.
                         Susan L. Kay

COMPLAINANTS:

MUR 4451                 Dr. John Hagelin
                         Dr. Mike Tompkins
                         Natural Law Party

MUR 4473                 PEROT '96, INC.

RESPONDENTS 

MUR 44                   ABC, Inc.
                         Clinton/Gore '96 General Committee, Inc., and Joan C.
                             Pollitt, as Treasurer
                         Commission on Presidential Debates
                         Dole/Kemp '96, Inc., and Robert E. Lighthizer, as
                             Treasurer
                         Fox Broadcasting Company
                         Public Broadcasting Service

MUR 4473

Clinton/Gore '96 General Committee, Inc., and Joan C. Pollitt, as Treasurer

Commission on Presidential Debates

DNC Services Corporation/Democratic National Committee and Carol Pensky, as Treasurer

Dole/Kemp '96, Inc., and Robert E. Lighthizer, as Treasurer

Republican National Committee and Alec Poitevint, as Treasurer

RELEVANT
STATUTES/REGULATIONS:

2 U.S.C. § 431(4), (8) and (9)
2 U.S.C. § 433
2 U.S.C. § 434
2 U.S.C. § 441a(b)
2 U.S.C. § 441b(a) and (b)(2)
11 C.F.R. § 100.5
11 C.F.R. § 100.7(a)(1), (a)(1)(iii)(A), (b)(2) and (b)(21)
11 C.F.R. § 100.8(a)(1), (a)(1)(iv)(A), (b)(2) and (b)(23)
11 C.F.R. § 102.1(d)
11 C.F.R. § 104.1(a)
11 C.F.R. § 110.8(g)
11 C.F.R. § 110.13
11 C.F.R. § 114.1(a)(1) and (a)(2)(x)
11 C.F.R. § 114.2(b)
11 C.F.R. § 114.4(f)
11 C.F.R. § 114.10
11 C.F.R. § 114.12(a)

INTERNAL REPORTS CHECKED:   Disclosure Reports

FEDERAL AGENCIES
CHECKED:                    None


I.     **GENERATION OF MATTERS**

These matters arose from two complaints filed with the Federal Election Commission (the "Commission"). The first complaint, MUR 4451, was submitted by the Natural Law Party and Drs. John Hagelin and Mike Tompkins, the Natural Law Party's candidates in the 1996 election for President and Vice President of the United States, respectively (collectively "NLP").

3

The second complaint, MUR 4473, was submitted by PEROT '96. INC. ("Perot"), which is the authorized general election campaign committee of Mr. Ross Perot, who was the Reform Party's candidate for President in the 1996 election.[1]

Both the NLP and Perot complaints challenge the criteria used by the Commission on Presidential Debates ("CPD") to select the candidates for President and Vice President to be invited to participate in debates sponsored by CPD, alleging that CPD's criteria do not comply with the standards for such criteria in 11 C.F.R. § 110.13(c). On this basis, the Perot complaint alleges that the debates constitute a corporate contribution to the participants' campaigns in violation of 2 U.S.C. § 441b and 11 C.F.R. § 114.2(b).[2] The Perot complaint further alleges that CPD is a political committee that has failed to register pursuant to 2 U.S.C. § 433(a) and 11 C.F.R. § 102.1(d). The NLP also challenges election-related television programming proposed by three television networks, alleging that the proposed programs would not qualify as news coverage or debate sponsorship and would therefore constitute prohibited corporate contributions.

In addition to CPD, the NLP names as respondents three television networks: ABC, Inc. ("ABC"), Fox Broadcasting Company ("Fox") and the Public Broadcasting Service ("PBS"),

---

[1]   The complainants were also among the parties to a lawsuit related to these debates, in which plaintiffs sought injunctive and declaratory relief. The U.S District Court for the District of Columbia denied the requested injunctive relief and, deferring to the Commission's administrative enforcement procedure, granted summary judgment to the Commission. See Hagelin v. FEC, 1996 WL 566762 (D.D.C. Oct. 1, 1996), aff'd sub nom. Perot v. FEC, 97 F.3d 553 (D.C. Cir. 1996), cert. denied, 117 S.Ct. 1692 (1997). In the candidates' appeal, the court of appeals held that the proper procedure was to dismiss the actions on jurisdictional grounds without prejudice to the filing of a new suit that challenges the Commission's authority to promulgate 11 C.F.R. § 110.13. See Perot, at 557 and 561. In doing so, the court of appeals expressly noted that it did not address "the merits of appellants other claims . . . that they were wrongfully excluded from the debates." See id., at 555.

[2]   Unlike the Perot complaint, the NLP complaint does not allege that the failures of CPD's debate participant selection criteria render the debates corporate in-kind contributions to the participants' campaigns. This analysis infers that NLP, like Perot, alleges that CPD's noncompliance renders the debates prohibited contributions to the campaigns. The respondents made similar assumptions.

alleging that the television programming each of the networks proposed would constitute corporate contributions to participating candidates.

The Office of General Counsel notified additional entities fairly implicated in the allegations in the complaints. To the NLP complaint, this Office also sought a response from Clinton/Gore '96 General Committee. Inc., and Joan C. Pollitt, as its treasurer (collectively "Clinton/Gore"), and Dole/Kemp '96 and Robert E. Lighthizer, as its treasurer (collectively "Dole/Kemp"). To the Perot complaint, this Office also sought a response from the general election committees and their treasurers named above and from the DNC Services Corporation/Democratic National Committee and Carol Pensky, as its treasurer (collectively the "DNC"), and from the Republican National Committee and Alec Poitevint, as its treasurer (collectively the "RNC").[3]

All of the responses to the complaints that were sought have been received. Attachments 1-10.

---

[3]     Several of the additional respondents noted objections to this Office's provision of an opportunity to respond when they were not named as respondents by the complainants. *See* Attachment 5, at 1; Attachment 7, at 1; and Attachment 8, at 1-2. The complainants' allegations implicate the additional respondents in the allegedly illegal conduct. This Office provided the respondents with an opportunity to respond in order to permit the respondents to be heard at the earliest feasible point and to provide the Commission with full information regarding the allegations. *See* 11 C.F.R. § 111.5(a).
        Clinton/Gore responded to the complaint in MUR 4473 on October 11, 1996. Clinton/Gore responded to the complaint in MUR 4451 on March 4, 1997. In its response in MUR 4451, Clinton/Gore states that it is relying upon the response it submitted in connection with MUR 4473. Dole/Kemp responded to the complaint in MUR 4473 on November 27, 1996. Dole/Kemp responded to the complaint in MUR 4451 on February 18, 1997. With the exception of noting that the complaints were filed by different complainants and have different MUR numbers, both responses are otherwise identical.

## II.   CPD'S DEBATE SELECTION CRITERIA

### A.   Legal Standard

Under the Federal Election Campaign Act of 1971, as amended ("FECA"). corporations are prohibited from making contributions[4] or expenditures[5] in connection with federal elections. 2 U.S.C. § 441b(a); *see also* 11 C.F.R. § 114.2(b).[6]  The Commission has promulgated a regulation that defines the term "contribution" to include: "A gift, subscription, loan . . ., advance or deposit of money or anything of value made . . . for the purpose of influencing any election for Federal office." 11 C.F.R. § 100.7(a)(1). *See also* 11 C.F.R. § 114.1(a). "Anything of value" is defined to include all in-kind contributions. 11 C.F.R. § 100.7(a)(1)(iii)(A).  The regulatory definition of contribution also provides:  "[u]nless specifically exempted under 11 C.F.R. § 100.7(b), the provision of any goods or services without charge . . . is a contribution." *Id.*

Section 100.7(b) of the Commission's regulations specifically exempts expenditures made for the purpose of staging debates from the definition of contribution.  11 C.F.R. § 100.7(b)(21).  This exemption requires that such debates meet the requirements of 11 C.F.R. § 110.13,[7] which establishes parameters within which staging organizations must conduct such

---

[4]     FECA defines contribution to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i); *see also* 2 U.S.C. § 441b(b)(2).

[5]     FECA defines expenditure to include "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(9)(A)(i); *see also* 2 U.S.C. § 441b(b)(2).

[6]     The presidential candidates of the major parties who accept public funds cannot accept contributions from any source, except in limited circumstances that are not raised herein. 26 U.S.C. § 9003(b)(2); *see also* 11 C.F.R. § 9012.2(a).

[7]     The exemption also requires that such debates meet the requirements of 11 C.F.R. § 114.4, which permits certain nonprofit corporations to stage candidate debates and other corporations and labor organizations to donate funds to organizations that are staging such debates  11 C.F.R. §§ 114.4(f)(1) and (3).  This section also requires the debates to be staged in accordance with the standards in 11 C.F.R. § 110.13. *Id.*

debates.  The parameters address:  (1) the types of organizations that may stage such debates, (2) the structure of debates, and (3) the criteria that debate staging organizations may use to select debate participants.  With respect to participant selection criteria, 11 C.F.R. § 110.13(c) provides, in relevant part:

> *Criteria for candidate selection.*  For all debates, staging organization(s) must use pre-established objective criteria to determine which candidates may participate in a debate.  For general election debates, staging organization(s) shall not use nomination by a particular political party as the sole objective criterion to determine whether to include a candidate in a debate.

11 C.F.R. § 110.13(c).  When promulgating this regulation, the Commission explained its purpose and operation as follows:

> Given that the rules permit corporate funding of candidate debates, it is appropriate that staging organizations use pre-established objective criteria to avoid the real or apparent potential for a quid pro quo, and to ensure the integrity and fairness of the process.  The choice of which objective criteria to use is largely left to the discretion of the staging organization. . . . .
>
>  . . . .  Staging organizations must be able to show that their objective criteria were used to pick the participants, and that the criteria were not designed to result in the selection of certain pre-chosen participants.  The objective criteria may be set to control the number of candidates participating in a debate if the staging organization believes there are too many candidates to conduct a meaningful debate.
>
> Under the new rule, nomination by a particular political party, such as a major party, may not be the sole criterion used to bar a candidate from participating in a general election debate.  But . . . nomination by a major party may be one of the criteria.

60 Fed. Reg. 64,262 (Dec. 14, 1995).

Thus, if an appropriate corporation staged a debate among candidates for federal office and that debate was staged in accordance with all of the requirements of 11 C.F.R. § 110.13, then the costs incurred by the sponsoring corporation would be exempt from the definition of contribution pursuant to the operation of 11 C.F.R. § 100.7(b)(21).  *See also* 11 C.F.R.

§§ 114.1(a)(2)(x) and 114.4(f)(1).  Similarly, other corporations could legally provide funds to the sponsoring corporation to defray expenses incurred in staging the debate pursuant to the operation of 11 C.F.R. §§ 114.1(a)(2)(x) and 114.4(f)(3).  Conversely, if a corporation staged a debate that was not in accordance with 11 C.F.R. § 110.13, then staging the debate would not be an activity "specifically permitted" by 11 C.F.R. § 100.7(b), but would constitute a contribution to any participating candidate under the Commission's regulations.  *See* 11 C.F.R. § 100.7(a)(1)(iii)(A) (noting "unless specifically exempted" anything of value provided to the candidate constitutes a contribution).  The participating candidates would be required to report receipt of the in-kind contribution as both a contribution and an expenditure pursuant to 11 C.F.R. § 104.13(a)(1) and (2).  *See* 2 U.S.C. § 434(b)(2)(C) and (4).

## B.    CPD's Debate Participant Selection Criteria

CPD was incorporated in the District of Columbia on February 19, 1987, as a private, not-for-profit corporation to "organize, manage, produce, publicize and support debates for the candidates for President of the United States."  *See* Attachment 4, at 45.  Prior to the 1996 campaign, CPD sponsored six debates, five between candidates for President, and one between candidates for Vice President.  In the 1996 campaign, CPD sponsored two Presidential debates and one Vice Presidential debate.  Only the candidates of the Democratic and Republican parties were invited to participate in the debates.  CPD produced written candidate selection criteria for the 1996 general election debate participation.  The introduction to these criteria explains as follows:

> In light of the large number of declared candidates in any given presidential election, [CPD] has determined that its voter education goal is best achieved by limiting debate participation to the next President and his or her principal rival(s).
> A Democratic or Republican nominee has been elected to the Presidency for more than a century.  Such historical prominence and sustained voter interest

warrants the extension of an invitation to the respective nominees of the two major parties to participate in [CPD's] 1996 debates.

In order to further the educational purposes of its debates, [CPD] has developed nonpartisan criteria upon which it will base its decisions regarding selection of nonmajor party candidates to participate in its 1996 debates. The purpose of the criteria is to identify nonmajor party candidates, if any, who have a realistic (i.e., more than theoretical) chance of being elected the next President of the United States and who properly are considered to be among the principal rivals for the Presidency.

The criteria contemplate no quantitative threshold that triggers automatic inclusion in a [CPD]-sponsored debate. Rather, [CPD] will employ a multifaceted analysis of potential electoral success, including a review of (1) evidence of national organization, (2) signs of national newsworthiness and competitiveness, and (3) indicators of national enthusiasm or concern, to determine whether a candidate has a sufficient chance of election to warrant inclusion in one or more of its debates.

Attachment 4, at 57-58. Thus, CPD identified its objective of determining which candidates have a realistic chance of being elected the next President, and it specified three primary criteria for determining which "nonmajor" party candidates to invite to participate in its debates. CPD further enumerated specific factors under each of the three primary criteria that it would consider in reaching its conclusion.

For "evidence of national organization," CPD introduces the factors by explaining that the criterion "encompasses objective considerations pertaining to the eligibility requirements . . . [and] also encompasses more subjective indicators of a national campaign with a more than theoretical prospect of electoral success." *Id.* The factors to be considered include:

a. Satisfaction of the eligibility requirements of Article II, Section 1 of the Constitution of the United States.

b. Placement on the ballot in enough states to have a mathematical chance of obtaining an electoral college majority.

c. Organization in a majority of congressional districts in those states.

> d.    Eligibility for matching funds from the Federal Election Commission or other demonstration of the ability to fund a national campaign, and endorsement by federal and state officeholders.

*Id.*

CPD's selection criteria note that the second criterion, "signs of national newsworthiness and competitiveness" focuses "both on the news coverage afforded the candidacy over time and the opinions of electoral experts, media and non-media, regarding the newsworthiness and competitiveness of the candidacy at the time [CPD] makes its invitation decisions." *Id.* Five factors are listed as examples of "signs of national newsworthiness and competitiveness":

> a.    The professional opinions of the Washington bureau chiefs of major newspapers, news magazines, and broadcast networks.
> b.    The opinions of a comparable group of professional campaign managers and pollsters not then employed by the candidates under consideration.
> c.    The opinions of representative political scientists specializing in electoral politics at major universities and research centers.
> d.    Column inches on newspaper front pages and exposure on network telecasts in comparison with the major party candidates.
> e.    Published views of prominent political commentators.

*Id.*

Finally, CPD's selection criteria state that the factors to be considered as "indicators of national public enthusiasm" are intended to assess public support for a candidate, which bears directly on the candidate's prospects for electoral success. The listed factors include:

> a.    The findings of significant public opinion polls conducted by national polling and news organizations.
> b.    Reported attendance at meetings and rallies across the country (locations as well as numbers) in comparison with the two major party candidates.

*Id.*

## C.    Complainants' Allegations

Both complainants allege that CPD's criteria violate 11 C.F.R. § 110.13(c) in two ways: first, both allege that CPD's selection criteria are not objective as required by 11 C.F.R. § 110.13(c); and second, both allege that CPD's selection criteria provide an invitation to the Democratic and Republican nominees solely on the basis of their parties' nominations in violation of 11 C.F.R. § 110.13(c). On this basis, the Perot complaint alleges that the debates constitute a corporate contribution to the participants' campaigns in violation of 2 U.S.C. § 441b and 11 C.F.R. § 114.2(b).[8]

The Perot complaint alleges that CPD's criteria are not objective as required by 11 C.F.R. § 110.13(c). The Perot complaint contends that three of the factors listed under signs of national newsworthiness are examples of the "predominantly subjective" CPD criteria.[9] The Perot complaint identifies another factor that calls for examination of the findings of significant public opinion polls as "leaving much room for subjectivity." Finally, the Perot complaint cites *Association of the Bar of the City of New York v. Commissioner*, 858 F.2d 876 (2d Cir. 1988), *cert. denied*, 490 U.S. 1030 (1989), and argues that the Commission should adopt the Second Circuit's analysis in that case of whether data are objective or subjective. In the context of examining the Bar Association's tax exempt status, the Second Circuit evaluated what is objective by defining "objective data."[10] The Second Circuit stated:

---

[8]    See note 7 supra.

[9]    The three factors identified as "predominantly subjective" in the Perot complaint are: "[t]he professional opinions of the Washington bureau chiefs of major newspapers, news magazines, and broadcast networks; [t]he opinions of a comparable group of professional campaign managers and pollsters not then employed by the candidates under consideration; [and] [t]he published views of prominent political commentators." Although the Perot complaint concedes that four elements of CPD's criteria are objective, it does not identify which four are objective in its view.

[10]    The Second Circuit stated that the Bar Association's ratings and endorsements of judicial candidates as "approved," "not approved," or "approved as highly qualified" were not objective, disagreeing with the bar

> Objective data are data that are independent of what is personal or private in our apprehension and feelings, that use facts without distortion by personal feelings or prejudices and that are publicly or intersubjectively observable or verifiable, especially by scientific methods. *Webster's Third International Dictionary,* 1556 (1971). Objective representations have been described judicially as "representations of previous and present conditions and past events, which are susceptible of exact knowledge and correct statement." <u>United Ben. Life Ins. Co. v. Knapp,</u> 175 Okla. 25, 26, 51·P.2d 963, 964 (1935).

*Id.,* at 880-81.[11]

Similarly, the NLP complaint discusses each of CPD's three criteria and the factors related to each, arguing that CPD's criteria are "inherently vague and subjective." With respect to the "evidence of national organization" criterion, the NLP complaint admits that the first two factors are objective, as is the portion of the third factor that examines eligibility for federal matching funds. NLP cites CPD's description of the remaining factors under this criterion, in which CPD admits: "This criterion also encompasses more subjective indicators of a national campaign with a more than theoretical prospect of electoral success." Organization in a majority of congressional districts in those states in which a candidate is on the ballot is too indefinite to be deemed objective, according to NLP. NLP added that this factor is also irrelevant and

---

association's defense that it merely collected and disseminated objective data. The Second Circuit overturned the Tax Court's grant of a tax exemption under 26 U.S.C. § 501(c)(3) to the local bar association based on Section 501(c)(3)'s bar on participating or intervening in political campaigns. *See Assoc. of the Bar of the City of New York v. Commissioner,* 858 F.2d at 880-81.

[11]  The Perot complaint argues that the Second Circuit's rationale in *Association of the Bar of the City of New York* with respect to subjective criteria was applied to a candidate debate sponsor in *Fulani v. Brady,* 809 F. Supp. 1112 (S.D.N.Y. 1993), *aff'd on other grounds,* 35 F.3d 49 (2d Cir. 1994).

In the *Fulani* case, the Southern District of New York found the League of Women Voters' debate participant selection criteria to be subjective and therefore inconsistent with the League's tax exempt status. *Fulani,* 809 F. Supp. at 1125-26 (stating that the following criteria are subjective: "significant candidate," "recognition by the national media as a candidate meriting media attention," "active campaigning in a number of states for the . . . nomination," and "such other factors that in the League's good faith judgment may provide substantive evidence of nationwide voter interest"). The district court also held, however, that it did not have the authority to grant the requested relief. *Id.* at 1127-28. The Second Circuit affirmed the result, but on the grounds that the plaintiff had no standing to challenge the tax exempt status of the League. 35 F.3d 49 (2d Cir. 1994). This case is part of a series of challenges brought by the plaintiff against the League and CPD. *See Fulani v. League of Women Voters Educ. Fund,* 684 F. Supp. 1185 (S.D.N.Y. 1988), *aff'd,* 882 F.2d 621 (2d Cir. 1989) and *Fulani v. Brady,* 729 F. Supp. 158 (D.D.C. 1990), *aff'd,* 935 F.2d 1324 (D.C. Cir. 1991), *cert. denied,* 502 U.S. 1048 (1992).

constitutes a "significant obstacle" to "debate inclusion" of third party candidates.  NLP also argues that "ability to fund a national campaign" is too indefinite, as is "endorsement by federal and state officeholders."  The latter is also a deemed an attempt "to disguise partisan bias as an objective criteria" due to the dominance of the Democratic and Republican parties among federal and state officeholders.  Further, NLP alleges that endorsements are merely subjective evaluations, and such "secondhand subjective evaluations" should not be permitted in debate participant selection criteria.

NLP attacks each of the factors under the "national newsworthiness" criteria.  Four of the five are based on the opinions of specified individuals, and NLP alleges that on this basis alone the four factors are subjective.  All five of the factors under this criteria require the CPD to consider evidence from sources that are described, but not precisely identified, and NLP alleges that this permits CPD to "shop around" and include only certain opinions within its consideration.

Both of the factors related to the "national public enthusiasm" criteria are deficient according to the NLP.  The first, related to findings of "significant public opinion polls," is subjective because the polls are not identified, leaving too much room for subjective decision making, in NLP's view.  Additionally, the polls themselves reflect the subjective judgments of those polled and may also reflect biases of the polltakers.  Reported attendance at rallies is insufficiently defined, and comparisons to the major parties are inappropriate because such standards reflect the preferential treatment afforded to the major parties, according to NLP.

Finally, the NLP complaint challenges CPD's criteria considered together because CPD fails to specify any relative weights assigned to each of the factors and criteria, which renders the

process of applying the criteria to candidates and evaluating the responses subjective.[12] Thus, even if the criteria were objective, "the process of evaluating and weighing the criteria is a subjective one," according to the NLP complaint. NLP argues that the logic and reasoning of this Office's 1994 recommendation to the Commission that the regulation should specify objective criteria should be invoked to invalidate CPD's criteria as subjective.[13]

Both the Perot complaint and the NLP complaint further allege a second failing of CPD's criteria to comply with 11 C.F.R. § 110.13(c), arguing that CPD's criteria provide an invitation to the Democratic and Republican nominees based solely on their nominations by their respective parties. Citing the CPD's selection criteria for 1996, the Perot complaint alleges that CPD did not reach the conclusion that either of the major party's candidates had a "realistic chance of being elected."

### D. Responses

#### 1. CPD's Response

CPD explains that both to develop and subsequently to apply the debate participant selection criteria, it convened advisory committees, which submitted recommendations to CPD. The Advisory Committee that was convened to apply the criteria to the 1996 candidates reached the unanimous conclusion that only the Democratic and Republican candidates met all of CPD's criteria and had a realistic chance of being elected. The CPD Board of Directors unanimously approved the Advisory Committee's recommendation that only the Democratic and Republican candidates met CPD's debate participant selection criteria.

---

[12] The NLP complaint also alleges that CPD's criteria fail to provide any other indication as to exactly how the criteria will be applied to a given candidate.

[13] NLP refers to a Memorandum from this Office to the Commission dated February 8, 1994 regarding "[*FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986)] Rulemaking: Summary of Comments and Draft Rules."

CPD maintains that its criteria are objective and that the process used fully complies with the requirements of 11 C.F.R. § 110.13(c). CPD points out the regulation does not define "objective." CPD argues that its criteria are consistent with the ordinary meaning of that term because the criteria do not call for CPD members to rely on "personal" or "private feelings," but instead require CPD to consider a strictly proscribed body of evidence. CPD also points to several prior uses of the term "objective" in the context of debate participant criteria, arguing that these uses were similar to its own.[14]

Furthermore, CPD asserts that "complainants would read the rule to bar the exercise of any judgment whatsoever by the staging organization," but would instead mandate "that . . . determinations be made solely on criteria that can be mechanically applied." CPD argues that it "must retain at least a modicum of judgment in applying its 'objective criteria' so as to ensure the avoidance of a potentially 'bizarre' or unwelcome result . . ."based solely on quantitative factors." In support of its position, CPD points to federal appellate court decisions that held that "objective criteria" in contexts other than debate participant selection criteria were not limited to "numerical or quantitative standards" and conceded that "utilization of 'objective criteria' allows for some subjective judgment on the part of the evaluators.""[15] CPD claims that the interpretation of "objective" advanced in the Perot and NLP complaints is such a radical alteration of the previous

---

[14]     CPD cites a previous complaint before the Commission, MUR 1617, in which respondent Dartmouth College referred to similar debate participant selection criteria as objective, and the Commission did not challenge that characterization in its disposition of that complaint  CPD also cites the League of Women Voters Education Fund's 1988 Criteria for General Election Debate Participation, which stated that similar criteria would be "objectively appli[ed]."

[15]     See Wilson v. Dep't of Health & Human Serv's , 770 F.2d 1048, 1055 (Fed. Cir. 1985). In this regard, CPD distinguishes the relevance of Association of the Bar of the City of New York v. Commissioner, 858 F.2d 876 (2d Cir. 1988), cert. denied, 490 U.S. 1030 (1989). CPD argues that that case is irrelevant because CPD does not assess the merits of any candidate and does not endorse the election of any candidate. CPD cites the Bar Association's admission that its criteria were designed to prevent the election of the unqualified as a distinguishing factor.

standard that the regulation would be unenforceable as having been promulgated without adequate notice. CPD argues that Perot and NLP's interpretation of "objective" would render the regulation defective under the First Amendment to the Constitution for its failure to be narrowly tailored to achieve a compelling governmental interest.

Finally, CPD disputes that it "automatically" invited the nominees of the Democratic and Republican parties. CPD maintains that its determination to invite the nominees of the two major parties was limited to 1996 and was based on its evaluation of the sustained voter interest in the major parties as witnessed by the historical prominence of those parties. Furthermore, both the Executive Director of CPD, Janet H. Brown, and the chairman of CPD's Advisory Committee, Professor Richard E. Neustadt of Harvard University's John F. Kennedy School of Government, stated in declarations submitted with the response that the Advisory Committee applied the 1996 selection criteria to the Democratic and Republican candidates, although the criteria did not require them to do so.[16]

### 2.   Clinton/Gore's Response

In response to the complaints, Clinton/Gore requests that the Commission find no reason to believe that any violations occurred and dismiss these matters. Clinton/Gore acknowledges that President Clinton participated in the debates, but maintains that it is inconsistent with FECA "to hold participating candidates responsible for the costs of the debates, when the sponsor has exercised its independent decision-making authority as to who should be included" in the debate.

---

[16]     The declarations were submitted to the United States District Court for the District of Columbia in the lawsuit described above in note 1 and the accompanying text. CPD's counsel does not refer to the Advisory Committee's application of the criteria to the major party candidates in its response to the Perot and NLP complaints.

citing Advisory Opinion ("A.O.") 1986-37.[17] Clinton/Gore maintains that doing so will "have an obvious chilling effect on the debates and cause candidates to decline participation in a forum which, to them, appears to be otherwise permissible, though in a less than perfect structure." Clinton/Gore further states that the Commission's regulations do not require "candidates, as a condition of participating [in a debate], to make an independent conclusion as to whether the sponsor complied with the requirements of" 11 C.F.R. § 110.13 and notes that it had nonetheless publicly sought for Perot to be included in the debates at issue here.

### 3.   Dole/Kemp's Response

In its response to the complaints, Dole/Kemp also requests that the Commission find no reason to believe that any violations occurred. Dole/Kemp acknowledges that Senator Dole and Representative Kemp participated in the events, but asserts that Dole/Kemp "reasonably relied upon [CPD's] public statements that its selection criteria were objective, fair, and complied with Federal law." Dole/Kemp further states that CPD's selection criteria appear "to be rigorous and objective." In support of this assertion, Dole/Kemp identifies the various criteria that make up the CPD selection criteria and notes that CPD "relies upon the advice of nonpartisan professionals and federal election experts as to whether proposed participants have anything more than a theoretical chance of winning."

### E.   Analysis

Based upon the available evidence, there is reason to believe that CPD's Candidate Selection Criteria for 1996 General Election Debate Participation do not comply with the

---

[17]   In A.O. 1986-37, the Commission determined that the debates proposed by the National Conservative Foundation would not qualify as candidate debates because they would not include a face-to-face confrontation among the candidates. The Commission held that the proposed events would therefore violate 2 U.S.C. § 441b.

requirements of 11 C.F.R. § 110.13(c).  Some of the factors appear to be subjective on their face

and other factors are so vague as to be imprecise in their definition.  Given the resulting

uncertainty, it appears that CPD's criteria are not objective as required by 11 C.F.R. § 110.13(c).

As a general standard, CPD assessed whether particular candidates had a "realistic

chance" of winning the general election.  CPD used three elements to make this determination.

CPD's criteria contain examples of factors to be considered with respect to each element.

However, the list of factors to be considered uses nonexhaustive terms, which suggests that CPD

may have used other factors that were not enumerated in making its decision.

Of the enumerated factors, CPD describes some of the factors as "more subjective" in its

document presenting the candidate selection criteria.  *See* Attachment 4, at 57.[18]  Furthermore,

Professor Neustadt, who served as Chair of the subcommittee that developed CPD's criteria and

as Chair of the Advisory Committee that applied the criteria in 1996, has been quoted as

describing CPD's standard of realistic chance of election and underlying criteria as follows:

> The criteria that were listed are to inform [CPD's] judgment [in applying] that
> standard.  It's a single standard, it's a standard for the future, and to that extent it
> is by nature subjective.  It has to be—it's a judgment in the future.

*Campaign for President: The Managers Look at '96.* 165 (Harvard Univ. Inst. of Pol., ed. 1997).

The five factors that are specified as part of CPD's criterion "signs of national

newsworthiness and competitiveness" are the most problematic of the three groups of factors.

Four of those five factors call for consideration of the opinions of groups of professionals that are

described, but not precisely identified in the pre-established criteria.  The Office of General

---

[18]      CPD first established its selection criteria under the earlier version of 11 C.F.R. § 110.13 which did not
require that the criteria be objective.  Despite the Commission's rulemaking that added the objectivity requirement,
CPD adopted nearly identical criteria and continued to describe some of those criteria as "subjective."  *See*
Attachment 4, at 51, 57 and 124; *see also* 60 Fed. Reg. 64,260 (Dec. 14, 1995).

Counsel is unsure how CPD applied these factors, but such factors appear to suffer from at least two deficiencies. First, the data that underlie each factor appear to be accumulated subjective judgments. For example, "opinions of representative political scientists specializing in electoral politics at major universities and research centers" seems to call for consideration of the subjective determinations of the political scientists. Second, it seems that a number of highly subjective judgments must be made to compile the data underlying this factor, ranging from the identification of which universities can be considered major universities to the question of what mix of political scientist would be "representative." Thus, there is reason to believe that such criteria fail CPD's proffered definition of objective because such matters may not be independent of what is personal and rational minds could certainly disagree on such questions. Such criteria can be said to include two levels of subjectivity: first, identifying the pool of sources involves numerous subjective judgments, and second, once the pool is identified, the subjective judgments of its members is considered. Criteria with such double levels of subjective judgments may not be consistent with 11 C.F.R. § 110.13(c)."

Moreover, in the absence of additional information, there is reason to believe that the other selection criteria appear to be similarly insufficiently defined to comply with 11 C.F.R. § 110.13(c)'s objectivity requirement: "other demonstration of the ability to fund a national campaign," "[c]olumn inches on newspaper front pages and exposure on network telecasts in comparison with the major party candidates," "the findings of significant public opinion polls conducted by national polling and news organizations," and "reported attendance at meetings and

---

[19]     *See also Fulani v. Brady*, 809 F. Supp. 1112, 1124-25 (S.D.N.Y. 1993) (characterizing similar criteria as subjective).

rallies across the country (locations as well as numbers) in comparison with the two major party candidates."

As noted by the Commission when it promulgated the current version of 11 C.F.R. § 110.13, "[s]taging organizations must be able to show that their objective criteria were used to pick the participants," 60 Fed. Reg. 64,262 (Dec. 14, 1995), and so too must the staging organization be able to show that its criteria were objective. Thus, this Office does not foreclose the possibility that a criterion that is vague or undefined as written could be shown to be sufficiently objective to meet the requirements of 11 C.F.R. § 110.13(c).[20]

CPD's failure to describe its multifaceted analysis of its factors and criteria makes it impossible to know at this point whether the criteria were applied in an objective or subjective manner. Although 11 C.F.R. § 110.13(c) does not specifically require staging organizations to specify the relative importance of each factor, the Commission contemplated that a method of application would be included in debate participant selection criteria, as is shown by the example in the explanation and justification for this regulation. See 60 Fed. Reg. 64,262 (Dec. 14, 1995) (stating: "for example, candidates must satisfy three of five objective criteria").

The manner in which the factors are to be considered and used to compare candidates is not clear. For example, the Advisory Committee cited Mr. Perot's acceptance of federal funds and the resultant limitation on total expenditures as one of the reasons why the committee recommended that he not be invited to participate in the CPD debates. See Attachment 4, at 128.

---

[20]   For example, one of CPD's criteria considers the endorsements of federal and state officeholders. As CPD puts forth this factor under its "evidence of national organization" criterion, it is vague in that it fails to identify which federal and state officeholders are to be considered. However, a staging organization could defend a similar criterion as objective if it narrowed the group of officeholders, thus eliminating the vagueness of the factor.

Yet, CPD's criteria list eligibility for federal funds as a factor that appears to support the invitation of a candidate.

CPD also lists its criteria and factors in non-exhaustive fashions, each time stating: "The factors to be considered include." That CPD apparently reserves the right to introduce additional criteria or factors into the consideration may add another aspect of subjectivity to the process.[21] Omitting such important aspects of the operation of the criteria is also inconsistent with the Commission's advice to make such criteria available to the candidates prior to the election. *See* 60 Fed. Reg. 64,262 (Dec. 14, 1995) ("staging organizations would be well advised to reduce their objective criteria to writing and to make the criteria available to all candidates before the debate").

Moreover, this Office has received additional information regarding the role that Clinton/Gore and Dole/Kemp may have played in excluding Mr. Perot from CPD's debates. In December 1996, a conference entitled "Campaign Decision Makers" was held, and it included representatives of Clinton/Gore, Dole/Kemp, and Perot as well as Frank Fahrenkopf, Co-Chair of CPD, and Professor Neustadt, Chair of CPD's Advisory Committee. An edited transcript of the conference was recently published, and some of the statements made at the conference appear to show that Clinton/Gore and Dole/Kemp both played a role in the decision to exclude Mr. Perot from CPD's debates. For example, George Stephanopoulos, Senior Adviser to the President, stated, referring to Dole/Kemp:

> [t]hey didn't have leverage going into the negotiations. They were behind, they needed to make sure Perot wasn't in it. As long as we would agree to Perot not

---

[21] The Advisory Committee cited the election results of 1992 as one of the reasons why the committee recommended that Mr. Perot not be invited to participate in the CPD debates. *See* Attachment 4, at 128. Yet, CPD's criteria do not list prior election results as part of the debate participant selection criteria.

being in it we could get everything else we wanted going in. We got our time frame, we got our length, we got our moderator.

*Campaign for President: The Managers Look at '96*, 170 (Harvard Univ. Inst. of Pol., ed. 1997). Tony Fabrizio, Chief Pollster for Dole/Kemp, seems to confirm Mr. Stephanopoulos's statement by following it with: "And the fact of the matter is, you got the number of dates." *Id*. Mr. Fabrizio also later stated: "George made very good observations about the positions we walked into the negotiations." *Id.*, at 171. Thus, there is evidence that both Clinton/Gore and Dole/Kemp campaigns appear to have participated in the selection process. Such information further obfuscates CPD's methodology and raises the possibility that CPD did not apply its pre-established criteria.

Thus, there is reason to believe that CPD's selection criteria, as written and as applied in 1996, do not comply with 11 C.F.R. § 110.13(c). If so, CPD is not entitled to the protection of the safe harbor created by 11 C.F.R. §§ 100.7(b)(21) and 110.13(c). *See also* 11 C.F.R. §§ 114.1(a)(2)(x) and 114.4(f). On this basis, there is reason to believe that the debates CPD sponsored were contributions to both of the participating candidates. Therefore, this Office recommends that the Commission find reason to believe that CPD violated 2 U.S.C. § 441b(a).

Additionally, CPD's criteria, as written, specify that the nominees of the Democratic and Republican parties are to be invited solely by virtue of their nominations by the respective parties. Such "automatic" invitations are in direct violation of 11 C.F.R. § 110.13(c). In this instance, however, CPD alleges that it did not follow its standards as written. Instead, CPD states that it applied its analysis of a realistic chance of being elected to both President Clinton and Senator Dole and determined that both candidates met the test. *See* Attachment 4, at 53 and 124-25. The Perot complaint contradicts CPD's claim, alleging that these criteria were not

applied to the Democratic and Republican candidates.  Information obtained in discovery should resolve this disputed factual issue and determine whether CPD's selection criteria failed to comply with 11 C.F.R. § 110.13(c) in this regard.

In response to the allegation that they received an in-kind contribution, the Clinton/Gore and Dole/Kemp campaigns claim that they merely relied on CPD's determination of debate participants.  However, these arguments appear to be inconsistent with the information showing that both campaigns played a role in the selection process.  Even if the campaigns were not involved in the selection process, their claimed reliance upon CPD's determination of which candidates could participate in the debates would not vitiate their receipt of free appearances in the debates sponsored and organized by CPD, a corporation, as an in-kind contribution.  FECA provides that it is unlawful for any candidate or political committee to "knowingly . . . accept or receive" corporate contributions, and it appears that Clinton/Gore and Dole/Kemp knowingly accepted the in-kind contributions from CPD." 2 U.S.C. § 441b(a).  Because CPD's standards include a statement that at least some of its criteria are subjective, reliance on any assurance that CPD's criteria complied with 11 C.F.R. § 110.13 may have been unreasonable.  Therefore, there is reason to believe that Clinton/Gore and Dole/Kemp knowingly accepted a prohibited contribution.  Accordingly, this Office recommends that the Commission find reason to believe

---

22      In *FEC v. California Medical Association*, 502 F. Supp. 196 (N.D. Calif. 1980), the court held that the recipient committee's knowledge of the facts that rendered its conduct unlawful was sufficient to create civil liability under the "knowing" standard of 2 U S C  § 441a(f).  *Id.* at 203.  That court so held despite its specific finding that a legal issue related to the illegal conduct had not yet been resolved at the time the committee received the contribution.  *See id.  See also FEC v. John A. Dramesi for Congress Comm.*, 640 F. Supp. 985, 987 (D.N.J. 1986) (holding that a facially defective contribution requires further inquiry to determine whether it is in compliance); *United States v. Marvin*, 687 F.2d 1221 (8th Cir. 1982), *cert. denied*, 460 U.S. 1081 (1983) (analyzing knowing standard similarly in another context)  The Commission's Advisory Opinion 1986-37, which is cited by Clinton Gore, stated that the debates proposed therein would violate 2 U.S.C. § 441b, but does not state which parties would violate that provision.  The cited statutory section prohibits both corporate contributions and the receipt of such contributions by candidates or committees.

that Clinton/Gore and Dole/Kemp violated 2 U.S.C. § 441b(a) by knowingly accepting a

prohibited corporate contribution from CPD.[23] If Clinton/Gore and Dole/Kemp accepted an in-

kind contribution from CPD, the general election committees were required to report the

contribution.[24] However, neither committee did so. Therefore, this Office further recommends

that the Commission find reason to believe that Clinton/Gore and Dole/Kemp violated 2 U.S.C.

§ 434(b) by failing to report CPD's in-kind contribution.

## III.   CPD'S ALLEGED STATUS AS A POLITICAL COMMITTEE

### A.   Legal Standard

FECA defines "political committee" as, in part: "any committee, club, association, or

other group of persons which receives contributions aggregating in excess of $1,000 during a

calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar

year." 2 U.S.C. § 431(4); *see also* 11 C.F.R. § 100.5. Political committees are required to

register with the Commission, and to report contributions received and expenditures made in

accordance with FECA and the Commission's regulations. *See* 2 U.S.C. § 433 and 11 C.F.R.

§ 102.1(d) (requiring political committees to register with the Commission); *see also* 2 U.S.C.

§ 434 and 11 C.F.R. § 104.1(a) (requiring political committees to file specified reports with the

---

[23]     As publicly financed candidates, Clinton Gore and Dole Kemp are subject to an expenditure limit. 2 U.S.C.
§ 441a(b)(1)(B), and expenditures made by any person at the candidates' request or authorization are counted
toward the limit. 2 U.S.C. § 441a(b)(2)(B)(ii). *See also* 11 C.F.R. § 110.8. Any contributions from CPD may have
caused Clinton/Gore and Dole/Kemp to exceed their expenditure limits. Both Clinton/Gore and Dole/Kemp have
not reported expenditures in response to FEC Form 3P, line 13, "Expenditures Subject to Limitation," during the
period from their inception through September 30, 1997. The amount of actual expenditures subject to the
limitation will be determined in the Commission's audit and examination of each committee pursuant to 26 U.S.C.
§ 9007(a). Therefore, the Office of General Counsel will make any appropriate recommendations based on
information from the Commission's audits and examinations.

[24]     *See* 2 U.S.C. § 434(b)(2)(A) and (D) (requiring committees to report contributions from persons other than
political committees and from political committees); 434(b)(3)(A) and (B) (requiring committees to identify certain
contributors); 434(b)(4)(A) (requiring committees to report expenditures); *see also* 11 C.F.R. § 104.13(a)(2)
(requiring committees to report in-kind contributions as expenditures).

Commission). Political committees that are "established, financed, maintained or controlled by the same . . . person, or group of persons . . . are affiliated." 11 C.F.R. § 100.5(g)(2).

In *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238 (1986), the Supreme Court cited *Buckley v. Valeo*, 424 U.S. 1, 79 (1976), and its requirement that "an entity subject to regulation as a 'political committee' under [FECA] is one that is either 'under the control of a candidate or the major purpose of which is the nomination or election of a candidate.'" *FEC v. Massachusetts Citizens for Life*, 479 U.S. at 252 n.6. Thus, in order to be a political committee under FECA, an organization that is not controlled by a candidate must have as its major purpose the nomination or election of a candidate in addition to meeting the statutory contribution or expenditure thresholds in 2 U.S.C. § 431(4).[25]

Political committees remain subject to the prohibition of contributing corporate funds to federal candidates in 2 U.S.C. § 441b. *See* 11 C.F.R. § 114.12(a) (exempting political committees that are incorporated "for liability purposes only"). In *FEC v. Massachusetts Citizens for Life*, the Supreme Court held that application of 2 U.S.C. § 441b's ban on corporate independent expenditures to corporations that meet certain qualifications was an unconstitutional restriction of First Amendment rights. However, its holding was expressly limited to corporate independent expenditures; even qualified nonprofit corporations remain subject to the prohibition of corporate contributions. *See* 11 C.F.R. § 114.10(d)(2).[26]

---

[25]     *But see Akins v. FEC*, 101 F.3d 731, 742 (D.C. Cir. 1996) (holding that Supreme Court's major purpose test applies only to expenditures, and not to contributions or coordinated expenditures), *cert. granted*, 117 S.Ct. 2451 (1997). The Commission continues to contest this decision, and its petition for certiorari was granted. The Supreme Court has heard oral argument on the case, but has not yet issued a decision. *See also* A.O. 1996-3 (April 19, 1996) and A.O. 1996-13 (June 10, 1996) (applying major purpose test to organizations that made contributions after the *Akins en banc* hearing was granted and the panel decision was vacated).

[26]     The Commission has codified the *FEC v. Massachusetts Citizens for Life* decision in its regulations. 11 C.F.R. § 114.10. CPD is not eligible for the exemption in 11 C.F.R. § 114.10 because it is a 26 U.S.C. § 501(c)(3) corporation. *See* 11 C.F.R. § 114.10(c)(5). Additionally, the exemption in 11 C.F.R. § 114.10 is limited to

Staging organizations for candidate debates are limited to organizations that are exempt from federal taxation under 26 U.S.C. §§ 501(c)(3) or 501(c)(4) and that do not endorse, support or oppose political parties or candidates. 11 C.F.R. § 110.13. Therefore, if political committees stage candidate debates, their efforts will be contrary to 11 C.F.R. § 110.13(a)(1) and the debates will be contributions to the participating candidates and must comply with the prohibitions and limitations for contributions.

### B.   Complainants' Allegations

The Perot complaint alleges that CPD qualifies as a political committee under FECA. Consequently, CPD is ineligible to stage candidate debates pursuant to 11 C.F.R. § 110.13(a) and it has failed to register as required by 2 U.S.C. § 433, according to the Perot complaint. The Perot complaint alleges that CPD is an affiliated committee of the Democratic National Committee and the Republican National Committee. CPD is "a bipartisan political organization that expends money and resources to assist in the election of either the nominee of the Democratic Party or of the Republican Party," according to the Perot complaint, which cites as evidence of this affiliation each of CPD's joint chairmen's status as a former chairman of one of the two major parties and CPD's membership's alleged equal division between representative of the Democratic and Republican parties. The Perot complaint also cites DNC and RNC press releases at the time of CPD's formation that describe the organization as "bi-partisan" that was formed to sponsor debates "by the National Republican and Democratic Committees between

---

independent expenditures, 11 C.F.R. § 114.10(d), and CPD's activities were sufficiently coordinated with the campaigns to constitute contributions. With respect to 11 C.F.R. § 114.10, see *Minnesota Citizens Concerned for Life v. FEC*, 113 F.3d 129 (8th Cir. 1997) (holding 11 C.F.R. § 114.10 void) and *FEC v. Survival Educ. Fund, Inc.*, 65 F.3d 285 (2d Cir. 1995) (holding requirement that qualified nonprofit corporations have a policy of not accepting corporate contributions invalid).

their respective nominees." The NLP complaint also includes an allegation that CPD is a

"bipartisan organization composed of Republicans and Democrats."

### C.   Responses

#### 1.   CPD's Response

CPD characterizes the Perot complaint's argument that CPD is a political committee as

an "ancillary attack" that fails because CPD's debate participant selection criteria are in

compliance with 11 C.F.R. § 110.13(c). CPD cites its limited mission to sponsor presidential

debates and conduct closely related educational activities as evidence that its expenditures are not

made to endorse, support or oppose any candidate or party. CPD cites *FEC v. Massachusetts*

*Citizens for Life.* 479 U.S. 238, 252 n.6 (1986), as stating that an entity's "major purpose" must

be to secure the nomination or election of a candidate in order for that entity to constitute a

political committee under FECA.

CPD maintains that it does not assess or endorse candidates; it only invites certain

candidates to participate in debates sponsored by CPD. According to CPD, the Commission's

debate regulation is premised on the notion that such invitations cannot constitute endorsement

or support of the invited candidates. Finally, CPD states that because its funds are used to defray

cost incurred staging debates, the expenditures do not constitute contributions or expenditures

under FECA, and therefore, CPD does not meet FECA's definition of a political committee.

#### RNC's Response

In its response to MUR 4473, the RNC requests that the Commission find no reason to

believe that a violation occurred. According to the RNC, the "CPD is not an affiliated committee

of the RNC." The RNC acknowledges that the CPD was established by Frank Fahrenkopf and

Paul Kirk, then the chairs of the RNC and the DNC, respectively, but the RNC maintains that they did so "separate and apart from their party organizations" and that they no longer serve as the chairs of the major national party committees.  The RNC further maintains that the CPD "was never an officially sanctioned or approved organization of the RNC," nor is it "a political committee established, . . . financed, maintained or controlled by the RNC."  The RNC argues that, accordingly, the complaint in this matter should be dismissed.

### 3.   DNC's Response

In its response to MUR 4473, the DNC also requests that the Commission find no reason to believe that any violations occurred in this matter and dismiss the complaint.  The DNC argues that "even if CPD could conceivably be considered a 'political committee,' it has not been 'established, financed, maintained or controlled' by the DNC."  The DNC acknowledges that CPD was established by the former chairs of the Democratic and Republican national parties, but denies that the DNC in anyway controls CPD.  The DNC argues that the "CPD is controlled by an independent board of directors, none of whom are DNC members, officers or employees."

### D.   Analysis

The Office of General Counsel is recommending that the Commission find reason to believe that CPD violated 2 U.S.C. § 441b(a) as a result of CPD's status as a corporation. However, there are also allegations and some supporting information that CPD may be a political committee.  Political committees that are incorporated for liability purposes are not prohibited by 2 U.S.C. § 441b(a) from making contributions or expenditures even though they have corporate status. 11 C.F.R. § 114.12(a).  The reason for CPD's incorporating is unknown, so it is not possible to determine if 11 C.F.R. § 114.12(a) is applicable to CPD.  Therefore, the questions

that must be addressed are whether CPD made expenditures of $1,000 and whether its major purpose is the nomination or election of a candidate.

As set forth in its Articles of Incorporation, CPD's purpose is "to organize, manage, produce, publicize and support debates for the candidates for President of the United States." CPD's purpose may have been to conduct debates and to do so in a manner that would not result in a contribution to either candidate. However, it appears that Clinton/Gore and Dole/Kemp may have played a role in the selection of debate participants. Such a role is not anticipated in CPD's criteria and the extent of involvement of the two campaigns in CPD actions cannot be known without further investigation. This factual issue raises the possibility that CPD might have a major purpose related to the election of candidates. Until the activities of Clinton/Gore and Dole/Kemp in connection with CPD have been investigated, it is impossible to be assured of CPD's major purpose.

Moreover, it appears that both the DNC and RNC played a substantial role in founding CPD. CPD continues to refer to its Co-Chairs' prior positions as former chairman of either the DNC or the RNC. At CPD's establishment in 1987, both Messrs. Fahrenkopf and Kirk were Chairman of the RNC and DNC, respectively, and it was in their capacity as party chairmen that they announced the creation of CPD at a joint press conference, according to a press release from the Democratic and Republican National Committees. According to that press release, the parties' chairmen stated that CPD was created to "better fulfill our party responsibilities to inform and educate the electorate, [and] strengthen the role of political parties in the electoral process" (emphasis added). Finally, the press release also cites an earlier agreement between the two party chairmen in which they "agree[d] in principle to pursue the party [debate] sponsorship

concept." That Memorandum of Agreement from November 26, 1985 was signed by both chairmen explicitly on behalf of their respective parties.

The role played by Clinton/Gore and Dole/Kemp in CPD's debate participant selection process and the role played by the DNC and the RNC in the creation CPD suggest that CPD's major purpose may be to facilitate the election of either of the major parties' candidates for president. Therefore, there is reason to believe that CPD is a political committee, and this Office recommends that the Commission find reason to believe that CPD violated 2 U.S.C. §§ 433 and 434.[27]

## IV.   NETWORKS' PROGRAMS

### A.   Legal Standard

FECA specifically exempts costs incurred by media organizations covering news stories from the definition of expenditures. The exemption states: "The term 'expenditure' does not include any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication, unless such facilities are owned or controlled by any political party, political committee, or candidate." 2 U.S.C. § 431(9)(B)(i). The Commission's regulations similarly exclude coverage of news events from the definitions of both contribution and expenditure. 11 C.F.R. §§ 100.7(b)(2) and 100.8(b)(2).[28]

---

[27]   Because the role that the DNC and the RNC played in CPD's status as a political committee is unclear, the Office of General Counsel is not making any recommendations against the DNC and the RNC at this time. Additionally, if CPD is a political committee, it would be prohibited from receiving corporate contributions, 2 U.S.C. § 441b(a), and it would be permitted to accept contributions subject to the contribution limitations, 2 U.S.C. § 441a(f). With respect to these issues, this Office may make additional recommendations based on the investigation.

[28]   The regulatory exemption is limited if the facility is owned or controlled by any political party, political committee, or candidate. If a facility is so-owned or controlled, the exemption will still apply if the costs for a news story "represent[] a *bona fide* news account communicated in a publication of general circulation or on a licensed broadcasting facility, and which is part of campaign-related news account which give reasonably equal coverage to all opposing candidates in the circulation or listening area." 11 C.F.R. §§ 100.7(b)(2) and 100.8(b)(2).

The legislative history for the statutory exemption for news stories explains that the exemption was intended "to make it plain that it is not the intent of Congress . . . to limit or burden in any way the first amendment freedoms of the press or of association. [This exemption] assures the unfettered right of the newspapers, TV networks, and other media to cover and comment on political campaigns." H.R. Rep. No. 1239, 93d Cong., 2d Sess. 4 (1974). Thus, television networks (as groups of television broadcasting stations) enjoy a statutory and regulatory exemption for any of the described costs incurred covering the election campaigns.

Certain media organizations are also permitted to sponsor candidate debates. The Commission's regulation on candidate debates permits broadcasters that are not owned or controlled by a political party, political committee or candidate to stage debates in accordance with the provisions of 11 C.F.R. § 110.13. 11 C.F.R. § 110.13(a)(2). That regulatory provision explicitly recognizes the dual role played by broadcasters in connection with candidate debates. It states: "In addition, broadcasters (including a cable television operator, programmer or producer), *bona fide* newspapers, magazines and other periodical publications, acting as press entities, may also cover or carry candidate debates in accordance with 11 C.F.R. 100.7 and 100.8." *Id.*

### B.   NLP's Allegations

NLP's complaint challenges television programming that Fox, PBS and ABC proposed to produce and broadcast in pleadings filed with the Federal Communications Commission ("FCC"). According to published reports, Fox permitted both President Clinton and Senator Dole to make 10 one-minute statements on its network. PBS permitted each of the two candidates to make six statements of two and one-half minutes per statement on its network. *See*

C. Adasiewicz et al., *Free Television for Presidential Candidates: the 1996 Experiment*, 6-7 (Annenberg Pub. Policy Ctr. of the Univ. of Pa. No. 11, 1997). ABC had proposed a one-hour debate, but both of the major parties' candidates declined to participate, and ABC canceled its program. *See* Stephen Seplow, *Experiment in Giving Candidates Free Airtime Had Mixed Results, Phila. Inquirer* (Nov. 1, 1996).

According to NLP, Fox and PBS proposed to invite only those candidates selected by CPD for participation in CPD's debates to participate in their programs. NLP alleges that, under Fox's proposal, Fox would place its production facilities at the candidates' disposal free of charge, and that such an action must constitute a contribution under FECA. NLP anticipates Fox's claim that the news story exemption would apply, but NLP argues that the news story exemption does not apply to the cost of producing (only "covering" or "carrying") a news story. NLP alleges that Fox's proposal is more analogous to an advertisement than to a news story. Further, NLP alleges that the news story exemption is inapplicable because Fox's facilities will be under the control of the candidates at least briefly and the news story exemption specifically requires that broadcasters with facilities under the control of candidates provide reasonably equal coverage to all opposing candidates in the viewing area.

The NLP complaint also challenges PBS's proposal because candidates would be "unrestricted as to content within certain minimal guidelines," according to NLP. This "gift of free air time" constitutes a contribution, according to NLP. Alternatively, NLP alleges that if PBS's programming is to be considered a debate, its debate participant selection are neither pre-announced, nor objective, to the extent PBS intends to rely on CPD's selection of candidates.

## C.     The Networks' Responses

In its response, Fox outlined its proposal, which included the format of the programs as aired: a series of one-minute position statements by each participating candidate, responding to ten identical questions from Fox that pertain to issues of "demonstrable concern to voters" that were broadcast on Tuesdays, Saturdays and Sundays from September 17 to October 15, 1996. *See* Adasiewicz, *supra,* at 6. Fox selected the candidates to participate "by reference to the decision of [CPD]" of which candidates to invite to participate in its debates. Fox retained a nonpartisan team of consultants to formulate the questions posed to candidates, and the order of appearance was determined by a coin toss. Fox did not permit the candidates to edit or otherwise modify or enhance the responses in the post-production process, and both candidates' presentations were recorded under the supervision of a Fox representative. The candidates declined Fox's offer to use its production facilities.

PBS responded by correcting a fact asserted in NLP's complaint:  PBS proposed and, in fact, provided candidates with segments of two and one-half minutes, not hours, during which candidates stated their views without restriction as to content, except for PBS's reservation of the right to delete libelous material. These segments were broadcast on successive business days from October 17 to November 1, 1996. *See* Adasiewicz, *supra,* at 7. PBS also described its efforts to ensure equality of treatment. PBS maintained control over the program in the exercise of its bona fide news judgment. To prevent candidates from incorporating campaign materials into the program, PBS required that only candidates appear on camera and that the candidates remain on screen for the entire length of the program.

Both networks defend their proposals as meeting FECA's standards for news coverage that is excluded from the definitions of contribution and expenditure. Similarly, both networks presented the alternative argument that their programs also meet the standards of a candidate debate that is excluded from the definitions of contribution and expenditure. Both networks also emphasized that the FCC had determined that the programming as proposed in the networks' pleadings would be exempt from the "equal opportunities" requirement of Section 315 of the Communications Act of 1934, as amended, 47 U.S.C. § 315, because the programming would constitute *bona fide* news event coverage under the Communications Act.[29]

### D.    Analysis

Initially, the Office of General Counsel notes that NLP's complaint was filed before any of the programming was actually broadcast, and its allegations are based on the proposals for such programming put forth by Fox, PBS and ABC in their FCC pleadings. *See* 11 C.F.R. § 111.4(a). Some of the program details as actually produced and broadcast differed from the proposals; however, none of the variations was material to this analysis. Therefore, this report analyzes the programs as they were broadcast. Additionally, because ABC canceled its program, the complaint with respect to ABC is moot.

The networks' programs appear to comply with the requirements for the news story exemption from the definition of a contribution. Prior Commission actions have held similar programs to constitute news stories. The Commission has issued several Advisory Opinions that held programs similar to those challenged by NLP to fall within the news story exemption. In

---

[29]    The FCC's declaratory ruling resolved issues related to the Communications Act that are of great importance to networks, as broadcasters regulated by the FCC. However, the FCC's resolution of Communications Act issues raised by the networks' proposal does not resolve this matter that involves issues under FECA. Nonetheless, this Office's recommendation is consistent with the FCC's action in this matter.

Advisory Opinion 1982-44, the Commission stated that the provision of free air time on a cable television network was not a contribution. The air time was to be given to both of the major parties, one of which had outlined a program that included various leading party members discussing public issues from their party's perspective and soliciting contributions to their party. Some of the participants were candidates for office. Nonetheless, the Commission held that the program qualified as commentary on the election and therefore it fell within the news story exemption.

Another advisory opinion authorized a multimedia presentation proposed by U.S. News & World Report to include a series of articles and candidate interviews in its magazine and television programs. In this Advisory Opinion, the Commission did not limit its holding to any particular structure of the proposed news coverage. *See* A.O. 1987-8. Thus, Commission precedent does not require that news stories or commentary conform to particular formats. The presentation of candidate views and positions that each of the networks' programs entails qualifies each of the networks' programs to meet the standard for the news story exemption. On this basis, there is reason to believe that both networks' programs constitute the presentation of a news story or commentary that meets FECA's standards for an exemption from the definition of contribution and expenditure.

Finally, neither of the programs constituted a debate under the Commission's requirement that a face-to-face confrontation is an essential element to a debate for purposes of 11 C.F.R. § 110.13. *See* A.O. 1986-37. The programs consisted of serial appearances by the participating candidates and lacked even opportunities for one candidate to respond to another. Thus, the programs did not provide any confrontation and cannot be considered a debate. Therefore, the

requirements of 11 C.F.R. § 110.13(c) are not applicable to the networks' programs.

Consequently, this Office recommends that the Commission find no reason to believe that any of

the respondents[30] violated 2 U.S.C. § 441b(a) with respect to the challenged television programs.

## V.   CONCLUSION AND PROPOSED DISCOVERY PLAN

The Office of General Counsel proposes to seek information about CPD's selection

criteria. Such information would include documents indicating how CPD defined the

enumerated factors, how CPD applied the selection criteria, and what criteria were used to

determine that the major parties' candidates should be invited to participate in the debates.

Additionally, this Office proposes to seek information regarding the role of the Clinton/Gore and

Dole/Kemp campaigns in the selection of debate participants. This Office also proposes to seek

information to identify CPD's major purpose, including specifically the role of the campaigns

and of the DNC and RNC in CPD's activities. In order to evaluate whether CPD should be

considered a political committee that is affiliated with the DNC and RNC, information related to

CPD's establishment is included within the information this Office proposes to seek. Finally,

this Office proposes to seek documentation of the cost incurred by CPD to stage the debates by

the candidates as a measure of the value of any contribution to Clinton/Gore and Dole/Kemp for

the two Presidential debates and the Vice Presidential debate.[31]

In order to do so, this Office recommends that the Commission approve the attached

subpoena directed to CPD requiring it to submit written answers to questions and to produce

---

[30]   The respondents to this allegation are: ABC, Inc.; Clinton/Gore '96 General Committee, Inc., and Joan C. Pollitt, as its Treasurer; Dole/Kemp '96 and Robert E. Lighthizer, as its Treasurer; Fox Broadcasting Company; and the Public Broadcasting Service.

[31]   The value of any media coverage of CPD's debates is not included in the value of the contribution because the media's coverage of the debates is exempt pursuant to the news story exemption in 2 U.S.C. § 431(9)(B)(i) and 11 C.F.R. § 100.7(b)(2).

documents that relate to the debates it staged.  Additionally, this Office recommends that the Commission approve the attached subpoenas directed to the participating candidates' committees and to the DNC and the RNC.  After this Office has reviewed the responses to the subpoenas, we will report back to the Commission with appropriate recommendations.

## VI.   RECOMMENDATIONS

1.      Find reason to believe that the Commission on Presidential Debates violated 2 U.S.C. §§ 433, 434 and 441b(a).

2.      Find reason to believe that the Clinton/Gore '96 General Committee, Inc., and Joan C. Pollitt, as its treasurer; and Dole/Kemp '96 and Robert E. Lighthizer, as its treasurer, violated 2 U.S.C. §§ 434(b)(2)(C), 434(b)(4) and 441b(a) with respect to the candidate debates staged by the Commission on Presidential Debates.

3.      Find no reason to believe that ABC, Inc., Fox Broadcasting Company or the Public Broadcasting Service violated 2 U.S.C. § 441b(a).

4.      Find no reason to believe that the Clinton/Gore '96 General Committee, Inc., and Joan C. Pollitt, as its treasurer; and Dole/Kemp '96 and Robert E. Lighthizer, as its treasurer, violated 2 U.S.C. § 441b(a) with respect to the television programs challenged by the complaints filed in MURs 4451 and 4473.

5.      Approve the appropriate letters.

6.      Approve the attached Factual and Legal Analyses and subpoenas.

7.    Close the files in MUR 4451 with respect to ABC, Inc., Fox Broadcasting

Company and Public Broadcasting Service.




_____                    _____

Date                                       Lawrence M. Noble
                                           General Counsel


Attachments:
1    Response from Fox Broadcasting Company
2    Response from ABC, Inc.
3    Response from Public Broadcasting Service
4    Response from Commission on Presidential Debates
5    Response from Dole/Kemp '96 and Robert E. Lighthizer, as its treasurer, to MUR 4451
6    Response from Clinton/Gore '96 General Committee, Inc., and Joan C. Pollitt, as its
     treasurer, to MUR 4451
7    Response from Clinton/Gore '96 General Committee, Inc., and Joan C. Pollitt, as its
     treasurer, to MUR 4473
8    Response from DNC Services Corporation/Democratic National Committee and R. Scott
     Pastrick, as its treasurer, to MUR 4473
9    Response from the Republican National Committee and William J. McManus, as its
     treasurer, to MUR 4473
10   Response from Dole/Kemp '96 and Robert E. Lighthizer, as its treasurer, to MUR 4473
11   Factual and Legal Analyses (3)
12   Subpoenas (5)

## BEFORE THE FEDERAL ELECTION COMMISSION

In the Matter of                            )
                                            )   MURs 4451
ABC, Inc.;                                  )   and 4473
Clinton/Gore '96 General                    )
  Committee, Inc., and Joan                 )
  C. Pollitt, as Treasurer;                 )
Commission on Presidential Debates;)
Dole/Kemp '96, Inc., and Robert E.  )
  Lighthizer, as Treasurer;                 )
Fox Broadcasting Company;                   )
Public Broadcasting Service;                )
DNC Services Corporation/Democratic)
  National Committee and Carol              )
  Pensky, as Treasurer;                     )
Republican National Committee and  )
  Alec Poitevint, as Treasurer              )

## CERTIFICATION

I, Marjorie W. Emmons, recording secretary for

the Federal Election Commission executive session on

February 24, 1998, do hereby certify that the Commission

decided by a vote of 5-0 to take the following actions

in MURs 4451 and 4473:

1.   Find no reason to believe that the
     Commission on Presidential Debates
     violated 2 U.S.C. §§ 433, 434, and
     441b(a).

2.   Find no reason to believe that the
     Clinton/Gore '96 General Committee,
     Inc., and Joan C. Pollitt, as its
     treasurer; and Dole/Kemp '96 and
     Robert E. Lighthizer, as its treasurer,
     violated 2 U.S.C. §§ 434(b)(2)(C),
     434(b)(4) and 441b(a) with respect to
     the candidate debates staged by the
     Commission on Presidential Debates.

                                (continued)

Federal Election Commission
Certification for MURs 4451 and 4473                    Page 2
February 24, 1998

3.   Find no reason to believe that ABC, Inc.,
     Fox Broadcasting Company or the Public
     Broadcasting Serviced violated 2 U.S.C.
     § 441b(a).

4.   Find no reason to believe that the
     Clinton/Gore '96 General Committee, Inc.
     and Joan C. Pollitt, as its treasurer;
     and Dole/Kemp '96 and Robert E.
     Lighthizer, as its treasurer, violated
     2 U.S.C. § 441b(a) with respect to the
     television programs challenged by the
     complaints filed in MURs 4451 and 4473.

5.   Approve the appropriate letters.

6.   Close the file with respect to all of
     the respondents in MURs 4451 and 4473.


Commissioners Aikens, Elliott, McDonald, McGarry,

and Thomas voted affirmatively for the decision.


                        Attest:


_2-25-98_                _Marjorie W. Emmons_
  Date                    Marjorie W. Emmons
                          Secretary of the Commission

Exhibit C



**FEDERAL ELECTION COMMISSION**
WASHINGTON DC 20463

## BEFORE THE FEDERAL ELECTION COMMISSION

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Commission on Presidential Debates | ) |
| | ) |
| Clinton/Gore '96 General Committee, | ) |
| Inc., and Joan C. Pollitt, as Treasurer | ) |
| | )          **MURs 4451 and 4473** |
| Dole/Kemp '96, Inc., and | ) |
| Robert E. Lighthizer, as Treasurer | ) |
| | ) |
| DNC Services Corporation/Democratic | ) |
| National Committee and Carol Pensky, | ) |
| as Treasurer | ) |
| | ) |
| Republican National Committee and | ) |
| Alec Poitevint, as Treasurer | ) |

### STATEMENT OF REASONS

Chairman Joan Aikens
Vice Chairman Scott E. Thomas
Commissioner Lee Ann Elliott
Commissioner Danny Lee McDonald
Commissioner John Warren McGarry

I.   INTRODUCTION

On February 24, 1998, the Commission found no reason to believe that the
Commission on Presidential Debates ("CPD") violated the law by sponsoring the 1996
presidential debates or by failing to register and report as a political committee. The
Commission also found no reason to believe that Clinton/Gore '96 General Committee,
Inc., Dole/Kemp '96, and their treasurers (collectively, the "Committees"), violated the
law by accepting and failing to report any contributions from CPD. The Commission

closed the file with respect to all of the respondents.   The reasons for the Commission's findings are set forth in this statement.

## II.   SELECTION OF PARTICIPANTS FOR CANDIDATE DEBATES

### A.   Legal Framework

Under the Federal Election Campaign Act of 1971, as amended ("FECA"), corporations are prohibited from making contributions[1] or expenditures[2] in connection with federal elections.  2 U.S.C. § 441b(a); *see also* 11 C.F.R. § 114.2(b).[3]  The Commission has promulgated a regulation that defines the term "contribution" to include: "A gift, subscription, loan . . ., advance or deposit of money or anything of value made... for the purpose of influencing any election for Federal office."  11 C.F.R. § 100.7(a)(1). *See also* 11 C.F.R. § 114.1(a).  "Anything of value" is defined to include all in-kind contributions.  11 C.F.R. § 100.7(a)(1)(iii)(A).  The regulatory definition of contribution also provides:  "[u]nless specifically exempted under 11 C.F.R. § 100.7(b), the provision of any goods or services without charge . . . is a contribution."  *Id.*

Section 100.7(b) of the Commission's regulations specifically exempts expenditures made for the purpose of staging debates from the definition of contribution. 11 C.F.R. § 100.7(b)(21).  This exemption requires that such debates meet the requirements of 11 C.F.R. § 110.13,[4] which establishes parameters within which staging organizations must conduct such debates.  The parameters address: (1) the types of organizations that may stage such debates, (2) the structure of debates, and (3) the criteria that debate staging organizations may use to select debate participants.  With respect to participant selection criteria, 11 C.F.R. § 110.13(c) provides, in relevant part:

---

[1]   FECA defines contribution to include "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(8)(A)(i); *see also* 2 U.S.C. § 441b(b)(2).

[2]   FECA defines expenditure to include "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. § 431(9)(A)(i); *see also* 2 U.S.C. § 441b(b)(2).

[3]   The presidential candidates of the major parties who accept public funds cannot accept contributions from any source, except in limited circumstances that are not raised herein. 26 U.S.C. § 9003(b)(2); *see also* 11 C.F.R. § 9012.2(a).

[4]   The exemption also requires that such debates meet the requirements of 11 C.F.R. § 114.4, which permits certain nonprofit corporations to stage candidate debates and other corporations and labor organizations to donate funds to organizations that are staging such debates. 11 C.F.R. §§ 114.4(f)(1) and (3).  This section also requires the debates to be staged in accordance with the standards in 11 C.F.R. § 110.13. *Id.*

*Criteria for candidate selection.* For all debates, staging organization(s) must use pre-established objective criteria to determine which candidates may participate in a debate. For general election debates, staging organization(s) shall not use nomination by a particular political party as the sole objective criterion to determine whether to include a candidate in a debate.

11 C.F.R. § 110.13.  When promulgating this regulation, the Commission explained its purpose and operation as follows:

> Given that the rules permit corporate funding of candidate debates, it is appropriate that staging organizations use pre-established objective criteria to avoid the real or apparent potential for a *quid pro quo*, and to ensure the integrity and fairness of the process. The choice of which objective criteria to use is largely left to the discretion of the staging organization. . . .

> . . . Staging organizations must be able to show that their objective criteria were used to pick the participants, and that the criteria were not designed to result in the selection of certain pre-chosen participants. The objective criteria may be set to control the number of candidates participating in a debate if the staging organization believes there are too many candidates to conduct a meaningful debate.

> Under the new rules, nomination by a particular political party, such as a major party, may not be the sole criterion used to bar a candidate from participating in a general election debate. But, in situations where, for example, candidates must satisfy three of five objective criteria, nomination by a major party may be one of the criteria. This is a change from the Explanation and Justification for the previous rules, which had expressly allowed staging organizations to restrict general election debates to major party candidates. *See* Explanation and Justification, 44 FR 76735 (December 27, 1979).  In contrast, the new rules do not allow a staging organization to bar minor party candidates or independent candidates from participating simply because they have not been nominated by a major party.

60 *Fed. Reg.* 64,260, 64,262 (Dec. 14, 1995).

Thus, if an appropriate corporation staged a debate among candidates for federal office and that debate was staged in accordance with all of the requirements of 11 C.F.R. § 110.13, then the costs incurred by the sponsoring corporation would be exempt from the definition of contribution pursuant to the operation of 11 C.F.R. § 100.7(b)(21). *See also* 11 C.F.R. §§ 114.1(a)(2)(x) and 114.4(f)(1). Similarly, other corporations legally could provide funds to the sponsoring corporation to defray expenses incurred in staging the debate pursuant to the operation of 11 C.F.R. §§ 114.1(a)(2)(x) and 114.4(f)(3). On the other hand, if a corporation staged a debate that was not in accordance with 11 C.F.R. § 110.13, then staging the debate would not be an activity "specifically permitted" by 11 C.F.R. § 100.7(b), but instead would constitute a contribution to any participating candidate under the Commission's regulations. *See* 11 C.F.R. § 100.7(a)(1)(iii)(A) (noting "unless specifically exempted" anything of value provided to the candidate constitutes a contribution). The participating candidates would be required to report receipt of the in-kind contribution as both a contribution and an expenditure pursuant to 11 C.F.R. § 104.13(a)(1) and (2). *See* 2 U.S.C. § 434(b)(2)(C) and (4).

B.    Commission on Presidential Debates Selection Criteria

CPD was incorporated in the District of Columbia on February 19, 1987, as a private, not-for-profit corporation designed to organize, manage, produce, publicize and support debates for the candidates for President of the United States. Prior to the 1992 campaign, CPD sponsored six debates, five between candidates for President, and one between candidates for Vice President. In the 1996 campaign, CPD sponsored two Presidential debates and one Vice Presidential debate. Only the candidates of the Democratic and Republican parties were invited to participate in the 1996 debates. CPD produced written candidate selection criteria for the 1996 general election debate participation. Relying on these criteria and the recommendation of an advisory committee consisting of a broad array of independent professionals and experts, the CPD determined that only the Democratic and Republican candidates had a "realistic chance of winning" the 1996 election.

The introduction to the candidate selection criteria explains, in pertinent part:

> In light of the large number of declared candidates in any given presidential election, [CPD] has determined that its voter education goal is best achieved by limiting debate participation to the next President and his or her principal rival(s).

> A Democratic or Republican nominee has been elected to the Presidency for more than a century. Such historical prominence and sustained voter interest warrants the extension of an invitation

to the respective nominees of the two major parties to participate in [CPD's] 1996 debates.

In order to further the educational purposes of its debates, [CPD] has developed nonpartisan criteria upon which it will base its decisions regarding selection of nonmajor party candidates to participate in its 1996 debates. The purpose of the criteria is to identify nonmajor party candidates, if any, who have a realistic (i.e., more than theoretical) chance of being elected the next President of the United States and who properly are considered to be among the principal rivals for the Presidency.

The criteria contemplate no quantitative threshold that triggers automatic inclusion in a [CPD]-sponsored debate. Rather, [CPD] will employ a multifaceted analysis of potential electoral success, including a review of (1) evidence of national organization, (2) signs of national newsworthiness and competitiveness, and (3) indicators of national enthusiasm or concern, to determine whether a candidate has a sufficient chance of election to warrant inclusion in one or more of its debates.

February 6, 1998 General Counsel's Report ("G.C. Report") at Attachment 4, at 57.

Thus, CPD identified its objective of determining which candidates have a realistic chance of being elected the next President, and it specified three primary criteria for determining which "nonmajor" party candidates to invite to participate in its debates. CPD further enumerated specific factors under each of the three primary criteria that it would consider in reaching its conclusion.

For its first criterion, "evidence of national organization," CPD explained that this criterion "encompasses objective considerations pertaining to [Constitutional] eligibility requirements . . . [and] also encompasses more subjective indicators of a national campaign with a more than theoretical prospect of electoral success." *Id.* The factors to be considered include:

> a. Satisfaction of the eligibility requirements for Article II, Section 1 of the Constitution of the United States.
>
> b. Placement on the ballot in enough states to have a mathematical chance of obtaining an electoral college majority.

c. Organization in a majority of congressional districts in those states.

d. Eligibility for matching funds from the Federal Election Commission or other demonstration of the ability to fund a national campaign, and endorsement by federal and state officeholders.

*Id.*

CPD's second criterion, "signs of national newsworthiness and competitiveness," focuses "both on the news coverage afforded the candidacy over time and the opinions of electoral experts, media and non-media, regarding the newsworthiness and competitiveness of the candidacy at the time [CPD] makes its invitation decisions." *Id.* Five factors are listed as examples of "signs of national newsworthiness and competitiveness":

a. The professional opinions of the Washington bureau chiefs of major newspapers, news magazines, and broadcast networks.

b. The opinions of a comparable group of professional campaign managers and pollsters not then employed by the candidates under consideration.

c. The opinions of representative political scientists specializing in electoral politics at major universities and research centers.

d. Column inches on newspaper front pages and exposure on network telecasts in comparison with the major party candidates.

e. Published views of prominent political commentators.

*Id.* at 58.

Finally, CPD's third selection criterion states that the factors to be considered as "indicators of national public enthusiasm" are intended to assess public support for a candidate, which bears directly on the candidate's prospects for electoral success. The listed factors include:

a. The findings of significant public opinion polls conducted by national polling and news organizations.

       b. Reported attendance at meetings and rallies across the country
       (locations as well as numbers) in comparison with the two major
       party candidates.

*Id.*

C.    Discussion

      After a thorough and careful examination of the factual record, the undersigned commissioners unanimously concluded the Commission on Presidential Debates used "pre-established objective criteria" to determine who may participate in the 1996 Presidential and Vice-Presidential debates. 11 C.F.R. §110.13.[5] As a result, CPD did not make, and the candidate committees did not receive, a corporate contribution.

      The CPD was set up and structured so that the individuals who made the ultimate decision on eligibility for the 1996 debates relied upon the independent, professional judgment of a broad array of experts. The CPD used multifaceted selection criteria that included: (1) evidence of a national organization; (2) signs of national newsworthiness and competitiveness; and (3) indicators of national enthusiasm or concern. We studied these criteria carefully and concluded that they are objective. Moreover, we could find no indication or evidence in the factual record to conclude that the criteria "were designed to result in the selection of certain pre-chosen participants." Explanation and Justification of 11 C.F.R. §110.13(c), 60 *Fed. Reg.* at 64262.

      The CPD debate criteria contain exactly the sort of structure and objectivity the Commission had in mind when it approved the debate regulations in 1995. Through those regulations, the Commission sought to reduce a debate sponsor's use of its own personal opinions in selecting candidates. It was essential, in the Commission's view, that this selection process be neutral. It is consistent with the 1995 regulations for a debate sponsor to consider whether a candidate might have a reasonable chance of winning through the use of outside professional judgment. Indeed, if anything, the use of a broad array of independent professionals and experts is a way of ensuring the *decision makers* are objective in assessing the "realistic chances" of a candidate.

---

[5]  Although not required to do so under the Commission's regulation, CPD reduced its candidate selection criteria to writing. *See* Explanation and Justification of 11 C.F.R. §110.13, 60 *Fed. Reg.* at 64262.

The pool of experts used by CPD consisted of top level academics and other professionals experienced in evaluating and assessing political candidates. By basing its evaluation of candidates upon the judgment of these experts, CPD took an objective approach in determining candidate viability.[6]

Significantly, the debate regulations sought to give debate sponsors wide leeway in deciding what specific criteria to use.  During the Commission's promulgation of §110.13, the Commission considered the staff's recommendation to specify certain ostensibly objective selection criteria in the regulations and to expressly preclude the use of "[p]olls or other assessments of a candidate's chances of winning the nomination or election."  *See* Agenda Document #94-11 at 74 (February 8, 1994) and Explanation and Justification of 11 C.F.R. §110.13, 60 *Fed. Reg.* at 64262. The Commission unanimously rejected this approach.[7] *Id.*  Instead, the Commission decided the selection criteria choice is at the discretion of the staging organization and indicated that the use of outside professional judgment in considering candidate potential is permissible.  Accordingly, the Commission cannot now tell the CPD that its employment of such an approach is unacceptable and a violation of law.

The Office of General Counsel, in effect, seemed to want to apply its own debate regulation proposal from several years ago in the instant matters.  It argued the use of candidate assessments, such as CPD's "signs of newsworthiness and competitiveness," are "problematic" for many of the same reasons it argued in 1994.  G.C. Report at 17.  Specifically, the Office of General Counsel contended the CPD criteria contain "two levels of subjectivity: first, identifying the pool of sources involves numerous subjective judgments, and second, once the pool is identified, the subjective judgments of its members is considered." *Id.* at 18.  The staff further insisted that there also is "reason to believe that the other selection criteria appear to be similarly insufficiently defined to comply with §110.13(c)'s objectivity requirement." *Id.*

---

[6]  That one reference in CPD's materials states that the criterion for evidence of national organization "encompasses more *subjective* indicators of a national campaign with a more than theoretical prospect of electoral success", *see* G.C. Report at 11(emphasis added), is not dispositive. Indeed, the factors referred to appear to be *objective* on their face and not subjective:

   a.  Satisfaction of the eligibility requirements of Article II, Section I of the Constitution of the United States.
   b.  Placement on the ballot in enough states to have a mathematical chance of obtaining an electoral college majority.
   c.  Organization in a majority of congressional districts in those states.
   d.  Eligibility for matching funds from the Federal Election Commission or other demonstration of the ability to fund a national campaign, and endorsements by federal and state officeholders.

*Id.* at Attachment 4, at 57.

[7]  Under the staff's proposed regulation, a debate sponsor could not look at the latest poll results even though the rest of the nation could look at this as an indicator of a candidate's popularity.  This made little sense to us.

The questions raised in the General Counsel's Report are questions which can be raised regarding *any* candidate assessment criterion. To ask these questions each and every time a candidate assessment criterion is used, however, would render the use of that criterion unworkable, contrary to the direction given by the Commission at the regulatory stage. Absent specific evidence that a candidate assessment criterion was "fixed" or arranged in some manner so as to guarantee a preordained result, we are not prepared to look behind and investigate every application of a candidate assessment criterion. This approach is consistent with the Commission's Explanation and Justification which states "reasonableness is implied" when using objective criteria. Explanation and Justification of 11 C.F.R. §110.13(c), 60 *Fed. Reg.* at 64262. We are satisfied with the affidavits presented by the CPD that its "criteria were not designed to result in the selection of certain pre-chosen participants." *Id.* See G.C. Report at Attachment 4, at 121-126 (affidavit of professor Richard E. Neustadt); Attachment 4 at 43-56 (affidavit of Janet H. Brown). Significantly, we have been presented with no evidence in the factual record which threatens the veracity of these sworn affidavits.

The General Counsel's Report contains several other points which must be addressed. First, the Report's suggestion that CPD misapplied Mr. Perot's qualification for public funding reflects a misunderstanding of CPD's reasoning. *See* G.C. Report at 19-20. While qualification for public funding is significant, the CPB observed that as a practical matter Mr. Perot's hands would be tied since he could not contribute his own money. Thus, compared to 1992, his "realistic" chances of winning in 1996 were greatly reduced:

> [In 1992], we concluded that his prospect of election was unlikely but not unrealistic. With the 1992 results and the circumstances of the current campaign before us, including Mr. Perot's funding limited by his acceptance of *a federal subsidy*, we see no similar circumstances at the present time. Nor do any of the academic or journalistic individuals we have consulted.

G.C. Report at Attachment 4, at 128 (Letter of Professor Richard E. Neustadt) (emphasis added). A limit on the amount of funds which can be spent by a candidate is certainly an objective factor which can be legitimately used by a sponsoring organization.

The General Counsel's Report also asserts the Democratic and Republican party nominees were issued "automatic" invitations to the debates as a result of their party nominations in violation of §110.13. *See* February 6, 1998 G.C. Report at 21-22. We find persuasive the specific denials by the CPD on this point. The CPD flatly denies it based its decision on this factor alone:

[I]n 1996, the CPD Board asked me to act as chairman of the advisory committee that applied the 1996 candidate selection criteria. The advisory committee convened on September 16, 1996 for the purpose of applying CPD's nonpartisan candidate selection criteria to more than 130 candidates running for the Presidency and Vice-Presidency in the 1996 general election campaign. *Although the candidate selection criteria do not require it to do so, the advisory committee independently applied the criteria to the* Democratic and Republican party candidates. After reviewing and discussing the facts and circumstances of the 1996 general election campaign, it was the unanimous conclusion of the advisory committee that, as of September 16, 1996, only President Clinton and Senator Dole have a realistic chance in 1996 of being elected President, and only Vice President Gore and Congressman Kemp have a realistic chance of being elected Vice President.

G.C. Report at Attachment 4, at 124-125 (Affidavit of Professor Richard E. Neustadt)(emphasis added). *See also id.* at 53-54 (Affidavit of Janet H. Brown)("After receipt of the data provided to the 1996 Advisory Committee and its own deliberation and discussion, *the CPD Board unanimously accepted the 1996 Advisory Committee's recommendation* that only President Clinton and Senator Dole be invited to participate in CPD's 1996 Presidential debate and only Vice President Gore and Congressman Kemp be invited to participate in CPD's 1996 vice presidential debate.")(emphasis added).

Additionally, we do not fully agree with the staff's conclusion that "'automatic' invitations are in direct violation of 11 C.F.R. §110.13(c)." G.C. Report at 21. Section 110.13(c) provides, in pertinent part, that "[f]or general election debates, staging organization(s) shall not use nomination by a particular political party as the sole objective criterion to determine whether to include a candidate in a debate." The phrase "whether to include" was intended to prevent a debate sponsor from *excluding* a candidate from a debate solely because the candidate was not a major party nominee. For example, a debate sponsor could not use the following as its "objective" criterion: "Only major party candidates are eligible to participate in the debate." The regulation's purpose was not to prevent a debate sponsor from issuing debate invitations to major party nominees.

The Explanation and Justification of §110.13(c) confirms this understanding of the regulation: "Under the new rules, nomination by a particular party, such as a major party, may not be the sole criterion used *to bar a candidate from participating* in a general election debate." Explanation and Justification of 11 C.F.R. §110.13(c), 60 *Fed. Reg.* at 64262 (emphasis added). Indeed, the entire paragraph explaining this new regulatory language focuses on the fact that "the new rules do not allow a staging organization to bar minor party candidates or independent candidates from participating

simply because they have not been nominated by a major party." *Id.* Conversely, no mention is made in the Explanation and Justification that the new rules were somehow intended to prevent the issuance of invitations to major party nominees. We believe it is consistent with the purpose of the regulation for the CPD to issue an invitation to the major party candidates in view of the "historical prominence" of, and "sustained voter interest" in, the Republican and Democratic parties. G.C. Report at Attachment 4, at 57.

Finally, the General Counsel's Report suggests the Clinton/Gore Committee and the Dole/Kemp Committee expressed an interest to either include or exclude Mr. Perot and that, as a result, the two candidate committees somehow tainted the debate selection process. G.C. Report at 20-21. Absent specific evidence of a controlling role in excluding Mr. Perot, the fact the Committees may have discussed the effect of Mr. Perot's participation on their campaigns is without legal consequence. There certainly is no credible evidence to suggest the CPD acted upon the instructions of the two campaigns to exclude Mr. Perot. To the contrary, it appears one of the campaigns wanted *to include* Mr. Perot in the debate. *See* G.C. Report at Attachment 6, at 7 ("since the start of the general election, the [Clinton/Gore] Committee fully supported the wishes of Ross Perot to be included in the CPD-sponsored presidential debates and had hoped that the CPD would make a determination to include him.") (response of Clinton/Gore '96). In fact, CPD's ultimate decision to exclude Mr. Perot (and others) only corroborates the absence of any plot to equally benefit the Republican and Democratic nominees to the exclusion of all others.

## III. STATUS AS A POLITICAL COMMITTEE

The FECA defines "political committee" as, in part: "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4); *see also* 11 C.F.R. § 100.5. Political committees are required to register with the Commission, and to report contributions received and expenditures made in accordance with the FECA and the Commission's regulations. *See* 2 U.S.C. § 433 and 11 C.F.R. § 102.1(d) (requiring political committees to register with the Commission); *see also* 2 U.S.C. § 434 and 11 C.F.R. § 104.1(a) (requiring political committees to file specified reports with the Commission). Since CPD did not make a contribution to or an expenditure on behalf of the Committees, it was not a political committee within the meaning of 2 U.S.C. § 431(4). Accordingly, CPD was not required to register and report with the Commission.

## IV. CONCLUSION

For all the reasons set forth above, the Commission did not approve the General Counsel's recommendations with regard to alleged violations of the FECA by the Commission on Presidential Debates, Clinton/Gore '96 General Committee and the Dole/Kemp '96 Committee and their treasurers.

_4/6/98_
Date

_Joan D. Aikens_
Chairman

_4/6/98_
Date

Scott E. Thomas
Vice Chairman

_____
Date

Lee Ann Elliott
Commissioner

_4/6/98_
Date

Danny L. McDonald
Commissioner

_____
Date

John Warren McGarry
Commissioner