UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HEIDI BECKER, MEDEA BENJAMIN, PHIL DONAHUE, MARK DUNLEA, ANNE GOEKE, ELIZABETH HORTON SCHEFF, RALPH NADER, JAMES O'KEEFE, SUSAN SARANDON, NADER 2000 PRIMARY COMMITTEE, INC., ASSOCIATION OF STATE GREEN PARTIES and GREEN PARTY USA, | |
| Plaintiffs, | Civil Action No.: 00-cv-11192-MLW |
| v. | |
| FEDERAL ELECTION COMMISSION, | |
| Defendant. | |

**AFFIDAVIT OF THERESA AMATO**

1.      I am the campaign manager for Nader 2000 Primary Committee, Inc., the official committee conducting Ralph Nader's presidential campaign (the "Nader Campaign"). I have overall responsibility for all aspects of the campaign. Since assuming my duties on March 1, 2000, I have advised Mr. Nader on how best to communicate his campaign platform to the American electorate. This affidavit is based upon personal knowledge, except where otherwise noted.

2.      If allowed to remain in force through this campaign cycle, the FEC's illegal Debate Regulations challenged in this lawsuit will substantially harm the Nader Campaign. The corporate money used to support Mr. Nader's opponents in the presidential debates degrades the campaign's efforts to spread Mr. Nader's electoral

message, impairs the campaign's efforts to build support for his alternative candidacy, and denies Mr. Nader and his supporters their right to compete fairly against the two major party candidates.

3.     Mr. Nader is a well-known citizen-advocate, lawyer, author, and organizer, who has devoted a substantial part of his life to advocacy on behalf of consumers, taxpayers, voters, workers, and the environment.  Mr. Nader is running on a platform that advances the sovereignty of the people over the power of corporations.  The Nader Campaign is dedicated to closing the "democracy gap" by fighting the corrosive influence of money in politics and diminishing corporate fraud, welfare, and abuse.  The Nader Campaign does not accept contributions from political action committees.

4.     The  FEC's illegal Debate Regulations allow corporations to spend and contribute money to support presidential debates between the two major-party candidates. These expenditures aid the campaigns of the debate participants in the same way as a direct contribution to the campaigns themselves.

5.     The corporate sponsorship of the presidential debate process gives the American people the false impression that only those candidates acceptable to corporate America are electable to office.  By allowing corporations to sponsor partisan debates, thus advertising the viewpoints of the invited participants, the FEC enables direct contribution to campaigns for federal office, invites the corruption of officials, and specifically promotes the political viewpoint that corporations *should* have influence over public policy.  The FEC's violation of long-established federal law allows corporations to appear as legitimate arbiters of electoral viability by obscuring the distinction between civic and corporate agendas.  The substance of Mr. Nader's platform contrasts sharply

with positions espoused by the candidates of the two major parties on a number of issues

of critical importance, especially with respect to the disproportionate influence of

corporations over our political and civic life.  As a result, the FEC's illegal regulations

directly undermine Mr. Nader's platform and candidacy.

6.      As recent polling indicates, a substantial number of American citizens

already support Ralph Nader's candidacy.  An NBC-Wall Street Journal poll released on

June 21, 2000 revealed 7 percent of registered voters intend to cast votes for Mr. Nader.

Mr. Nader has a higher net favorability rating than either of the two major-party

candidates and a name recognition factor of 91 percent with the American public.  Most

voters decide to support a candidacy only if they have an opportunity to hear and

understand a candidate's campaign platform.  Many voters have expressed dismay that

Mr. Nader's distinct positions do not appear in the mainstream media's coverage of

election issues.  If the FEC's illegal regulations are not struck down, corporate-sponsored

debates will serve as the primary and exclusive source of campaign information for tens

of millions of voters.  Mr. Nader's pro-consumer, pro-worker, pro-taxpayer, pro-voter,

pro-environment, corporate watchdog message will go largely unheard because the FEC

has allowed corporations to tilt the electoral playing field.

7.      The damage caused by the FEC's Debate Regulations is compounded by

the fact that only one entity provides what is, in practice, the sole forum for presidential

debates.  The exclusive position occupied by the Commission on Presidential Debates

(the "CPD") is strengthened by the illegal presence of corporate funding; alternative

debate sponsors are directly discouraged by the cost of mounting and televising

alternative debates in "competition" with the debates already mounted with the support of

3

corporate money and corporate media.  The high-gloss debates sponsored by the CPD, an

organization created by the two major parties, make it very difficult for third-party and

independent candidates to get their message to the American people.

8.     In November 1985, the respective chairmen of the Democratic and

Republican National Committees, Paul G. Kirk, Jr. and Frank J. Fahrenkopf, Jr., agreed

that the two major parties would work together to sponsor presidential debates.  They

proposed debates in the form of "nationally televised joint appearances conducted

between the presidential and vice-presidential nominees of the two major political parties

during general election campaigns."

9.     Fifteen months later, the Democratic and Republican Parties jointly

announced the incorporation of the Commission on Presidential Debates ("CPD"), an

organization controlled by the Democratic and Republican National Committees.  They

declared that the CPD is a "bipartisan" organization formed to implement joint

sponsorship of general election debates by the national Democratic and Republican

Committees "between their respective nominees."  The CPD's Board of Directors

consists of nine individuals, all of whom are either Democrats or Republicans.

10.     The CPD's corporate-sponsored debates immediately supplanted the

debates previously sponsored by the League of Women Voters.  Though the League of

Women Voters (the "League") had originally planned to share or alternate sponsorship of

debates with the CPD, the League withdrew those plans in 1988 on account of what the

League called "outrageous" scripting and conditions that the major-party candidates had

put upon the debates, conditions that the CPD readily accepted.  In a news release

announcing its withdrawal, the League stated that it could no longer serve as an

4

independent debate sponsor alongside the CPD because to do so "would perpetrate a fraud on the American Voter."

11.     The CPD staged all of the nationally-televised general election presidential debates in 1988, 1992 and 1996 and is expected to stage all such presidential debates this year.

12.     The CPD has solicited substantial sums of money from for-profit corporations to help it stage its presidential debates. According to the CPD website, the corporate sponsors of its 1992 debates included: AT&T, Atlantic Richfield, Ford Motor Company, IBM, J.P. Morgan & Co. and Philip Morris Companies, Inc.  The corporate sponsors of its 1996 debates included: Anheuser-Busch, Lucent Technologies, Philip Morris Companies, Inc., Sara Lee Corporation and Sprint Corporation.

13.     On January 6, 2000, the CPD announced that Anheuser-Busch will serve as one of the national financial sponsors for its 2000 presidential debates, as well as the sole national financial sponsor of CPD's scheduled October 17, 2000 presidential debate in St. Louis, Missouri.  Anheuser-Busch will reportedly pay $550,000 to underwrite the upcoming St. Louis debate.  It appears that the CPD is actively seeking to raise additional corporate contributions to stage its debates and promote them on the Internet.  Notably, on Friday June 14, 2000, before this lawsuit was filed, the CPD had a list of the sponsors of its 2000 debates posted on its website.  As of Tuesday June 20, 2000, the day after this suit was filed, that list had been removed.

14.     The CPD's presidential debates have become a critical part of the overall presidential election process.  The CPD's own website describes the debates "as a permanent part of every general election."  The CPD's debates are nationally televised

5

and watched by tens of millions of American voters.  In fact, the CPD's presidential

debates have been the only nationally televised debates in the last three general elections.

According to polls and the CPD website, tens of millions of voters have turned to the

debates as a major source of information about the candidates competing for election and

have based their balloting decisions on the televised debates.

15.      As third-party presidential candidate Ross Perot proved in 1992, an

appearance in the CPD/corporate-sponsored presidential debates contributes dramatically

to the legitimacy and potential success of a candidate's campaign.  Prior to the first 1992

CPD presidential debate, Mr. Perot received 7% of the public's support in national polls.

Following the debates, Mr. Perot received roughly 19% of the popular vote in the general

election.  In addition to providing the major forum for campaign communication with the

American electorate, the CPD debates confer a distinct imprimatur of legitimacy and

electability upon the candidates who are permitted to participate.

16.      The CPD/corporate-sponsored debates amount to a valuable campaign

advertisement for the candidates who participate.  Though monetary value of an

appearance in the CPD/corporate-sponsored debates is difficult to quantify, many

millions of dollars would have to be spent by any entity sponsoring an alternative debate

merely to secure comparable television coverage.  To achieve an equivalent of the CPD's

imprimatur of electability would require untold millions more.   The CPD's corporate

sponsored debates have become "the only game in town".

17.      The CPD has adopted rules to determine who will be permitted to

participate in the presidential debates it stages.  Under the CPD's current rules, both

plaintiff Ralph Nader and Reform Party candidate Patrick Buchanan are likely to be excluded from the presidential debates, even though recent polls show that a majority of American voters want to hear both of these candidates in the debates.

18.    The FEC's illegal authorization of corporate-sponsored debates forces the Nader Campaign into an untenable position. If Mr. Nader is invited to the CPD debates, he will be forced either to participate in an event funded by illegal corporate contributions or to pass up his chief opportunity to communicate with the American public. Should he choose to participate, he would in effect be forced to violate his own platform in order to communicate that platform to the electorate.

19.    In sum, the Nader Campaign will suffer irreparable harm if the FEC's illegal Debate Regulations are not struck down during this election cycle. The corporate money used to support Mr. Nader's opponents who participate in the debates corrupts the political process, tilts the electoral playing field, and undermines Mr. Nader's platform, candidacy and party-building efforts.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 22, 2000.
        Washington, D.C.

Theresa Amato

7