UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HEIDI BECKER, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 00-CV-11192 MLW |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S OPPOSITION
TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Lawrence M. Noble
General Counsel

Richard B. Bader
Associate General Counsel

Stephen E. Hershkowitz
Assistant General Counsel

Vivien Clair
Attorney

Erin K. Monaghan
Attorney

FOR THE DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

July 21, 2000

# TABLE OF CONTENTS

**PAGE**

I.  BACKGROUND ............................................................................................3

    A.  The Federal Election Commission......................................................3

    B.  Statutory Framework...........................................................................3

    C.  The Debate Regulations .............................................................4

II. PLAINTIFFS HAVE FAILED TO SATISFY THE
PREREQUISITES FOR A PRELIMINARY INJUNCTION ............................6

    A.  Plaintiffs Have Not Met Their Burden to Show that They
Are Substantially Likely to Succeed on the Merits................................7

    B.  Plaintiffs Have Not Met Their Burden of Showing They
Will Suffer Irreparable Harm if the Preliminary Injunction
Is Denied, or that Such an Injunction Will Not Harm the
Commission or the Public Interest........................................................21

    CONCLUSION ............................................................................................24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HEIDI BECKER, et al. | ) | |
| | ) | 00-CV-11192 MLW |
| Plaintiffs, | ) | |
| | ) | Opposition to Plaintiffs' |
| v. | ) | Motion For Preliminary |
| | ) | Injunction |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT FEDERAL ELECTION COMMISSION'S OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs filed a complaint alleging that the Federal Election Commission (the "Commission" or "FEC") acted in excess of its statutory authority in promulgating 11 C.F.R. 110.13 and 114.4(f) ("the debate regulations"), which permit corporate and labor union disbursements in certain situations to stage debates among candidates for federal office. Plaintiffs assert those regulations are inconsistent with 2 U.S.C. 441b, which prohibits corporations and labor unions for using their funds in connection with a federal election. The plaintiffs have filed a motion for a preliminary injunction to prevent the Commission "from enforcing or implementing, or relying in any way upon" those regulations. The Commission hereby opposes that motion and is concurrently filing a motion to dismiss the complaint in this case for lack of jurisdiction.

Plaintiffs can satisfy none of the criteria for the issuance of a preliminary injunction. 2 U.S.C. 441b, which generally prohibits corporations and labor organizations from making "contributions or expenditures" (as defined in subsection 441b(b)) "in connection with any election" to federal office, and 2 U.S.C. 431(8) and (9), which provide the general definitions of

"contribution" and "expenditure" for purposes of the Act, do not speak to the "precise question at issue," Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., et al., 467 U.S. 837, 842 (1984), the financing of electoral debates or the appropriate criteria for the staging and funding of such debates. Thus, review of the Commission's debate regulations falls within the deference owed to agency action, Chevron, 467 U.S. at 843, and these safe harbor regulations clearly meet that test. They permit only non-profit organizations to accept and use funds from corporations and labor unions for debates that do not promote or advance any candidate, using pre-established objective criteria to select candidate participants. This is a reasonable construction that fosters nonpartisan debates to educate the voters.

Because plaintiffs cannot show that the debate regulations have caused them or will cause them any legally cognizable harm, they cannot satisfy the "irreparable harm" prerequisite for a preliminary injunction. Moreover, the Commission has had regulations permitting candidate debates sponsored by nonprofit corporations for 20 years, plaintiffs have known of them for years, and yet plaintiffs failed to bring their ultra vires argument to the Commission's attention at any time before filing this suit. In these circumstances, plaintiffs' own delay belies their claim of an emergency. In contrast, the broad preliminary injunction that plaintiffs seek will cause the Commission and the public great harm. It is intended to interfere with the plans underway to stage presidential and congressional debates this fall, with the Commission's exclusive jurisdiction and prosecutory discretion, and with the exclusive jurisdiction of the United States District Court for the District of Columbia to review a conclusion by the Commission that a private party's actions do not violate the Act. Finally, granting the motion would be futile, for neither the major party candidates nor any debate-sponsoring organizations are parties to this

2

lawsuit and, therefore, their actions cannot be controlled by an order issued by this Court. For these reasons, the Court should deny plaintiffs' motion for a preliminary injunction.

## I.    BACKGROUND

### A.    Federal Election Commission

The Commission is the independent agency of the United States government empowered to administer, interpret, and enforce the Federal Election Campaign Act of 1971, as amended, codified at 2 U.S.C. 431-455 (the "Act" or "FECA"). See generally 2 U.S.C. 437c(b)(1), 437d(e), and 437g. Congress specifically authorized the Commission not only to "administer" and "seek to obtain compliance with" the Act, but also to "formulate policy with respect to" the Act. 2 U.S.C. 437c(b)(1). In addition, the Commission is authorized to "make, amend, and repeal such rules, pursuant to the provisions of chapter 5 of title 5, United States Code, as are necessary to carry out the provisions of this Act[.]" 2 U.S.C. 437d(a)(8). The Commission's rulemaking authority is subject, however, to the requirement that it transmit any proposed regulations to Congress, 2 U.S.C. 438(d)(1), and the regulations only become effective if Congress "does not disapprove" them "within 30 legislative days . . . ." 2 U.S.C. 438(d)(2).

### B.    Statutory Framework

Section 441b of the Act generally prohibits corporations and labor organizations from making a "contribution or expenditure" in connection with any election to a federal office. See 2 U.S.C. 441b(a). However, the Act does not prohibit all uses of corporate or union money for political purposes. As defined in section 441b(b), the term "contribution or expenditure" includes "any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value ... to any candidate, campaign committee or political party or organization, in connection with any election" to federal office. However, it excludes

3

(1) communications "on any subject" by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (2) "nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at to its members and their families;" and (3) "the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes." 2 U.S.C. 441b(b)(2)(A)-(C).

The Act also contains a general definitional section, 2 U.S.C. 431, under which the terms "contribution" and "expenditure" are defined. "Contribution" and "expenditure" both include any gift, loan, deposit, or advance of money or "anything of value ... for the purpose of influencing any election for Federal office." 2 U.S.C. 431(8)(A)(i), 431(9)(A)(i). Both definitions also exclude, inter alia, "any payment made or obligation incurred by a corporation or labor union which, under section 441b(b) of this title, would not constitute an expenditure by such corporation or labor organization." 2 U.S.C. 431(8)(B)(vi) and 431(9)(B)(v). The general definition of "expenditure" also expressly excludes, inter alia, "nonpartisan activity designed to encourage individuals to vote or to register to vote," 2 U.S.C. 431(9)(B)(ii), and "any news story, commentary, or editorial distributed through the facilities of any broadcasting station . . . unless such facilities are owned or controlled by any political party, political committee, or candidate," 2 U.S.C. 431(9)(B)(i).

## C.    The Debate Regulations

In 1980, the Commission issued regulations interpreting section 441b to permit certain organizations to stage and finance political debates among candidates for federal office. These debate regulations, which were revised in early 1996, set eligibility requirements for entities that

4

may stage debates among candidates for any federal office, and requirements for the structure and selection of participants in candidate debates by such organizations. See 11 C.F.R. 110.13. A debate-staging organization must be a nonprofit organization that "do[es] not endorse, support or oppose political candidates or political parties[,]" 11 C.F.R. 110.13(a)(1), or a media entity "not owned or controlled by a political party, political committee or candidate[,]" id. at (a)(2). A debate must "include at least two candidates[,]" and the staging organization may not "structure the debates to promote or advance one candidate over another." 11 C.F.R.110.13(b). Staging organizations "must use pre-established objective criteria to determine which candidates may participate in a debate[,]" and for general election debates "shall not use nomination by a particular political party as the sole objective criterion to determine whether to include a candidate in a debate." 11 C.F.R. 110.13(c).

The debate regulations permit corporations and labor organizations to donate funds to staging organizations that meet these various requirements for safeguarding against promoting or opposing the election of particular candidates. 11 C.F.R. 114.4(f)(3). A complementary provision permits the staging organizations (qualified under 26 U.S.C. 501(c)(3) and (c)(4)) to use corporate or labor union funds, as well as their own funds, to defray the costs of staging debates. 11 C.F.R. 114.4(f)(1). Donations authorized by 11 C.F.R. 114.4(f) are also expressly excluded from the Commission's general regulatory definitions of "contribution" and "expenditure." See 11 C.F.R. 100.7(b)(21) (excluded from "contribution") and 110.8(b)(23) (excluded from "expenditure").

As required by 2 U.S.C. 438(d), in December 1995 the Commission submitted these revised regulations to Congress before finally promulgating them, and Congress took no action to disapprove them during the subsequent 30-day period the statute provides.

## II.   PLAINTIFFS HAVE FAILED TO SATISFY THE PREREQUISITES FOR A PRELIMINARY INJUNCTION

Plaintiffs have not satisfied their burden to show that they are entitled to the

"extraordinary equitable remedy" of a preliminary injunction. Boston's Children First v. City of

Boston, 62 F. Supp.2d 247, 253 (D. Mass. 1999). Because a preliminary injunction "requires

intervention by the Court on an emergency basis, without the usual careful procedures and

litigation methods," id., a plaintiff has the burden to show that "(1) it is substantially likely to

succeed on the merits of its claim; (2) absent the injunction there is a significant risk of

irreparable harm; (3) the balance of hardships weighs in its favor; and (4) the injunction will not

harm the public interest." Lanier Professional Services, Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999)

(internal quotation marks and citation omitted).

Ordinarily, "[t]he purpose of interlocutory injunctive relief is to preserve the status quo

pending final relief and to prevent irreparable injury to the plaintiff." American Bd. of Psychiatry

and Neurology, Inc. v. Johnson-Powell, 129 F.3d 1, 4 (1st Cir. 1997). The plaintiffs here,

however, are seeking a preliminary injunction to change the status quo that has been in effect for

20 years. Every presidential campaign since 1976 has included televised candidate debates. All of

the general presidential election debates since 1988 have been sponsored by the Commission on

Presidential Debates ("CPD"), acting pursuant to the Commission regulations. That is the status

quo. Indeed, plaintiffs not only ask this Court to disrupt the status quo, but they are attempting to

obtain now, through the preliminary injunction, the full relief they requested in the underlying

suit. A plaintiff must make a particularly strong showing of the likelihood of success and of

irreparable harm where a preliminary injunction is requested that upsets rather than preserves the

status quo. See Boston's Children First, 62 F. Supp.2d at 253-54; McLaughlin v. Boston School Committee, 938 F. Supp. 1001, 1011 (D. Mass. 1996).

### A.    Plaintiffs Have Not Met Their Burden to Show that They Are Substantially Likely to Succeed on the Merits

In their complaint, plaintiffs allege that the debate regulations are invalid because they are inconsistent with the plain language of section 441b of the Act. See Complaint ¶¶ 1, 17, 18. Thus, the merits of this case concern an issue of statutory construction.[1] "When courts review an agency's interpretation of a statute that it administers, Chevron directs them to engage in a bifurcated inquiry." Strickland v. Commissioner, Maine Dep't of Human Services, 96 F.3d 542, 545 (1st Cir. 1996). The first question is "'whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" Id. at 546 (quoting Chevron, 467 U.S. at 842). However, "'if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on

---

[1]      In their memorandum in support of their motion for a preliminary injunction ("Mem."), however, plaintiffs attempt to expand the grounds of their attack by asserting that the debate regulations also violate their First Amendment rights. See Mem. 20-21, 24-26. The Supreme Court's decision in Arkansas Educational Television Comm'n v. Forbes, 523 U.S. 666, 675-76 (1998), forecloses that argument. The Court held that, even when a government entity sponsors and broadcasts a candidate debate, minor candidates have no First Amendment right to be included in the debate. All the First Amendment requires, even of a governmental debate sponsor, is viewpoint neutrality in determining whether to "grant or deny access to a candidate debate." Id. at 675-76. Because the Court held that the informal, individualized method of selection used by the Arkansas public television broadcaster in Forbes, when it decided to exclude a candidate from its debates for lack of sufficient public support, met the requirements of viewpoint neutrality and reasonableness, the Commission's pre-established, objective criteria requirements satisfy the Court's test a fortiori. See id. at 685, 693-94 (Stevens, J., dissenting) (three Justices favorably contrasting 11 C.F.R. 110.13(c) with the ad hoc decision by the Arkansas broadcaster to exclude candidate Forbes from its debate and noting that they did "not endorse the view ... that all candidates who qualify for a position on the ballot are necessarily entitled to access to any state-sponsored debate").

a permissible construction of the statute.'" Id. (quoting Chevron, 467 U.S. at 843). Where an

agency's statutory interpretation "fills a gap or defines a term in a way that is reasonable in light

of the legislature's revealed design, we give [that] judgment 'controlling weight.'" NationsBank

of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 257 (1995) (quoting Chevron,

467 U.S. at 844). The Commission is "precisely the type of agency to which deference should

presumptively be afforded." FEC v. Democratic Senatorial Campaign Comm. ("DSCC"),

454 U.S. 27, 37 (1981).

  Although candidate debates (including the first televised presidential debates in 1960)

had occurred prior to the initial adoption of the Act in 1971, no language in the statute

specifically addresses debates, much less explicitly restricts sponsorship of candidate debates, by

corporations or any other entity. Thus, the Act itself is "silent" regarding candidate debates, and

the statute's legislative history also does not directly discuss candidate debates. Plaintiffs claim

that the Act's general language prohibiting "contributions" or "expenditures" by corporations or

labor organizations "in connection with" elections to federal office, 2 U.S.C. 441b, on its face

unambiguously forecloses any use or donation of funds by corporations and unions to defray the

costs of staging debates. But that general language says nothing indicating any congressional

consideration, much less a clear congressional intent, about candidate debates— that is "the

precise question at issue." PBGC v. LTV Corp., 496 U.S. 633, 647 (1990). See also, e.g.,

Duckworth v. Pratt & Whitney, Inc., 152 F.3d 1, 5-6 (1st Cir. 1998). Plaintiffs' simplistic claim

that the Act's general language resolves this issue ignores the intricacies of the relevant statutory

definitions, prohibitions, and permissions, and the indications of congressional intent expressed

in legislative history and in Congress's failure to disapprove the Commission's debate

regulations when they were submitted for review as required by the Act. In fact, although the

Commission has adhered to its construction of the Act for 20 years, and candidate debates have been a regular function of presidential campaigns for at least that long, Congress has not amended the statute to overrule the Commission's construction. See, e.g., Strickland, 96 F.3d at 547. Thus, plaintiffs' superficial approach to this complex statutory scheme merely begs the question of what type of corporate disbursements constitute "contributions" or "expenditures" within the meaning of the Act. Just because a corporation or union spends money does not necessarily mean that it has made a "contribution" or "expenditure."

The government's compelling purpose to "limit the actuality and appearance of corruption resulting from large individual financial contributions [to candidates]" is "a constitutionally sufficient justification" for the Act's limitations on contributions. Buckley v. Valeo, 424 U.S. 1, 26 (1976). Section 441b embodies the general prohibition of contributions to, or expenditures in support of, candidates and political parties by corporations and labor organizations that has been included in federal law for decades, since the Tillman Act of 1907 (corporate contributions) and the Taft-Hartley Act of 1947 (corporate and union contributions and expenditures). The primary rationale behind this prohibition is to prevent use of corporate and labor union treasury funds "amassed in the economic marketplace ... to provide an unfair advantage in the political marketplace." FEC v. Massachusetts Citizens for Life, Inc. ("MCFL"), 479 U.S. 238, 257 (1986). Despite the general prohibition, however, 2 U.S.C. 441b also "permits some participation of unions and corporations in the federal electoral process," FEC v. National Right to Work Committee, 459 U.S. 197, 201 (1982), through permissive exceptions to the definitions of "contribution" and "expenditure" in both the general definitions in 2 U.S.C. 431(8) and (9) and the particularized definition found in 2 U.S.C. 441b(b).

Amendments to the Act in 1974 exempted "nonpartisan activity designed to encourage individuals to vote or to register to vote" from the Act's general definition of "expenditure." 2 U.S.C. 431(9)(B)(ii). In 1976, Congress incorporated into the Act the long-standing prohibition of corporate contributions and expenditures that had been in 18 U.S.C. 610. Congress included a provision exempting from the definition of "contribution or expenditure" "nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families[.]" 2 U.S.C. 441b(b)(2)(B). Congress explained precisely how it intended this provision to work with the exemption from the general definition of "expenditure" for "nonpartisan activity designed to encourage individuals to vote or to register to vote," 2 U.S.C. 431(9)(B)(ii):

> The conferees' intent with regard to the interrelationship between sections [2 U.S.C 431(9)(B)(ii)] and [2 U.S.C. 441b(b)(2)(B)] which permit such activities as assisting eligible voters to register and get to the polls, so long as these services are made available without regard to the voter's political preference, is the following: these provisions should be read together to permit corporations both to take part in nonpartisan registration and get-out-the-vote activities that are not restricted to stockholders and executive or administrative personnel, if such activities are jointly sponsored by the corporation and an organization that does not endorse candidates and are conducted by that organization; and to permit corporations, on their own, to engage in such activities restricted to executive or administrative personnel and stockholders and their families. The same rule, of course, applies to labor organizations.

H.R. Rep. No. 94-1057, at 63-64 (1976), quoted in FEC, Explanation and Justification, Funding and Sponsorship of Federal Candidate Debates, 44 Fed. Reg. 76,734, at 76,735 (1979) ("1979 Explanation") (Exhibit A). In 1979, Congress also added exceptions to the general statutory definitions of "contribution" and "expenditure" that exempt "any payment made or obligation incurred by a corporation or a labor organization which, under section [2 U.S.C. 441b(b)], would

10

not constitute an expenditure by such corporation or labor organization." 2 U.S.C. 431(8)(B)(vi) and 431(9)(B)(v).

In 1979, the Commission addressed the funding and sponsorship of candidate debates in a rulemaking. Pursuant to its explicit statutory authority to "formulate policy with respect to" the Act, 2 U.S.C. 437c(b)(1), the Commission determined that since the legislative policy behind the exemptions discussed above was to permit corporations and unions to help finance activity directed to the general public to encourage voter participation, if the activity is conducted primarily by a nonpartisan organization, "permitting corporations and labor organizations to donate funds to nonprofit nonpartisan organizations for [debate] staging is consistent with congressional intent and policy" so long as the activity was actually conducted by a nonpartisan nonprofit entity. 1979 Explanation, 44 Fed. Reg. 76,734 at 76,736 (1979); see also 44 Fed. Reg. 39,348, at 39,349 (Exhibit B). The Commission concluded that "[t]he educational purposes" of a debate sponsored by such nonpartisan organizations "is similar to the purpose underlying nonpartisan voter registration and get-out-the-vote campaigns." 44 Fed. Reg. at 39,348. "Unlike single candidate appearances, nonpartisan debates are designed to educate and inform voters rather than to influence the nomination or election of a particular candidate. Hence, funds received and expended [by certain nonprofit organizations] to defray costs incurred in sponsoring nonpartisan public debates are not considered contributions or expenditures under the Act." Id.

The Commission also explained that "the prohibitions of 2 U.S.C. 441b were not specifically aimed at the donation of corporate or union funds to a nonpartisan tax-exempt organization." 44 Fed. Reg. at 39,350. It noted that the special definition of "contribution or expenditure" in section 441b(b) addressed payments "'to any candidate, campaign committee or political party or organization,'" Id. (emphasis in original). Since debate staging organizations

would have to have "a history of nonpartisanship," and be subject to the provision in the Internal Revenue Code forbidding nonprofit corporations "from intervening in any political campaign on behalf of any candidate for public office," an "organization qualified to sponsor candidate debates would be neither a campaign committee, a political party nor a political organization referred to in 2 U.S.C. § 441b." Id.

"Finally," the Commission explained, section 441b has generally been construed "to prohibit only active electioneering on behalf of a candidate or a political party or conduct designed to influence the public for or against a particular candidate." 44 Fed. Reg. at 39,350 (citing cases). "Unlike single candidate appearances . . . a properly constructed nonpartisan public debate involving two or more candidates would not be construed to be active electioneering to promote or influence the nomination or election of one particular candidate." Id.

The agency's first draft of debate regulations permitting corporations and unions to donate funds to support candidate debates staged by nonpartisan organizations was sent to Congress as required by 2 U.S.C. 438d(d), along with this analysis of congressional intent, on June 28, 1979. See 44 Fed. Reg. 39,348-39,351 (1979). Congress disapproved this first set of proposed regulations on September 18, 1979. One of the co-sponsors of the resolution of disapproval, Senator Pell, explained that the Senate's action "should not be construed to prohibit, in any way, organizations such as the League of Women Voters, or broadcasters from sponsoring candidate debates." 125 Cong. Rec. 24,957 (1979) (Exhibit C). To the contrary, the Commission's proposed regulations were rejected because "any regulation which could be interpreted as being burdensome to organizations which are likely to sponsor candidate debates, or which could in any way impede the heretofore successful debate procedure that has evolved

12

through direct arrangements made between sponsors and candidates should not be allowed to

take effect." Id. As Senator Hatfield, the other co-sponsor of the resolution, explained, the

Commission's proposed debate regulations

> represent[ed] an unwarranted intrusion of new Federal regulation into the
> political process, and are not in keeping with Congress [sic] intent in enacting
> Federal election campaign laws.... [T]he regulations as they are written would
> prohibit the broadcast media's sponsorship of candidate debates.... Another
> serious question raised by the regulations is their restriction of newspapers'
> sponsorship of candidate debates.... Principles of restraint should guide us when
> considering the reach of the laws that Congress enacted into a new area in the
> form of regulation.  I question whether Congress ever intended to involve the
> Federal Election Commission in determining the format for candidate debates,
> or in deciding who may sponsor them.

Id. at 24,957-24,958. Significantly, there was no statement of congressional disapproval of the

proposed regulatory provisions allowing corporations and unions to donate funds for the cost of

candidate debates sponsored by nonprofit, nonpartisan organizations, even though this portion of

the proposed regulations had been objected to before the Senate Committee on Rules and

Administration (then chaired by Senator Pell, with Senator Hatfield serving as the ranking

minority member). Federal Election Campaign Act Amendments, 1979; Hearings on S. 926

before the Committee on Rules and Administration, United States Senate, 96th Cong. 158-159

(1979) (statement of Mary Meehan, treasurer, Committee for a Constitutional Presidency),

reprinted in Legislative History of Federal Election Campaign Act Amendments of 1979, at 164-

65 (1983) (Exhibit D).

The Commission submitted revised proposed regulations regarding candidate debates to

Congress on December 20, 1979.  44 Fed. Reg. 76,734 (1979). The revisions retained the

provisions permitting corporate and union donations to help nonprofit debate staging

organizations defray their staging costs, and gave the same rationale for such a rule. The revised

regulations became effective on April 1, 1980. 45 Fed. Reg. 21,210 (1980) (Exhibit E).[2] The

failure of Congress to disapprove them "indicat[es] that Congress [did] not look unfavorably"

upon the Commission's construction of the Act. DSCC., 454 U.S. at 34. Such "congressional

failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation

is the one intended by Congress." Young v. Community Nutrition Institute, 476 U.S. 974, 983

(1986) (internal quotation marks omitted). See also Strickland, 96 F.3d at 547. It is even more

persuasive when supported by explicit legislative statements directly on point, like those set out

above.

The 1995 amendments to the debate regulations, which are the subject of plaintiffs'

lawsuit, were part of a larger rulemaking effort by the Commission in response to the Supreme

Court's decision in MCFL. Following the holding in MCFL that an independent "expenditure

must constitute 'express advocacy' in order to be subject to the prohibition [of corporate

expenditures] of § 441b[,]" MCFL, 479 U.S. at 249, a petition was filed to revise the

Commission's regulations to replace the terms "partisan" or "nonpartisan" in distinguishing

prohibited from permitted expenditures of corporate and union treasury funds with the "express

advocacy" standard enunciated by the Supreme Court. See Admin. Record, Tab # 1.[3] The

Commission thereafter replaced the words "partisan" and "nonpartisan" in numerous sections

---

[2]    The policy statement from August 30, 1976, that plaintiffs mention in their memorandum in support of their motion (p.12 n.10) was an interim statement that was expressly vacated "and declared to have no continuing legal effect" on February 9, 1978. 43 Fed. Reg. 16,547 (1978) (Exhibit F). Even if it had not been vacated, however, the interim statement was superseded 20 years ago by the Commission's rulemaking, pursuant to the Administrative Procedure Act's notice and comment procedure.

[3]    Citations to "Admin. Record" refer to documents in the Verified Administrative Record of the MCFL Rulemaking Before the Federal Election Commission, filed concurrently with this opposition. See Perot, 97 F.3d at 561 ("Among other things, the APA directs courts to consider the administrative record in determining the legality of agency action. [5 U.S.C.] § 706").

throughout the Commission's regulatory scheme, including 11 C.F.R. 110.13 of the debate

regulations. See Admin. Record, Tab # 199 (60 Fed. Reg. 35,292-35,293 (1995)) and Tab # 242

(60 Fed. Reg. 64,260 (1995)). Although the word "nonpartisan" was removed in

11 C.F.R. 110.13(b)(2), the requirement that any debate "not be structured to promote or advance

one candidate over another" was not altered, nor was the requirement in 11 C.F.R. 110.13(b)(1)

that any debate must "include at least two candidates." These safeguards against partisan

structuring of debates were thus retained without change, and the Commission stated that other

proposals regarding equal treatment of participating candidates were "subsumed within the

requirement that the debate not be structured to promote or advance a particular candidate over

the others." See Admin. Record, Tab # 242 (60 Fed. Reg. 64,260, at 64,261).

The Commission augmented the debate regulations in 1995 by adding a new paragraph to

11 C.F.R. 110.13 "to require all staging organizations to use pre-established objective criteria to

determine which candidates are allowed to participate in debates."

> Given that the rules permit corporate funding of candidate debates, it is appropriate that
> staging organizations use pre-established objective criteria to avoid the real or apparent
> potential for a quid pro quo, and to ensure the integrity and fairness of the process.... The
> suggestion that the criteria be "reasonable" is not needed because reasonableness is
> implied.... Staging organizations must be able to show that their objective criteria were
> used to pick the participants, and that the criteria were not designed to result in the
> selection of certain pre-chosen participants.

See Admin. Record, Tab # 242 (60 Fed. Reg. 64,260, at 64,262).[4] The new paragraph also

prohibits staging organizations from using nomination by a particular political party as the sole

objective criterion to determine whether to include a candidate in a general election debate. Lest

---

[4]      This option was selected over the alternative possibility that the Commission could itself
"establish reasonable, objective, nondiscriminatory criteria to be used by staging organizations in
determining who must be invited to participate in candidate debates." Admin. Record, Tab # 242
(60 Fed. Reg. 64,260, at 64,262).

there be any question, the Commission clearly stated that, unlike the prior debate rules, "which had expressly allowed staging organizations to restrict general election debates to major party candidates," "the new rules do not allow a staging organization to bar minor party candidates or independent candidates from participating simply because they have not been nominated by a major party." Id.

Because neither the Act nor the legislative history addresses the specific question of candidate debates at all, the Commission's regulation applying the Act's general terms and complex structure to this specific activity is reviewable only under the second step of the Chevron test, which limits judicial review to determining whether the Commission's debate regulations embody a "permissible construction of the statute." Chevron, 467 U.S. at 843. Plaintiffs' exclusive reliance upon their preferred reading of the general terms of the Act does not satisfy this burden, for the question under Chevron is not whether plaintiffs' reading of the statute is a reasonable one, but only whether the Commission's contrary construction is also a "permissible" one.

> A statute may be ambiguous, for purposes of Chevron analysis, without being inartful or deficient. The present case exemplifies the familiar proposition that Congress need not, and likely cannot, anticipate all circumstances in which a general policy must be given specific effect. . . . The statute ... gives direction not only by stating a general policy ... but also by determining some specifics of the policy .... For purposes of the Chevron analysis, the statute is ambiguous ... in that the agency must use its discretion to determine how best to implement the policy in those cases not covered by the statute's specific terms. Those specifics are instructive to the agency as to the general congressional purpose, and the agency's rules as to instances not covered by the statute should be parallel, to the extent possible, with the specific cases Congress did address.

United States v. Haggar Apparel Co., 526 U.S. 380, 392-93 (1999) (emphases added). See also Clifton v. FEC, 114 F.3d 1309, 1312 (1st Cir. 1997) ("Normally an agency with rulemaking power has a measure of latitude where it is dealing with the regulated entity (here, corporations

and unions) and where the rule is reasonably designed to achieve the statute's goal .... The FEC has such rulemaking power.... Agencies often are allowed through rulemaking to regulate beyond the express substantive directives of the statute, so long as the statute is not contradicted"), cert. denied, 522 U.S. 1108 (1998); Mobile Communications Corp. v. FCC, 77 F.3d 1399, 1405 (D.C. Cir) (under Chevron, "congressional prohibition of particular conduct may . . . support the view that the administrative agency can exercise its authority to eliminate similar danger") (citations omitted), cert. denied, 519 U.S. 823 (1996).  Thus, the view plaintiffs take of the Act—one that sees only the portions of 2 U.S.C. 431(8) and (9) and 441b(b) that define what is a prohibited "contribution" or "expenditure" by a corporation or union—fails to account for the exclusions that provide limits to the prohibitory language, and on which the Commission relied to adopt debate regulations "parallel, to the extent possible, with the specific cases Congress did address," Haggar, 526 U.S. at 393.

Plaintiffs' narrow, rigid parsing of the general language used in the FECA is at odds with the Supreme Court's and the First Circuit's approach to statutory construction. See, e.g., Local Lodge No. 1424 v. NLRB, 362 U.S. 411, 417 n.7 (1960) (admonishing that "insights derived from syntactical analysis form a hazardous basis for the explication of major legislative enactments"). "[T]he cardinal rule [is] that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context. . . . Rather than culling selected words [or sentences] from a statute's text and inspecting them in an antiseptic laboratory setting, a court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language ...." Cablevision of Boston, Inc. v. Public Improvement Commission of the City of Boston, 184 F.3d 88, 101 (1st Cir. 1999) (internal quotation marks and citations omitted).  As shown supra, pp. 11-14, the

Commission took all these factors into account in balancing the interests and policies at issue in regulating the financing of candidate debates, while plaintiffs ignore everything beyond their own, self-serving interpretation of some of the words used in the statute.

In fact, plaintiffs' approach to statutory construction leads to nonsensical results that directly conflict with congressional intent and disregard the accommodation of competing interests at the heart of the Commission's interpretation. For example, plaintiffs insist (Mem. 9) that the terms "contribution" and "expenditure" in section 441b(a) must be construed solely as explicated in section 441b(b)(2), without regard to the definitions of those same terms of art in the Act's general definition section, 2 U.S.C. 431. The error of this argument can be seen from the fact that the exception from the statute for "any news story, commentary, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, or other periodical publication" (known as the press or news media exemption) is contained only in the general statutory definition of "expenditure," 2 U.S.C. 431(9)(B)(i), and not in section 441b(b). Since most, if not all, of the institutional press are corporations, plaintiffs' view that the exceptions in the general definitions have no effect on the application of section 441b would not only make the press exemption purposeless, but could result in much of the news coverage of federal elections being treated as corporate contributions or expenditures prohibited by 2 U.S.C. 441b(a).

Elimination of news coverage of federal election campaigns was obviously not the intent of the Act. In fact, Congress noted that these two definitions "overlap" in some respects and "should be read together." H.R. Conf. Rep. No. 1057, 94th Cong., 2d Sess. 63 (1976), reprinted in Legislative History of the FECA Amendments of 1976, at 1057 (1977) (Exhibit G). The Supreme Court has also refused to apply the section 441b(b) definition to the exclusion of the

section 431 definitions when construing section 441b.  FEC v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 245-46 and n.3 (1986).

The same problem results from plaintiffs' similar expressio urius argument (Mem. 9 n.7) that activities written in as exceptions to the definition of "expenditure" in 2 U.S.C. 431(9)(B), but not written in explicitly as exceptions to the definition of "contribution" in 2 U.S.C. 431(8)(B), cannot be treated by the Commission as outside the definition of "contribution." Plaintiffs use this sort of logic to argue that, because "nonpartisan activity designed to encourage individuals to vote or to register to vote" is only written in as an exception from "expenditure," any expenditure for that purpose that involves working with candidates (like planning a debate) must be considered a "contribution" under 2 U.S.C. 431(8). However, the news media exception is also written in as an exception only in the definition of "expenditure" in 2 U.S.C. 431(9)(B)(i), and not in the definition of "contribution." Thus, plaintiffs' rigid construction could mean that interviews of federal candidates on television, appearances of federal candidates on news panel shows, and profiles of federal candidates in newspapers or magazines that are based on interviews with the candidates, could also be prohibited corporate contributions to those candidates.

Such obviously incorrect results show why the Supreme Court has found the expressio unius approach relied upon by plaintiffs to be "'a questionable one in light of the dubious reliability of inferring specific intent from silence,'" Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 703 (1991) (citation omitted). Since statutory silence requires deference to the agency under Chevron, not rejection of the agency's construction, the courts "defer to [an agency's] refusal to read the Act in the manner suggested by the expressio canon if its interpretation is otherwise reasonable." Texas Rural Legal Aid, Inc. v. Legal Services Corp., 940 F.2d 685, 694 (D.C. Cir.

1991). Since this is essentially plaintiffs' only argument for overturning the Commission's

construction of the Act, plaintiffs have entirely failed to sustain their burden of showing a strong

likelihood of success on the merits.

In sum, the Commission's careful balancing not only of the statutory language, but also of

the competing interests embodied in the Act, the legislative history, and the educational purposes

served by nonpartisan candidate debates, demonstrates that the debate regulations are a

"permissible construction of the statute" that is entitled to deference under Chevron. Though

plaintiffs assert that the selection criteria announced by one debate staging organization, CPD,

are not in their view sufficiently nonpartisan, that is a factual complaint about whether a

particular debate sponsor is violating 11 C.F.R. 110.13, which, as described in our motion to

dismiss, is subject to review only in the United States District Court for the District of Columbia

under 2 U.S.C. 437g(a)(8). Even if true, such allegations do not undermine the facial validity of

the regulatory exemption in 11 C.F.R. 114.4(f) permitting corporations and labor organizations to

donate funds to defray costs of staging debates that are conducted pursuant to the requirements of

11 C.F.R. 110.13. Plaintiffs' suspicions about the motives, express or implied, of organizations

that meet the qualifications to stage candidate debates under 11 C.F.R. 110.13 cannot render the

Commission's regulation ultra vires on its face.

**B.      Plaintiffs Have Not Met Their Burden of Showing They Will Suffer
            Irreparable Harm if the Preliminary Injunction Is Denied, or that Such an
            Injunction Will Not Harm the Commission or the Public Interest**

Even if plaintiffs had met their substantial burden of showing that they are likely to

succeed on the merits, they would also have to demonstrate that, "if emergency relief is not

granted, they will be 'irreparably' harmed.'" Boston's Children First, 62 F. Supp.2d at 253. As

noted above, this burden is particularly demanding when the plaintiff is asking the Court to

change, rather than preserve, the status quo. As our discussion of standing in our motion to

dismiss establishes, however, plaintiffs neither have suffered, nor will suffer, any legally

cognizable harm from the Commission's debate regulations. It follows from this that plaintiffs

cannot suffer any "irreparable" harm from the denial of their motion. Other factors also

undermine any claim of irreparable harm here.

Plaintiffs' delay until the eleventh hour to challenge regulations that have been in effect in

their revised form since 1996 and were originally promulgated in 1980 belies plaintiffs' claim of

an emergency. See Boston's Children First, 62 F. Supp.2d at 254 ("Laches has special resonance

in the context of a request for preliminary relief, when, in effect, the plaintiffs claim urgent action

must be taken"). As we explained in our motion to dismiss, at least one of the leading plaintiffs

in this case, Green Party USA, which claims to represent all Green Party supporters, see

Complaint ¶ 14, actually filed amicus papers in 1996 in the district court in Perot v. FEC, 97 F.3d

553 (D.C. Cir. 1996), cert. denied, 520 U.S. 1210 (1997), a case alleging that CPD had violated

these same regulations and that challenged the validity of these regulations. See Hagelin v. FEC

(consolidated with Perot v. FEC), 1996 WL 566762, at *1 (D.D.C. October 1, 1996). Yet, they

waited until just three months before CPD's scheduled 2000 debates to bring this case to court.

21

Moreover, as we have also shown, a preliminary injunction against the Commission would neither bar nor mandate any action on the part of debate sponsors or candidates who are not parties to this case. Injunctive relief that does not redress the injury alleged would be improper and futile. See, e.g., Suarez-Cestero v. Pagan-Rosa, 172 F.3d 102, 104 (1st Cir. 1999) ("By definition, the court's refusal to grant a preliminary injunction caused plaintiffs no harm since they were equally impeded by the [legislatively imposed] moratorium") (footnote omitted)); Perot, 97 F.3d at 561 (Perot "will not suffer unduly from any delay in resolving this issue [whether 11 C.F.R. 110.13 is ultra vires], as even an immediate order invalidating the regulations would not provide him with any meaningful relief from the alleged harms").

The broad injunction plaintiffs seek would, however, harm the Commission. If a complaint involving candidate debates were filed with the Commission pursuant to 2 U.S.C. 437g(a)(1), the preliminary injunction the plaintiffs have requested—restraining the FEC from "enforcing or implementing, or relying in any way upon" 11 C.F.R. 110.13 and 114.4(f)—would interfere with the Commission's exclusive jurisdiction to investigate and resolve such a complaint under 2 U.S.C. 437c(b)(1), 437d, and 437g(a), and it would also interfere with the exclusive jurisdiction of the United States District Court for the District of Columbia to determine whether the Commission's dismissal of such a complaint is "contrary to law."[5] 2 U.S.C. 437g(a)(8). In addition, it would unfairly foreclose the right of a respondent in

---

[5]     There is in fact a lawsuit presently pending in the U.S. District Court for the District of Columbia, filed pursuant to 2 U.S.C. 437g(a)(8) after the Commission's dismissal of a 1996 administrative complaint, in which the debate regulations are at issue. Natural Law Party v. FEC, Civil Action No. 98-1025 (ESH) (D.D.C., filed April 24, 1998). Any injunction issued in this lawsuit that prevented the Commission from "relying in any way upon" the debate regulations would interfere with the Commission's ongoing defense of the Natural Law Party lawsuit, and with the proceedings of a case before another judge in a parallel court. Moreover, the Commission has recently dismissed several administrative complaints alleging that CPD is about

any such administrative proceeding to have its arguments for following the debate regulations considered by the Commission in deciding whether there is probable cause to believe the respondent violated the Act. 2 U.S.C. 437g(a)(3). Such an injunction would, moreover, mandate that the Commission act contrary to the explicit requirement of 2 U.S.C. 438(e) ("Notwithstanding any other provision of law, any person who relies upon any rule or regulation prescribed by the Commission in accordance with the provisions of this section and who acts in good faith in accordance with such rule or regulation shall not, as a result of such act, be subject to any sanction provided by this Act").

Even if this Court could issue an injunction based on plaintiffs' construction of the Act that would bind debate participants, such an order would severely harm the public interest in having debates between major party candidates. Plaintiffs' rigid construction of the Act would not only prohibit corporate funding of presidential debates, it would virtually preclude any candidate debates in the presidential general election at all. Since 1976, all presidential nominees of the major parties have accepted full public funding of their general election campaigns under 26 U.S.C. 9001-9013, and both of the likely major party nominees have stated their intention to do so this year. One condition of this public financing is that the candidate certify that neither the candidate nor his or her authorized committee will accept contributions to defray their qualified campaign expenses. 26 U.S.C. 9003(b)(2). Therefore, an injunction based on plaintiffs' theory, that disbursements to finance candidate debates are necessarily "contributions" to the

---

to violate the Act and the current debate regulations by sponsoring presidential debates this fall. In the likely event that judicial review of these decisions is sought in the U.S. District Court for the District of Columbia under 2 U.S.C. 437g(a)(8), an injunction by this Court preventing the Commission from relying on the debate regulations will interfere with the D.C. District Court's consideration of such cases.

participating candidates, would preclude major party candidates who accept public funding from participating in debates sponsored by <u>anyone</u> else, not just by corporations.[6] Such an order would also interfere with the plans of the major party candidates, CPD, and the broadcasting industry, who are in the later stages of their preparations for the 2000 presidential debates, not to mention the untold number of debates planned for congressional candidates. As the Supreme Court concluded, "[a] First Amendment jurisprudence yielding these results does not promote speech but represses it." <u>Arkansas Educational Television Comm'n v. Forbes</u>, 523 U.S. 666, 682 (1998).

**CONCLUSION**

For the reasons set out above, the Federal Election Commission respectfully submits that plaintiffs' motion for a preliminary injunction should be denied.

Respectfully submitted,

Lawrence M. Noble
General Counsel

Richard B. Bader (SSH)
Richard B. Bader
Associate General Counsel

---

[6]   As shown <u>supra</u>, pp. 18-19, plaintiffs' statutory construction theory would make the financing of candidate debates by media corporations "contributions" as well, since the press exemption is not written explicitly into the definition of "contribution" in 2 U.S.C. 431(8) or the definition of "contribution or expenditure" in 2 U.S.C. 441b(b). The major presidential candidates might still be able jointly to finance such debates out of their own campaign funds, or their political parties might be able to finance them jointly out of the coordinated expenditures permitted by 2 U.S.C. 441a(d)(2), but debates between the major party candidates financed with their own partisan campaign funds obviously would exacerbate, rather than alleviate, any harm to excluded minor candidates.

Stephen E. Hershkowitz
Assistant General Counsel

Vivien Clair
Attorney

Erin K. Monaghan
Attorney

FOR THE DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
July 21, 2000                     (202) 694-1650

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Scott P. Lewis, Palmer & Dodge LLP, One Beacon Street, Boston MA 02108-0100, and John C. Bonifaz, National Voting Rights Institute, 294 Washington Street, Suite 713, Boston MA 02108, the attorneys of record for plaintiffs, by facsimile and first-class United States mail, postage prepaid, on July 21, 2000.

Erin K. Monaghan

## FEDERAL ELECTION COMMISSION

[Notice 1979-23]

11 CFR Parts 100, 110 and 114

**Funding and Sponsorship of Federal Candidate Debates**

**AGENCY:** Federal Election Commission.

**ACTION:** Transmittal of Regulations to Congress.

**SUMMARY:** The Commission has transmitted regulations to Congress to govern the funding and sponsorship of nonpartisan federal candidate debates. The regulations create an exemption from various provisions of the Federal Election Campaign Act to permit certain nonprofit organizations and news media organizations to stage nonpartisan federal candidate debates. Further information on the scope of the regulations appears below under Supplementary Information in the Explanation and Justification of the regulations.

2 U.S.C. 438(c) requires that any rule or regulations proposed by the Commission to implement Chapter 14 of Title 2, United States Code be transmitted to the Speaker of the House and the President of the Senate prior to final promulgation. If neither House of Congress disapproves the regulation within 30 legislative days after its transmittal, the Commission may finally prescribe the regulations in question. The following regulations were transmitted to Congress on December 20, 1979.

**EFFECTIVE DATE:** Further action, including the announcement of an effective date will be taken after the regulations have been before Congress 30 legislative days in accordance with 2 U.S.C. § 438(c).

**FOR FURTHER INFORMATION CONTACT:** Ms. Patricia Ann Fiori, Assistant General Counsel, 1325 K Street, N.W., Washington, D.C. 20463 (202) 523–4143.

**SUPPLEMENTARY INFORMATION:** The following regulations were drafted pursuant to a Notice of Proposed Rulemaking published on October 12, 1979, at 44 FR 59162. Pursuant to that notice oral testimony was taken at hearings held on October 23 and 24, 1979, and numerous written comments were received. In response to these comments, the regulations now transmitted to Congress provide exemptions to permit not only certain nonprofit organizations, but also news media organizations, to stage nonpartisan federal candidate debates.

Previous regulations transmitted to Congress on this subject were published on July 5, 1979, at 44 FR 39348. Those regulations were disapproved by S. Res. 236 on September 18, 1979.

**Explanation and Justification of Regulations on Funding of Federal Candidate Debates**

The main purpose of these regulations is to create a narrow exemption from the provisions of the Federal Election Campaign Act to permit certain nonprofit organizations and news media organizations to stage nonpartisan federal candidate debates. In addition, certain of those organizations would be permitted to receive donations from other corporations and from labor organizations to stage debates. With this exemption, expenditures for staging such debates will be regarded as neither made for the purpose of influencing an election under 2 U.S.C. §§ 431(e) and 431(f), nor in connection with a federal election under 2 U.S.C. § 441b. The coverage of debates by news media organizations is already exempt from those provisions.

**11 CFR 100.4(b)(16) and 11 CFR 100.7(b)(18):**

Under the Act, the terms "contribution" and "expenditure" include "a gift, subscription, loan, advance, or deposit of money or anything of value made for the purpose of influencing the nomination for election, or the election, of any person to Federal office. . .," 2 U.S.C. § 431(e)(1)(A). Congress has, however, recognized that certain nonpartisan activity is not undertaken for the purpose of influencing the nomination or election of any candidate and has removed that activity from the coverage of the Act. Therefore, amounts spent for "nonpartisan activity designed to encourage individuals to register to vote or to vote" are exempt from the definition of the term "expenditure," 2 U.S.C. § 431(f)(4)(B).

The educational purpose of nonpartisan public candidate debates is similar to the purpose underlying nonpartisan voter registration and get-out-the-vote campaigns. A nonpartisan candidate debate staged by a qualified nonpartisan organization or by a news media organization provides a forum for significant candidates to communicate their views to the public. Unlike single candidate appearances, nonpartisan debates are designed to educate and inform voters rather than to influence the nomination or election of a particular candidate. Hence, funds received and expended by certain nonprofit organizations to defray costs incurred in staging nonpartisan debates are not considered contributions or expenditures under the Act. Similarly, expenditures by news media corporations to stage debates are not considered contributions or expenditures under the Act.

**11 CFR 110.13:**

This section sets forth the criteria for staging organizations and the structure of candidate debates which are exempt under 11 CFR 100.4(b)(16), 100.7(b)(18), and 114.4(e).

Under subsection (a)(1) two types of nonprofit organizations qualify as staging organizations: those organizations which are exempt from federal taxation under 26 U.S.C. § 501(c)(3); and those organizations which are exempt from federal taxation under 26 U.S.C. § 501(c)(4) and which do not endorse, support or oppose political candidates or political parties. Organizations which are tax-exempt under 501(c)(3) are prohibited by statute from participating in or intervening in any political campaign on behalf of any candidate for public office. Organizations which are tax-exempt under 501(c)(4) may participate in political campaigns to a limited degree. However, a 501(c)(4) organization which participates in political campaigns even to a limited degree may not stage debates under this subsection because that organization would not qualify as one which does not endorse, support or oppose political candidates or political parties. By permitting 501(c)(3) corporations and 501(c)(4) corporations which are nonpartisan to stage debates, the integrity and fairness of the debate process is insured.

Under subsection (a)(2) those organizations which are specified in 2 U.S.C. § 431(f)(4)(A), the "news story" exemption under the Act, are also permitted to stage nonpartisan candidate debates. Section 431(f)(4)(A), read in conjunction with 2 U.S.C. § 441b, exempts expenditures related to particular functions of the news media from the prohibitions of Section 441b: news stories, commentaries and editorials. The news story exemption was not intended to permit the staging of candidate debates, but rather is a limited exemption designed to insure the right of the media to cover and comment on election campaigns. H.R. Rep. No. 93–943, 93d Cong., 2d Sess. at 4 (1974). However, due to the historical role of the news media in fostering public debate on issues (Mills v. Alabama, 384 U.S. 214 (1966), New York Times Co. v. Sullivan, 376 U.S. 254 (1964)), and in light of congressional acknowledgment of the media's role in election campaigns

as expressed in 2 U.S.C. § 431(f)(4)(A), *bona fide* news media corporations are permitted to stage nonpartisan candidate debates.

It is the Commission's belief that sufficient safeguards as to nonpartisanship of debates staged by broadcasters are set forth in the Communications Act, most particularly 47 U.S.C. § 315, and the present regulations and interpretations of the Federal Communications Commission under this section. Section 315 provides that if a broadcast licensee allows a legally qualified candidate for public office to use its broadcasting station, that licensee must afford all other candidates for the same office equal opportunities to use the station.

Further, fundamental principles of journalism, combined with the requirement that such debates be nonpartisan, provides sufficient safeguards as to nonpartisanship of debates staged by newspapers, magazines and other periodical publications.

For the purposes of this section, the term "broadcaster" is meant to include broadcasting facilities licensed by the Federal Communications Commission, as well as networks. The term "bona fide" newspaper is intended to mean a publication of general circulation produced on newsprint paper which appears at regular intervals (usually daily or weekly) and which is devoted primarily to the dissemination of news and editorial opinion to the general public. Only newspapers which ordinarily derive their revenues from subscriptions or advertising would be considered "bona fide". A "bona fide" magazine or other periodical publication is a publication in bound pamphlet form appearing at regular intervals (usually either weekly, bi-weekly, monthly or quarterly) and containing articles of news, information, opinion and entertainment, whether of general or specialized interest. Only magazines and periodicals which ordinarily derive their revenues from subscriptions and advertising would be considered "bona fide". In addition, a news gathering service that provides news coverage on a regular basis to newspapers and magazines may stage nonpartisan debates.

News media organizations which are owned or controlled by a political party, political committee or candidate may not stage debates. *See* 2 U.S.C. § 431(f)(4)(A). Moreover, not included within the newspaper exemption are periodical publications which are not of general distribution but serve as internal "house organs." *See* legislative history of Taft-Hartley Act (Labor Management

Relations Act of 1947, 61 Stat. 159), 93 Cong. Rec. 6439, 6440 (remarks of Sens. Magnuson and Taft interpreting the coverage of 18 U.S.C. § 610, the predecessor to 2 U.S.C. § 441b).

Nothing in this section limits the right of broadcasters, newspapers, magazines or other periodical publications to cover or broadcast debates staged by other entities That activity is specifically exempted from the provisions of the Act by 2 U.S.C. § 431(f)(4)(A), and in the case of broadcasters is regulated by the Federal Communications Commission.

Under subsection (b) the precise structure of candidate debates is left to the discretion of the staging organization. Such debates must, however, be nonpartisan in nature and they must provide fair and impartial treatment of candidates. The primary question in determining nonpartisanship is the selection of candidates to participate in such debates.

Although the section does not prescribe specific requirements for selection of candidates to participate, a general election debate may not be structured so as to promote one candidate over another. An organization staging a debate may invite candidates to participate in a debate on the basis of party affiliation. Hence, such an organization could stage a general election debate to which only major party candidates are invited.

For debates at the primary, caucus or convention level, a staging organization may restrict participation to candidates seeking the nomination of one party. Moreover, if a staging organization restricts participation to candidates seeking the nomination of one party, there would be no requirement to stage a debate for candidates seeking the nomination of any other party. However, any debate held for primary, caucus or convention candidates may not promote one candidate over another.

A debate is nonpartisan if it is for the purpose of educating and informing the voters, provides fair and impartial treatment of candidates, and does not promote or advance one candidate over another.

### 11 CFR 114.4(e):

Certain nonpartisan voter registration and get-out-the-vote activity is exempt from the coverage of all provisions of the Act, including the prohibition against corporate and labor union contributions and expenditures. Because nonpartisan public candidate debates are similar in nature and purpose to registration and vote activity, under subsections (e)(1) and (e)(3), corporations and labor organizations are permitted to donate funds to nonprofit

organizations qualified to stage debates under 11 CFR 110.13(a)(1).

Although 2 U.S.C. § 441b broadly prohibits corporate and labor organization political spending, Congress carved out an exemption from that prohibition for certain nonpartisan registration and get-out-the-vote activity. Corporations are thus specifically permitted under 2 U.S.C. § 441b(b)(2)(B) to use their treasury funds to conduct nonpartisan registration and get-out-the-vote campaigns aimed at their stockholders and their executive and administrative personnel. Similarly, under that section, labor organizations are permitted to use treasury funds to conduct registration and get-out-the-vote campaigns aimed at union members and their families.

Moreover, in permitting corporations and labor organizations to support registration and get-out-the-vote campaigns aimed at the public, Congress prescribed a role for nonpartisan nonprofit organizations. In addition to § 441b(b)(2)(B), 2 U.S.C. § 431(f)(4)(B) also specifically provides that the term "expenditure" does not include "nonpartisan activity designed to encourage individuals to register to vote, or to vote." In discussing the interrelationship between 2 U.S.C. § 431(f)(4)(B) and 2 U.S.C. § 441b(b)(2)(B), the 1976 conferees expressly stated that corporate and labor organization treasury funds could be used for nonpartisan registration and get-out-the-vote efforts aimed at the general public, if such efforts were jointly sponsored by a nonprofit nonpartisan organization.

. . . The conferees' intent with regard to the interrelationship between sections 301(f)(4)(B) and 321(b)(2)(B) which permit such activities as assisting eligible voters to register and to get to the polls, so long as these services are made available without regard to the voter's political preference, is the following: these provisions should be read together to permit corporations both to take part in nonpartisan registration and get-out-the-vote activities that are not restricted to stockholders and executive or administrative personnel, if such activities are jointly sponsored by the corporation and an organization that does not endorse candidates and are conducted by that organization; and to permit corporations, on their own, to engage in such activities restricted to executive or administrative personnel and stockholders and their families. The same rule, of course, applies to labor organizations. H.R. Rep. No. 1057, 94th Cong., 2d Sess. 63–64 (1976).

The conferees' intent is embodied in Commission regulations at 11 CFR 114.4(d). That section permits corporations or labor organizations to support and donate funds for nonpartisan registration and get-out-the-vote drives aimed at the public if the activities are jointly sponsored with and conducted by a nonprofit organization which does not support or endorse candidates or political parties.

In sections 431(f)(4)(B) and 441b(b)(2)(B) Congress expressly indicated an intent to permit corporations and labor organizations to participate in nonpartisan activity aimed at encouraging voter participation where that activity was undertaken in conjunction with a nonpartisan nonprofit organization. Permitting corporations and labor organizations to donate funds to nonpartisan nonprofit organizations for the purpose of staging nonpartisan candidate debates furthers that express congressional intent. Candidate debates stimulate voter interest and hence "encourage individuals to register to vote or to vote." Inasmuch as candidate debates are in the public interest and encourage educated voter involvement, permitting corporations and labor organizations to donate funds to nonprofit nonpartisan organizations for their staging is consistent with congressional intent and policy underlying sections 431(f)(4)(B) and 441b(b)(2)(B).

It is also important to note that the prohibitions of 2 U.S.C. § 441b were not specifically aimed at the donation of corporate or labor organization funds to a nonpartisan tax-exempt organization. Under 2 U.S.C. § 441b(b)(2), the terms "contribution" and "expenditure" are defined to mean "any direct or indirect payment, distribution, loan, advance, deposit or gift of money . . . to any candidate, campaign committee or political party or organization." Under 11 CFR 114.4(e), only nonprofit nonpartisan corporations which are tax-exempt under 26 U.S.C. §§ 501 (c)(3) or (c)(4) may accept corporate or labor organization donations to stage debates. Such organizations would be neither a campaign committee, a political party nor a political organization referred to in 2 U.S.C. § 441b.

Finally, courts have generally construed 2 U.S.C. § 441b to prohibit only active electioneering on behalf of a candidate or a political party or conduct designed to influence the public for or against a particular candidate. See, United States v. United Auto Workers, 352 U.S. 567 (1957); United States v. Pipefitters Local Union No. 562, 434 F.2d 1116 (8th Cir. 1970), rev'd on other grounds, 407 U.S. 385 (1972); Miller v. American Telephone & Telegraph, 507 F.2d 759 (3d Cir. 1974). Unlike single candidate appearances which have the effect of promoting the nomination or election of one individual, a properly structured nonpartisan debate involving two or more candidates would not be construed to be active electioneering to promote or influence the nomination or election of one particular candidate.

Subsection (e)(2) permits broadcasters, newspapers, magazines and other periodical publications to use their own funds to stage nonpartisan debates. Consistent with ordinary practice and applicable regulations of the Federal Communications Commission, a broadcaster may accept both regular commercial advertising and underwriting by corporations and labor organizations to finance the broadcast of debates staged or covered by the broadcaster. Similarly, nothing in this section prohibits a newspaper, magazine or other periodical publication from accepting regular paid advertising in an issue which covers a debate, whether staged by the newspaper or by another entity. Broadcasters, newspapers, magazines and other periodical publications may not, however, accept direct corporate or labor organization payments (other than payments for regular commercial advertising and underwriting) to finance the staging of debates.

Only nonprofit corporations may accept such payments under 11 CFR 114.4(e)(1). The reason for this distinction is that federal tax law restrictions on the activities of nonpartisan corporations provide sufficient safeguards to insure nonpartisanship. There is no comparable safeguard for broadcasters, newspapers, magazines and other periodical publications. Indeed, media corporations are specifically permitted by the Act to endorse candidates, while a nonprofit corporation which endorses candidates is not permitted to stage debates under the proposed regulations.

Authority: 2 U.S.C. §§ 431(a), 431(f) and 441b.

11 CFR Chapter I is amended as follows:

1. 11 CFR 100.4(b)(18) is added to read as follows:

§ 100.4   Contribution.

*   *   *   *   *

(b) * * *

(18) Funds provided to defray costs incurred in staging nonpartisan candidate debates in accordance with the provisions of 11 CFR 110.13 and 114.4(e).

2. 11 CFR 100.7(b)(18) is added to read as follows:

§ 100.7   Expenditure.

*   *   *   *   *

(b) * * *

(18) Funds used to defray costs incurred in staging nonpartisan candidate debates in accordance with the provisions of 11 CFR 110.13 and 114.4(e).

3. 11 CFR 110.13 is added to read as follows:

§ 110.13   Nonpartisan candidate debates.

(a) Staging organizations. (1) A nonprofit organization which is exempt from federal taxation under 26 U.S.C. § 501(c)(3), and a nonprofit organization which is exempt from federal taxation under 26 U.S.C. § 501(c)(4) and which does not endorse, support or oppose political candidates or political parties may stage nonpartisan candidate debates in accordance with 11 CFR 110.13(b) and 114.4(e).

(2) Broadcasters, bona fide newspapers, magazines and other periodical publications may stage nonpartisan candidate debates in accordance with 11 CFR 110.13(b) and 114.4(e).

(b) Debate Structure. The structure of debates staged in accordance with 11 CFR 110.13 and 114.4(e) is left to the discretion of the staging organization, provided that (1) such debates include at least two candidates, and (2) such debates are nonpartisan in that they do not promote or advance one candidate over another.

4. 11 CFR 114.4(e) is added to read as follows:

§ 114.4   Nonpartisan communications.

*   *   *   *   *

(e) Nonpartisan candidate debates. (1) A nonprofit organization qualified under 11 CFR 110.13(a)(1) may use its own funds and may accept funds donated by corporations or labor organizations under 11 CFR 114.4(e)(3) to defray costs incurred in staging nonpartisan candidate debates held in accordance with 11 CFR 110.13.

(2) A bona fide broadcaster, newspaper, magazine and other periodical publication may use its own funds to defray costs incurred in staging nonpartisan public candidate debates held in accordance with 11 CFR 110.13.

(3) A corporation or labor organization may donate funds to nonprofit organizations qualified under 11 CFR 110.13(a)(1) to stage nonpartisan candidate debates held in accordance with 11 CFR 110.13 and 114.4(e).

Dated: December 20, 1979.

Robert O. Tiernan,

*Chairman, Federal Election Commission.*

[FR Doc. 79-39505 Filed 12-26-79; 8:45]

BILLING CODE 6715-01-M

**FEDERAL ELECTION COMMISSION**

**11 CFR Parts 100, 110, and 114**

**Funding and Sponsorship of Candidate Debates**

**AGENCY:** Federal Election Commission.

**ACTION:** Transmittal of Regulations to Congress.

**SUMMARY:** The Commission has adopted regulations which govern the funding and sponsorship of candidate debates. These regulations have been transmitted to Congress pursuant to 2 U.S.C. 438(c). The regulations exempt from the definitions of contribution and expenditure funds provided and used to defray the costs of nonpartisan public candidate debates. They also specify which organizations may sponsor such debates and establish a structure for various types of nonpartisan debates between Federal candidates. Further information on the new regulations is contained in the statement of explanation and justification under Supplementary Information.

2 U.S.C. 438(c) requires that any rule or regulation prescribed by the Commission to implement Chapter 14 of Title II, United States Code, be transmitted to the Speaker of the House of Representatives and the President of the Senate prior to final promulgation. If neither House of Congress disapproves of the regulation within 30 legislative days of its transmittal, the Commission may finally prescribe the regulation in question. The following regulations were transmitted to Congress on June 28, 1979.

**EFFECTIVE DATE:** Further action, including the announcement of an effective date will be taken by the Commission after these regulations have been before the Congress 30 legislative days in accordance with 2 U.S.C. 438(c).

**FOR FURTHER INFORMATION CONTACT:** Ms. Patricia Ann Fiori, Assistant General Counsel for Regulations and Legislation, 1325 K Street, Northwest, Washington, D.C. 20463 (202) 523–4143.

**SUPPLEMENTARY INFORMATION:** These regulations were drafted pursuant to a Notice of Proposed Rulemaking published by the Commission on July 12, 1977, (42 FR 35856) and incorporate comments received subsequent to that notice and at public hearings held on September 12, 1977.

**Explanation and Justification of Regulations on Funding and Sponsorship of Candidate Debates**

CFR 100.4(b)(16) and 11 CFR 100.7(b)(18):

Under the Act, the terms "contribution" and "expenditure" include "a gift, subscription, loan, advance, or deposit of money or anything of value made for the purpose of influencing the nomination for election, or the election, of any person to Federal office . . ." (2 U.S.C. § 431(e)(1)(A)) Congress has, however, recognized that certain nonpartisan activity is not undertaken for the purpose of influencing the nomination or election of any candidate and has removed that activity from the coverage of the Act. Therefore, amounts spent for "nonpartisan activity designed to encourage individuals to register to vote or to vote" is exempt from the definition of the term "expenditure" (2 U.S.C. § 431(f)(4)(B)).

The educational purpose of nonpartisan public candidate debates is similar to the underlying nonpartisan voter registration and get-out-the-vote campaigns. A properly held nonpartisan public candidate debate sponsored by a qualified nonpartisan organization provides a forum for significant candidates to communicate their views to the public. Unlike single candidate appearances, nonpartisan public debates are designed to educate and inform voters rather than to influence the nomination or election of a particular candidate. Hence, funds received and expended to defray costs incurred in sponsoring nonpartisan public debates are not considered contributions or expenditures under the Act.

**11 CFR 110.13:**

This section sets forth the criteria for sponsoring organizations and the structure of candidate debates which are exempt under 11 CFR 100.4(b)(16), 100.7(b)(18), and 114.4(e).

Under subsection (a), only an organization which has a history of nonpartisanship would qualify as a sponsor. In addition, the sponsor would have to be tax exempt under 26 U.S.C. § 501(c)(3). Organizations which are tax exempt under that section are prohibited by statute from participating in or intervening in any political campaign on behalf of any candidate for public office. By limiting sponsorship of debates to § 501(c)(3) organizations with a history of nonpartisanship, the integrity and fairness of the debate process is insured.

Subsection (b) outlines the structure for candidate debates at the presidential, House and Senate levels. This structure is designed to permit participation in a debate by significant serious candidates for the same public office.

In a general election debate at the presidential, House or Senate level, participation by candidates is based on affiliation with a political party. If a sponsoring organization invites a major party candidate to participate in a debate then the sponsor must also invite all other major party candidates seeking the same office to participate in that debate. Similarly, if a sponsor invites a minor party candidate to participate in a debate, then the sponsor is obligated to invite all other minor party candidates running for the same office to participate in the same debate.

If, under this standard, only one major party candidate agrees to participate in a debate, then the sponsor must invite all minor party candidates nominated for the same office to participate in a debate with that major party candidate. Similarly, if only one minor party candidate accepts a sponsor's invitation to participate in a debate, then the sponsor must invite all new party candidates nominated for the same office to participate in a debate with that minor party candidate.

Although there would usually be no obligation to invite candidates who are not major party candidates to a debate with major party candidates, the sponsor would have the discretion to invite a minor party, new party, independent, or write-in candidate to appear in the same debate with major party candidates. Hence, the sponsor would have the discretion to include all candidates whom the sponsor viewed as significant in the debate to which major party candidates are invited, thereby enhancing the educational value of the debate.

Structuring debates on the basis of party affiliation is similar to the standard used in the Act for public funding entitlement. Under the Act, only those presidential primary candidates who are seeking nomination by a political party are entitled to receive matching funds (26 U.S.C. § 9033(b)(2)). Moreover, the amount of funding to which a general election candidate is entitled is based on whether the candidate is a major, minor or new party candidate. (26 U.S.C. § 9004).

The Supreme Court in *Buckley v. Valeo* upheld the constitutionality of the Act's public financing provisions. The Court stated:

. . . The Constitution does not require Congress to treat all declared candidates the same for public financing purposes. As we said in *Jenness v. Fortson,* "there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization in

the other. . . . Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike, a truism well illustrated in *Williams v. Rhodes, supra.*"

By basing participation in candidate debates on party affiliation, a standard which has been found constitutional by the Supreme Court is employed. Moreover, this standard will ensure that a sponsor to present debates in which all significant candidates may appear to express their views.

At the caucus, convention and primary election levels, the standard is basically the same as for presidential and Congressional candidate debates. However, while congressional candidate debates are held on a State basis, presidential primary candidate debates may be held on a regional basis, with the sponsor designating the region.

Sponsors holding caucus, convention or primary election candidate debates have three different options for structuring those debates.

Option No. 1: The sponsor may hold a debate to which all candidates of all parties are invited. Thus, in States, which hold primary elections, all candidates qualified to appear on the ballot must be invited to participate in one debate; and in caucus or convention States, all recognized, active candidates must be invited to participate.

Option No. 2: The sponsor may hold a debate to which all candidates of one type (major, minor or new) of party are invited. For example, assume in a State that there are two major parties—Party X and Party Y—and one minor party—Party Z. The sponsor may hold a debate to which only candidates seeking the nomination of Party X and Party Y are invited. The sponsor would not be obligated to include the candidate seeking nomination by Party Z in any debate.

Option No. 3: The sponsor may hold separate debates restricted to candidates seeking the nomination of one party. If the sponsor chooses to hold such a debate for one party, then the candidates of all parties of the same type (major, minor or new) must be invited to participate in similar separate debates. This option is, however, not available if each party of the same type does not have at least two candidates seeking the nomination of that party.

As an example, assume that in a State, there are two major parties—Party X and Party Y—and one minor party—Party Z. Assume also that each party has two candidates. In this situation, if the sponsor chooses to hold a debate to which the candidates of Party X are invited, the sponsor must

also invite the candidates of Party Y to participate in a debate to which only they are invited. There would be no obligation to hold a debate for the candidates of Party Z—the minor party.

As a different example, assume the same parties in a State, but only one candidate rather than two, seeking the nomination of Party X. Because in such a situation there would be one major party with less than two candidates seeking the nomination of that party, the sponsor would not have the option of holding separate debates for each major party.

The standard at the House and Senate caucus, convention and primary election level is basically the same as for presidential caucus, convention and primary debates. This standard provides a fair opportunity for a wide number of candidates to participate in a debate and at the same time, allows the sponsor sufficient flexibility to hold separate debates for candidates of different parties when such debates would be more meaningful and of greater educational value.

11 CFR 114.4(e):

Certain nonpartisan voter registration and get-out-the-vote activity is exempt from the coverage of all provisions of the Act, including the prohibition against corporate and labor union contributions and expenditures. Because nonpartisan public candidate debates are similar in nature and purpose to registration and voter activity, corporations and labor unions are permitted to donate funds to support such debates.

Although 2 U.S.C. § 441b broadly prohibits corporate and labor union political spending, Congress carved out an exemption from that prohibition for certain nonpartisan registration and get-out-the-vote activity. Corporations are thus specifically permitted under 2 U.S.C. § 441b(b)(2)(B) to use their treasury funds to conduct nonpartisan registration and get-out-the-vote campaigns aimed at their stockholders and their executive and administrative personnel. Similarly, under that section, unions are permitted to use treasury funds to conduct registration and get-out-the-vote campaigns aimed at union members and their families.

Moreover, in permitting corporations and labor unions to support registration and get-out-the-vote campaigns aimed at the public, Congress prescribed a role for nonpartisan nonprofit organizations. In addition to § 441b(b)(2)(B), 2 U.S.C. § 431(f)(4)(B) also specifically provides that the term "expenditure" does not include "nonpartisan activity designed to encourage individuals to register to

vote, or to vote." In discussing the interrelationship between 2 U.S.C. § 431(f)(4)(B) and 2 U.S.C. § 441b(b)(2)(B), the 1976 conferees expressly stated that corporate and union treasury funds could be used for nonpartisan registration and get-out-the-vote efforts aimed at the general public, if such efforts were jointly sponsored by a nonprofit nonpartisan organization.

. . . The conferees' intent with regard to the interrelationship between sections 301(f)(4)(B) and 321(b)(2)(B) which permit such activities as assisting eligible voters to register and to get to the polls, so long as these services are made available without regard to the voter's political preference, is the following: these provisions should be read together to permit corporations both to take part in nonpartisan registration and get-out-the-vote activities that are not restricted to stockholders and executive or administrative personnel, if such activities are jointly sponsored by the corporation and an organization that does not endorse candidates and are conducted by that organization; and to permit corporations, on their own, to engage in such activities restricted to executive or administrative personnel and stockholders and their families. The same rule, of course, applies to labor organizations. H.R. Rep. No. 1057, 94th Cong., 2nd Sess., p. 63–64 (1976).

The conferees' intent is embodied in Commission regulations at 11 CFR 114.4(d). That section permits corporations or labor unions to support and donate funds for nonpartisan registration and get-out-the-vote drives aimed at the public if the activities are jointly sponsored with and conducted by a nonprofit organization which does not support or endorse candidates or political parties.

In sections 431(f)(4)(B) and 441b(b)(2)(B) Congress expressly indicated an intent to permit corporations and labor organizations to participate in nonpartisan activity aimed at encouraging voter participation where that activity was undertaken in conjunction with a nonpartisan nonprofit organization. Permitting corporations and unions to donate funds to a nonpartisan nonprofit organization for the purpose of sponsoring nonpartisan candidate debates furthers that express congressional intent. Candidate debates stimulate voter interest and hence "encourage individuals to register to vote or to vote." Inasmuch as candidate debates are in the public interest and encourage educated voter involvement, permitting corporations and unions to donate funds for their sponsorship is consistent with congressional intent and policy underlying sections 431(f)(4)(B) and 441b(b)(2)(B).

It is also important to note that the prohibitions of 2 U.S.C. § 441b were not specifically aimed at the donation of corporate or union funds to a nonpartisan tax exempt organization. Under 2 U.S.C. § 441b(b)(2), the terms "contribution" and "expenditure" are defined to mean "any direct or indirect payment, distribution, loan, advance, deposit or gift of money . . . to any candidate, campaign committee or political party or organization." Under 11 CFR 114.4(e), only an organization which has a history of nonpartisanship is qualified to sponsor candidate debates, and that organization must in addition be tax exempt under 26 U.S.C. § 501(c)(3). Such tax exempt organizations are prohibited by statute from intervening in any political campaign on behalf of any candidate for public office. Hence, an organization qualified to sponsor candidate debates would be neither a campaign committee, a political party nor a political organization referred to in 2 U.S.C. § 441b.

Finally, courts have generally construed 2 U.S.C. § 441b to prohibit only active electioneering on behalf of a candidate or a political party or conduct designed to influence the public for or against a particular candidate. (See, United States v. United Auto Workers, 352 U.S. 567 (1957); United States v. Pipefitters Local Union No. 562, 434 F.2d 1116 (8th Cir. 1970), rev'd on other grounds, 407 U.S. 385 (1972); Miller v. American Telephone & Telegraph, 507 F.2d 759 (3d Cir. 1974). Unlike single candidate appearances which have the effect of promoting the nomination or election of one individual, a properly structured nonpartisan public debate involving two or more candidates would not be construed to be active electioneering to promote or influence the nomination or election of one particular candidate.

11 CFR Chapter I is amended as follows:

1. 11 CFR 100.4(b)(16) is added to read as follows:

§ 100.4  Contribution.

* * * * *

(b) * * *

(16) Funds provided to defray costs incurred in sponsoring nonpartisan public candidate debates held in accordance with the provisions of 11 CFR 110.13.

2. 11 CFR 100.7(b)(18) is added to read as follows:

§ 100.7  Expenditure.

* * * * *

(b) * * *

(18) Funds used to defray costs incurred in sponsoring nonpartisan public candidate debates held in accordance with the provisions of 11 CFR 110.13.

3. 11 CFR 110.13 is added to read as follows:

§ 110.13  Nonpartisan public candidate debates.

(a) Sponsor. A nonprofit organization which is exempt from federal taxation under 26 U.S.C. 501(c)(3) and which has a history of neither supporting nor endorsing candidates or political parties may sponsor nonpartisan public debates held in accordance with 11 CFR 110.13(b).

(b) Debate Structure. (1) Presidential, House or Senate General Election Candidate Debates. (i) If the sponsor invites one general election candidate who has been nominated by a major party to participate in a debate, then the sponsor must invite all candidates nominated for the same office by any major party to participate in the same debate.

(ii) If the sponsor invites one general election candidate who has been nominated for election to that office by a minor party to participate in a debate, then the sponsor must invite all candidates nominated for the same office by any minor party to participate in the same debate.

(iii) If the sponsor invites one general election candidate who has been nominated for election to that office by a new party to participate in a debate, then the sponsor must invite all candidates nominated for the same office by any new party to participate in the same debate.

(iv) If, in a debate under 11 CFR 110.13(b)(1)(i), only one major party candidate agrees to participate, then the sponsor must invite all minor party candidates nominated for the same office to participate in the debate. If, in a debate under 11 CFR 110.13(b)(1)(ii), only one minor party candidate agrees to participate, then the sponsor must invite all new party candidates nominated for the same office to participate in the debate.

(v) The sponsor shall have the discretion to include any minor party, new party, independent or write-in candidate in any debate held under 11 CFR 110.13(b)(1).

(vi) If a sponsor holds a debate for presidential general election candidates, it may also hold a separate debate to which all vice-presidential running-mates of the candidates who participated in the general election debate are invited.

(vii) In States where the names of a candidate's electors, rather than the name of the candidate, will appear on a State election ballot, that candidate will be deemed to be the candidate for the purpose of 11 CFR 110.10(b)(1).

(2) Presidential Caucus, Convention or Primary Election Candidate Debates. (i) A sponsor may hold a presidential, caucus, convention or primary election candidate debate in any of the following ways:

(A) The sponsor shall invite all candidates qualified to appear on a State primary election ballot in a specified region, as well as each recognized, active candidate in any caucus or convention State in that region.

(B) In lieu of a debate held under 11 CFR 110.13(2)(i) (A) or (C), the sponsor has the option of holding a debate to which all candidates of all parties of the same type (major, minor or new) in a specified region are invited.

(C) In lieu of a debate held in accordance with 11 CFR 110.13(b)(2)(i) (A) or (B), the sponsor has the option of holding a debate restricted to candidates seeking the nomination of one party in a specified region. If the sponsor chooses to held a debate restricted to the candidates for a particular party's nomination, then the sponsor must also invite the candidates for nomination by each party of that type (major, minor or new) to participate in a similar separate debate restricted to the candidates seeking nomination by one party. However, where each of the parties of that type does not have at least two candidates seeking the nomination of that party, then the sponsor does not have the option to hold separate debates under this section.

(ii) In States where the name of a candidate's electors, or the name of delegate candidates pledged or committed to a presidential candidate seeking nomination of a party, rather than the name of the candidate, will appear on a State election ballot, that candidate will be deemed to be the candidate for the purposes of 11 CFR 110.13(b)(2).

(3) House or Senate Caucus, Convention or Primary Election Candidate Debates. (i) For House or Senate candidate debates in a primary election State, the sponsor shall invite all candidates who are seeking party nomination for the same office and are qualified to appear on the ballot; or in a caucus or convention State, the sponsor shall invite all recognized active candidates seeking party nomination for the same office.

(ii) In lieu of a debate held under 11 CFR 110.13(b)(3) (i) or (iii), the sponsor has the option of holding a debate to which all candidates of all parties of the same type (major, minor or new) in a specified region are invited.

(iii) In lieu of a debate held in accordance with 11 CFR 110.13(b)(3) (i) or (ii), the sponsor has the option of holding a debate restricted to candidates seeking the nomination of one party. If the sponsor chooses to hold a debate restricted to the candidates for a particular party nomination, then the sponsor must also invite the candidates for nomination by each party of that type (major, minor or new) to participate in a similar separate debate restricted to the candidates seeking nomination by one party. However, where each of the parties of that type does not have at least two candidates seeking the nomination of that party, then the sponsor does not have the option to hold separate debates under this section.

(4) *Two candidate requirement.* At least two candidates must participate in any debate held under 11 CFR 110.13(b).

(5) *Definitions.* For purposes of 11 CFR ‡10.13(b), the following definitions apply.

(i) The term "major party" means, with respect to any United States presidential, House, or Senate general election, a political party whose candidate for that office in the preceding election for that office received, as the candidate of such party 25 percent or more of the total number of popular votes received by all candidates for such office.

(ii) The term "minor party" means, with respect to any United States presidential, House, or Senate general election, a political party whose candidate for that office in the preceding election for that office received, as the candidate of such party, 5 percent or more but less than 25 percent of the total number of popular votes received by all candidates for such office.

(iii) The term "new party" means, with respect to any United States presidential, House, or Senate general election, a political party which is neither a major party nor a minor party.

(6) *Endorsements by more than one party.* For purposes of 11 CFR 110.13(b), a candidate receiving the endorsement of a major party and a minor or new party will be considered a major party candidate. A candidate receiving the endorsement of a minor party and a new party will be considered a minor party candidate.

4. 11 CFR 114.4(e) is added to read as follows:

## § 114.4   Nonpartisan communication.

* * * * *

(e) *Nonpartisan public candidate debates.* A corporation or labor organization may donate funds to organizations qualified under 11 CFR 110.13 to sponsor nonpartisan public candidate debates held in accordance with the provisions of that section.

Dated: June 29, 1979.

**Robert O. Tiernan,**

*Chairman, Federal Election Commission.*

[FR Doc. 79-20713 Filed 7-3-79; 8:45 am]

**BILLING CODE 6715-01-M**

To continue hearings on proposed authorizations for fiscal year 1981 for programs under the Higher Education Act.

8226 Dirksen Building

**Labor and Human Resources**
Health and Scientific Research Subcommittee
To mark up S. 1177, to establish a partnership between the Federal government and the States in the planning and provisions of mental health services.

Room to be announced

**OCTOBER 4**

9:00 a.m.
**Agriculture, Nutrition, and Forestry**
Agricultural Credit and Rural Electrification Subcommittee
To hold hearings on S. 1465, proposed Farm Credit Act Amendments.

322 Russell Building

10:00 a.m.
**Labor and Human Resources**
Education, Arts, and Humanities Subcommittee
To continue hearings on proposed authorizations for fiscal year 1981 for programs under the Higher Education Act.

4232 Dirksen Building

**OCTOBER 5**

9:00 a.m.
**Agriculture, Nutrition, and Forestry**
Agricultural Credit and Rural Electrification Subcommittee
To continue hearings on S. 1465, proposed Farm Credit Act Amendments.

322 Russell Building

10:00 a.m.
**Labor and Human Resources**
Education, Arts, and Humanities Subcommittee
To continue hearings on proposed authorizations for fiscal year 1981 for programs under the Higher Education Act.

4232 Dirksen Building

**OCTOBER 9**

9:00 a.m.
**Agriculture, Nutrition, and Forestry**
Agricultural Credit and Rural Electrification Subcommittee
To resume hearings on S. 1465, proposed Farm Credit Act Amendments.

322 Russell Building

**OCTOBER 10**

9:30 a.m.
**Labor and Human Resources**
Handicapped Subcommittee
To resume oversight hearings on the implementation of the Education for All Handicapped Children Act of 1975 (P.L. 94-142).

4232 Dirksen Building

**Veterans' Affairs**
To hold hearings on S. 1523 and H.R. 4015, bills to provide the capability of maintaining health care and medical services for the elderly under the Veterans' Administration.

457 Russell Building

10:00 a.m.
**Labor and Human Resources**
Education, Arts, and Humanities Subcommittee
To resume hearings on proposed authorizations for fiscal year 1981 for programs under the Higher Education Act.

1318 Dirksen Building

**OCTOBER 11**

10:00 a.m.
**Labor and Human Resources**
Education, Arts, and Humanities Subcommittee
To continue hearings on proposed authorizations for fiscal year 1981 for programs under the Higher Education Act.

4232 Dirksen Building

**OCTOBER 12**

10:00 a.m.
**Labor and Human Resources**
Education, Arts, and Humanities Subcommittee
To continue hearings on proposed authorizations for fiscal year 1981 for programs under the Higher Education Act.

4232 Dirksen Building

**OCTOBER 17**

8:00 a.m.
**Labor and Human Resources**
Child and Human Development Subcommittee
To hold oversight hearings on the implementation of older American volunteer programs by ACTION agencies.

4232 Dirksen Building

**CANCELLATIONS**

**SEPTEMBER 19**

9:30 a.m.
**Labor and Human Resources**
To continue hearings on S. 1486, to exempt family farms and nonhazardous small businesses from the Occupational Safety and Health Act of 1970.

4232 Dirksen Building

---

# SENATE—*Tuesday, September 18, 1979*

(*Legislative day of Thursday, June 21, 1979*)

The Senate met at 9:45 a.m., on the expiration of the recess, and was called to order by Hon. J. James Exon, a Senator from the State of Nebraska, the Acting President pro tempore.

## PRAYER

The Chaplain, the Reverend Edward L. R. Elson, D.D., offered the following prayer:

Let us pray.

Open our lives, O Lord, to the wonders of the world of the spirit. Open our hearts to beauty and goodness and truth. Make us apostles of hope transformed from apathy, cynicism, and despair; ready to work for that higher kingdom yet to come, whose builder and maker is God. Move us to a deeper, profounder understanding of man and the world and Thy coming kingdom. Take from us all that obstructs doing Thy will. To all who serve this Government impart Thy grace and wisdom. Bind us together in Thy love that with purity of purpose we may walk in the steps of the Master, in whose name we pray. Amen.

## RECOGNITION OF THE MAJORITY LEADER

The ACTING PRESIDENT pro tempore. The Chair recognizes the majority leader.

## THE JOURNAL

Mr. ROBERT C. BYRD. Mr. President, I ask unanimous consent that the Journal of the proceedings be approved to date.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. ROBERT C. BYRD. Mr. President, it is my understanding that Mr. PELL desires to have me yield to him and I do so.

Mr. PELL. Mr. President, I thank the majority leader.

I am glad at this time to make a comment on the resolution of disallowance of the debate regulations submitted by the Federal Election Commission which I submit.

## RESOLUTION RELATING TO FUNDING AND SPONSORSHIP OF CANDIDATE DEBATES

Mr. PELL. Mr. President, I wish to make a brief comment on the resolution of disapproval of the debate regulations submitted by the Federal Election Commission which I submitted. This resolution is submitted pursuant to the FECA which reserves to the Congress the power to disapprove regulations.

The Senate's action today should not be construed to prohibit, in any way, organizations such as the League of Women Voters, or broadcasters from sponsoring candidate debates. Debates have been a beneficial means of presenting the views of the candidates on issues of concern and should continue.

Rather, it is my hope, in introducing this resolution with Senator HATFIELD, not to discourage such debates, but to encourage them. Consistent with my support of debates, I feel that any regulation which could be interpreted as being burdensome to organizations which are likely to sponsor candidate debates, or which could in any way impede the heretofore successful debate procedure that has evolved through direct arrangements made between sponsors and candidates should not be allowed to take effect.

I feel that this resolution is necessary to keep the candidate debate process which has evolved workable, open, and accessible to candidates. I would strongly support the passage of legislation or the promulgation of any regulation which would encourage candidate debates. However, I am of the opinion that we must disapprove these regulations for the reasons previously set forth.

Mr. HATFIELD. Mr. President, I am concerned that the Federal Election Commission's proposed regulations on the funding and sponsorship of candidate debates represent an unwarranted

---

● This "bullet" symbol identifies statements or insertions which are not spoken by the Member on the floor.

Becker, et al. v. FEC
00-CV-11192 MLW
Exhibit C

intrusion of new Federal regulation into the political process, and are not in keeping with Congress intent in enacting Federal election campaign laws.

Letters to both the Rules Committee and the FEC from the Federal Communications Commission, CBS, NBC, and the National Association of Broadcasters have voiced the criticism that the regulations as they are written would prohibit the broadcast media's sponsorship of candidate debates. Broadcast stations are already subject to regulation by the FCC, and to provisions of the Communications Act. The FCC has assured that the proposed regulations be rejected, saying that local broadcasters would devote less time to the discussion of public issues, when faced with the problem of complying with the new regulations. Pointing to the broadcast industry's role in informing the electorate during Federal elections campaigns, the FCC stressed that such a result would be contrary to the public interest.

Another serious question raised by the regulations is their restriction of newspapers' sponsorship of candidate debates. A representative of the Gannett newspaper chain, in a letter to the FEC's General Counsel, described the experience of a selected handful of local papers which had sponsored candidate debates—and stated strongly that such debates enriched citizen knowledge of elections issues and candidates, and were conducted in as fair and impartial a manner as the sponsors could devise. I express my own concern on this point that the record is bare of evidence of abuse by the thousands of newspapers in the States and communities across the country which have in the past sponsored candidate debates.

It was Congress intent in enacting Federal election laws to safeguard the integrity of the electoral process largely by means of campaign finance disclosure. The laws were not intended to impede the free flow of information to the voters, or disrupt the dialog among candidates for political office.

Principles of restraint should guide us when considering the reach of the laws that Congress enacted into a new area in the form of regulation. I question whether Congress ever intended to involve the Federal Election Commission in determining the format for candidate debates, or in deciding who may sponsor them.

The Senate has received no statement from the Commission offering to amend the regulations in response to the serious criticisms which have been leveled at them. It is my understanding that in light of the controversy surrounding the proposed regulations, that this matter has been discussed at several Commission meetings without resolution. Given all the facts and circumstances, I feel it is appropriate for the Senate to act to disapprove the proposed regulations.

In my view they would, if enacted, place yet another burden on participants in the political process, on the pretext of remedying abuses which have not been shown.

For this reason, I support the resolution disapproving the proposed regulations, and urge my colleagues to do the same.

Mr. PELL. Mr. President, I call for the motion on the resolution.

Mr. BAKER. Mr. President, will the Senator yield to me a moment?

Mr. PELL. I yield.

Mr. BAKER. Mr. President, I am on the Rules Committee, as the Senator knows, and I, of course, respect the decision of the ranking member, but I must say I was not aware of this nor that it was going to come up this morning.

I wish just a few minutes to look into this matter, if the Senator does not mind.

Mr. PELL. Certainly.

Mr. BAKER. If the Senator will withhold, then, his request, I assure the Senator that with the concurrence of the majority leader I will be glad to consider it at some point soon, meaning this morning, but I wish just a moment to check into this.

Mr. ROBERT C. BYRD. I thought it was cleared on the minority side.

Mr. BAKER. It may have been. It was not cleared with me.

Mr. PELL. Mr. President, I suggest the absence of a quorum.

The ACTING PRESIDENT pro tempore. The clerk will call the roll.

The assistant legislative clerk proceeded to call the roll.

Mr. PELL. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The ACTING PRESIDENT pro tempore. Without objection, it is so ordered.

Mr. BAKER. Mr. President, will the Senator from Rhode Island yield to me?

Mr. PELL. I yield to the Senator from Tennessee.

Mr. BAKER. I appreciate the Senator from Rhode Island's accommodation to me in permitting me to try to check with Members on this side to see what kind of condition we were in on this matter.

Let me say for the record that the fault does not lie with the distinguished Senator from Rhode Island nor the distinguished majority leader. Word was given to my staff in my office; it was simply that there was another commitment outstanding in this respect that they were not aware of. That caused this complication; but I am ready to proceed now, although in view of the situation I would hope that the distinguished majority leader and the Senator from Rhode Island would not proceed through the step of reconsideration.

Mr. PELL. Yes, of course.

Mr. ROBERT C. BYRD. I am agreeable to that.

Mr. President, I ask unanimous consent that the Senate proceed to the immediate consideration of Senate Resolution 236.

The ACTING PRESIDENT pro tempore. Is there objection? Without objection, it is so ordered.

The resolution will be stated.

The legislative clerk read as follows:

The Senator from Rhode Island (Mr. PELL) for himself, Mr. HATFIELD, and Mr. CANNON submits a resolution (S. Res. 236) to disapprove of the regulations proposed by the Federal Election Commission relating to the funding and sponsorship of candidate debates

Mr. PELL. I move the adoption of the resolution.

The ACTING PRESIDENT pro tempore. The question is on agreeing to the resolution.

The resolution (S. Res. 236) was agreed to, as follows:

RESOLUTION

To disapprove of the regulations proposed by the Federal Election Commission relating to funding and sponsorship of candidates debates

Resolved, That the Senate disapproves of the regulations proposed by the Federal Election Commission relating to the funding and sponsorship of candidate debates, submitted to the Senate pursuant to section 315(c) of the Federal Election Campaign Act of 1971, and received by the Senate on July 2, 1979.

## SECOND CONCURRRENT RESOLUTION ON THE BUDGET

The ACTING PRESIDENT pro tempore. Under the previous order, the hour of 10 a.m. having arrived, the Senate will now resume consideration of the pending business, Senate Concurrent Resolution 36, which the clerk will state.

The legislative clerk read as follows:

Senate Concurrent Resolution 36 revising the congressional budget for the U.S. Government for fiscal years 1980, 1981, and 1982.

The Senate resumed consideration of the concurrent resolution.

AMENDMENT NO. 437

The ACTING PRESIDENT pro tempore. The pending question is on amendment No. 437 by the Senator from New Mexico (Mr. DOMENICI) and the Senator from Oklahoma (Mr. BELLMON), on which there shall be 45 minutes' debate, to be equally divided and controlled by the Senator from New Mexico (Mr. DOMENICI) and the Senator from Maine (Mr. MUSKIE).

The amendment is as follows:

Delete the first paragraph of Section 1(a) of the pending amendment and insert in lieu thereof:

"The allocation pursuant to Section 302 (a) of the Budget Act to the Committee on Appropriations for all legislation within its jurisdiction shall not exceed $383.6 billion in budget authority and $338.4 billion in outlays as assumed in this Budget Resolution. All bills making appropriations for the Fiscal Year beginning Oct. 1, 1979, not enrolled as of the date of enactment of this resolution shall not be enrolled until:

"(a) all regular FY 1980 appropriations bills are ready for enrollment;

"(b) The Committee on the Budget has reported to the Senate an estimate of the budget authority and outlays attributable to each FY 1980 appropriations bill which has been enacted or which is awaiting enrollment;

"(c) The Committee on the Budget has reported to the Senate a detailed estimate of the foreseeable supplemental requirements for appropriations and permanent appropriations for Fiscal Year 1980.

"If the Budget Committee report under this Section indicates that the foreseeable total of all bills within the Appropriations Committee's jurisdiction for FY 1980 will exceed the totals provided by the section for all such bills, then it shall not be in order for the Congress to consider a motion for sine die adjournment for the First Session of the 96th Congress until the Committee on Appropriations of each House has reported a bill or resolution rescinding or reconciling FY 1980 appropriations provided in already enacted bills or in bills awaiting

# LEGISLATIVE HISTORY
## OF
# FEDERAL ELECTION CAMPAIGN ACT AMENDMENTS
## OF
# 1979



**The Federal Election Commission**
1325 K Street, Northwest
Washington, D.C.  20463

October 1983

Becker, et al. v. FEC
00-CV-11192 MLW
Exhibit D

# HEARING
# BEFORE THE
# COMMITTEE ON
# RULES AND ADMINISTRATION
# UNITED STATES SENATE
# NINETY-SIXTH CONGRESS
# FIRST SESSION

---

## TO AMEND
## THE FEDERAL ELECTION CAMPAIGN ACT OF 1971
## AS AMENDED, AND FOR OTHER PURPOSES

---

JULY 13, 1979

# FEDERAL ELECTION CAMPAIGN ACT AMENDMENTS, 1979

# HEARING

### BEFORE THE

# COMMITTEE ON
# RULES AND ADMINISTRATION
# UNITED STATES SENATE

## NINETY-SIXTH CONGRESS

### FIRST SESSION

---

**TO AMEND THE FEDERAL ELECTION CAMPAIGN ACT OF 1971,
AS AMENDED, AND FOR OTHER PURPOSES**

---

**JULY 13, 1979**



Printed for the use of the
Committee on Rules and Administration

---

**U.S. GOVERNMENT PRINTING OFFICE**
**WASHINGTON : 1979**

49-780

3

COMMITTEE ON RULES AND ADMINISTRATION

CLAIBORNE PELL, Rhode Island, *Chairman*

HOWARD W. CANNON, Nevada
ROBERT C. BYRD, West Virginia
HARRISON A. WILLIAMS, Jr.,
   New Jersey
WENDELL H. FORD, Kentucky
DENNIS DeCONCINI, Arizona

MARK O. HATFIELD, Oregon
HOWARD H. BAKER, Jr., Tennessee
JOHN TOWER, Texas
RICHARD S. SCHWEIKER,
   Pennsylvania

WILLIAM McWHORTER COCHRANE, *Staff Director*
CHESTER H. SMITH, *Chief Counsel*
THOMAS K. DECKER, *Minority Staff Director*
WINFIELD W. MAJOR, Jr., *Counsel (Elections)*
JACK L. SAPP, *Professional Staff Member*

(II)

4

# CONTENTS

___

### FRIDAY, JULY 13, 1979

Page

Opening statement of Hon. Claiborne Pell, chairman of the Committee on Rules and Administration------------------------------------------------- 1
Statement of—
  Robert O. Tiernan, chairman, Federal Election Commission; accompanied by Max Friedersdorf, vice chairman; Orlando B. Potter, staff director; and William C. Oldaker, general counsel---------- 2
  Panel consisting of Morley Winograd, president, Association of State Democratic Chairpersons; Fred Wertheimer, senior vice president, Common Cause; and Russell D. Hemenway, national director, National Committee for an Effective Congress------------------- 33
    Fred Wertheimer------------------------------------------------- 35
    Russell D. Hemenway--------------------------------------------- 37
Prepared statement of—
  Federal Election Commission (with an attachment)----------------- 4
  Morley Winograd, president, Association of State Democratic Chairpersons--------------------------------------------------------- 38
  Fred Wertheimer, senior vice president, Common Cause------------ 39
  Russell D. Hemenway, national director, National Committee for an Effective Congress-------------------------------------------- 45
  The Associated General Contractors of America------------------- 152
  Daniel J. Swillinger, chairman of the Legislative Subcommittee of the Political Campaign and Election Law Committee of the Federal Bar Association------------------------------------------------- 152
  Mary Meehan, treasurer, Committee for a Constitutional Presidency_ 155
Written responses of the Federal Election Commission to questions propounded by—
  Senator Pell---------------------------------------------------- 144
  Senator Hatfield------------------------------------------------ 149
Letters addressed to Hon. Claiborne Pell, chairman of the Committee on Rules and Administration, from:
  Hilton Davis, vice president, Legislative and Political Affairs, Chamber of Commerce of the United States-------------------------- 154
  Hon. Ed Bethune, a U.S. Representative from the State of Arkansas, enclosing a letter from the Secretary of the State of Arkansas----- 164
  Hon. Burt L. Talcott, a former U.S. Representative from the State of California, and presently with Louis C. Kramp and Associates, Washington, D.C. (with an enclosure)-------------------------- 165
Miscellaneous:
  Committee working draft No. 1----------------------------------- 56
    Summary------------------------------------------------------- 95
  Committee working draft No. 2----------------------------------- 102
    Summary------------------------------------------------------- 137
  "Decontrol of Campaigns," from the Washington Post, July 23, 1979_ 167

(III)

# FEDERAL ELECTION CAMPAIGN ACT AMENDMENTS, 1979

---

### FRIDAY, JULY 13, 1979

U.S. SENATE,
COMMITTEE ON RULES AND ADMINISTRATION,
*Washington, D.C.*

The committee met, pursuant to call, at 10 a.m., in room 301, Russell Senate Office Building, Hon. Claiborne Pell (chairman), presiding.

Present: Senators Pell, Cannon, Hatfield, and Schweiker.

Staff present: William M. Cochrane, staff director; Chester H. Smith, chief counsel; Thomas K. Decker, minority staff director; Raymond N. Nelson, professional staff member; John K. Swearingen, director, technical services; Winfield Major, counsel (elections); Jack L. Sapp, professional staff member; Donald F. Massey, minority counsel; Elaine W. Milliken, minority counsel (elections); John L. Sousa, counsel (elections); Peggy L. Parrish, chief clerk; and Paul E. Goulding, professional staff member.

## OPENING STATEMENT OF HON. CLAIBORNE PELL, CHAIRMAN OF THE COMMITTEE ON RULES AND ADMINISTRATION

The CHAIRMAN. The Committee on Rules and Administration will come to order.

Today we are going to conduct hearings on long-overdue amendments to the Federal Election Campaign Act. We also have a certain amount of committee business to do as well, so we hope the hearing can move as expeditiously as possible.

The basis for the committee's consideration is a bill from the 95th Congress, S. 926, which passed the Senate by a vote of 88 to 1 on August 3, 1977. Although this legislation was not enacted because of complications on the House side, the bill contained many important provisions which have received strong bipartisan support as necessary revisions to the Campaign Act.

The committee has also included in its working draft some of the legislative recommendations of the Federal Election Commission. The Commission's experience with the act over the past 4 years has provided valuable suggestions for simplifying the act's reporting requirements and improving its administration.

Although the Commission has been subject to criticism recently because of problems encountered in administering the Federal Election Campaign Act, some of that criticism can legitimately be directed at the Congress which enacted this exceedingly complicated statute. It is my hope that today's hearing will launch the Congress on a construc-

(1)

7

The Committee proposal would discourage the operation of smaller committees. It is imperative that the $1,000 figure be reduced substantially to assure that companies maintain their political action committees and that smaller companies are ensured of having continued equal political privileges and opportunities.

### POLITICAL COMMITTEES AND ADMINISTRATIVE COSTS

Although there is no mention in the Senate draft of political committees administrative costs, the subject has been brought to the Committee's attention by other organizations; therefore, I feel it necessary to comment.

It has been suggested by one self-sustaining political committee, in testimony before this Committee, that the law be amended to require that all political committees pay their administrative costs. This would mean that money from contributions would be used for administrative purposes such as legal and accounting services, rent on political committee offices, salaries of employees, travel and per diem, office equipment and postage and printing charges of the committee.

Basic differences exist between the two types of committees, and therefore it is unreasonable and illogical to propose the committees be treated identically. As the law now reads, corporate and union political committee administrative costs are paid by the parent organization; that is, either the company or the union. Self-sustaining political committees pay their own administrative expenses out of the funds they raise.

Another major difference exists in the solicitation privileges of the two types of committees. Unions may solicit their members, and corporations can solicit their management and shareholders. On the other hand, self-sustaining committees can solicit anyone and everyone, as often as the committee feels it necessary. Clearly, self-sustaining committees have much greater freedom of action.

A fundamental difference in objective must be recognized as well. Self-sustaining political committees identify themselves as ideological in nature. They are often organized on a single issue or for a single purpose.

Corporate and union committees are formed to increase their employee's and member's political awareness and to give them an opportunity to participate in the political process.

The National Chamber strongly urges the Committee to retain present law in this area, and to recognize the basic structural and ideological differences between the two types of committees.

To summarize, we consider most of the draft constructive, workable and commendable. The provisions ending the needless paperwork, and thereby reducing the bureaucratic nightmare which has plagued the FEC over the past five years are needed. However, the provisions dealing with multicandidate committees and political committee administrative costs clearly discriminate against business political action committees.

I will appreciate your considering our views and making this letter a part of the hearings record.

Cordially,

HILTON DAVIS,
*Vice President,*
*Legislative and Political Affairs.*

---

### STATEMENT BY MARY MEEHAN, TREASURER, COMMITTEE FOR A CONSTITUTIONAL PRESIDENCY

Mr. Chairman and Members of the Committee, as one of the many victims of the Federal Election Campaign Act, I welcome the opportunity to submit this statement to you.

My committee supported Eugene McCarthy's independent campaign for President in 1976. I have studied and written about the federal election act for nearly five years, and have learned of the experiences of many others with the act. So it is not only from my own experience that I speak.

I want to suggest to you that amending the federal election act is nearly a hopeless task. To enact technical amendments is to use a bandaid for cancer. The law is such a bad law, in so many different ways, that the best thing to do with it is to repeal it. I suggest that it be replaced with a simple disclosure law—a law that everyone can understand and comply with.

Because it is serious business to say that a federal law is so bad that it cannot be improved, I would like to document this contention in specific terms.

(2) By limiting individual contributions to $1,000 per election, the law makes it difficult for anyone running against an incumbent to raise enough money for a serious race. Sometimes it makes it impossible.

(3) By setting the contribution limit for political action committees (PACs) at $5,000, the law again discriminates against insurgents. PACs give money almost exclusively to incumbents and to challengers who have exceptionally good chances of winning. Long-shot challengers must abide by the $1,000 limit on individual contributions while their incumbent opponents pick up much larger PAC donations.

One of the worst features of the election act is that its very existence tempts incumbents to tinker with it in such a way as to increase their advantages over challengers.[12] This, I believe, is a far greater danger to our democracy than is monetary corruption. The corruption of money can taint the system; the corruption of power can kill it.

Minority-party candidates are doubly disadvantaged under the election act. Almost all of them are insurgents to begin with. In addition to that, they must run against candidates who are favored—and in some cases subsidized—by the law.

Independent candidates are triply disadvantaged by the election act. The pro-party bias of the act is strong, and seems to become stronger each time the act is amended.

The Democratic and Republican parties are, of course, the major beneficiaries. Their conventions are subsidized, and their presidential candidates are subsidized.

While an individual may contribute only $1,000 per election to a federal candidate, s/he may contribute as much as $20,000 to a political party's national committee. When our committee, supporting an independent candidate for President in 1976, requested that the FEC treat it as a national party committee for purposes of the election act, the FEC commissioners deadlocked and thus failed to answer our request for an advisory opinion. The three Democratic Commissioners all voted against us. (This was during the period when the Democratic Party was engaged in a strenuous and ultimately successful effort to throw our candidate off the ballot in New York.) Since the Commissioners failed to meet their legal responsibility to respond to our request, we were left to our own interpretation of the law. We followed it. And in February of 1978, the FEC told us that it had found "reason to believe" that we may have violated the law by accepting over $1,000 per election from one individual. Over one year later, it is still considering the matter. This is the kind of justice an independent campaign receives from the Federal Election Commission.[13]

When then-Democratic Party chairman Robert Strauss and various Members of Congress were worried about possible prosecution for accepting illegal contributions, the statute of limitations was shortened to accommodate them.[14] When the Republicans wanted to solicit corporate donations to help pay for their national headquarters, the law was amended so they could do so.[15]

When the Democrats and Republicans wanted debates between their presidential candidates in 1976, the Federal Election Commission interpreted the law to allow the League of Women Voters Education Fund to spend huge sums for the debates without counting the money as contributions to the Republican and Democratic candidates. More recently, the FEC proposed regulations allowing corporations and labor unions to contribute funds for candidate debates provided that the debates are sponsored by groups like the League.[16] At this writing,

[12] For example, the effort of House Democrats to cripple the Republican fundraising effort for House races in 1978. See *Washington Star*, March 8, 10, 16, 19, 20, and 22, 1978; and *Washington Post*, March 10, 19, and 22, 1978.

[13] U.S. Federal Election Commission. Minutes for Thursday, October 14, 1976, pp. 4–5. Court battles over McCarthy's ballot status in New York were reported in the *New York Times*, October 9, 27, and 28, 1976; *New York Post*, October 22 and 28, 1976; *Washington Post*, October 30, 1976.

[14] Richard L. Rashke and David H. Rothman, "How Congress Saves Its Own," *The Nation*, January 24, 1976, pp. 77–79; Robert Shogan, "Strauss Admits Possible Slip," *Washington Post*, January 10, 1975, p. A–3; "Strauss Case Held Unlikely Due to Time," *Washington Post*, April 26, 1975, p. A–2; "Strauss Prosecution to Be Dropped," *Washington Post*, June 14, 1975, p. A–2.

[15] "Corporations Help Pay for GOP Headquarters," *Congressional Quarterly Weekly Report*, June 24, 1978, p. 1612.

[16] U.S. Federal Election Commission. Commission Memo No. 828, August 30, 1976, with attached "Policy Statement, Presidential Debates"; Federal Election Commission *Record*, March, 1978, p. 1; *Federal Register*, July 5, 1979, pp. 39348–39351.

neither House of Congress has disapproved the regulations, and the regulations are about to take effect. Perhaps 1980 presidential debates will be brought to us courtesy of Mobil Oil and the maritime unions.

Earlier this year, when submitting its legislative recommendations to Congress, the FEC declared, "Political parties have a central role to play in the political system. Campaign finance legislation must be carefully drafted to bolster the role of political parties in campaign financing . . ." Although it offered no rationale, constitutional or other, for this broad statement, the Commission went on to recommend allowing party committees to spend more money. It did not suggest that non-party committees be allowed to spend more.[17]

All of this bolstering of political parties discriminates against independent candidates and against the approximately one-third of American voters who consider themselves independents.[18] Propping up the parties also goes against the general spirit of the Constitution and against the letter of it in the Fourteenth Amendment, which guarantees "equal protection of the laws."

Those who quote the *Federalist Papers* and other writings of the Founding Fathers as opposing "splinter parties" or a multi-party system miss the point entirely. The men who wrote the Declaration of Independence and the Constitution were against *all parties.* They were non-party men, anti-party men; they were independents. Thus on October 2, 1780, John Adams, writing to a friend about the new constitution for Massachusetts, said, "There is nothing which I dread so much as a division of the republic into two great parties, each arranged under its leader, and concerting measures in opposition to each other. This, in my humble apprehension, is to be dreaded as the greatest political evil under our Constitution."[19] And on September 19, 1796, in his Farewell Address, George Washington declared, "I have already intimated to you the danger of parties in the State, with particular reference to the founding of them on geographical discriminations. Let me now take a more comprehensive view, and warn you in the most solemn manner against the baneful effects of the spirit of party, generally. . . . the common and continual mischiefs of the spirit of party are sufficient to make it the interest and the duty of a wise people to discourage and restrain it."[20]

**THE LAW'S COMPLIANCE PROCEDURES INFRINGE UPON THE DUE PROCESS GUARANTEES**

The operations of the Federal Election Commission demonstrate the dangers of combining legislative, executive, and judicial powers in one agency. The FEC serves not only as lawmaker and administrator, but also as judge, jury, and executioner. Some of us who have endured FEC compliance or "conciliation" procedures have felt like victims of a Lewis Carroll creature called Fury :

> "I'll be judge,"
> I'll be jury,"
> Said cunning old Fury :
> "I'll try the whole cause,
>     and condemn you to death."[21]

Or like the King's Messenger, who is "in prison now, being punished : and the trial doesn't even begin till next Wednesday ; and, of course, the crime comes last of all." Alice asked, "Suppose he never commits the crime?" And the Queen replied, "That would be all the better, wouldn't it?"[22]

By passing an election law which is so complex and so broad in scope, Congress has given the FEC enormous power. Because so many technical violations of the law are possible—and almost inevitable for all but the best-financed campaigns—the FEC has enormous power over every federal campaign in the country. The law is virtually impossible for most campaigns to comply with in every respect, so nearly everyone is "guilty" of technical violations. This ensures a constant flow of FEC form letters demanding amended reports within

[17] U.S. Federal Election Commission. Agenda Document No. 79-25. January 29, 1979, pp. 16–17.
[18] *Gallup Opinion Index*, December, 1977. p. 30. Of those willing to label themselves, far more considered themselves independents (31 percent) than Republicans (20 percent).
[19] John Adams. *The Works of John Adams* (Boston, 1854), vol. 9, p. 511.
[20] George Washington. *The Writings of George Washington* (Washington, 1940), vol. 35. pp. 226–227.
[21] Lewis Carroll. *Alice in Wonderland and Through the Looking Glass* (Kingsport, TN, 1946), p. 28.
[22] *Ibid.*, p. 218.

§ 110.1 [Amended]

22. In 11 CFR 110.1(i)(1): Delete "§ 104.5(e)", insert "11 CFR 104.8(d)".

23. In 11 CFR 110.1(i)(2): Delete "§ 104.5(e)", insert "11 CFR 104.8(d)".

§ 110.2 [Amended]

24. In 11 CFR 110.2(b): Delete "§ 100.14(a)(3)", insert "11 CFR 100.5(e)(3)".

§ 110.3 [Amended]

25. In 11 CFR 110.3(a)(1)(i): Delete "§ 100.14(c)", insert "11 CFR 100.5(g)".

§ 110.7 [Amended]

26. In 11 CFR 110.7(c)(2)(ii): Delete "Part 102", insert "11 CFR 102.2".

§ 110.8 [Amended]

27. In 11 CFR 110.8(c)(2): Delete "§ 100.7(b)(13)", insert "11 CFR 100.8(b)(21)".

§ 110.11 [Amended]

28. In 11 CFR 110.11(a)(1)(ii): Delete "§ 102.2(a)(3)", insert "11 CFR 102.2(a)(1)(ii)".

§ 111.8 [Amended]

29. In 11 CFR 111.8(c): Delete "§ 104.5(a)(1)(i)", and insert "11 CFR 104.5(a)(1)(iii)"; delete "104.5(a)(1)(iii)" and insert "by 104.5(a)(1)(i)".

§ 114.1 [Amended]

30. In 11 CFR 114.1(a)(1): Delete "(except a loan by a National or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business)" insert "(except a loan of money by a State bank, a federally chartered depository institution (including a national bank) or a depository institution whose deposits and accounts are insured by the Federal Deposit Insurance Corporation, the National Savings and Loan Insurance Corporation, or the National Credit Union Administration, if such loan is made in accordance with 11 CFR 100.7(b)(11))".

31. In 11 CFR 114.1(a)(2)(vi): Delete "of the national committee", insert "of any political committee".

32. In 11 CFR 114.1(a)(2)(vii): Delete "of a candidate or political committee", insert "of an authorized committee of a candidate or any other political committee"; delete "Part 104", insert "11 CFR 104.3(h)".

33. In 11 CFR 114.1(a)(2)(ix): Delete "Part 104", insert "11 CFR 104.3(g)".

§ 114.3 [Amended]

34. In 11 CFR 114.3(b): Delete "§ 100.7(b)(15)", insert "11 CFR 100.8(b)(4)".

§ 114.5 [Amended]

35. In 11 CFR 114.5(e)(2)(i): Delete "§ 100.7(b)(5)", insert "11 CFR 100.8(b)(4)".

§ 114.9 [Amended]

36. In 11 CFR 114.9(a)(2): Delete "§ 100.4(a)(1)(iii)(B)", insert "11 CFR 100.7(a)(1)(iii)(B)".

37. In 11 CFR 114.9(b)(2): Delete "§ 100.4(a)(1)(iii)B)", insert "11 CFR 100.7(a)(1)(iii)(B)".

38. In 11 CFR 114.9(d): Delete "§ 100.4(a)(1)(iii)(B)", insert "11 CFR 100.7(a)(1)(iii)(B)".

§ 114.12 [Amended]

39. In 11 CFR 114.12(a): Delete "§ 100.14", insert "11 CFR 100.5".

40. In 11 CFR 114.12(a): In the second sentence, delete "the chairman and"; delete "remain", insert "remains".

§ 115.1 [Amended]

41. In 11 CFR 115.1(a): Delete "§ 100.13", insert "11 CFR 100.10".

§ 9008.2 [Amended]

42. In 11 CFR 9008.2(e): Delete "(2 U.S.C. 431(k))", insert "(2 U.S.C 431(14))".

§ 9008.6 [Amended]

43. In 11 CFR 9008.6(b)(3): Delete "2 U.S.C. 431(o)", insert "2 USC 431(19)".

§ 9008.7 [Amended]

44. In 11 CFR 9008.7(a)(3): Delete "2 U.S.C. 431(o)", insert "2 USC 431(19)".

§ 9008.8 [Amended]

45. In 11 CFR 9008.8(a)(4): Delete "2 U.S.C. 431(o)", insert "2 USC 431(19)".

§ 9032.4 [Amended]

46. In 11 CFR 9032.4: Delete "11 CFR 100.4", insert "11 CFR 100.7".

§ 9033.1 [Amended]

47. In 11 CFR 9033.1(c): Delete "this disclosure requirements", insert "the disclosure requirements".

§ 9033.9 [Amended]

48. In 11 CFR 9033.9(a): Insert after "candidate", "or his or her authorized committee(s)".

§ 9034.2 [Amended]

49. In 11 CFR 9034.2(a)(3): Delete "principal place of business", insert "name of employer".

§ 9034.3 [Amended]

50. In 11 CFR 9034.3(d): Delete "11 CFR 100.14", insert "11 CFR 100.5".

§ 9036.2 [Amended]

51. In 11 CFR 9036.2(a)(3): Delete "2 U.S.C. 432(c)(2), 434(b)(2) and 11 CFR 102.9(a) (20), 104.2(b)(2)", insert "2 USC

432(c)(3), 434(b)(3)(A), and 11 CFR 102.9(a)(2), 104.3 (a)(4)(i)".

Dated: March 27, 1980.

Robert O. Tiernan,

*Chairman, Federal Election Commission.*

[FR Doc. 80-9876 Filed 3-31-80; 8:45 am]

BILLING CODE 6715-01-M

## 11 CFR Parts 100, 110, and 114

## Funding and Sponsorship of Federal Candidate Debates

**AGENCY:** Federal Election Commission.

**ACTION:** Final rule: Announcement of effective date.

**SUMMARY:** The Commission announces the effective date of regulations on the funding and sponsorship of nonpartisan candidate debates published on December 27, 1979, at 44 FR 76736.

**EFFECTIVE DATE:** April 1, 1980.

**FOR FURTHER INFORMATION CONTACT:** Ms. Patricia Ann Fiori, Assistant General Counsel, 1325 K Street NW., Washington, D.C. 20463, (202) 523-4143.

**SUPPLEMENTARY INFORMATION:** On December 27, 1979, at 44 FR 76736, the Commission published regulations on the funding and sponsorship of candidate debates. The regulations create an exemption from various provisions of the Federal Election Campaign Act to permit certain nonprofit organizations and news media organizations to stage nonpartisan federal candidate debates.

2 U.S.C. 439(d) (formerly 2 U.S.C. 438(c)) requires that any rule or regulations proposed by the Commission to implement Chapter 14 of Title 2, United States Code, be transmitted to the Speaker of the House and the President of the Senate prior to final promulgation. If neither House of Congress disapproves the regulation within 30 legislative days after its transmittal, the Commission may finally prescribe the regulation.

The regulations published at 44 FR 76736 were transmitted to Congress on December 20, 1979. 30 legislative days having passed, the Commission announces they will become effective on publication of this notice.

"11 CFR 100.4(b)(16), 100.7(b)(18), 110.13, and 114.4(e), published at 44 FR 76736, are effective as of April 1, 1980."

Dated: March 27, 1980.

Robert O. Tiernan,

*Chairman, Federal Election Commission.*

[FR Doc. 80-9877 Filed 3-31-80; 8:45 am]

BILLING CODE 6715-01-M

**NOTICES**

Dated: April 13, 1978.

COURTNEY RIARDON,
*Acting Associate Deputy Assist-
ant Administrator for Air,
Land, and Water Use.*

[FR Doc. 78-10608 Filed 4-18-78; 8:45 am]

[6410-01]

## FEDERAL ELECTION COMMISSION

[Notice 1978-4]

### VACATING PAST COMMISSION POLICY PRONOUNCEMENTS

Under the Federal Election Commission's statutory authority in 2 U.S.C. § 437c(b)(1) and § 437d(a)(9) to formulate general policy with respect to the administration of the Federal Election Campaign Act of 1971, as amended (and chapters 95 and 96 of the Internal Revenue Code of 1954), the Commission has issued a number of policy statements, interim guidelines, and other pronouncements of a policy nature which were published in the FEDERAL REGISTER. These policy materials were published between June 1975 and January 1977 as a means of expressing the Commission's interpretation and intended application of selected provisions of the act. Certain other policy pronouncements, publicized through the FEC Record and other means but not published in the FEDERAL REGISTER, were also issued during the stated time period.

Since the Commission's regulations were prescribed on April 13, 1977 (42 FR 19324) and the policy statements were originally conceived as only interim pronouncements, by vote of the Commission on February 9, 1978, these policy statements and other policy materials listed below have no continuing legal effect. It should be noted, however, that any advisory opinion incorporating or applying an interpretation of the act or Commission regulations, which was also set forth in a policy statement, is of continuing validity for purposes of 2 U.S.C. § 437f.

There follows a listing of policy statements, interim guidelines, and various other policy pronouncements which are vacated. Citations to advisory opinions, and Commission responses to advisory opinion requests, are inserted with respect to particular policy statements. These opinion responses are not abrogated by the Commission's decision to vacate the listed policy pronouncements.

| FEC notice No. | Publication date | Citation |
|---|---|---|
| 1975-1 | June 2, 1975 | 40 FR 23831 |
| 1975-3 | June 16, 1975 | 40 FR 25440 |
| 1975-4 | June 24, 1975 | 40 FR 26659 |
| 1975-6 | June 26, 1975 | 40 FR 26991 |

| FEC notice No. | Publication date | Citation |
|---|---|---|
| 1975-9 | July 7, 1975 | 40 FR 28578 |
| 1975-19 | Aug. 5, 1975 | 40 FR 32852 |
| 1975-20 | do | 40 FR 32950 |
| 1975-23 | Aug. 11, 1975 | 40 FR 33817 |
| 1975-34 | Sept. 3, 1975 | 40 FR 40668 |
| 1975-36 | do | 40 FR 40671 |
| 1975-40 | Sept. 9, 1975 | 40 FR 41953 |
| 1975-47 | Sept. 22, 1975 | 40 FR 43660 |
| 1975-50 | Sept. 29, 1975 | 40 FR 44708 |
| 1975-53 | Oct. 9, 1975 | 40 FR 47691 |
| 1975-81 | Dec. 17, 1975 | 40 FR 58617 |
| 1976-30 | June 18, 1976. See Advisory Opinion (AO) 1975-12 at 40 FR 55506. | 40 FR 34513 |
| Unpublished | Issued August 30, 1976. (Funding presidential debates sponsored by League of Women Voters). | None |
| 1976-46 | October 6, 1976. See Commission's response to Advisory Opinion Request (AOR) 1976-30. | 41 FR 44130 |
| 1976-50 | October 8, 1976. See AO's 1976-36, 1976-74 and 1977-18. | 41 FR 44130 |
| 1976-56 | October 18, 1976 | 41 FR 45964 |
| 1976-57 | do | 41 FR 45967 |
| 1976-73 | January 13, 1977. See the Commission's response to AOR's 1976-101 and 1976-102; also see AO's 1977-11, -34, -39, and -48 which by implication clarify some of the issues treated in the policy statement. | 42 FR 2694 |
| § | | |

Dated: April 14, 1978.

THOMAS E. HARRIS,
*Chairman for the
Federal Election Commission.*

[FR Doc. 78-10567 Filed 4-18-78; 8:45 am]

[6730-01]

## FEDERAL MARITIME COMMISSION

### AGREEMENTS FILED

The Federal Maritime Commission hereby gives notice that the following agreements have been filed with the Commission for approval pursuant to section 15 of the Shipping Act, 1916, as amended (39 Stat. 733, 75 Stat. 763, 46 U.S.C. 814).

Interested parties may inspect and obtain a copy of each of the agreements and the justifications offered therefor at the Washington Office of the Federal Maritime Commission, 1100 L Street NW., Room 10126; or may inspect the agreements at the Field Offices located at New York, N.Y.; New Orleans, La.; San Francisco, Calif.; and San Juan, Puerto Rico. Interested parties may submit comments on each agreement, including requests for hearing, to the Secretary, Federal Maritime Commission, Washington, D.C. 20573, by May 1, 1978. Comments should include facts and arguments concerning the approval, modification, or disapproval of the proposed agreement. Comments shall discuss with particularity allegations that the agreement is unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or operates to the detriment of the commerce of the United States, or is contrary to the public interest, or is in violation of the Act.

A copy of any comments should also be forwarded to the party filing the agreements and the statement should indicate that this has been done.

AGREEMENT No. 10330

Filing Party: William H. Fort, Esquire, Kominers, Port, Schlefer & Boyer, 1776 F Street NW., Washington, D.C. 20006.

Summary: Agreement No. 10330, between Companhia de Navegacao Lloyd Brasileiro and Prudencial Lines, Inc., is a cargo revenue pooling and sailing agreement in the northbound trade from Brasilian ports in the Rio Grande/Rio de Janeiro range, both inclusive, to any port on the United States Pacific Coast. The agreement sets forth, among other things, individual pool shares, minimum number of required sailings, settlement and forfeiture procedures, and establishes an expiration date of December 31, 1980.

By Order of the Federal Maritime Commission.

Dated: April 14, 1978.

FRANCIS C. HURNEY,
*Secretary.*

[FR Doc. 78-10570 Filed 4-18-78; 8:45 am]

[6730-01]

### AGREEMENTS FILED

The Federal Maritime Commission hereby gives notice that the following agreements have been filed with the Commission for approval pursuant to section 15 of the Shipping Act, 1916, as amended (39 Stat. 733, 75 Stat. 763, 46 U.S.C. 814).

Interested parties may inspect and obtain a copy of each of the agreements and the justifications offered therefor at the Washington Office of the Federal Maritime Commission, 1100 L Street NW., Room 10126; or may inspect the agreements at the Field Offices located at New York, N.Y.; New Orleans, La.; San Francisco, Calif.; and San Juan, Puerto Rico. Interested parties may submit comments on each agreement, including requests for hearing, to the Secretary, Federal Maritime Commission, Washington, D.C., 20573, by May 1, 1978 in which this notice appears. Comments should include facts and arguments concerning the approval, modification, or disapproval of the proposed agreement.

# LEGISLATIVE HISTORY
## OF
# FEDERAL ELECTION CAMPAIGN ACT AMENDMENTS
## OF
# 1976



**The Federal Election Commission**
1325 K Street, Northwest
Washington, D.C.   20463

August 1977

<u>Becker, et al. v. FEC</u>
00-CV-11192 MLW
Exhibit G

For sale by the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402

94TH CONGRESS }  HOUSE OF REPRESENTATIVES {  REPORT
2d Session    }                             { No. 94–1057

# FEDERAL ELECTION CAMPAIGN ACT AMENDMENTS OF 1976

APRIL 28, 1976.—Ordered to be printed

Mr. HAYS of Ohio, from the committee of conference,
submitted the following

## CONFERENCE REPORT

[To accompany S. 3065]

The committee of conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (S. 3065) to amend the Federal Election Campaign Act of 1971 to provide for its administration by a Federal Election Commission appointed in accordance with the requirements of the Constitution, and for other purposes, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its disagreement to the amendment of the House to the text of the bill and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the House amendment insert the following:

### SHORT TITLE

SECTION 1. This Act may be cited as the "Federal Election Campaign Act Amendments of 1976".

## TITLE I—AMENDMENTS TO FEDERAL ELECTION CAMPAIGN ACT OF 1971

### FEDERAL ELECTION COMMISSION MEMBERSHIP

SEC. 101. (a) (1) The second sentence of section 309(a) (1) of the Federal Election Campaign Act of 1971 (2 U.S.C. 437c(a) (1)), as redesignated by section 105 (hereinafter in this Act referred to as the "Act"), is amended to read as follows: "The Commission is composed of the Secretary of the Senate and the Clerk of the House of Representatives, ex officio and without the right to vote, and 6 members ap-

57–006 O

## JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (S. 3065) to amend the Federal Election Campaign Act of 1971 to provide for its administration by a Federal Election Commission appointed in accordance with the requirements of the Constitution, and for other purposes, submit the following joint statement to the House and the Senate in explanation of the effect of the action agreed upon by the managers and recommended in the accompanying conference report:

The House amendment to the text of the bill struck out all of the Senate bill after the enacting clause and inserted a substitute text.

The Senate recedes from its disagreement to the amendment of the House with an amendment which is a substitute for the Senate bill and the House amendment. The differences between the Senate bill, the House amendment, and the substitute agreed to in conference are noted below, except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor drafting and clarifying changes.

### SHORT TITLE

The Senate bill, the House amendment, and the conference substitute provide that this legislation may be cited as the "Federal Election Campaign Act Amendments of 1976".

## AMENDMENTS TO FEDERAL ELECTION CAMPAIGN ACT OF 1971

### FEDERAL ELECTION COMMISSION MEMBERSHIP

*Senate bill*

Section 101 of the Senate bill amended the Federal Election Campaign Act of 1971 (hereinafter in this statement referred to as the "Act") to provide that the Federal Election Commission (hereinafter in this statement referred to as the "Commission") is to consist of the Secretary of the Senate, the Clerk of the House, both ex officio and without the right to vote, and 8 members appointed by the President by and with the advice and consent of the Senate. No more than 3 members of the Commission at any time may be affiliated with the same political party, and at least 2 members shall not be affiliated with any party.

The bill provided for 8-year terms for members with the terms of 2 members, not affiliated with the same political party, expiring every 2 years, beginning in 1977, so that members are not reap-

## 59

The conference substitute is the same as the House amendment and the Senate bill with regard to an overall limitation of $25,000 on contributions by an individual in a calendar year and with regard to defining "contribution".

This definition distinguishes between independent expressions of an individual's views and the use of an individual's resources to aid a candidate in a manner indistinguishable in substance from the direct payment of cash to a candidate.

The conference substitute is the same as the House amendment and the Senate bill with regard to contributions made through intermediaries.

The conference substitute is the same as the House amendment and the Senate bill regarding limitations on expenditures by a candidate who is eligible to receive public campaign financing funds, except that the conference substitute uses the language of the Senate bill with regard to the eligibility requirement.

The conference substitute is the same as the House amendment and the Senate bill with regard to political party expenditures on behalf of the party's candidates. This limited permission allows the political parties to make contributions in kind by spending money for certain functions to aid the individual candidates who represent the party during the election process. Thus, but for this subsection, these expenditures would be covered by the contribution limitations stated in subsections (a) (1) and (a) (2) of this provision.

The conference substitute is the same as the Senate bill with regard to contributions by the Republican or Democratic senatorial campaign committee, except that the amount of such contributions is limited to $17,500 per candidate.

It is the conferees' intent that the additional calendar year contribution limitations imposed by section 320 of the Act shall apply in the first instance to the period beginning on the date of the enactment of the conference substitute and extending through December 31, 1976. Thereafter, of course, the term "calendar year" will be accorded its normal meaning.

### B. CONTRIBUTIONS OR EXPENDITURES BY NATIONAL BANKS, CORPORATIONS, OR LABOR ORGANIZATIONS

### *Senate bill*

Section 610 of title 18, United States Code, prohibiting contributions by corporations and labor organizations, was transferred by the Senate bill from title 18 to the Act as new section 321 of the Act. The following changes from existing law are noted:

(1) The penalty provisions are removed from the section and replaced by a general penalty provision contained in a new section 328 of the Act which includes a separate provision making it a felony to violate the anticoercion provisions of this section. Violations of this section would also be subject to the civil enforcement powers of the Commission and the courts under the Senate bill.

(2) Corporations are prohibited from soliciting contributions from persons who are not stockholders, executive or administrative personnel, or the families of such persons, and labor organizations are pro-

hibited from soliciting contributions from persons other than members of the organization and their families. The term "executive or administrative personnel" is defined as individuals who are paid by salary rather than on an hourly basis, and who have policymaking or supervisory responsibilities. The term "stockholder" is defined to include any individual who has a legal, vested, or beneficial interest in stock, including, but not limited to, employees of a corporation who participate in a stock bonus, stock option, or employee stock ownership plan.

(3) Corporations, labor organizations, or separate segregated funds of such corporation or labor organization may in addition to (2) above, make 2 written solicitations for contributions during a calendar year from any stockholder, officer, or employee of a corporation or the families of such persons. Such solicitations may be made only by mail to such person's residence and designed so that the corporation, labor organization, or separate segregated fund conducting such solicitation cannot determine who makes a contribution as a result of such solicitation and who does not.

(4) A membership organization, cooperative, or corporation without capital stock or a separate segregated fund established by such organizations may solicit contributions to such a fund from members of such organization, cooperative, or corporation without capital stock.

(5) Any method of soliciting voluntary contributions or of facilitating the making of voluntary contributions to a separate segregated fund permitted to corporations shall also be permitted to labor organizations.

(6) A corporation which uses any particular method for soliciting or facilitating the making of voluntary contributions to a separate segregated fund is required to make that method available to a labor organization representing employees of that corporation upon written request and at a cost sufficient only to reimburse the corporation for the expenses incurred thereby.

*House amendment*

Section 321 (a) of the Act, as added by the House amendment, makes it unlawful for any national bank or any Federal corporation to make any contribution or expenditure in connection with (1) any election to any political office; or (2) any primary election or political convention or caucus held to select candidates for any political office. Subsection (a) also prohibits any corporation or labor organization from making a contribution or expenditure in connection with (1) any general election for Federal office; or (2) any primary election or political convention or caucus held to select candidates for any Federal office.

Subsection (a) also prohibits any candidate, political committee, or other person from knowingly accepting or receiving any contribution which is prohibited by section 321. It is also unlawful for any officer or director of a corporation or national bank, or any officer of a labor organization, to consent to any contribution or expenditure which is prohibited by section 321.

Section 321 (b) (1) defines the term "labor organization" to mean any organization or any agency or employee representation committee or plan in which employees participate and which exists for the purpose of dealing with employers regarding grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work.

Subsection (b) (2) defines the term "contribution or expenditure" to include any payment or other distribution of money, services, or anything of value (except a lawful loan by a national or State bank in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any Federal office.

Such term, however, does not include—

(1) communications on any subject by a corporation to its stockholders and executive officers and their families, or by a labor organization to its members and their families;

(2) nonpartisan registration and voting campaigns conducted by a corporation with respect to its stockholders and its executive officers and their families, or by a labor organization with respect to its members and their families; and

(3) the establishment, administration, and solicitation of contributions to a separate segregated fund to be used for political purposes by a corporation or labor organization, except that—

(A) it is unlawful for such a fund to make a contribution or expenditure through the use of money or anything of value secured by (i) physical force; (ii) job discrimination; (iii) financial reprisal; (iv) the threat of force, job discrimination, or financial reprisals; (v) dues, fees, or other moneys required as a condition of membership in a labor organization or as a condition of employment; or (vi) moneys obtained in any commercial transaction;

(B) it is unlawful for a corporation or a separate segregated fund established by a corporation to solicit contributions from any person other than stockholders and executive officers of such corporation and their families, for an incorporated trade association or a separate segregated fund established by such an association to solicit contributions from any person other than the stockholders and executive officers of the member corporations of such trade association and the families of stockholders and executive officers (to the extent that any such solicitation has been separately and specifically approved by the member corporation involved, and such member corporation has not approved any such solicitation by more than one such trade association in any calendar year), or for a labor organization or a separate segregated fund established by a labor organization to solicit contributions from any person other than the members of the labor organization and their families;

(C) any method of soliciting voluntary contributions, or of facilitating the making of voluntary contributions, to a separate segregated fund established by a corporation which may be used by a corporation also may be used by labor organizations; and

(D) a corporation which uses a method of soliciting voluntary contributions or facilitating the making of voluntary contributions shall make such method available to a labor organization representing any members who work for the corporation, upon written request by the labor organization.

## 62

The House amendment was intended to acknowledge the use by corporations of various methods, such as check-off systems, to solicit voluntary contributions or to facilitate the making of such contributions to separate segregated political funds. If a corporation uses such a method, the House amendment extended the same right to labor organizations. The House amendment, however, also would permit a corporation to allow a labor organization to use a method even though the corporation has chosen not to use such method. The House amendment also intended to authorize such methods notwithstanding any other provision of law.

In any instance in which a corporation uses a method (such as the use of computer data) to solicit voluntary contributions or to facilitate the making of contributions to separate segregated political funds, the House amendment also was intended to require that the corporation make such method available to a labor organization if the labor organization represents members who work for the corporation, and the labor organization makes a written request for the use of the method involved. The labor organization would be required to reimburse the corporation for any expense incurred in connection with the use of the method by the labor organization.

Subsection (b)(3) defines the term "executive officer" to mean an individual employed by a corporation who is paid on a salary rather than an hourly basis and who has policymaking or supervisory responsibilities.

### Conference substitute

The conference substitute is the same as the House amendment, except as follows:

1. The conference substitute follows the Senate bill in applying the definition of the term "contribution or expenditure" contained in section 321 to section 791(h) of the Public Utility Holding Company Act.

2. The conference substitute follows the Senate bill in using the term "executive or administrative personnel" throughout section 321 rather than "executive officer". The conference substitute defines that term to mean an employee who is paid on a salary, rather than hourly, basis and who has policymaking, managerial, professional, or supervisory responsibilities. The term "executive or administrative personnel" is intended to include the individuals who run the corporation's business, such as officers, other executives, and plant, division, and section managers, as well as individuals following the recognized professions, such as lawyers and engineers, who have not chosen to separate themselves from management by choosing a bargaining representative; but is not intended to include professionals who are members of a labor organization, or foremen who have direct supervision over hourly employees, or other lower level supervisors such as "strawbosses".

3. The conference substitute follows the Senate bill in requiring that when a corporation solicits its executive and administrative personnel as permitted by subsection (b)(4)(B), for a contribution to a separate segregated fund, the employee being solicited must be informed at the time of the solicitation of the political purposes of the fund and that he may refuse to contribute.

63

4. The conference substitute follows the Senate bill in permitting under certain circumstances written solicitations by corporations and labor organizations of stockholders, executive or administrative personnel, members of labor organizations, and other employees (and their families) of a corporation. It is the conferees' intent that in order to assure the ananymity of those who do not wish to respond or who wish to respond with a small contribution the mail solicitations shall be conducted so that an independent third person, who acts as fiduciary for the separate segregated fund, receives the return envelopes, keeps the necessary records, and provides the fund only with information as to the identity of individuals who make a single contribution of over $50 or multiple contributions that aggregate more than $100. The conference substitute follows the House amendment with regard to the solicitation by a trade association of stockholders and executive or administrative personnel (and their families) of a member corporation of such trade association. The conference substitute contains the provision of the Senate bill permitting a membership organization, cooperative, or corporation without capital stock, or a separate segregated fund established by such organizations, to solicit contributions to such a fund from members of such organization, cooperative, or corporation without capital stock. In light of the fact that subsection (b) (4) (D) governs solicitations by a trade association of the stockholders and executive or administrative personnel of a member corporation, the term "membership organization" in subsection (b) (4) (C) is not intended to include a trade association which is made up of corporations.

The conferees' intent is also noted with regard to the following additional points:

1. Subparagraphs (B) and (C) of section 301(f) (4), and subparagraphs (A) and (B) of section 321(b) (2), which were added to the law at different times, overlap in that both make exceptions to the term "expenditure" for internal communications and for nonpartisan registration and get-out-the-vote activity. The dual reference to internal communications is intended to permit corporations to write, or call, or address their stockholders and executive or administrative personnel and their families (and unions to reach their members and their families in the same ways), to communicate a partisan or nonpartisan political message, subject only to the reporting requirement added by the conference substitute and already discussed. (The conferees agree that section 301(f) (4) (C), as amended by the conference substitute, makes reporting requirements applicable to certain communications which are not expenditures under this section but which expressly advocate the election or defeat of a clearly identified candidate.) The conferees' intent with regard to the interrelationship between sections 301(f) (4) (B) and 321(b) (2) (B) which permit such activities as assisting eligible voters to register and to get to the polls, so long as these services are made available without regard to the voter's political preference, is the following: these provisions should be read together to permit corporations both to take part in nonpartisan registration and get-out-the-vote

activities that are not restricted to stockholders and executive or administrative personnel, if such activities are jointly sponsored by the corporation and an organization that does not endorse candidates and are conducted by that organization; and to permit corporations, on their own, to engage in such activities restricted to executive or administrative personnel and stockholders and their families. The same rule, of course, applies to labor organizations.

2. With regard to subparagraphs (B) and (C) of section 321 (b) (3), which provide certain protections to employees solicited by their employer, it is intended that the general rule inherent in the plan of the entire section—that unions insofar as they are employers, stand in the same shoes as corporations—shall apply. In addition, while the conference substitute permits corporations in connection with an overall solicitation of stockholders to solicit employee-stockholders, such a solicitation would, of course, have to be in conformity with the requirements of subparagraphs (B) and (C) of section 321(b) (3). The same rule, of course, applies to labor organizations in the solicitation of their members.

3. The conferees agree that subsections (b) (4) (B) and (b) (6), taken together, require a corporation to make available to the labor organization any method utilized by such corporation to make the written solicitation of employees and of stockholders who are not employees. However, if the corporation does not desire to relinquish or disclose to the labor organization the names and addresses of individuals to be solicited, it is the conferees' intent that an independent mailing service shall be retained to make the mailing for both the corporation and the labor organization. Finally, it is intended that in a situation in which there are several labor organizations, rather than one, with members at a single corporation, the unions as a group shall have no greater right to make solicitations than a single union would. It is the conferees' intent that corporations and labor organizations are entitled to utilize such method solely for a mail solicitation for contributions to their separate segregated fund and not for any other purpose.

4. Subsection (b) (5), as opposed to (b) (6), merely eliminates any legal impediment to the use by a labor organization of any method permitted by law to a corporation with regard to the solicitation of its stockholders and executive or administrative personnel, or with regard to facilitating the making of contributions by stockholders and executive and administrative personnel, and does not automatically make such methods available to unions.

5. The conference substitute does not define the term "stockholder". It is intended that in this regard the normal concepts of corporate law shall be controlling.

### C. CONTRIBUTIONS BY GOVERNMENT CONTRACTORS

*Senate bill*

The prohibitions against contributions by government contractors contained in 18 U.S.C. 611 were transferred to the Act as new section 322, absent the existing penalty provisions, which are replaced by the penalty and enforcement provisions under new sections 313 and 328