UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HEIDI BECKER, MEDEA BENJAMIN, PHIL DONAHUE, MARK DUNLEA, ANNE GOEKE, ELIZABETH HORTON SCHEFF, RALPH NADER, JAMES O'KEEFE, SUSAN SARANDON, NADER 2000 PRIMARY COMMITTEE, INC., ASSOCIATION OF STATE GREEN PARTIES and GREEN PARTY USA, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | 00-CV-11192 MLW |
| v. | ) ) ) | Defendant's Motion to Dismiss (Fed.R.Civ.P. 12(b)(1)) |
| FEDERAL ELECTION COMMISSION, | ) ) | **ORAL ARGUMENT** |
| Defendant. | ) | **CONDITIONALLY** **REQUESTED** |

## DEFENDANT FEDERAL ELECTION COMMISSION'S MOTION TO DISMISS FOR LACK OF JURISDICTION

Defendant Federal Election Commission ("Commission") hereby moves the Court,

pursuant to Federal Rule of Civil Procedure 12(b)(1), to dismiss plaintiffs' complaint for lack of

jurisdiction. The Commission submits a memorandum in support of its motion to dismiss

herewith, that states in greater detail the following grounds for dismissal of this lawsuit:

- The Federal Election Campaign Act, 2 U.S.C. 431 et seq., provides that the

Commission's administrative procedures, 2 U.S.C. 437g, are the exclusive remedy for

complaints about possible violations of the Federal Election Campaign Act ("Act"), and therefore

the plaintiffs' allegations that the Commission on Presidential Debates' selection criteria for the

proposed 2000 presidential debates, and source of funds for those debates, violate the Act must

be brought to the Commission, not this Court, 2 U.S.C. 437d(e);

- Even if plaintiffs' allegations were not about violations of the Act, but actually sought facial review of the Commission's debate regulations, plaintiffs' failure to exhaust their administrative remedies by petitioning the Commission for a rulemaking on that subject deprives this Court of jurisdiction; and

- Even if this Court had statutory jurisdiction, none of the twelve plaintiffs can demonstrate Article III standing.

The undersigned counsel Erin K. Monaghan certifies that she consulted with Gregory G. Luke, opposing counsel, on July 18, 2000, pursuant to Local Rule 7.1(A)(2), and that counsel for the plaintiffs opposes this motion to dismiss.

Pursuant to Local Rule 7.1(d), the Commission requests that, if oral argument is granted on plaintiffs' motion for a preliminary injunction, then this motion be set for oral argument prior to, or concurrently with, the argument on plaintiffs' motion.

Wherefore, for the reasons stated in the accompanying memorandum, the Federal Election Commission requests that the Court dismiss plaintiffs' complaint in this lawsuit. A proposed order of dismissal is submitted herewith.

Respectfully submitted,

Lawrence M. Noble
General Counsel

Richard B. Bader
Associate General Counsel

_____

Stephen E. Hershkowitz
Assistant General Counsel


_____

Vivien Clair
Attorney


_____

Erin K. Monaghan
Attorney



July 21, 2000                    FOR THE DEFENDANT
                                 FEDERAL ELECTION COMMISSION
                                 999 E Street, N.W.
                                 Washington, D.C.  20463
                                 (202) 694-1650
                                 facsimile:  (202)-219-0260



### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Scott P. Lewis, Palmer & Dodge LLP, One Beacon Street, Boston MA 02108-0100, and John C. Bonifaz, National Voting Rights Institute, 294 Washington Street, Suite 713, Boston MA 02108, the attorneys of record for plaintiffs, by facsimile and first-class United States mail, postage prepaid, on July 21, 2000.


_____

Erin K. Monaghan

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

HEIDI BECKER, MEDEA BENJAMIN, PHIL       )
DONAHUE, MARK DUNLEA, ANNE               )
GOEKE, ELIZABETH HORTON SCHEFF,          )
RALPH NADER, JAMES O'KEEFE, SUSAN        )
SARANDON, NADER 2000 PRIMARY             )
COMMITTEE, INC., ASSOCIATION OF          )
STATE GREEN PARTIES and GREEN            )
PARTY USA,                               )
                                         )     00-CV-11192 MLW
                        Plaintiffs,      )
                                         )
            v.                           )
                                         )
FEDERAL ELECTION COMMISSION,             )
                                         )
                        Defendant.       )

## ORDER

Upon consideration of defendant Federal Election Commission's motion to dismiss

plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), plaintiffs' response to

the motion, and argument presented by the parties at argument on the motion, it is hereby

ORDERED, that defendant's motion is GRANTED; and it is further

ORDERED, that plaintiffs' complaint be, and hereby is, DISMISSED.

_____
Mark L. Wolf
United States District Judge

Dated: _____, 2000
          Boston, Massachusetts

copies to:
John C. Bonifaz
Gregory G. Luke
National Voting Rights Institute
294 Washington Street, Suite 713
Boston, MA  02108
Counsel for the Plaintiffs

Scott P. Lewis
Palmer & Dodge LLP
One Beacon Street
Boston, MA  02108
Counsel for the Plaintiffs

Erin K. Monaghan
Federal Election Commission
999 E Street, N.W.
Washington, D.C.  20463
Counsel for the Defendant

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HEIDI BECKER, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 00-CV-11192 MLW |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
PLAINTIFFS' COMPLAINT FOR LACK OF JURISDICTION**

Lawrence M. Noble
General Counsel

Richard B. Bader
Associate General Counsel

Stephen E. Hershkowitz
Assistant General Counsel

Vivien Clair
Attorney

Erin K. Monaghan
Attorney

FOR THE DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

July 21, 2000

# TABLE OF CONTENTS

**PAGE**

ARGUMENT.................................................................................................2

I.   BACKGROUND......................................................................................2

      A.   Statutory Framework.........................................................................2

      B.   The Debate Regulations ....................................................................3

II.  THE ACT FORECLOSES JURISDICTION IN THIS CASE .........................5

III. PLAINTIFFS HAVE FAILED TO EXHAUST THEIR ADMINISTRATIVE
    REMEDIES BECAUSE THE STATUTORY ARGUMENTS THEY
    PRESENT TO THIS COURT HAVE NOT BEEN PRESENTED TO THE
    COMMISSION......................................................................................9

IV.  THIS CASE SHOULD BE DISMISSED BECAUSE PLAINTIFFS LACK
    STANDING.........................................................................................12

      A.  The Elements of Standing...................................................................12

      B.  None of the Plaintiffs Has Alleged Facts Supporting an Injury in
         Fact.................................................................................................14

            1.   No One Is Legally Harmed if Ralph Nader Does Not Participate
               in Debates with the Major Party Candidates..................................16

            2.   The Plaintiffs Are Not Harmed by the Use of Corporate Funds
               to Pay for Staging the Presidential Debates...................................19

      C.   Plaintiff's Have Failed to Allege Facts Showing that Their Claimed
         Harms Are Caused by the Debate Regulations ...................................21

      D.   Plaintiffs Cannot Demonstrate that Any Injury Caused by the
         Debate Regulations Can be Redressed by this Court...........................22

CONCLUSION ................................................................................................24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HEIDI BECKER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 00-CV-11192 MLW |
| | ) | |
| FEDERAL ELECTION COMMISSION, | ) | FEC Supporting Memorandum |
| | ) | |
| Defendant. | ) | |

**DEFENDANT FEDERAL ELECTION COMMISSION'S
MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
PLAINTIFFS' COMPLAINT FOR LACK OF JURISDICTION**

Plaintiffs filed a complaint alleging that the defendant Federal Election Commission ("the

Commission" or "FEC") exceeded its statutory authority by promulgating two regulations,

11 C.F.R. 110.13 and 114.4(f) ("the debate regulations"). Plaintiffs contend that those

regulations will permit the Commission on Presidential Debates ("CPD") to use corporate and

labor union treasury funds to stage debates this year that will include the two major party

presidential candidates but likely exclude third party and independent candidates. Plaintiffs

believe the use of these funds would constitute corporate contributions prohibited by 2 U.S.C.

441b(a), a provision of the Federal Election Campaign Act of 1971, as amended, codified at

2 U.S.C. 431-455 ("the Act" or "FECA"). Although plaintiffs frame their complaint as a facial

challenge to the debate regulations, in fact the gravamen of their complaint is their claim that

CPD's financing of the proposed presidential debates this year will violate 2 U.S.C. 441b.

The Commission has moved to dismiss this suit on jurisdictional grounds. The Act

provides that the Commission's administrative procedures are the "exclusive remedy" for

complaints about possible violations of the Act, such as the plaintiffs' allegations that CPD is

preparing to violate 2 U.S.C. 441b.  See 2 U.S.C. 437d(e).  If the Commission dismisses such a complaint in reliance on its regulations or for any other reason, that action is reviewable, but only in the United States District Court for the District of Columbia.  2 U.S.C. 437g(a)(8). Furthermore, even if this suit were actually a proper facial challenge to the Commission's debate regulations, plaintiffs' failure to exhaust their administrative remedies by petitioning the Commission for a rulemaking to consider their proposed construction of the Act deprives this Court of jurisdiction.  Finally, even if this Court had statutory jurisdiction, none of the twelve plaintiffs can demonstrate Article III standing.  Accordingly, this suit should be dismissed.

## ARGUMENT

I.    **BACKGROUND**

A.    **Statutory Framework**

2 U.S.C. Section 441b generally prohibits corporations and labor organizations from making a contribution or expenditure in connection with any election to a federal office.  See 2 U.S.C. 441b(a).  However, not all uses of corporate or union funds are subject to that prohibition.  Section 441b itself excludes several kinds of political disbursements from the section's definition of "contribution or expenditure."  As defined in section 441b(b), that term includes, inter alia, "any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value ... to any candidate, campaign committee or political party or organization, in connection with any election" to federal office.  The term excludes (1) communications "on any subject" by a corporation to its stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (2) "nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their

2

families, or by a labor organization aimed at to its members and their families;" and (3) "the

establishment, administration, and solicitation of contributions to a separate segregated fund to

be utilized for political purposes." 2 U.S.C. 441b(b)(2)(A)-(C). The Supreme Court has also

held that independent corporate expenditures for communications addressing political matters are

not subject to section 441b unless they expressly advocate the election or defeat of a clearly

identified candidate. FEC v. Massachusetts Citizens for Life, Inc., ("MCFL"), 479 U.S. 238, 249

(1986).

The Act also contains a general definition section, 2 U.S.C. 431, under which the terms

"contribution" and "expenditure" are defined. "Contribution" and "expenditure" are both

defined to include, any gift, loan, deposit, or advance of money or of "anything of value . . . for

the purpose of influencing any election for Federal office." 2 U.S.C. 431(8)(A)(i), 431(9)(A)(i).

Both of these definitions exclude "any payment made or obligation incurred by a corporation or

labor union which, under section 441b(b) of this title, would not constitute an expenditure by

such corporation or labor organization." 2 U.S.C. 431(8)(B)(vi) and 431(9)(B)(v). The

definition of "expenditure" also expressly excludes "nonpartisan activity designed to encourage

individuals to vote or to register to vote." 2 U.S.C. 431(9)(B)(ii).

## B.    The Debate Regulations

In 1980, the Commission issued regulations interpreting section 441b as not prohibiting

payments by certain organizations to stage and finance public debates among candidates for

federal office. These debate regulations, which were revised in early 1996, set eligibility

requirements for organizations that may stage debates among candidates for federal office, and

requirements for the structure and selection of participants in candidate debates by those

organizations.[1]  See 11 C.F.R. 113.10.  A debate staging organization must be a nonprofit

organization that "do[es] not endorse, support or oppose political candidates or political

parties[,]" 11 C.F.R. 110.13(a)(1), or a media entity "not owned or controlled by a political party,

political committee or candidate[,]" id. at (a)(2).  A debate must "include at least two

candidates[,]" and the staging organization may not "structure the debates to promote or advance

one candidate over another."  11 C.F.R.113.10(b).  Staging organizations "must use pre-

established objective criteria to determine which candidates may participate in a debate[,]" and

for general election debates "shall not use nomination by a particular political party as the sole

objective criterion to determine whether to include a candidate in a debate."  11 C.F.R. 113.10(c).

    The debate regulations permit corporations and labor organizations to donate funds to

staging organizations that meet these various requirements for safeguarding against promoting or

opposing the election of particular candidates.  11 C.F.R. 114.4(f)(3).  A complementary

provision permits the staging organizations (qualified under 26 U.S.C. 501(c)(3) or (c)(4)) to use

any donated corporate or labor union funds, as well as their own funds, to defray the costs of

staging debates.  11 C.F.R. 114.4(f)(1).  Donations authorized by 11 C.F.R. 114.4(f) are also

expressly excluded from the Commission's general regulatory definitions of "contribution" and

"expenditure."  See 11 C.F.R. 100.7(b)(21) (excluded from "contribution") and 100.8(b)(23)

(excluded from "expenditure").

    As required by 2 U.S.C. 438(d), in 1996 the Commission submitted these revised

regulations to Congress before finally promulgating them, and Congress took no action to

---

[1]    The debate regulations are not limited to debates among candidates for the presidency and
vice-presidency of the United States, but also apply to debates among candidates for seats in the
United States Senate and House of Representatives.  See 11 C.F.R. 113.10.

disapprove them during the subsequent 30-day period the statute provides.

## II.   THE ACT FORECLOSES JURISDICTION IN THIS CASE

This entire case really concerns purported violations of 2 U.S.C. 441b(a) that plaintiffs

allege CPD will soon commit.  Although plaintiffs try to couch their allegations about CPD in

general terms, the crux of their complaint and motion for preliminary injunction is their

allegation that the Commission, relying upon the debate regulations, would reject their claim that

CPD's financing of presidential debates in 2000 will violate 2 U.S.C. 441b.  Plaintiffs assert that

CPD's criteria for determining debate participation will likely operate to exclude third party

candidates and independent candidates, and that CPD's use of corporate funds to pay for debates

will be corporate contributions prohibited by 2 U.S.C. 441b.  But a claim that CPD's financing of

candidate debates is illegal is not a facial challenge to the regulation itself.  Rather, it is a thinly

veiled allegation that CPD is about to violate the law—a matter that is within the Commission's

exclusive jurisdiction to enforce the Act.  2 U.S.C. 437c(b)(1), 437d(e).

Plaintiffs assert that their action "arises under" the Administrative Procedure Act

("APA").  See Complaint ¶ 2. However, the APA, which authorizes any person "adversely

affected or aggrieved by agency action" to seek judicial review, 5 U.S.C. 702, is inapplicable

here since plaintiffs seek an adjudication of the law applicable to CPD, which is within the

Commission's exclusive enforcement jurisdiction, not of the law applicable to themselves. See

Stockman v. FEC, 138 F.3d 144, 151-52 (5th Cir. 1998). Cf. FEC v. NCPAC, 470 U.S. 480, 485-

88 (1985).[2]

---

[2]   Plaintiffs base this Court's jurisdiction on 28 U.S.C. 1331. See Complaint ¶ 2. If the APA's
provisions for judicial review do not create a cause of action for plaintiffs' claim, then this more
general provision is of no aid here, for it, unlike the APA, see 5 U.S.C. 702, contains no waiver
of sovereign immunity.  See MacMann v. Titus, 819 F.2d 8, 9-10 (1st Cir. 1987). The Declaratory

Plaintiffs are trying to use the APA to bypass the Commission's exclusive statutory procedure in order to obtain a judicial decision that CPD's proposed actions are illegal in advance of the debates scheduled for October.  However, a "'challenge to administrative action . . . falls outside the grant of jurisdiction [in the APA] when the only harm the challenger seeks to avert is the inconvenience of having to go through the administrative process before obtaining a definitive declaration of his legal rights.'"  Stockman, 138 F.3d at 155 (citation omitted, brackets and ellipsis in original).

> [I]n formulating those procedures Congress, whose members are elected every two or six years, knew full well that complaints filed shortly before elections, or debates, might not be investigated and prosecuted until after the event.  Congress could have chosen to allow judicial intervention in the face of such exigencies, but it did not do so.  And as we have said, a court is not free to disregard that congressional judgment.

Perot v. FEC, 97 F.3d 553, 559 (D.C. Cir. 1996), cert. denied, 520 U.S. 1210 (1997), quoted in

Stockman, 138 F.3d at 156.

The Supreme Court has cautioned that "before any review at all may be had [under the Administrative Procedure Act], a party must first clear the hurdle of § 701(a) [of the APA]." Heckler v. Chaney, 470 U.S. 821, 828 (1985). Section 701(a) provides that "[t]his chapter applies . . . except to the extent that" the relevant underlying statutes "preclude judicial review . . . ." 5 U.S.C. 701(a).  See Stockman, 138 F.3d at 152 n.13, 155, and n.18. Congress

---

Judgment Act, 28 U.S.C. 2201, cited by the plaintiffs, also does not waive sovereign immunity, and it provides no jurisdictional basis for actions under federal law. See Progressive Consumers Federal Credit Union v. United States, 79 F.3d 1228, 1230-31 (1st Cir. 1996). Furthermore, specific provisions for judicial action in a comprehensive scheme, like 2 U.S.C. 437g, discussed infra, ordinarily displace general jurisdictional provisions, such as section 1331. See, e.g., Brown v. GSA, 425 U.S. 820 (1976); Preiser v. Rodrigues, 411 U.S. 475, 488-490 (1973); Stockman, 138 F.3d at 152-55.

explicitly vested the Commission with "exclusive jurisdiction with respect to the civil enforcement of" the Act. 2 U.S.C. 437c(b)(1). When Congress enacted 2 U.S.C. 437c(b)(1) in 1976, it stated that it was using the term "exclusive primary jurisdiction" in that provision in its technical legal sense, to accord the Commission jurisdiction over matters within its special competence to the exclusion of "all other tribunals."[3] See H.R. Rep. No. 917, 94th Cong., 2d Sess. 4 (1976). The Conference Committee expressly adopted the view of the House Report. H.R. Rep. No. 1057, 94th Cong., 2d Sess. 35 (1976). See Stockman, 138 F.3d at 154.[4]

The Act precludes judicial review under the APA for a challenge concerning the civil enforcement of FECA because it provides an exclusive administrative procedure for review by the Commission when a party believes the Act has been or will be violated. See 2 U.S.C. 437g. The party must file a complaint with the Commission, which then follows a detailed procedure for investigating the complaint, 2 U.S.C. 437g, tailored to the delicate First Amendment area in which the Commission regulates. Galliano v. United States Postal Service, 836 F.2d 1362, 1370 (D.C. Cir. 1988); Perot, 97 F.3d at 559 (Section 437g sets out "procedures purposely designed to ensure fairness not only to complainants but also to respondents"); In re Carter-Mondale Re-election Committee, Inc., 642 F.2d 538, 542-543, 545 (D.C. Cir. 1980). The Act explicitly limits judicial review of the Commission's conclusion that actions of a private party do not violate the Act to the United States District Court for the District of Columbia. 2 U.S.C.

---

[3]     The 1974 Senate bill had included a provision for judicial review of "[a]ny agency action by the Commission" under the Act. See S.3044, 93rd Cong., 2d Sess. § 209 (1974); 120 Cong. Rec.10,959 (1974); S.Rep. No. 689, 93rd Cong., 2d Sess. 63 (1974). The Conference Committee, however, deleted this proposed review provision, H.R. Conf. Rep. No. 1438, 93rd Cong. 2d Sess. 94-96.

[4]     In 1980, Congress amended the Act to delete the word "primary" so as to eliminate an apparently redundant word. See Stockman, 138 F.3d at 154 n.17.

7

437g(a)(8)(A).[5] See Stockman, 138 F.3d at 153. Only if the Commission fails to comply with an order of that court finding its rejection of the administrative complaint to be contrary to law can a private party file its own private action to remedy the alleged violation. 2 U.S.C. 437g(a)(8)(C). FEC v. NCPAC, 470 U.S. at 488.[6]

The Act explicitly provides that this administrative procedure is "the exclusive civil remedy for enforcement of this Act." 2 U.S.C. 437d(e). This exclusive jurisdiction is to be "scrupulously respect[ed]." Stockman, 138 F.3d at 152; In re Carter-Mondale, 642 F.2d at 543. Apart from the procedure prescribed in section 437g(a)(8), there is no private right of action to enforce the Act against an alleged violator. Karahalios v. National Fed'n of Fed. Employees, Local 1263, 489 U.S. 527, 533 (1989); Cort v. Ash, 422 U.S. 66, 74-76 (1975).[7] "'Congress could not have spoken more plainly in limiting the jurisdiction of federal courts to adjudicate claims under [the Act].'" Stockman, 138 F.3d at 153 (quoting Perot, 97 F.3d at 557). "The

---

[5]     Indeed, the United States District Court for the District of Columbia has pending a claim under section 437g(a)(8)—that CPD violated 2 U.S.C. 441b(a) by financing the 1996 presidential debates—in which the validity of the debate regulations is at issue. Natural Law Party v. FEC, No 98-1025 (D.D.C. filed April 24, 1998).

[6]     Congress relied upon the elaborate administrative enforcement process "to winnow out, short of litigation . . . those matters as to which settlement is both possible and desirable." H.R.Rep. 917, at 4. Thus, "Congress has explicitly expressed its desire to have the FEC engage in methods of conference, conciliation and persuasion before litigation ensues over any federal election laws." In re Carter-Mondale, 642 F.2d at 543 (internal quotation marks and citation omitted).

[7]     See also Stockman, 138 F.3d at 152-153; National Committee of the Reform Party v. Democratic National Committee, 168 F.3d 360, 364 (9th Cir. 1999); Perot, 97 F.3d at 557; Gabauer v. Woodcock, 594 F.2d 662, 673 (8th Cir.), cert. denied, 444 U.S. 841 (1979); McNamara v. Johnston, 522 F.2d 1157, 1162 (7th Cir. 1975), cert. denied, 425 U.S. 911 (1976); In re Federal Election Campaign Act Litigation, 474 F.Supp. 1051, 1053 (D.D.C. 1979). Cf. Forbes v. Arkansas Educational Television Communication Network Foundation, 22 F.3d 1423, 1427 (8th Cir. 1994) (en banc) (alleged violations of Communications Act must be brought before Federal Communications Commission), cert. denied, 513 U.S. 995 (1994) and 514 U.S. 1110 (1995).

legislative history of the Campaign Act confirms that '[t]he delicately balanced scheme of

procedures and remedies set out in the Act is intended to be the exclusive means for vindicating

the rights and declaring the duties stated therein.'" Stockman, 138 F.3d at 154 (quoting

120 Cong. Rec. 35,134 (1974) (remarks of Chairman Hays, reporting the bill)).

Since the FECA gives the Commission exclusive jurisdiction over plaintiffs' complaint

that CPD's financing of and selection criteria for presidential debates this year will violate the

Act, with judicial review assigned exclusively to the United States District Court for the District

of Columbia, this Court lacks jurisdiction over their claims. Accordingly, this Court should

dismiss plaintiffs' complaint for lack of subject matter jurisdiction.

## III.   PLAINTIFFS HAVE FAILED TO EXHAUST THEIR ADMINISTRATIVE REMEDIES BECAUSE THE STATUTORY ARGUMENTS THEY PRESENT TO THIS COURT HAVE NOT BEEN PRESENTED TO THE COMMISSION

Even if plaintiffs could "clear the hurdle of §701(a)" of the APA, they have failed to

exhaust their administrative remedies.  None of the plaintiffs allege that they submitted any

comments at all during the 1995 rulemaking proceeding that produced the current debate

regulations.  Moreover, on May 25, 1999, the Commission received a petition for rulemaking

contending "that the objective criteria for inclusion in Presidential and Vice Presidential debates

should be established by the Commission itself, and not left to the discretion of the debate

staging organizations. Specifically, the petition recommends that the debates be open to any

candidate that (1) has the mathematical potential to win the election . . .; and (2) has proven his

or her viability by having spent at least $500,000 . . . ."  64 Fed. Reg. 31,160 (June 10, 1999)

(Exhibit 1).  Plaintiffs Association of State Green Parties and Mark Dunlea submitted comments

on this rulemaking petition, but did not present any of the statutory construction arguments they

ask this Court to address.  (Exhibits 2 and 3).

"Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." United States v. Tucker Truck Lines, 344 U.S. 33, 37 (1952). See also Massachusetts v. Hayes, 691 F2d 57, 60 (1st Cir. 1982). Thus, to challenge an agency's promulgation of a regulation under the APA, the person challenging the regulation ordinarily must demonstrate that he has exhausted the administrative remedies available to him. In this case, plaintiffs cannot satisfy this requirement. All the plaintiffs had an opportunity to present these arguments to the Commission during the 1995 rulemaking. Plaintiffs cannot circumvent the rulemaking proceeding by bringing those claims to this Court without first giving the Commission an opportunity to address them.

Where a plaintiff is challenging the validity of a regulation, the rule of exhaustion normally requires that the plaintiff first petition the agency for rulemaking on the issues presented. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997). See also Brown v. Secretary of HHS, 46 F.3d 102, 113-14 (1st Cir. 1995) ("Where . . . plaintiffs seek to raise a host of factual and policy issues . . . in a matter over which Congress has vested the Secretary with primary discretion, it was patently appropriate and, in many instances could be essential, for plaintiffs to have petitioned the agency before seeking judicial redress").

During the rulemaking challenged here, neither the plaintiffs nor anyone else argued to the Commission that it was beyond the agency's authority to promulgate any regulations permitting the use of corporate and union funds to sponsor candidate debates. If that argument had been presented to the Commission for consideration in the rulemaking, then a court would have the Commission's reasoning on that question to review as part of the administrative record.

Because no one presented these arguments to the Commission in the 1995 rulemaking, anyone who wants to challenge the regulations on those grounds should be required first to petition the Commission for a rulemaking or present those arguments to the Commission during the pending rulemaking. Only if the Commission rejects these arguments could they be ripe for judicial review.

Although "[c]onsideration of the issue by the agency at the behest of another party is enough to preserve it" in a subsequent challenge by a party that did not itself present it to the agency, Cellnet Communication, Inc. v. FCC, 965 F.2d 1106, 1109 (D.C. Cir. 1992), the failure of any party to raise an issue can preclude a challenge to the agency action based on such an issue. See Skubel, 113 F.3d at 334. The date of the first presidential debate is approaching. The current debate regulations were promulgated in 1996, and one of the leading plaintiffs in this case, Green Party USA, was certainly aware of them since in that year it filed amicus papers in the district court in Perot v. FEC, 97 F.3d 553 (D.C. Cir. 1996), cert. denied, 520 U.S. 1210 (1997), arguing that CPD was violating those regulations in 1996. See Hagelin v. FEC (consolidated with Perot v. FEC), 1996 WL 566762, at *1 (D.D.C. Oct. 1, 1996).

Thus, plaintiffs could have brought their objections to the Commission's attention at any time over the past four years, as well as during the 1995 rulemaking. Plaintiffs' decision to wait until the last minute, and then go directly to court to try to stop the 2000 presidential debates from proceeding without third party and independent candidates, should give them no license to circumvent the required administrative procedures. Accordingly, this Court should dismiss this action for failure to exhaust administrative remedies.

## IV. THIS CASE SHOULD BE DISMISSED BECAUSE PLAINTIFFS LACK STANDING

### A. The Elements of Standing

The party invoking federal jurisdiction bears the burden of establishing that the elements of constitutional standing exist. Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992). "The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." Lujan, 504 U.S. at 571 n.4 (original emphasis) (citation omitted). A plaintiff "must allege in his pleading the facts essential to show jurisdiction," McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936), and "the necessary factual predicate may not be gleaned from the briefs and arguments," FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 235 (1990) (citation omitted).

Three elements constitute the "irreducible constitutional minimum" of standing: 1) an injury-in-fact, 2) a causal connection between the injury and the challenged conduct, and 3) a likelihood that the injury will be redressed by a favorable decision of the court. Lujan, 504 U.S. at 560-61. Accord, e.g., Citizens to End Animal Suffering and Exploitation, Inc. v. New England Aquarium, 836 F. Supp. 45, 50 (D. Mass. 1993). A plaintiff is required to demonstrate all three elements in a case seeking to have a regulation declared ultra vires. See Haitian Refugee Center v. Gracey, 809 F.2d 794, 816 (D.C. Cir. 1987); Harrington v. Bush, 553 F.2d 190, 209 (D.C. Cir. 1977). See also American Postal Workers Union v. Frank, 968 F.2d 1373, 1378 (1st Cir. 1992) ("Even an important substantive issue cannot be brought to federal court ... if a plaintiff fails to satisfy Article III's requirements"). As the Supreme Court has noted, "[t]he fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." Flast v. Cohen, 392 U.S. 83, 99 (1968).

First, an injury in fact is an invasion of a legally protected interest that is "concrete and particularized" as well as "actual or imminent," rather than "conjectural" or "hypothetical." Lujan, 504 U.S. at 560 (internal quotation marks and citation omitted). The injury cannot be merely a generalized grievance that affects all citizens or derives from an interest in the proper enforcement of the law. FEC v. Akins, 524 U.S. 11, 22 (1998); Lujan, 504 U.S. at 573-74. See also Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 473 (1982) (the judicial process is not "a vehicle for the vindication of the value interests of concerned bystanders") (internal quotation marks and citation omitted).

Second, a plaintiff must show that its injury is "'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" Lujan, 504 U.S. at 560 (quoting Simon v. Eastern Ky. Welfare Rights Organization, 426 U.S. 26, 41-42 (1976)). It is therefore notably more difficult to establish standing when "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else." Id. at 562. This difficulty arises because "one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" Id. (citation omitted). Such independent actors are intervening factors that break the claimed causal chain between the asserted injury and the government's actions. Fulani v. Brady, 935 F.2d 1324, 1329 (D.C. Cir. 1991), cert. denied, 502 U.S. 1048 (1992).

Finally, a party must demonstrate that a favorable decision by the court would provide actual relief from the alleged injury to that party. The relief cannot be speculative. Lujan, 504 U.S. at 561. This third element of standing, redressability, is closely related to causation.

13

"To the extent there is a difference, it is that [causation] examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas [redressability] examines the causal connection between the alleged injury and the judicial relief requested." Allen v. Wright, 468 U.S. 737, 753 n.19 (1984). Intervening causal factors, which the court cannot control, prevent a party from establishing redressability because a favorable decision by the court may not prevent the injury. Allen v. Wright, 468 U.S. at 757 - 758.. The court cannot provide actual redress to the plaintiff if the source of the injury is beyond the court's control.

Beyond these constitutional requirements, the Supreme Court has held that "'the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" Valley Forge Christian College, 454 U.S. at 474 (citation omitted). Although this "general proscription on third-party standing is not absolute," Benjamin v. Aroostook Medical Center, Inc., 57 F.3d 101, 106 (1st Cir. 1995), prudential considerations "militate against standing" where the litigant "asserts the rights and interests of a third party," id. at 104. To assert the rights of a third party, a litigant "must have suffered an 'injury in fact,'" "must have a close relationship to the third party," and there must exist "some hindrance to the third party's ability to protect his or her own interests." Id. at 106 (internal quotation marks and citation omitted). Finally, especially for suits under the APA, the plaintiff's asserted injury must "fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" Valley Forge Christian College, 454 U.S. at 475 (citation and footnote omitted).

### B.   None of the Plaintiffs Has Alleged Facts Supporting an Injury in Fact

Plaintiffs assert that the disbursements by a nonprofit corporation to stage candidate debates and the corporate donations to those staging organizations for that purpose, which are

14

permitted by the debate regulations, are actually corporate "expenditures" in connection with an election and "contributions" to the participating candidates, which are prohibited by 2 U.S.C. 441b. See Complaint ¶¶ 1, 17-19. In their view, therefore, the regulations contravene the language of section 441b(a) by creating an exception to its prohibition not set out explicitly in the language of the Act itself.

Although plaintiffs thus frame their claim as a facial attack on the debate regulations, they actually devote their complaint, including their allegations of individual injury, to one particular staging organization, CPD. See Complaint ¶¶ 20-35. Their alleged harms actually amount to little more than a collective charge that CPD has adopted a standard for candidate participation in its upcoming presidential debates that will likely result in its inviting only the two major party candidates and not any third party or independent candidates. None of the plaintiffs can demonstrate an injury in fact based on this alleged harm.

All of the plaintiffs claim that they will be harmed if corporate funds are used to stage the presidential debates, Complaint ¶ 29, and Ralph Nader and his principal campaign committee also claim that the debate regulations undermine his campaign for the presidency. See Complaint ¶¶ 30, 32. Plaintiffs Association of State Green Parties, Green Party USA, and voter supporters of Ralph Nader assert only a derivative claim that they will also be harmed if Ralph Nader is harmed by being denied an opportunity to debate the major party candidates. See Complaint ¶¶ 33, 31. Plaintiff Becker claims she is harmed if she cannot hear all the candidates so that she can cast an informed vote. See Complaint ¶ 34. All of these alleged harms collapse into a single complaint: plaintiffs are harmed if Ralph Nader does not participate in the debates with the major party candidates.

15

### 1.   No One Is Legally Harmed if Ralph Nader Does Not Participate in Debates with the Major Party Candidates

Ralph Nader does not allege that he has sought to participate in CPD's debates and CPD has denied his request, or that he plans to ask to participate. Indeed, he does not even allege that he wants to participate, and plaintiffs' memorandum in support of their motion for a preliminary injunction states that, even if Ralph Nader is invited to join CPD's debates, he might well decline the invitation. Memorandum in Support of Motion ("Mem.") 22. Thus, all of the so-called concerns raised by the plaintiffs are merely conjectural and speculative and do not show the type of concrete harm that is necessary for standing.

Even if Ralph Nader's claims were not speculative, the debate regulations do not impede his right to speak or voters' derivative interest in hearing him. None of the plaintiffs has claimed, nor can they claim, that the Commission has prevented Ralph Nader from saying anything he wants. The Supreme Court has held that third party and independent candidates have no enforceable constitutional right to participate in candidate debates, even when sponsored by the government itself. Arkansas Educational Television Comm'n v. Forbes, 523 U.S. 666, 680-83 (1998). If a candidate has no constitutional right to participate in a debate, voters have no independent right to hear their preferred candidate in a debate, as the right to receive speech is derivative of the right to speak. See Application of Dow Jones & Co., Inc., 842 F.2d 603, 608 (2d Cir.) (listeners' rights are "entirely derivative of the rights of the [speakers] to speak"), cert. denied, 488 U.S. 946 (1988). NAACP, Los Angeles Branch v. Jones, 131 F.3d 1317, 1323-24 (9th Cir. 1997) ("The First Amendment simply does not guarantee access to all of the information a voter would like to receive"), cert. denied, 525 U.S. 813 (1998). Since these allegations of

harm are not based on a concrete legally protected interest, they do not state a legally cognizable injury in fact.

Ralph Nader, his campaign committee, Green Party USA, and the Association of State Green Parties ("ASGP") also allege a competitive injury if he is not permitted to debate the major party candidates. In essence, they claim that they have been or will be injured because the Commission regulations allegedly allow a private group, CPD, unfairly to confer a benefit, an aura of "legitimacy," on Nader's Democratic and Republican opponents.

While injuries to economic competitive interests have long been recognized as a basis for standing in some circumstances, to our knowledge the theory of competitive advocate standing on which plaintiffs apparently rely has not been recognized except in dicta in the Second Circuit. See Gottlieb v. FEC, 143 F.3d 618, 620-21 (D.C. Cir. 1998); Fulani v. Brady, 935 F.2d 1324, 1327 (D.C. Cir. 1991), cert. denied, 502 U.S. 1048 (1992). Even in the Second Circuit, however, "a plaintiff must show that he personally competes in the same arena with the party to whom the government has bestowed the assertedly illegal benefit." In re United States Catholic Conference, 885 F.2d 1020, 1029, (2d Cir. 1989), cert. denied, 495 U.S. 918 (1990). In Fulani v. Bentsen, 35 F.3d 49 (2d Cir. 1994) that court explicitly rejected a candidate's claim of competitive advocate standing to challenge the actions of a government agency that enabled a private corporation to sponsor candidate debates from which she was excluded.

In Fulani, a candidate who was excluded from the 1992 presidential debates staged by the League of Women Voters sued the Treasury Department to challenge the League's tax-exempt status and thus make the League ineligible for debate sponsorship. She claimed that the Treasury Department conferred a benefit on the League that allowed the League, in turn, to confer a benefit on competing candidates invited to the debate. 35 F.3d at 51 ("According to Fulani, . . .

17

failure to revoke the tax-exempt status of the League subsidizes an imbalanced political system that unfairly favors some candidates over others."). The Second Circuit rejected this reasoning and specifically held that Fulani did not qualify for competitive advocate standing. The court found that Fulani was a political candidate and was challenging the government's treatment of the League, a tax-exempt debate staging organization. Id. at 54. But Fulani and the League were not themselves competitors, and the court emphatically refused to "extend the rule of [competitive advocate standing] to encompass not only a plaintiff's competitors in a defined arena, but also any entity that provides a tangential benefit to those competitors." Id. Ralph Nader's claim of competitive advocate standing is identical: he argues that the Commission's debate regulations illegally enable CPD to sponsor candidate debates, from which he will likely be excluded. His claim of standing on this basis should therefore be rejected for the same reasons.

Plaintiffs' allegation that the use of corporate funds to sponsor debates between the major party candidates "skew[s] the presidential election" (Complaint ¶ 31) and "tilt[s] the electoral playing field" (Mem. 2) is deficient in several respects. Not only is it a generalized grievance, but the purported lack of a level playing field is not a legally protected interest. See Buckley, 424 U.S. at 48 (holding that a "governmental interest in equalizing the relative ability of individuals and groups to influence the outcomes of elections" does not justify "restrict[ing] the speech of some elements of our society")," Kruse v. City of Cincinnati, 142 F.3d 907, 917 (6th Cir.), cert. denied, 525 U.S. 1001 (1998).

**2. The Plaintiffs Are Not Harmed by the Use of Corporate Funds to Pay for
Staging the Presidential Debates**

Plaintiffs claim they will be harmed if corporate funds are used to pay to stage the

presidential debates, regardless of who participates, because it will deprive them of a "right to

participate in presidential elections that are free of the corrupting influence of illegal corporate

contributions" (Complaint ¶ 35). "A mere interest in an event—no matter how passionate or

sincere the interest and no matter how charged with public import the event—will not substitute

for an actual injury." United States v. AVX Corp., 962 F.2d 108, 114 (1st Cir. 1992). Whether

viewed as an interest in proper enforcement of the law, which is a generalized interest that "is not

sufficient, standing alone, to confer jurisdiction on a federal court," Allen v. Wright, 468 U.S. at

754, or an allegation that such corporate spending causes "damage" to plaintiffs' "social goal,"

National Taxpayers Union v. United States, 68 F.3d 1428, 1433 (D.C. Cir. 1995), of eliminating

what they view as corrupt influences on elections, plaintiffs' general objections to corporate

funding of candidate debates are generalized grievances that do not constitute the sort of concrete

personal harm needed to support standing. Lujan, 504 U.S. at 573-74. Plaintiffs also allege that

they will suffer harm because corporate money used to support debates in which only the major-

party candidates will participate somehow "devalues" plaintiffs' participation in the Ralph Nader

campaign (Complaint ¶ 31). However, there is no "fundamental right of voters to contribute to a

successful campaign." NAACP, 131 F.3d at 1324. Moreover, there is no basis for concluding that

any effect on Ralph Nader's campaign from his exclusion from candidate debates would have

anything to do with whether or not corporate or union funds are used to finance such debates.

See Fulani, 35 F.3d at 54 (finding no injury to excluded candidate from change in identity of the

sponsor of candidate debates). The Court must be careful to avoid plaintiff's attempt to convert

19

their "genuine motivation to sue into a personalized injury in fact." In re Catholic Conference,

885 F.2d at 1024. See also Allen v. Wright, 468 U.S. at 755-56 (when the injury asserted is an

"abstract stigmatic injury," the requirement that a plaintiff be personally injured takes on

heightened importance).

Plaintiffs also claim that they are harmed because the "corporate money used to support

Ralph Nader's opponents under the Debate Regulations ... dilutes their vote" (Complaint ¶ 31).

See also Mem. 21 (citing candidate filing fees and ballot access cases). But nothing in the

Commission's debate regulations interferes in any way with the individual plaintiffs' ability to

cast their votes for Ralph Nader, if they so choose. That others may vote differently does not

"dilute" plaintiffs' votes. "The inability to influence other people's votes . . . is not equivalent to

the inability to cast one's own vote." NAACP, 131 F.3d at 1323-1324. The Supreme Court in

Buckley v. Valeo, 424 U.S. 1, 49 n.55, 93-94, 100-101 (1976), held that the principles underlying

the voting cases and the ballot access cases do not apply to campaign finance regulations.

Accord, e.g., Georgia State Conference of NAACP v. Cox, 183 F.3d 1259, 1263 (11th Cir. 1999);

Albanese v. FEC, 78 F.3d 66, 69 (2d Cir.), cert. denied, 519 U.S. 819 (1996); Whitmore v. FEC,

68 F.3d 1212, 1216 (9th Cir. 1995), cert. denied, 517 U.S. 1155 (1996). See also National

Committee of the Reform Party v. Democratic National Committee ("Reform Party"), 168 F.3d

360, 363-64 (9th Cir. 1999).

In sum, the voter plaintiffs do not claim to have anything personally to do with candidate

debates, other than perhaps to watch them. They cannot show that the debate regulations affect

their own personal interests any more particularly than those regulations affect the interests of

any other citizen. Their mere generalized grievances, assertions of harms to interests that are not

legally protected, and purely derivative claims do not constitute the injury in fact necessary for

standing.[8] The goal of these plaintiffs, like the goal of the clergy plaintiffs in Catholic

Conference, is not to effectuate change in governmental policy but rather to change the behavior

of third parties—debate sponsors—of whose activities they do not approve. In Catholic

Conference, the pro-choice clergy wanted to stop the Catholic Church from engaging in pro-life

political activity and tried to use the IRS's tax exemption rules as a tool to do so. The voter

plaintiffs in the present case want debate staging organizations to be forced to stage the debates

without corporate contributions. As Catholic Conference found, such a claim "could be asserted

by any member of the public who disagrees with the views of the [debate staging organization]

and [the FEC's debate regulation]." 885 F.2d at 1025-26. Thus, they do not assert a

particularized harm.

> ### C. Plaintiffs Have Failed to Allege Facts Showing that Their Claimed Harms Are Caused by the Debate Regulations

The plaintiffs' asserted injuries arise from "the government's allegedly unlawful

regulation (or lack of regulation) of someone else," Lujan, 504 U.S. at 562, namely, CPD and the

corporations that choose to help fund the debates CPD will be staging. These independent actors

are intervening causal factors. As discussed earlier, plaintiffs' various allegations of harm are

many ways of describing one underlying claim of harm: the likely exclusion by CPD of third

party and independent candidates like Ralph Nader from the debates. However, the debate

regulations require only that the criteria for eligibility be pre-established and objective and that

the structure of the debate not promote one candidate over others. The regulations themselves are

---

[8]     As in Benjamin, where the patients of an African-American physician brought an action
against the medical center that had terminated the physician's provisional staff privileges for
allegedly racially motivated reasons, "no exception to the ban [on relying on third-party standing]
is applicable in this case." 57 F.3d at 106.

neutral; they neither require nor encourage the inclusion or exclusion of any particular candidates from any debates. See 11 C.F.R. 110.13. Within those constraints, the private debate staging organizations, not the government, determine which candidates will be invited to participate in the debates, each invited candidate determines for himself or herself whether to participate, and each member of the media decides whether to report on, or broadcast, the debate. See, e.g., Freedom Republicans, Inc. v. FEC, 13 F.3d 412 (D.C. Cir.), cert. denied, 513 U.S. 821 (1994). Therefore, it is the independent decisions of these third parties — none of which is a party to this suit — that will determine what (if any) candidate debates will occur and which candidates will participate.

### D. Plaintiffs Cannot Demonstrate That Any Injury Caused by the Debate Regulations Can be Redressed by this Court

Finally, to establish standing, a party must demonstrate that a favorable decision by the court would provide actual relief to that party. Such relief cannot be speculative. Lujan, 504 U.S. at 561. Intervening causal factors, which the court cannot control, prevent a party from establishing redressability because a favorable decision by the court may not prevent the injury. See, e.g., Allen v. Wright, 468 U.S. at 757-59 (finding no standing because relief sought would not necessarily bring about the change plaintiffs wanted due to third parties' independent decisions). In such a case, the court cannot provide actual redress to the plaintiff because the source of the injury is beyond the court's control.

Plaintiffs cannot show that even the inadequate and abstract injuries they allege will be redressed by a favorable decision by this Court. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement." Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 107 (1998). Neither

CPD, nor any major party candidate, nor any member of the news media is a party to this case, so none of them can be bound by any order issued by this Court. Moreover, there is no federal regulation or absence of a regulation that can force a major party candidate to debate a minor party candidate, like Ralph Nader. Thus, this Court cannot redress any of the harms plaintiffs have alleged.

An injunction only against the Commission would neither prohibit CPD from sponsoring debates, nor gain Ralph Nader an invitation to participate in them. Moreover, even if this Court could enjoin the debates entirely, this would not help promote the view of minor candidates, nor would it correct any imbalance in the media exposure they receive. Enjoining the debate regulations also would not eliminate perceived "legitimacy" of the Democratic and Republican candidates' campaigns, nor would it improve the "legitimacy" of other candidates' campaigns. See, e.g., Reform Party, 168 F.3d at 365 ("The Reform Party has not explained how the relief it requests ... will make minority party representation any more likely"); Sprint Spectrum, L.P. v. City of Woburn, 8 F. Supp.2d 118, 122 (D. Mass. 1998) ("Sprint lacks standing because of insufficient redressability—the City Council would not be bound to execute the lease even if this court ordered them to issue the special permit").

Finally, if this Court were to accept the plaintiffs' basic premise that the funds used to pay for the staging of candidate debates is a contribution to the candidates who participate in the Presidential debates, then there likely could be no debates at all in the presidential general election campaign, for major party presidential candidates who accept public financing of their campaigns are prohibited from accepting contributions from anyone, not just corporations.

26 U.S.C 9003(b)(2).[9]  Thus, if plaintiffs' theory were accepted, the only entities that could pay

for presidential debates would be the candidates' campaign committees or their party committees

from their permitted coordinated expenditures, 2 U.S.C. 441a(d)(2).  In the absence of the

Commission's debate regulations, then, either presidential debates would not occur at all, or the

choice of participants would be left to the partisan choices of the major candidates paying for

them as campaign events, with no legal obligations at all to minor party candidates like Ralph

Nader. Therefore, even if this Court adopted plaintiffs' claim on the merits, it would not enable

Ralph Nader to participate in any candidate debates. In sum, there is nothing that this Court can

order the Commission to do or not do that would result in Ralph Nader appearing in the same

debate as the major party candidates.

Because plaintiffs have failed to demonstrate that enjoining the Commission from

enforcing or using the debate regulations would redress any of the harms they allege, they have

failed to establish standing in this case.

## V.    CONCLUSION

For the reasons set out above, the Federal Election Commission respectfully submits that

plaintiffs' motion for a preliminary injunction should be denied.

Respectfully submitted,

_____

Lawrence M. Noble
General Counsel

---

[9]    As discussed in our opposition to the motion for preliminary injunction, under plaintiffs'
rigid construction of the Act, even sponsorship of debates by media corporations could be
contributions to the participating candidates.

_____

Richard B. Bader
Associate General Counsel

_____

Stephen E. Hershkowitz
Assistant General Counsel

_____

Vivien Clair
Attorney

_____

Erin K. Monaghan
Attorney

FOR THE DEFENDANT
FEDERAL ELECTION COMMISSION
999 E Street, N.W.
Washington, D.C. 20463
(202) 694-1650

July 21, 2000

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Scott P. Lewis, Palmer & Dodge LLP, One Beacon Street, Boston MA 02108-0100, and John C. Bonifaz, National Voting Rights Institute, 294 Washington Street, Suite 713, Boston MA 02108, the attorneys of record for plaintiffs, by facsimile and first-class United States mail, postage prepaid, on July 21, 2000.

_____

Erin K. Monaghan

25

Register at 51 FR 31901. The weight of imported pork and pork products is converted to a carcass weight equivalent by utilizing conversion factors which are published in the Department's Statistical Bulletin No. 697 "Conversion Factors and Weights and Measures." These conversion factors take into account the removal of bone, weight lost in cooking or other processing, and the nonpork components of pork products. Secondly, the carcass weight equivalent is converted to a live animal equivalent weight by dividing the carcass weight equivalent by 70 percent, which is the average dressing percentage of porcine animals in the United States. Thirdly, the equivalent value of the live porcine animal is determined by multiplying the live animal equivalent weight by an annual average market price for barrows and gilts based on information reported by USDA, AMS, LGMN Branch. Finally, the equivalent value is multiplied by the applicable assessment rate of 0.45 percent due on imported pork and pork products. The end result is expressed in an amount per pound for each type of pork or pork product. To determine the amount per kilogram for pork and pork products subject to assessment under the Act and Order, the cent per pound assessments are multiplied by a metric conversion factor 2.2046 and carried to the sixth decimal.

The formula in the preamble for the Order at 51 FR 31901 contemplated that it would be necessary to recalculate the equivalent live animal value of imported pork and pork products to reflect changes in the annual average price of domestic barrows and gilts to maintain equity of assessments between domestic porcine animals and imported pork and pork products.

The average annual market price decreased from $51.30 per hundredweight in 1997 to $31.82 per hundredweight in 1998, a decrease of about 38 percent. This decrease would result in a corresponding decrease in assessments for all HTS numbers listed in the table in § 1230.110, 63 FR 45935; August 28, 1998, of an amount equal to sixteen-hundredths of a cent per pound, or as expressed in cents per kilogram, thirty-three hundredths of a cent per kilogram. Based on the most recent available Department of Commerce, Bureau of Census, data on the volume of imported pork and pork products available for the period January 1, 1998, through December 31, 1998, the proposed decrease in assessment amounts would result in an estimated $888,000 decrease in assessments over a 12-month period.

This proposed rule provides for a 30-day comment period. This comment period is appropriate because the proposed rule simply provides for an adjustment in the per pound assessment levels on imported pork and pork products to reflect changes in live hog prices which occurred from 1997 to 1998. These live hog prices form the basis for the assessments. This adjustment, if adopted, should be made effective as soon as possible to promote optimum equity.

## List of Subjects in 7 CFR Part 1230

Administrative practice and procedure, Advertising, Agricultural research, Marketing agreement, Meat and meat products, Pork and pork products.

For the reasons set forth in the preamble, it is proposed that 7 CFR Part 1230 be amended as follows:

## PART 1230—PORK PROMOTION, RESEARCH, AND CONSUMER INFORMATION

1. The authority citation for 7 CFR Part 1230 continues to read as follows:

**Authority:** 7 U.S.C. 4801–4819.

## Subpart B—[Amended]

2. In § 1230.110 paragraph (b) is revised to read as follows:

### § 1230.110  Assessments on imported pork and pork products.

\*   \*   \*   \*   \*

(b) The following HTS categories of imported pork and pork products are subject to assessment at the rates specified.

| Pork and pork products | Assessment | |
|---|---|---|
| | cents/lb | cents/kg |
| 0203.11.0000 | .20 | .440920 |
| 0203.12.1010 | .20 | .440920 |
| 0203.12.1020 | .20 | .440920 |
| 0203.12.9010 | .20 | .440920 |
| 0203.12.9020 | .20 | .440920 |
| 0203.19.2010 | .24 | .529104 |
| 0203.19.2090 | .24 | .529104 |
| 0203.19.4010 | .20 | .440920 |
| 0203.19.4090 | .20 | .440920 |
| 0203.21.0000 | .20 | .440920 |
| 0203.22.1000 | .20 | .440920 |
| 0203.22.9000 | .20 | .440920 |
| 0203.29.2000 | .24 | .529104 |
| 0203.29.4000 | .20 | .440920 |
| 0206.30.0000 | .20 | .440920 |
| 0206.41.0000 | .20 | .440920 |
| 0206.49.0000 | .20 | .440920 |
| 0210.11.0010 | .20 | .440920 |
| 0210.11.0020 | .20 | .440920 |
| 0210.12.0020 | .20 | .440920 |
| 0210.12.0040 | .20 | .440920 |
| 0210.19.0010 | .24 | .529104 |
| 0210.19.0090 | .24 | .529104 |
| 1601.00.2010 | .28 | .617288 |
| 1601.00.2090 | .28 | .617288 |
| 1602.41.2020 | .31 | .683426 |
| 1602.41.2040 | .31 | .683426 |
| 1602.41.9000 | .20 | .440920 |
| 1602.42.2020 | .31 | .683426 |
| 1602.42.2040 | .31 | .683426 |
| 1602.42.4000 | .20 | .440920 |
| 1602.49.2000 | .28 | .617288 |
| 1602.49.4000 | .24 | .529104 |

Dated: June 4, 1999.

**Barry L. Carpenter,**
*Deputy Administrator, Livestock and Seed Program.*

[FR Doc. 99–14689 Filed 6–9–99; 8:45 am]

**BILLING CODE 3410–02–P**

## FEDERAL ELECTION COMMISSION

**[Notice 1999–8]**

## 11 CFR Part 110

## Candidate Debates

**AGENCY:** Federal Election Commission.

**ACTION:** Petition for rulemaking; notice of availability.

**SUMMARY:** On May 25, 1999, the Commission received a Petition for Rulemaking from Mary Clare Wohlford, William T. Wohlford and Martin T. Mortimer urging the Commission to amend its rules so that the objective criteria for inclusion in Presidential and Vice Presidential debates is established by the Commission itself, and not left to the discretion of debate staging organizations. This petition is available for inspection in the Commission's Public Records Office.

**DATES:** Statements in support of or in opposition to the petitions must be filed on or before July 12, 1999.

**ADDRESSES:** All comments should be addressed to Rosemary C. Smith, Senior Attorney, and must be submitted in either written or electronic form. Written comments should be sent to the Federal Election Commission, 999 E Street, NW., Washington, DC 20463. Faxed comments should be sent to (202) 219–3923, with printed copy follow up. Electronic mail comments should be sent to debates@fec.gov, and should include the full name, electronic mail address and postal service address of the commenter. Additional information on electronic submission is provided below.

**FOR FURTHER INFORMATION CONTACT:** Rosemary C. Smith, Senior Attorney, or Paul Sanford, Staff Attorney, 999 E Street, NW., Washington, DC 20463, (202) 694–1650 or (800) 424–9530.

**SUPPLEMENTARY INFORMATION:** On May 25, 1999, the Commission received a Petition for Rulemaking from Mary Clare Wohlford, William T. Wohlford and Martin T. Mortimer regarding the Commission's candidate debate regulations at 11 CFR 110.13. Paragraph (c) of that section states, *inter alia,* that "[f]or all debates, staging organization(s) must use pre-established objective criteria to determine which candidates may participate in a debate." *Id.* The petitioners assert that the objective criteria for inclusion in Presidential and Vice Presidential debates should be established by the Commission itself, and not left to the discretion of debate staging organizations. Therefore, the petition urges the Commission to revise this paragraph to set forth "mandatory criteria for participation in Presidential and Vice Presidential Debates." Petition at 1.

Specifically, the petition recommends that the debates be open to any candidate who (1) has the mathematical potential to win the election in that he or she is on the ballot in enough states to earn 270 Electoral College votes; and (2) has proven his or her viability by having spent at least $500,000 on the campaign by the end of the month preceding the date of the first scheduled debate held on or after September 1 of the election year. In addition, the petition recommends that candidates have equal access to debates held before September 1 without regard to the above requirements.

Copies of the petitions are available for public inspection in the Commission's Public Records Office, 999 E Street, NW., Washington, DC 20463, Monday through Friday between the hours of 9:00 a.m. and 5:00 p.m. Copies of the petitions can also be obtained at any time of the day and week from the Commission's home page at www.fec.gov, or from the Commission's FlashFAX service. To obtain copies of the petitions from FlashFAX, dial (202) 501–3413 and follow the FlashFAX service instructions. Request document # 239 to receive the petition.

All statements in support of or in opposition to the petitions should be addressed to Rosemary C. Smith, Senior Attorney, and must be submitted in either written or electronic form. Written comments should be sent to the Commission's postal service address: Federal Election Commission, 999 E Street, NW., Washington, DC 20463. Faxed comments should be sent to (202) 219–3923. Commenters submitting faxed comments should also submit a printed copy to the Commission's postal service address to ensure legibility.

Comments may also be sent by electronic mail to debates@fec.gov. Commenters sending comments by electronic mail should include their full name, electronic mail address and postal service address within the text of their comments. All comments, regardless of form, must be submitted by July 12, 1999.

Consideration of the merits of the petition will be deferred until the close of the comment period. If the Commission decides that the petition has merit, it may begin a rulemaking proceeding. Any subsequent action taken by the Commission will be announced in the **Federal Register**.

Dated: June 4, 1999.

**Scott E. Thomas,**

*Chairman, Federal Election Commission.*

[FR Doc. 99–14714 Filed 6–9–99; 8:45 am]

BILLING CODE 6715-01-P

---

# DEPARTMENT OF THE TREASURY

**Office of the Comptroller of the Currency**

## 12 CFR Part 24

**[Docket No. 99–09]**

**RIN 1557-AB69**

**Community Development Corporations, Community Development Projects, and Other Public Welfare Investments**

**AGENCY:** Office of the Comptroller of the Currency, Treasury.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Office of the Comptroller of the Currency (OCC) is proposing to amend part 24, the regulation governing national bank investments that are designed primarily to promote the public welfare. This proposal simplifies the prior notice and self-certification requirements that apply to national banks' public welfare investments; expands the types of investments that a national bank may self-certify by removing geographic restrictions; and permits eligible national banks with assets of less than $250 million to self-certify any public welfare investment. The OCC is also seeking comment on whether to modify the methods of demonstrating community support or participation currently prescribed by part 24, and whether the OCC could simplify or streamline the procedures and standards contained in part 24. The proposal encourages national banks to make public welfare investments by making it easier to comply with the applicable procedures.

**DATES:** Comments must be received on or before August 9, 1999.

**ADDRESSES:** Please direct comments to: Docket No. 99–09, Communications Division, Third Floor, Office of the Comptroller of the Currency, 250 E Street, SW, Washington, DC, 20219. Comments are available for inspection and photocopying at that address. In addition, comments may be sent by facsimile transmission to FAX number (202) 874-5274, or by electronic mail to REGS.COMMENTS@OCC.TREAS.GOV.

**FOR FURTHER INFORMATION CONTACT:** David Lewis, Community Development Investments Manager, Community Development Division, (202) 874–4930; Michael S. Bylsma, Director, Community and Consumer Law Division, (202) 874–5750; or Heidi M. Thomas, Senior Attorney, Legislative and Regulatory Activities Division, (202) 874–5090.

**SUPPLEMENTARY INFORMATION:**

## Background

The OCC is proposing to amend 12 CFR part 24, which contains the rules relating to national banks' investments in community development corporations (CDCs), community development (CD) projects, and other public welfare investments. Part 24 implements 12 U.S.C. 24(Eleventh), which authorizes national banks to make investments designed primarily to promote the public welfare, including the welfare of low- and moderate-income communities and families, subject to certain percentage of capital limitations. (The investments authorized pursuant to 12 U.S.C. 24(Eleventh) are collectively referred to in this proposal as "public welfare investments"). The purpose of this proposal is to make burden-reducing changes that will make it easier for national banks to use the public welfare investment authority that the statute and regulation provide.

The OCC originally adopted part 24 in 1993 and substantially revised the regulation, pursuant to its Regulation Review Program, in 1996. *See* 58 FR 68464 (Dec. 27, 1993) (final regulation); 61 FR 49654 (Sept. 23, 1996) (1996 amendments). The 1996 amendments encouraged national banks to make public welfare investments by eliminating unnecessarily burdensome provisions and streamlining the part 24 procedures. Among other things, the 1996 amendments: modified the test for determining whether an investment primarily promotes the public welfare; streamlined the investment self-certification and prior approval



# ASGP

## Association of State Green Parties

**CO-CHAIRS**
Nancy Allen
*Maine Green Party*
Anne Goeke
*Green Party of Pennsylvania*
Tom Sevigny
*Green Party of Connecticut*

**SECRETARY**
Dean Myerson
*Green Party of Colorado*

**TREASURER**
Nick Mellis
*Green Party of New Jersey*

July 6, 1999

Rosemary C. Smith, Senior Attorney
Federal Election Commission
999 F St. NW
Washington, D.C. 20463

Dear Ms. Smith,

The Association of State Green Parties would like to comment on the Reform Party Petition for Rulemaking regarding objective rules for participation in Presidential Debates.

There is extensive evidence that these debates are a critical part of the national presidential campaign. When three candidates participated in 1992, viewership was higher than at any other time. Candidates from parties other than the Democrats and Republicans deserve to know the rules of play when designing their campaigns. We request that the FEC grant the Reform Party petition and establish fair and objective rules for presidential debates.

For the ASGP Steering Committee,

*Dean Myerson*

ASGP Secretary

<u>Becker, et al. v. FEC</u>
00-CV-11192 MLW
Exhibit 2





DunleaEnck a aol.com on 07 26 99 03:26:14 PM

To:        Debates
cc:
Subject:   Petition Comments 3rd Party Presidential Debates

---

Green Party of New York State
156 Big Toad Way, Poestenkill NY 12140
518 286-3411
GreensNY98@aol.com

July 26, 1999

To the Federal Election Commission:

RE: Petition for amendment of 11 CFR Sec. 110.13 et seq.
Inclusion of Third Party Candidates in Presidential Debates

The Green Party of New York State is recognized as a political party under
both NYS election law and by the Federal Election Commission. The Green Party
participated in the Presidential election for the first time in 1996. The
Green Party Presidential candidate Ralph Nader finished fourth nationwide in
the popular vote total. Mr. Nader however was excluded from the Presidential
debates, even though many public opinion polls list him as the most trusted
person in America after more than three decades of consumer and environmental
advocacy.

The Green Party of NYS is writing in support of the proposal by the Reform
Party that the Federal Election Commission establish objective criteria for
inclusion of candidates in the debates. The FEC presently allows the staging
organization to define such criteria. The Green Party found such criteria in
1996 to be overly subjective (e.g., media coverage, ability to win).

Since participation in debates is critical in determining a candidate's
political viability, such criteria needs to be a specific as possible,
allowing candidates and parties to determine how to best invest their
resources to enable them to meet such criteria. Voters - not FEC staff,
reporters, or political pundits - must be the ones who determine who gets
elected.

The petition by the Virginia Reform Party proposes the following mandatory
criteria for inclusion in the political debates: first, any candidate shall
have the mathematical potential to win the election by being on the ballot in
enough states to achieve an Electoral College win (i.e., 270), and, second,
that each candidate shall have proven his or her vitality by having spent at
least $500,000 on his or her campaign by the end of the month preceding the
date of the first scheduled debate held on/after September 1st.

We support the proposal with respect to the requirement regarding ballot access. The two major parties, through their control of the state legislatures, have imposed significant ballot access obstacles on third parties and independent candidates in many states. The FEC should not reward such exclusionary and predatory practices; the requirement as to the number of states that the candidate has qualified for should stop well short of 50.

As to the proposed monetary threshold, we would add an additional alternative of having qualified for Presidential primary matching funds. This requirement is met when a candidate raises $5,000 in each of 20 different states, with no more than $250 from any individual donor counting towards the $5,000 limit.

The federal constitution does not mandate a two party political system. The United States is virtually the only democracy in the world so dominated by a "two party" system. The FEC should be careful not to give the two dominant parties a stranglehold over democracy.

Both Voters and Candidates Have A Right to Debates

The Green Party believes that the participation by federal candidates in public debates is a constitutionally protected right, a right of both the candidates and of the electorate. Our democracy is based on the assumption that the voters choose among competing ideas; such choice is not possible if the voters have no realistic means of determining how the candidates stand on the various issues.

The Courts have held that free and fair elections are a constitutional right. United States v. Classic, 313 U.S. 299, 315 (1941) and Anderson v. United States, 417 U.S. 211 (1974). The right to participate in the electoral process lies at the very heart of our system of government.

We deny voters access to the information necessary for an informed electoral decision at our peril. According to founding father James Madison, as quoted in Board of Educ. Island Trees Union Free School Dist. No. 26 v. Pico, 457 US 853 (1982), "a popular government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or Tragedy; or, perhaps both". Similarly, Justice Brandeis in Whitney v. California, 274 U.S. 357, 375 (1927): "Those who won our independence ... believed that public discussion is a political duty; and that this should be a fundamental principle of the American government". "It is of particular importance that candidates have the...opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day," Buckley v. Valeo, 424 U.S. 1 (1976).

"Free elections" are the right of each citizen of the Republic, a right needed to make our Constitution work. The deliberative process of debate, which enables the electorate to hear and discern the truth, is the essence of our democracy. The process of discerning the truth is not something determined by public opinion polls or evaluation of newsworthiness or the amount of campaign contributions that are received.

In 1988, the League of Women Voters withdrew from the co-sponsorship of the debates in protest against the monopolistic practices of the major parties,

which they denounced as a "fraud on the American Voter"( League of Women
Voters News Release #83 Oct. 3, 1988).  The CPD, which consisted of members
of the two major parties, then took over entire control, and continued
precisely the practices that the League of Women Voters had objected to.
Once in charge, they have managed to exclude every third party candidate,
except Ross Perot in 1992, by citing the spurious criterion requiring a
"realistic chance to win" (Commission on Presidential Debates press release
of Sept. 17, 1996). If this criteria had been used objectively in 1996, Sen.
Dole as the Republican candidate would have been excluded from participation
in the debates.

The use of this criterion creates a catch-22 situation for every third party
candidate.  Exposure to the national public by inclusion in the debates is
itself a necessary condition of having a realistic chance to win the
election, so exclusion from the debates ensures that this criterion will not
be satisfied. For instance, one of the critical factors in the recent
election of Reform Party candidate Jesse Ventura as Governor of Minnesota was
that he was allowed to participate in the two public debates, which resulted
in a doubling of his support.

The only way to guarantee conformity to the democratic process in
Presidential campaigns, is to establish genuinely democratic qualifications
for inclusion in the debates.  We believe the American public wants these
reforms to be made, as evidenced by the decline in the number of viewers of
the debates when third party candidates were excluded in the past, as
compared to the times when they were included.  116.8 million fewer viewers
tuned in to the 1996 debates (Broadcasting and Cable Oct. 21 1996), where
Perot was excluded, than to the 1992 debates, where he was included.   In
1980, polls reported that the public was very enthusiastic about third party
candidate Anderson's debate with Reagan, and annoyed by Carter's refusal to
participate (Harris Poll of June 30th, 1980 and ABC News Harris Survey vol. 2
#118 Sept. 24, 1980).

Supporters of the present Presidential debate system often contend that
opening up the process to additional candidates would "clutter up" the
debate, offering the viewers too many options so that in effect "no one is
heard". However, many of the televised national Republican and Democratic
debates in recent decades have had half-a-dozen or more candidates
participate. To a large extent, Ronald Reagan saved his campaign and went on
to the Presidency when he grabbed the microphone in the 1980 New Hampshire
Republican debate and insisted that candidates beside himself and George Bush
be allowed to participate.

Our experience has been that additional candidates make the debates more
information, interesting and lively. Perhaps the worst debate in recent
memory was between Al D'Amato and Chuck Schumer for U.S. Senate in 1998. Sen.
D'Amato apparently decided that the debate was going to be so boring that
most viewers would turn the channel after a few minutes; he thus resorted to
the strategy of giving the same answer to virtually every question,
regardless of the topic. Such a spectacle would have been unlikely to occur
if the other Senatorial candidates had been allowed to participate.

Sincerely

Mark A. Dunlea
Green Party of New York State
Clearinghouse Coordinator