

FEDERAL ELECTION COMMISSION
WASHINGTON, D.C. 20463

August 28, 2000

BY FEDERAL EXPRESS OVERNIGHT DELIVERY

Hon. Patti B. Saris
United States District Judge
U.S. Courthouse
One Courthouse Way
Boston, MA 02210

    Re:   Heidi Becker, et al. v. Federal Election Commission,
             No. 00-CV-11192 PBS (filed June 19, 2000)

Your Honor,

      As you requested at the close of oral argument in the above-captioned lawsuit on August 23, 2000, this letter responds to your questions regarding the Verified Administrative Record of the MCFL Rulemaking submitted to the Court and opposing counsel by the Federal Election Commission. While a complete administrative record must be compiled by a federal agency when a regulation is challenged on its face under the Administrative Procedures Act, at present only the documents cited in the parties' briefs on plaintiffs' motion for a preliminary injunction would be most relevant in this litigation. For the convenience of the Court, enclosed with this letter are copies of the Explanation and Justification documents and final regulations published at 60 Fed. Reg. 35,292-35,306 (July 6, 1995) and 60 Fed. Reg. 64,260-64,279 (December 14, 1995), which were cited by the Federal Election Commission in its opposition papers as "Admin. Record Tab #199" and "Admin. Record Tab #242," respectively.

                                                    Respectfully,

                                                    Stephen E. Hershkowitz
                                                    Assistant General Counsel

Enclosures

cc:    John C. Bonifaz (by facsimile, without enclosures, and U.S. Mail)
        Scott P. Lewis (by facsimile, without enclosures, and U.S. Mail)
        Clerk of the Court (by Federal Express overnight delivery, for filing)

**DOCKETED**    37

**Thursday
December 14, 1995**



## Part IV

## Federal Election Commission

11 CFR Part 100, et al.
Corporate and Labor Organization Activity; Express Advocacy and Coordination With Candidates; Final Rule

*Section 109.1(b)(4)   Coordination with Candidates*

The Notice suggested revising 11 CFR 109.1(b)(4) to indicate that the limited types of communication with candidates and their campaign staff which are described in 11 CFR 114.2(c), 114.3 and 114.4 do not constitute coordination if they comply with the requirements of those sections. Upon further reflection, this proposal has been dropped because 11 CFR part 109 covers all persons, and the Commission's concerns regarding the coordination of corporate or labor organization activity is more appropriately addressed in 11 CFR 114.2 through 114.4, which are discussed below.

*Section 110.12   Candidate Appearance on Public Educational Institution Premises*

New section 110.12 of the regulations addresses candidate appearances on the premises of public educational institutions. This section generally follows new paragraph (c)(7) of section 114.4, which is discussed more fully below. It has been included in the regulations so that public colleges and universities may continue to invite candidates to appear and address either the academic community or the general public in the same manner as incorporated private colleges and universities. A number of commenters pointed out that private schools should be treated the same as public educational institutions. Please note, however, that these institutions are also governed by state law which may impose additional requirements in this area.

*Section 110.13   Candidate Debates*

The Commission has revised its regulations at 11 CFR 110.13 governing the staging of candidate debates in several respects. First, the previous requirement that debates be "nonpartisan" has been removed. However, the rules continue to specify that candidate debates may not be structured to promote or advance a particular candidate. Also, debates may not be coordinated with a candidate in a manner that would result in the making of an in-kind contribution.

In the NPRM, the Commission has proposed several additional requirements, such as a restriction on discussing campaign strategy and tactics with the candidate or agents of the candidate. The NPRM also included restrictions on giving one candidate more time during the debate or more advance information as to the questions to be asked. Several commenters were critical of these proposals. While this language has been deleted from the final rules, these restrictions are subsumed within the requirement that the debate not be structured to promote or advance a particular candidate over the others.

The Commission also considered including language stating that staging organizations may not expressly advocate the election or defeat of any clearly identified candidate during the debates. That language does not need to be included in the final rule because the rules already state that the debates may not be structured to promote or advance one candidate over another. Please note that no portion of the entire event, including any pre-debate or post-debate commentary and analysis, may be structured to promote or advance a particular candidate. Nevertheless, a news organization that stages a candidate debate may produce a separate editorial containing express advocacy under the news story exception to the definitions of contribution and expenditure in 11 CFR 100.7(b)(2) and 100.8(b)(2).

1. Definition of Staging Organization

Section 110.13(a) addresses several issues that have been raised regarding nonprofit groups and media organizations that wish to be staging organizations for candidate debates. First, this provision was rewritten to clarify that nonprofit organizations described in 26 U.S.C. 501 (c)(3) and (c)(4) may stage debates even if they have not received official confirmation from the Internal Revenue Service of their status as nonprofit organizations. In addition, the previous language may have been confusing because it described these entities as "exempt from Federal taxation", when they may be required to pay taxes on their nonexempt function income. Please note that under section 110.13, it is possible for a candidate debate to be sponsored by multiple staging organizations. The Internal Revenue Service commented that while the requirements in the FEC's rules are not identical to the factors the IRS considers, they do not conflict with the IRS's rules regarding political activity carried out by 501(c) organizations. Another commenter questioned the reason for disqualifying nonprofit organizations from staging debates if they endorsed candidates, as long as the debate is fair. The Commission is retaining this requirement because it is needed to ensure the integrity of candidate debates.

Section 110.13(a)(2) follows the previous provision by indicating that broadcasters and the print media may stage candidate debates, but it does not indicate whether local cable stations or cable networks may stage debates. However, questions involving cable debates will be addressed in a separate NPRM. This area is currently subject to many changes, and the Commission intends to consult further with the Federal Communications Commission before addressing it.

Two comments questioned the use of the term "*bona fide*" to describe newspapers who may qualify as debate staging organizations, and the Commission's authority to determine what is a *bona fide* newspaper or magazine under the First Amendment guarantee of freedom of the press. *Bona fide* newspapers and magazines include publications of general circulation containing news, information, opinion, and entertainment, which appear at regular intervals and derive their revenues from subscriptions and advertising. This term is explained in more detail in the Explanation and Justification for the 1979 rules on funding and sponsorship of federal candidate debates. *See* 44 FR 76734 (December 27, 1979). These rules were transmitted to Congress on December 20, 1979, together with the Explanation and Justification. They became effective on April 1, 1980, after neither house of Congress disapproved them under 2 U.S.C. 438(d)(2). (An earlier version of the candidate debate rules was disapproved by Congress on September 18, 1979. *See* 44 FR 39348 (July 5, 1979).) This is, as the Supreme Court has noted, an "indication that Congress does not look favorably" upon the Commission's construction of the Act. *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 34 (1981). *See also, e.g., Sibbach v. Wilson*, 312 U.S. 1, 16 (1941) ("That no adverse action was taken by Congress indicates, at least, that no transgression of legislative policy was found"). Accordingly, the revised rules follow the previous provisions by retaining the term "*bona fide*" to describe newspapers and magazines that may stage candidate debates.

Finally, please note that the purpose of section 110.13 and 114.4(f) is to provide a specific exception so that certain nonprofit organizations and the news media may stage debates, without being deemed to have made prohibited corporate contributions to the candidates taking part in debates. This exception is consistent with the traditional role these organizations have played in the political process. Individuals and unincorporated entities wishing to stage debates are not covered by the exception.

corporate or labor organization communications containing express advocacy. It has been included to avoid describing everyone in the restricted class in numerous places throughout the regulations where it would be more convenient to simply use the term "restricted class." The definition does not change who is considered to be within the restricted class. It also does not change who is an executive or administrative employee under section 114.1(c) or who is a member of a membership association under section 114.1(e).

For most corporations and labor organizations, the restricted class is the same as the solicitable class. However, for incorporated trade associations and certain cooperatives, there are differences in who can receive solicitations and who can receive express advocacy communications. For example, a trade association's restricted class includes member corporations who are not in its solicitable class, since corporations may not make contributions under section 441b of the FECA. Conversely, however, a trade association may solicit its member corporations' stockholders and executive and administrative personnel, even though these individuals are not in its restricted class, if the member corporations have approved the solicitations. See, e.g., AO 1991-24 and 11 CFR 114.8.

Section 114.2 Prohibitions on Contributions and Expenditures

1. Express Advocacy

The final rules incorporate an express advocacy standard in several sections of 11 CFR part 114. First, new language in paragraphs (a) and (b) of section 114.2 prohibits corporations and labor organizations from making expenditures for communications to the general public that expressly advocate the election or defeat of one or more clearly identified candidates. Please note that some portions of the regulations refer to "communications containing express advocacy." This term has the same meaning as the references elsewhere to "communications expressly advocating the election or defeat of one or more clearly identified candidates."

For the reasons explained above, the express advocacy standard in the revised rules applies to independent expenditures, but not contributions. The prohibition against contributions made by corporations and labor organizations in connection with federal elections remains unaffected by MCFL. Most, but not all, commenters supported the adoption of an express advocacy standard for evaluating independent expenditures under section 441b of the FECA.

The provision prohibiting expenditures for communications containing express advocacy applies to all corporations and labor organizations except for qualified nonprofit corporations meeting the criteria set out in new section 114.10. Thus, these qualified nonprofit corporations may use general treasury funds to make independent expenditure communications to the general public which contain express advocacy. These could include registration and voting communications, official registration and voting information, voting records and voter guides. See also 11 CFR 114.4(c)(1)(i) and (ii).

2. Coordination With Candidates

A new paragraph (c) has been added to 11 CFR 114.2 to address the topic of coordination of corporate or labor organization activity with candidates or their authorized committees or agents, which results in the making of an in-kind contribution. Previous paragraphs (c) and (d) have been redesignated as paragraphs (d) and (e), respectively.

a. Initial Proposals. In Buckley v. Valeo, the Supreme Court made a distinction between independent expenditures and contributions. The Court observed, "[u]nlike contributions, such independent expenditures may well provide little assistance to the candidate's campaign and indeed may prove counterproductive. The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate." Buckley, 424 U.S. at 47. Thus, Buckley could be interpreted to prohibit all contacts with candidates. However, the NPRM recognized that it is justifiable to allow some forms of contact to preserve the previous range of permissible activity, such as sponsoring candidate appearances. The prohibition against corporate contributions was expressly reaffirmed in MCFL. 479 U.S. at 260. Therefore, the NPRM sought to draw a distinction between permissible contacts with candidates which are necessary to conduct these activities, and more extensive coordination that will result in in-kind contributions in some circumstances. The proposals in the NPRM would have defined coordination to include discussions of specific campaign strategy or tactics.

The proposed rules include new language in section 114.2(c) indicating when corporate and labor organization disbursements will be treated as impermissible in-kind contributions to particular candidates. Prior to the MCFL decision, the Commission had not needed to examine the extent to which such payments by corporations and labor organizations could be treated as in-kind contributions, because they were simply treated as prohibited corporate or labor organization expenditures in connection with federal elections, unless permitted by a specific exemption.

b. Comments and Testimony. Numerous commenters expressed a wide variety of views on this topic. Many were confused as to how such a standard would work in practice. Some pointed out that this was an area not addressed by the MCFL decision, and that it appeared as though the Commission was trying to find a way to impose new requirements that would be at least as restrictive as the former partisan/nonpartisan standard. They argued that section 441b(b)(2)(A) of the FECA excludes communications with the restricted class on any subject from the definition of contribution or expenditures. Others favored a more restrictive rule allowing no contacts except for arranging the logistics of candidate debates and appearances, or obtaining responses for voter guides.

c. Revised Rules. In response to these concerns, new section 114.2(c) has been rewritten to clarify what types of contacts with candidates are considered impermissible coordination, and what types are permissible. The comments received in response to these proposals illustrated the need to clarify and simplify the operation of these provisions. Under revised section 114.2, a corporation or labor organization that only makes communications to its restricted class does not run the risk of having its expenditures treated as in-kind contributions. On the other hand, a corporation or labor organization that engages in election-related activities directed at the general public must avoid most forms of coordination with candidates, as this will generally result in prohibited in-kind contributions, and will compromise the independence of future communications to the general public. For example, a prohibited in-kind contribution would result if a voter guide is prepared and distributed after consulting with the candidate regarding his or her plans, projects or needs regarding the campaign. Please note that, in the case of a communication just to the restricted class, coordination will not cause that activity or future communications to the restricted class to be considered in-kind contributions.

a candidate's committee [emphasis added]. See MUR 2185."

However, the new facilitation regulations now provide another exemption where an individual or a candidate's committee or other political committee pays in advance for the use of corporate personnel who are directed to organize or conduct a fundraiser for the candidate as part of their job, and hence are not volunteers. Although employees may be asked to undertake such activity, under new language in paragraph (f)(2)(iv) of this section, it is not permissible to use coercion, threats, force or reprisal to urge any individual to contribute to a candidate or engage in fundraising activities. Thus, employees who are unwilling to perform these services as part of their job have a right to refuse to do so.

Under new paragraphs (f)(2)(iii) and (f)(4)(iii), facilitation includes corporate or labor organization solicitation of earmarked contributions that will be collected and forwarded by the organization's separate segregated fund (whether or not deposited in the separate segregated fund's account), unless the earmarked contributions are treated as contributions both by and to that separate segregated fund. The corporation or labor organization may name in the solicitation the candidate(s) for whom an earmarked contribution is sought. Space may be left on the contribution response card for contributors to designate candidates of their choice, but no candidates are suggested in the accompanying solicitation materials. The latter situation was presented in AO 1995-15. In both cases, under new paragraphs (f)(2)(iii) and (f)(4)(iii), the contributions must be counted against the separate segregated fund's limits to avoid facilitation, which is impermissible. Hence these new provisions supersede those portions of AOs 1991-29, 1981-57 and 1981-21 which indicate that a conduit separate segregated fund's contribution limits under 2 U.S.C. 441a are only affected if it exercises direction or control over the choice of the recipient candidate. Please note that 11 CFR 110.6(b)(2)(ii) has not been changed, and therefore continues to prohibit corporations or labor organizations, themselves, from acting as conduits for contributions earmarked to candidates. See AO 1986-4. However, in AO 1983-18, the Commission recognized that a trade association political action committee may collect and forward contributions to other trade association political action committees where directed by member corporation executives. A corporation or union employee may still utilize the volunteer exemption found at 11 CFR 100.7(b)(3) to collect earmarked contributions on their own time and forward such contributions to a specific candidate or committee. Such earmarked contributions would not be considered as contributions by the separate segregated fund.

Paragraph (f)(3) lists two examples of separate segregated fund activity that do not constitute corporate or labor organization facilitation. First, separate segregated funds may continue to solicit or make contributions in accordance with the requirements of 11 CFR 110.1, 110.2, and 114.5 through 114.8. Secondly, separate segregated funds may continue to solicit, collect and forward earmarked contributions to candidates under 11 CFR 110.6. The money expended by the separate segregated fund to solicit earmarked contributions must come from permissible funds received under the FECA, and will count against the separate segregated fund's contribution limit for the candidate(s) involved. These examples contrast with new paragraphs (f)(2)(iii) and (f)(4)(iii), under which a solicitation by the corporation or labor organization would either constitute facilitation or result in the contribution being counted against the separate segregated fund's contribution limits.

In addition to the latter example discussed above, paragraph (f)(4) lists two other examples of corporate or labor organization activity which do not result in facilitation. The first preserves the practice of enrolling the restricted class in a payroll deduction plan or check-off system, or an employee participation plan. No changes are being made in the operation of employee participation plans under 11 CFR 114.11 or payroll deduction plans. The second example permits solicitations of the restricted class for contributions that contributors will send directly to candidates, without being bundled or forwarded through the separate segregated fund. This situation was presented in AO 1989-29, and falls within the corporation's or labor organization's right to communicate with its restricted class on any subject under 2 U.S.C. 441b(b)(2)(A).

Section 114.3 Disbursements for Communications to the Restricted Class in Connection With a Federal Election

1. Express Advocacy, Coordination, and Reporting Internal Communications

The revised rules preserve several distinctions between communications and other activities directed solely to the restricted class (set forth at 11 CFR 114.3) and those directed to the general public or other individuals outside the restricted class (set forth at 11 CFR 114.4). Section 114.3 continues to recognize that the FECA permits corporations and labor organizations to communicate with their restricted classes on any subject. 2 U.S.C. 441b(b)(2)(A). However, in light of the MCFL decision, the references to "partisan" activities have been replaced with narrower provisions that only apply to communications containing express advocacy. For example, in paragraph (c) of section 114.3, revised language makes clear that communications directed solely to the restricted class may contain express advocacy. In addition, amended section 114.3(b) now states more explicitly that only communications expressly advocating the election or defeat of a clearly identified candidate are subject to the reporting requirements of 11 CFR 100.8(b)(4) and 104.6. Similarly, the revisions delete the more restrictive language in previous section 114.3(a)(1) that had prohibited corporate and labor organization expenditures for "partisan" communications to the general public because revised section 114.4 establishes that such communications are only prohibited if they contain express advocacy or are impermissibly coordinated with candidates or political committees.

In contrast, under revised section 114.3(a)(1), communications directed solely to the restricted class may be coordinated with candidates and political committees. For example, they may involve discussions with campaign staff regarding a candidate's plans, projects, or needs. Such coordination will not transform that restricted class communication into an in-kind contribution. Nor will it affect subsequent activities directed only to the restricted class. However, communications to the restricted class that are based on a candidate's plans, projects and needs may jeopardize the independence of subsequent communications or activities, including those financed from the separate segregated fund, which extend to anyone outside the restricted class.

One witness at the hearing objected to labor organizations' use of general treasury funds which could come from compulsory union dues to subsidize new forms of election-related activity, or even the activities set out in sections 114.3 and 114.4. This is an area over which the Department of Labor has jurisdiction, and recently it issued final rules removing 29 CFR part 470, in response to Executive Order 12836 revoking Executive Order 12800. 58 FR

### 3. Registration and Get-Out-the-Vote Drives

Section 114.3(c)(4) sets forth provisions governing voter registration and get-out-the-vote drives aimed at a corporation's or labor organization's restricted class. The NPRM included one revision to this provision. The proposed languaged stated explicitly that express advocacy is permissible in voter drive communications aimed solely at a corporation's or labor organization's restricted class. Consequently, the proposed revisions to section 114.3(c)(4) also retained the former language specifically permitting voter drive communications to urge the restricted class to vote for particular candidates and to register with a particular party. The proposed rules also contemplated continuing the long-standing policy that information and assistance in registering and voting shall not be withheld on the basis of support for or opposition to particular candidates or political parties.

The Internal Revenue Service indicated that while the FEC's proposed rules regarding candidate appearances are more specific than theirs, they do not impinge upon the Internal Revenue Service's "facts and circumstances" test.

Some commenters opposed removing the "nonpartisan" requirement from section 114.3(c)(4) because section 441b(b)(2)(B) of the Act requires that drives aimed at a corporation's or labor organization's restricted class be nonpartisan. The Commission believes the basic purpose of this statutory provision will be maintained by continuing to require corporations and labor organizations to make the same voter registration and voter drive services available to those who do not support the organization's preferred candidates or political party. Consequently, the final voter driver rules in this section follow the previous proposals, with one change. The revised rules specify that voter registration efforts may include transportation to the place of registration in addition to transportation to the polls.

### Section 114.4 Disbursement for Communications Beyond the Restricted Class in Connection With a Federal Election

#### 1. Express Advocacy and Coordination

The provisions of section 114.4 regarding communications by corporations and labor organizations to persons outside the restricted class have also been substantially revised and reorganized. First, the nonpartisan standards found in the previous regulations have been replaced by language prohibiting corporations and labor organizations from including express advocacy in communications directed outside the restricted class when: (1) holding candidate appearances; (2) issuing registration and get-out-the-vote communications; (3) distributing registration and voting information, forms, or absentee ballots; (4) producing voter guides or voting records; or (5) conducting voter registration and get-out-the-vote drives.

Second, in response to the concerns expressed by several commenters which are discussed above, the Commission has substantially revised the concept of coordination in section 114.4. The *MCFL* decision addressed the scope of the FECA's prohibition against corporate expenditures. However, the prohibition against corporate contributions was expressly reaffirmed in *MCFL*, 479 U.S. at 260. Accordingly, the final rules which follow preserve the statutory ban on contributions made by corporations and labor organizations in connection with federal elections. Prohibited contributions include in-kind contributions resulting from the coordination of election-related corporate or union communications with candidates, except for certain activities described in this section and 11 CFR 114.3, which may involve limited types of coordination with candidates.

Under revised section 114.4(a), communications to the general public or to employees outside the restricted class that are based on information about a candidate's plans, projects and needs provided by the candidate or the candidate's agent are considered coordinated, and hence, in-kind contributions. Such coordination may also jeopardize the independence of subsequent communications to the general public, but will not affect future communications to the restricted class.

Qualified nonprofit corporations under 11 CFR 114.10 are subject to the same restriction on coordinating their communications directed to the general public. Consequently, they may not include express advocacy in coordinated communications directed beyond the restricted class. Conversely, if they do include express advocacy in communications to the general public, these communications may not be coordinated with any candidate or political party. The purpose of the limited exception the Supreme Court recognized in *MCFL* was to avoid impermissibly infringing on these organizations' First Amendment rights when making independent expenditures.

#### 2. Candidate and Party Appearances

The NPRM sought comments on several questions and possible amendments regarding corporate and labor organization funding of candidate appearances before employees who are not in the restricted class. Section 114.4(b), as set out in the Notice, followed the previous rules at 11 CFR 114.4(a)(2) by allowing rank and file employees who are not in the restricted class to attend candidate appearances organized by corporations or labor organizations. Please note that corporate appearances are covered in paragraph (b)(1), and parallel provisions for labor organizations are found in paragraph (b)(2).

As explained above, certain contacts with the candidate's campaign may be necessary to arrange the appearance. However, because these communications are being made beyond the restricted class, discussions of the candidate's plans, projects or needs relating to the campaign go beyond the permissible level of coordination, and hence would transform the appearance into an in-kind contribution. Likewise, corporations and labor organizations are also not permitted to expressly advocate the election or defeat of any clearly identified candidates in conjunction with the appearance. Nor should they promote or encourage express advocacy by the audience, thereby transforming the appearance into little more than a campaign rally.

##### a. Notifying and Inviting Other Candidates; Audience

In situations where one candidate appears at a corporate or labor organization event, the proposed rules in section 114.4(b) would have followed the previous provisions by requiring corporations and labor organizations to let the other candidates for that office come and speak if they so request. However, comments were sought on possibly requiring a corporation to notify the other candidates in advance whenever they invite a candidate to appear. The commenters expressed concern that such a requirement would be unworkable. Accordingly, the final rules do not contain a prior notice provision.

Instead, the final rules on candidate appearances generally follow the candidate debate rules in the case of Presidential candidates by requiring corporations and labor organizations to establish, in advance, objective criteria for deciding which Presidential and Vice Presidential candidates may appear, upon request. Under section 114.4(b)(1)(i), appearances by House

the title enhances disclosure of those who are making the communication and it would encourage fraud if identifications were not allowed, and because the speech of people associated with nonprofit groups would be inhibited.

The Commission considered the use of corporate or labor organization titles in individual communications and advertisements on behalf of a candidate when it prepared the final rules, but could not reach a majority decision by the required four affirmative votes. See 2 U.S.C. 437c(c). Consequently, the proposed language has not been included in the final rules.

4. Registration and Voting Communications; Official Registration and Voting Information

The provisions of previous paragraphs (b)(2) and (b)(3) of section 114.4 regarding the distribution of registration and voting communications and information to the general public have been moved to new paragraphs (c)(2) and (c)(3), respectively. In addition to the changes regarding express advocacy and coordination with candidates, which are discussed above, revised paragraph (c)(3)(ii) no longer contains a reference to "applicable state law" permitting voter registration by mail. That language was made obsolete by the National Voter Registration Act of 1993, 42 U.S.C. 1973gg–1 et seq.

Please also note that section 114.4(c)(2), regarding voting communications, does not change the Commission's decision in AO 1980–20 that corporations may place newspaper or magazine advertisements simply urging the general public to register to vote.

5. Voting Records

Provisions regarding the dissemination of voting records of Members of Congress are being moved from previous section 114.4(b)(4) to new section 114.4(c)(4). In response to the MCFL decision, the NPRM proposed modifying these rules in two respects. First, new language was put forth prohibiting voting records, and all accompanying communications to the general public, from expressly advocating the election or defeat of one or more clearly identified candidates or the candidates of a clearly identified political party. The proposed amendments also sought to disallow coordination with candidates in distributing voting records. The Internal Revenue Service commented that although their standards were different than the FEC's, the FEC's proposed rules do not impinge on the test used by the Internal Revenue Service to determine whether voting records or voter guides constitute political activity. Another commenter believed there was no need to discuss these matters with candidates.

The revised version of section 114.4(c)(4) is substantially similar to the proposed rules. However, new language has been included to indicate that the decision as to the content of a voting record also may not be coordinated with a candidate or political party. The NPRM raised the question of whether to include language preventing corporations and labor organizations from obtaining voting record information directly from Members of Congress or political parties. The Commission has decided not to include such a restriction in the revised regulations.

6. Voter Guides

In Faucher v. Federal Election Commission, 928 F.2d 468 (1st Cir. 1991), cert. denied sub nom. Federal Election Commission v. Keefer et al., 502 U.S. 820 (1991), the Court of Appeals for the First Circuit invalidated the Commission's previous voter guide regulations at 11 CFR 114.4(b)(5)(i). The Court concluded that the previous provisions of section 114.4(b)(5)(i) exceed the regulatory boundaries imposed by the FECA as interpreted by the Supreme Court: 928 F.2d at 472.

Consequently, the NPRM proposed revisions, located in section 114.4(c)(5), to allow corporations and labor organizations to prepare and distribute to the general public their own voter guides or to obtain voter guides prepared by nonprofit organizations that are tax-exempt under 26 U.S.C. 501 (c)(3) or (c)(4). The proposed rules would have required that the same amount of space be provided for each candidate's response, that the voter guide not contain express advocacy, and that contact with candidates be limited to the preparations reasonably necessary to produce the guide, such as written communications regarding the candidate's positions on issues. The proposed revisions also sought to eliminate the previous restrictions on the geographic area in which voter guides could be distributed, and to prohibit coordination of the distribution of voter guides with candidates.

Several commenters and witnesses challenged these proposals as contrary to the intent of the court in Faucher. In particular, they questioned the need to reprint the candidates' responses verbatim, the restriction that contacts with campaigns be in writing, the prohibition on coordinating the distribution of the guides, and the prohibition on distributing voter guides prepared by 501(c) organizations that endorse candidates, when the corporation or labor organization can make its own endorsements.

In view of these comments, the Commission has substantially revised the final rules to provide a choice of two different ways of issuing and distributing voter guides, which are intended to comport with Faucher. Revised section 114.4(c)(5) begins by explaining that voter guides consist of candidates' positions on campaign issues, and may include biographical information on the candidates. Voter guides are similar to candidate debates in that they must include at least two candidates in the same election. However, no particular format is required for either type of voter guide.

Under the new rules, both types of voter guides may be obtained from nonprofit organizations described in 26 U.S.C. 501 (c)(3) or (c)(4), regardless of whether the nonprofit group endorses candidates. Please note however, that a comment from the Internal Revenue Service indicates that nonprofit corporations organized under 26 U.S.C. 501(c)(3) cannot endorse candidates. The previous rules referred to these groups as "tax exempt," which may be confusing given that they may pay tax on certain categories of income.

The first type of permissible voter guide, which is described in paragraph (c)(5)(i), is one that is prepared and distributed without any contact, cooperation, coordination or consultation with the candidate, the candidate's campaign or the candidate's agent. Hence, the information regarding the candidate's position on issues must be obtained from news articles, voting records, or other non-campaign sources. The voter guide also must not expressly advocate the election or defeat of any clearly identified candidate.

The second type of permissible voter guide, which is described in paragraph (c)(5)(ii), is subject to further restrictions because it contemplates limited written contact with the candidate's campaign committee to obtain the candidate's responses to issues included in the voter guide. For example, further coordination with a candidate or his or her agents, such as a discussion of the candidate's plans, projects, or needs relating to the campaign, does not fall within this limited exception, and would thus result in an in-kind contribution. The Faucher decision does not mandate eliminating all restrictions on voter guides save for the prohibition on express advocacy. Accordingly, organizations preparing the second type

events in other capacities, such as when the candidate is also a faculty member.

Although the proposed rules in the Notice covered candidate appearances on college campuses, they did not specifically address candidate debates. As noted by the commenters, there is a long tradition of holding candidate debates in college auditoriums. The Commission did not intend to curtail this practice, and the final rules do not prevent such debates from being held. Colleges and universities that qualify for tax-exempt status under 26 U.S.C. 501(c)(3) may stage candidate debates in accordance with the requirements set out in 11 CFR 110.13 and 114.4(f).

The proposed rules in section 114.4(c)(7)(i) would have required educational institutions to have an established policy allowing associated organizations, such as student groups, to sponsor candidate appearances so long as the policy does not favor one candidate or party over any other. Several commenters questioned the need for such a policy, and expressed concern that colleges and universities would be forced to grant access to their facilities to groups not connected with the educational institution. Consequently, the language in new section 114.4(c)(7) is being amended to include a more general requirement that the educational institution does not favor any one candidate or political party in allowing the appearances.

The proposed rules also sought to ensure that admission to a candidate's appearance would not be based on party affiliation, or any other indications of support for or opposition to the candidate by requiring either the educational institution or the sponsoring group to control access to the facility, rather than the candidate's campaign committee. This proposal has been dropped as impracticable.

The NPRM indicated that one objective was to ensure that these candidate appearances will not become campaign rallies, fundraising events, or opportunities for the school or group issuing the invitation to expressly advocate, or encourage the audience to expressly advocate, the election or defeat of the candidate who is appearing. Accordingly, the proposals sought to restrict the presence of campaign banners, posters, balloons and other similar items which would be viewed as indicative of a campaign rally. Several commenters and witnesses recognized the necessity for educational institutions to refrain from express advocacy, so as to avoid jeopardizing their nonprofit status. However, the comments also emphasized the practical difficulties in trying to control expressions of support or opposition by the audience, and trying to ensure that a campaign rally atmosphere does not ensue. They also questioned distinctions between posters and hats or buttons. Finally, they argued that colleges are public fora, and the government's ability to restrict speech in public fora is limited.

The revised rules in paragraph (c)(7)(ii)(B) retain the prohibition against the educational institution engaging in express advocacy. However, the language regarding a campaign rally atmosphere has been modified to require the educational institution to make reasonable efforts to ensure that the appearance does not turn into a campaign rally. This does not require the college or university to monitor buttons or campaign materials brought in or worn by members of the audience. These provisions are consistent with the requirement that exempt organizations under 26 U.S.C. 501(c)(3) refrain from participating in or intervening in political campaigns.

The NPRM also proposed a prohibition against candidates collecting contributions during the appearance, coupled with language allowing candidates to ask for contributions to be sent to their campaign committees. The Notice also suggested a provision barring educational institutions from soliciting contributions. The comments generally supported these proposals as consistent with the nonprofit status of these educational institutions under the Internal Revenue Code. They also suggested that candidates be informed in advance that they may not collect contributions.

It is not necessary to include in the final rules these restrictions on soliciting and collecting contributions. They are already subsumed within the requirement that the educational institution make a reasonable effort to ensure the candidate appearance does not become a campaign rally. In addition, candidate appearances at incorporated private colleges and universities are already subject to additional requirements under the Internal Revenue Code and regulations issued thereunder.

The NPRM also included provisions allowing educational institutions to invite the media to cover these candidate appearances and to broadcast them to the general public, provided the schools follow the same guidelines that would apply to other corporations, as set forth in section 114.3(c)(2)(iii) and section 114.4(b)(1)(viii). The Commission has decided not to include this provision in the final rules and to allow educational institutions and the news media to work out their own arrangements.

9. Candidate Appearances in Churches

The NPRM presented the possibility of issuing rules regarding candidate appearances in churches and religious facilities. However, this topic received little attention from the commenters. The large number of other more immediate issues in this rulemaking may have overshadowed considerations of candidate appearances in religious settings. At this point, the Commission has decided to defer this matter for further consideration.

10. Registration and Get-Out-The-Vote Drives

Voter registration and get-out-the-vote drives aimed at the general public or at employees outside the restricted class have been moved from previous paragraph (c) to renumbered paragraph (d) of section 114.4. The NPRM included several revisions to this provision, most of which are included in the attached final rules. First, the regulations distinguish between the speech and nonspeech components of voter drives. Thus, the rules conform to the MCFL decision by applying an express advocacy standard to the speech components of voter drives. Hence, new language in paragraph (d)(1) indicates that communications containing express advocacy may not be made during voter drives aimed at employees outside the restricted class, or during voter drives aimed more broadly at the general public.

The revised voter drive rules also include changes regarding the nonspeech components of voter drives. Under section 114.4(d), corporations and labor organizations may conduct voter registration and get-out-the-vote drives without the involvement of a nonprofit organization which is described in 26 U.S.C. 501 (c)(3) or (c)(4). To the extent that AO 1978–102 indicates that such drives must be jointly sponsored with a civic or nonprofit organization, that opinion is superseded by the regulatory changes to this section. However, the validity of AO 1980–45, which affirmed the ability of a 501(c)(3) nonprofit corporation to conduct a voter registration drive, is not affected by the revised rules. Paragraph (d)(2) specifies that these drives cannot be coordinated with any candidate or political party. Moreover, under paragraph (d)(5), workers cannot be paid only to register voters supporting a particular candidate or political party.

Both the proposed and the final rules in section 114.4(d)(4) contemplate

## PART 102—REGISTRATION, ORGANIZATION, AND RECORDKEEPING BY POLITICAL COMMITTEES (2 U.S.C. 433)

4. The authority citation for Part 102 continues to read as follows:

Authority: 2 U.S.C. 432, 433, 438(a)(8), 441d.

5. 11 CFR part 102 is amended by revising paragraph (c)(1) of section 102.4 to read as follows:

§ 102.4 Administrative termination (2 U.S.C. 433(d)(2)).

* * * * *

(c) * * *

(1) The committee has complied with the debt settlement procedures set forth at 11 CFR part 116.

* * * * *

## PART 109—INDEPENDENT EXPENDITURES (2 U.S.C. 431(17), 434(c))

6. The authority citation for part 109 continues to read as follows:

Authority: 2 U.S.C. 431(17), 434(c), 438(a)(8), 441d.

7. 11 CFR part 109 is amended by revising paragraph (b)(4) of section 109.1 to read as follows:

§ 109.1 Definitions (2 U.S.C. 431(17)).

* * * * *

(b) * * *

(4) *Made with the cooperation or with the prior consent of, or in consultation with, or at the request or suggestion of, a candidate or any agent or authorized committee of the candidate*—

(i) Means any arrangement, coordination, or direction by the candidate or his or her agent prior to the publication, distribution, display, or broadcast of the communication. An expenditure will be presumed to be so made when it is—

(A) Based on information about the candidate's plans, projects, or needs provided to the expending person by the candidate, or by the candidate's agents, with a view toward having an expenditure made; or

(B) Made by or through any person who is, or has been, authorized to raise or expend funds, who is, or has been, an officer of an authorized committee, or who is, or has been, receiving any form of compensation or reimbursement from the candidate, the candidate's committee or agent;

(ii) But does not include providing to the expending person upon request Commission guidelines on independent expenditures.

* * * * *

## PART 110—CONTRIBUTION AND EXPENDITURE LIMITATIONS AND PROHIBITIONS

8. The authority citation for part 110 continues to read as follows:

Authority: 2 U.S.C. 431(8), 431(9), 432(c)(2), 437d(a)(8), 438(a)(98), 441a, 441b, 441d, 441e, 441f, 441g and 441h.

9. 11 CFR part 110 is amended by adding new section 110.12 to read as follows:

§ 110.12 Candidate appearances on public educational institution premises.

(a) *Rental of facilities at usual and normal charge.* Any unincorporated public educational institution exempt from federal taxation under 26 U.S.C. 115, such as a school, college or university, may make its facilities available to any candidate or political committee in the ordinary course of business and at the usual and normal charge. In this event, the requirements of paragraph (b) of this section are not applicable.

(b) *Use of facilities at no charge or at less than the usual and normal charge.* An unincorporated public educational institution exempt from federal taxation under 26 U.S.C. 115, such as a school, college or university, may sponsor appearances by candidates, candidates' representatives or representatives of political parties at which such individuals address or meet the institution's academic community or the general public (whichever is invited) on the educational institution's premises at no charge or at less than the usual and normal charge, if:

(1) The educational institution makes reasonable efforts to ensure that the appearances constitute speeches, question and answer sessions, or similar communications in an academic setting, and makes reasonable efforts to ensure that the appearances are not conducted as campaign rallies or events; and

(2) The educational institution does not, in conjunction with the appearance, expressly advocate the election or defeat of any clearly identified candidate(s) or candidates of a clearly identified political party, and does not favor any one candidate or political party over any other in allowing such appearances.

10. 11 CFR part 110 is amended by revising section 110.13 to read as follows:

§ 110.13 Candidate debates.

(a) *Staging organizations.* (1) Nonprofit organizations described in 26 U.S.C. 501 (c)(3) or (c)(4) and which do not endorse, support, or oppose political candidates or political parties may stage candidate debates in accordance with this section and 11 CFR 114.4(f).

(2) Broadcasters, *bona fide* newspapers, magazines and other periodical publications may stage candidate debates in accordance with this section and 11 CFR 114.4(f).

(b) *Debate structure.* The structure of debates staged in accordance with this section and 11 CFR 114.4(f) is left to the discretion of the staging organization(s), provided that:

(1) Such debates include at least two candidates; and

(2) The staging organization(s) does not structure the debates to promote or advance one candidate over another.

(c) *Criteria for candidate selection.* For all debates, staging organization(s) must use pre-established objective criteria to determine which candidates may participate in a debate. For general election debates, staging organization(s) shall not use nomination by a particular political party as the sole objective criterion to determine whether to include a candidate in a debate. For debates held prior to a primary election, caucus or convention, staging organizations may restrict candidate participation to candidates seeking the nomination of one party, and need not stage a debate for candidates seeking the nomination of any other political party or independent candidates.

## PART 114—CORPORATE AND LABOR ORGANIZATION ACTIVITY

11. The authority citation for part 114 continues to read as follows:

Authority: 2 U.S.C. 431(8)(B), 431(9)(B), 432, 437d(a)(8), 438(a)(8), and 441b.

12. 11 CFR part 114 is amended by revising paragraphs (a)(1), (a)(2) introductory text and (a)(2)(ii), and by adding paragraph (j) to section 114.1 as follows:

§ 114.1 Definitions.

(a) For purposes of part 114 and section 12(h) of the Public Utility Holding Company Act (15 U.S.C. 791(h))—

(1) The terms *contribution* and *expenditure* shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a State bank, a federally chartered depository institution (including a national bank) or a depository institution whose deposits and accounts are insured by the Federal Deposit Insurance Corporation or the National Credit Union Administration, if such loan is made in accordance with 11 CFR 100.7(b)(11)) to any candidate, political

corporation's or labor organization's separate segregated fund, or other similar items which would assist in transmitting or delivering contributions, but not including providing the address of the candidate or political committee;

(iii) Soliciting contributions earmarked for a candidate that are to be collected and forwarded by the corporation's or labor organizations's separate segregated fund, except to the extent such contributions also are treated as contributions to and by the separate segregated fund; or

(iv) Using coercion, such as the threat of a detrimental job action, the threat of any other financial reprisal, or the threat of force, to urge any individual to make a contribution or engage in fundraising activities on behalf of a candidate or political committee.

(3) Facilitating the making of contributions does not include the following activities if conducted by a separate segregated fund—

(i) Any activity specifically permitted under 11 CFR 110.1, 110.2, or 114.5 through 114.8, including soliciting contributions to a candidate or political committee, and making in kind contributions to a candidate or political committee; and

(ii) Collecting and forwarding contributions earmarked to a candidate in accordance with 11 CFR 110.6.

(4) Facilitating the making of contributions also does not include the following activities if conducted by a corporation or labor organization—

(i) Enrolling members of a corporation's or labor organization's restricted class in a payroll deduction plan or check-off system which deducts contributions from dividend or payroll checks to make contributions to the corporation's or labor organization's separate segregated fund or an employee participation plan pursuant to 11 CFR 114.11;

(ii) Soliciting contributions to be sent directly to candidates if the solicitation is directed to the restricted class, see 11 CFR 114.1(a)(2)(i); and

(iii) Soliciting contributions earmarked for a candidate that are to be collected and forwarded by the corporation's or labor organization's separate segregated fund, to the extent such contributions also are treated as contributions to and by the separate segregated fund.

14. 11 CFR part 114 is amended by revising section 114.3 to read as follows:

§ 114.3  Disbursements for communications to the restricted class in connection with a Federal election.

(a) *General.* (1) Corporations and labor organizations may make communications on any subject, including communications containing express advocacy, to their restricted class or any part of that class. Corporations and labor organizations may also make the communications permitted under 11 CFR 114.4 to their restricted class or any part of that class. The activities permitted under this section may involve election-related coordination with candidates and political committees. *See* 11 CFR 109.1 and 114.2(c) regarding independent expenditures and coordination with candidates.

(2) Incorporated membership organizations, incorporated trade associations, incorporated cooperatives and corporations without capital stock may make communications to their restricted class, or any part of that class as permitted in paragraphs (a)(1) and (c) of this section.

(b) *Reporting communications containing express advocacy.* Disbursements for communications expressly advocating the election or defeat of one or more clearly identified candidate(s) made by a corporation, including a corporation described in paragraph (a)(2) of this section, or labor organization to its restricted class shall be reported in accordance with 11 CFR 100.8(b)(4) and 104.6.

(c) *Communications containing express advocacy.* Communications containing express advocacy which may be made to the restricted class include, but are not limited to, the examples set forth in paragraphs (c)(1) through (c)(4) of this section.

(1) *Publications.* Printed material expressly advocating the election or defeat of one or more clearly identified candidate(s) or candidates of a clearly identified political party may be distributed by a corporation or by a labor organization to its restricted class, provided that:

(i) The material is produced at the expense of the corporation or labor organization; and

(ii) The material constitutes a communications of the views of the corporation or the labor organization, and is not the republication or reproduction, in whole or in part, of any broadcast, transcript or tape or any written, graphic, or other form of campaign materials prepared by the candidate, his or her campaign committees, or their authorized agents. A corporation or labor organization may, under this section, use brief quotations from speeches or other materials of a candidate that demonstrate the candidate's position as part of the corporation's or labor organization's expression of its own views.

(2) *Candidate and party appearances.* (i) A corporation may allow a candidate, candidate's representative or party representative to address its restricted class at a meeting, convention or other function of the corporation, but is not required to do so. A labor organization may allow a candidate or party representative to address its restricted class at a meeting, convention, or other function of the labor organization, but is not required to do so. A corporation or labor organization may bar other candidates for the same office or a different office and their representatives, and representatives of other parties addressing the restricted class. A corporation or labor organization may allow the presence of employees outside the restricted class of the corporation or labor organization who are necessary to administer the meeting, other guests of the corporation or labor organization who are being honored or speaking or participating in the event, and representatives of the news media.

(ii) The candidate, candidate's representative or party representative may ask for contributions to his or her campaign or party, or ask that contributions to the separate segregated fund of the corporation or labor organization be designated for his or her campaign or party. The incidental solicitation of persons outside the corporation's or labor organization's restricted class who may be present at the meeting as permitted by this section will not be a violation of 11 CFR part 114. The candidate's representative or party representative (other than an officer, director or other representative of a corporation or official, member or employee of a labor organization) or the candidate, may accept contributions before, during or after the appearance at the meeting, convention or other function of the corporation or labor organization.

(iii) The corporation or labor organization may suggest that members of its restricted class contribute to the candidate or party committee, but the collection of contributions by any officer, director or other representative of the corporation or labor organization before, during, or after the appearance while at the meeting, is an example of a prohibited facilitation of contributions under 11 CFR 114.2(f).

(iv) If the corporation or labor organization permits more than one candidate for the same office, or more than one candidate's representative or party representative, to address its restricted class, and permits the news

(vii) Coordination with each candidate, candidate's agent, and candidate's authorized committee(s) may include discussions of the structure, format and timing of the candidate appearance and the candidate's positions on issues, but shall not include discussions of the candidate's plans, projects, or needs relating to the campaign; and

(viii) Representatives of the news media may be allowed to be present during a candidate, candidate representative or party representative appearance under this section, in accordance with the procedures set forth at 11 CFR 114.3(c)(2)(iv).

(2) *Candidate and party appearances on labor organization premises or at a meeting, convention or other function.* A labor organization may permit candidates, candidates' representatives or representatives of political parties on the labor organization's premises or at a meeting, convention, or other function of the labor organization to address or meet its restricted class and other employees of the labor organization, and their families, in accordance with the conditions set forth in paragraphs (b)(1)(i) through (iii), (vi) through (viii), and paragraphs (b)(2) (i) and (ii) of this section. Other guests of the labor organization who are being honored or speaking or participating in the event and representatives of the news media may be present. A labor organization may bar all candidates, candidates' representatives and representatives of political parties from addressing or meeting its restricted class and other employees of the labor organization and their families on the labor organization's premises or at any meeting, convention or other function of the labor organization.

(i) The candidate's representative or party representative (other than an official, member or employee of a labor organization) or the candidate, may ask for contributions to his or her campaign or party, or ask that contributions to the separate segregated fund of the labor organization be designated for his or her campaign or party. The candidate, candidate's representative or party representative shall not accept contributions before, during or after the appearance while at the meeting, convention or other function of the labor organization, but may leave campaign materials or envelopes for members of the audience. No official, member, or employee of a labor organization or its separate segregated fund shall, either orally or in writing, solicit or direct or control contributions by members of the audience to any candidate or party representative under this section, and shall not facilitate the making of contributions to any such candidate or party. See 11 CFR 114.2(f).

(ii) A labor organization or its separate segregated fund shall not, in conjunction with any candidate or party representative appearance under this section, expressly advocate the election or defeat of any clearly identified candidate(s), and shall not promote or encourage express advocacy by its members or employees.

(c) Communications by a corporation or labor organization to the general public.

(1) *General.* A corporation or labor organization may make the communications described in paragraphs (c)(2) through (c)(5) of this section to the general public. The general public includes anyone who is not in the corporation's or labor organization's restricted class. The provisions of paragraph (c) of this section shall not prevent a qualified nonprofit corporation under 11 CFR 114.10(c) from including express advocacy in any communication made to the general public under paragraphs (c)(2) through (c)(5)(i) of this section.

(2) *Registration and voting communications.* A corporation or labor organization may make registration and get-out-the vote communications to the general public, provided that the communications do not expressly advocate the election or defeat of any clearly identified candidate(s) or candidates of a clearly identified political party. The preparation and distribution or registration and get-out-the-vote communications shall not be coordinated with any candidate(s) or political party. A corporation or labor organization may make communications permitted under this section through posters, billboards, broadcasting media, newspapers, newsletter, brochures, or similar means of communication with the general public.

(3) *Official registration and voting information.*

(i) A corporation or labor organization may distribute to the general public, or reprint in whole and distribute to the general public, any registration or voting information, such as instructional materials, which has been produced by the official election administrators.

(ii) A corporation or labor organization may distribute official registration-by-mail forms to the general public. A corporation or labor organization may distribute absentee ballots to the general public if permitted by the applicable State law.

(iii) A corporation or labor organization may donate funds to State or local government agencies responsible for the administration of elections to help defray the costs of printing or distributing registration or voting information and forms.

(iv) The corporation or labor organization shall not, in connection with any such distribution, expressly advocate the election or defeat of any clearly identified candidate(s) or candidates of a clearly identified political party and shall not encourage registration with any particular political party.

(v) The reproduction and distribution of registration or voting information and forms shall not be coordinated with any candidate(s) or political party.

(4) *Voting records.* A corporation or labor organization may prepare and distribute to the general public the voting records of Members of Congress, provided that the voting record and all communications distributed with it do not expressly advocate the election or defeat of any clearly identified candidate, clearly identified group of candidates or candidates of a clearly identified political party. The decision on content and the distribution of voting records shall not be coordinated with any candidate, group of candidates or political party.

(5) *Voter guides.* A corporation or labor organization may prepare and distribute to the general public voter guides consisting of two or more candidates' positions on campaign issues, including voter guides obtained from a nonprofit organization which is described in 26 U.S.C. 501 (c)(3) or (c)(4), provided that the voter guides comply with either paragraph (c)(5)(i) or (c)(5)(ii) (A) through (E) of this section. The sponsor may include in the voter guide biographical information on each candidate, such as education, employment positions, offices held, and community involvement.

(i) The corporation or labor organization shall not contact or in any other way act in cooperation, coordination, or consultation with or at the request or suggestion of the candidates, the candidates' committees or agents regarding the preparation, contents and distribution of the voter guide, and no portion of the voter guide may expressly advocate the election or defeat of one or more clearly identified candidate(s) or candidates of any clearly identified political party.

(ii) (A) The corporation or labor organization shall not contact or in any other way act in cooperation, coordination, or consultation with or at the request or suggestion of the candidates, the candidates' committees or agents regarding the preparation, contents and distribution of the voter

funds to defray costs incurred in staging public candidate debates held in accordance with 11 CFR 110.13.

(3) A corporation or labor organization may donate funds to nonprofit organizations qualified under 11 CFR 110.13(a)(1) to stage candidate debates held in accordance with 11 CFR 110.13 and 114.4(f).

16. 11 CFR part 114 is amended by revising the title of section 114.12, and by removing and reserving paragraph (b) of section 114.12 to read as follows:

**§ 114.12  Incorporation of political committees; Payment of fringe benefits.**

\* \* \* \* \*

(b) [Reserved]

\* \* \* \* \*

17. 11 CFR part 114 is amended by adding section 114.13 to read as follows:

**§ 114.13  Use of meeting rooms.**

Notwithstanding any other provisions of part 114, a corporation or labor organization which customarily makes its meeting rooms available to clubs, civic or community organizations, or other groups may make such facilities available to a political committee or candidate if the meeting rooms are made available to any candidate or political committee upon request and on the same terms given to other groups using the meeting rooms.

Dated: December 8, 1995.

**Danny L. McDonald,**

*Chairman, Federal Election Commission.*

[FR Doc. 95–30381 Filed 12–13–95; 8:45 am]

**BILLING CODE 6715-01-M**

Tab 199



# federal register

**Thursday
July 6, 1995**

## Part VI

### Federal Election Commission

11 CFR Parts 100, 106, 109, and 114
Express Advocacy; Independent Expenditures; Corporate and Labor Organization Expenditures; Final Rule

section 441b of the FECA. The *Austin* decision prompted the Commission to issue a second notice seeking further comments on what changes to its regulations were warranted. Request for Further Comment, 55 FR 40397 (Oct. 3, 1990), comment period extended 55 FR 45809 (Oct. 31, 1990). This notice also welcomed comments on the express advocacy questions raised by the *Faucher* and *NOW* decisions.

Eight commenters responded to the second notice, including some who reiterated their earlier positions. Most, but not all, of the commenters urged the Commission to adopt an express advocacy test for expenditures under section 441b. One comment favored the development of definitions which precisely set out what activity will be deemed within the scope of the FECA under such a standard, while another comment supported the use of a case by case approach. There was also some support for revising the regulations to reflect the approach to express advocacy taken into the *Furgatch* opinion. The Commission also received specific suggestions for delineating the class of nonprofit corporations falling within *MCFL*'s exception from the independent expenditure prohibition. Two comments advocated a broad scope for the exemption, while a third comment emphasized the narrowness of the group of organizations possessing the three essential features delineated in *MCFL* and *Austin*.

Subsequently, the Court of Appeals for the First Circuit upheld the district court's decision in *Faucher*. *Faucher v. Federal Election Commission*, 928 F.2d 468 (1st Cir. 1991). *cert. denied sub nom. Federal Election Commission v. Keefer et al.*, 502 U.S. 820 (1991). The Commission sought certiorari in *Faucher*, arguing that the express advocacy standard should not be made applicable to the 441b prohibition on corporate expenditures. On October 7, 1991, the Supreme Court denied the petition for certiorari, and thus declined to consider narrowing or otherwise modifying the statements it made in *MCFL* regarding the scope of section 441b. Accordingly, the Commission moved for the dismissal of its appeal in *NOW* and resumed consideration of several substantial changes to its regulations necessitated by the *MCFL* decision.

The Commission published a Notice of Proposed Rulemaking on July 29, 1992 seeking public comment on draft rules codifying the reduced scope of the prohibition on corporate expenditures. 57 FR 33548 (July 29, 1992). The proposed language set forth the general rule that corporations and labor organizations are prohibited from making expenditures for communications to the general public expressly advocating the election or defeat of a clearly identified candidate. The draft regulations also sought to establish criteria for determining whether nonprofit corporations qualify for the exemption from section 441b's prohibition on independent expenditures.

The Commission received 35 separate comments on the NPRM from 32 commenters between July 29, 1992 and November 22, 1993. The Commission also received 149 form comments during that period. The Commission held a public hearing on October 15 and 16, 1992, at which 15 of these commenters testified on the issues presented in the *MCFL* decision and the proposed rules. The comments and testimony are discussed in more detail below.

As indicated above, this rulemaking process has involved a broader range of issues regarding the scope of permissible and prohibited corporate and labor organization expenditures than is reflected in the final rules being promulgated today. The rulemaking with regard to the other issues is continuing, and the Commission expects to issue additional new rules revising 11 CFR Parts 110 and 114 at a later date. These subsequent changes will replace the partisan/nonpartisan standards in sections 110.13, 114.1, 114.2, 114.3, 114.4 and 114.12(b) with language prohibiting corporations and labor organizations from making expenditures for communications to the general public expressly advocating the election or defeat of clearly identified candidates. Specifically, these provisions govern candidate debates, candidate appearances, distributing registration and voting information, voter guides, voting records, conducting voter registration and get-out-the-vote drives and use of meeting rooms. At the same time, the Commission intends to address issues which have arisen regarding activities undertaken by incorporated colleges and universities, the use of logos, trademarks and letterheads, endorsements of candidates, activities which facilitate the making of contributions, and coordination between candidates and corporations or labor organizations which results in in-kind contributions. These issues, not previously addressed in the rules, involve activities that are also impacted by the express advocacy standard and the case law in this area.

Section 438(d) of Title 2, United States Code requires that any rules or regulations prescribed by the Commission to carry out the provisions of Title 2 of the United States Code be transmitted to the Speaker of the House of Representatives and the President of the Senate 30 legislative days before they are finally promulgated. These regulations were transmitted to Congress on June 30, 1995.

### Explanation and Justification

Generally, the new and amended rules contain the following changes. First, the definitions of "express advocacy" and "clearly identified" at 11 CFR 109.1 (b)(2) and (b)(3) have been moved to new 11 CFR 100.22 and revised 11 CFR 100.17, respectively. They have been reworded to provide further guidance on what types of communications constitute express advocacy of clearly identified candidates, in accordance with the judicial interpretations found in *Buckley, MCFL, Furgatch, NOW* and *Faucher*.

Second, new section 114.10 has been added to implement the *MCFL* Court's conclusion that nonprofit corporations possessing certain essential features may not be bound by the restrictions on independent expenditures contained in section 441b. This new section expressly permits certain corporations to use general treasury funds for independent expenditures, and sets out the reporting obligations for these corporations.

Part 100—Scope and Definitions (2 U.S.C. 431)

*Section 100.17   Clearly Identified (2 U.S.C. 431(18))*

The definitions of "clearly identified" in 11 CFR 106.1(d) and "clearly identified candidate" in 11 CFR 109.1(b)(3) have been removed and replaced by a revised definition in section 100.17. It is not necessary for this definition to appear in multiple locations throughout these regulations.

The NPRM sought comments on two alternative approaches regarding the requirement that the candidates be "clearly identified." Alternative A-1 indicated that this would include candidates of a clearly identified political party and a clearly identified group of candidates, such as the "pro-life" candidates in the *MCFL* case. Alternative A-2 did not specifically mention clearly identified groups of candidates or candidates of clearly identified political parties.

Several commenters and witnesses argued that under Alternative A-1, it could be too difficult to determine the candidates in the group. Examples cited were buttons that read "Elect Women

advocacy. The revised definition in 11 CFR 100.22(a) includes a somewhat fuller list of examples. The expressions enumerated in *Buckley*, such as "vote for," "Smith for Congress," and "defeat" have no other reasonable meaning than to urge the election or defeat of clearly identified candidates.

### 3. Communications Lacking Such Phrases

The NPRM also addressed communications that contain no specific call to take action on any issue or to vote for a candidate, but which do discuss a candidate's character, qualifications, or accomplishments, and which are made in close proximity to an election. An example is a newspaper or television advertisement which simply states that the candidate has been caring, fighting and winning for his or her constituents. Another example is a case in which a candidate is criticized for missing many votes, or for specific acts of misfeasance or malfeasance while in office.

Under Alternative A-2, these types of communications would have constituted exhortations if made within a specified number of days before an election, and if they did not encourage any type of action on any specific issue, such as, for example, supporting pro-life or pro-choice legislation. Comments were requested as to what an appropriate time frame should be—as short as 14 days, or as long as six months, prior to an election, or some other time period considered reasonable.

Some commenters opposed treating these communications as express advocacy on the grounds that there is not a clear call to action. Others argued that such communications, particularly when made by a candidate's campaign committee, were clearly intended to persuade the listener or reader to vote for the candidate.

Communications discussing or commenting on a candidate's character, qualifications, or accomplishments are considered express advocacy under new section 100.22(b) if, in context, they have no other reasonable meaning than to encourage actions to elect or defeat the candidate in question. The revised rules do not establish a time frame in which these communications are treated as express advocacy. Thus, the timing of the communication would be considered on a case-by-case basis.

### 4. Communications Containing Both Issue Advocacy and Electoral Advocacy

The final rules, like the proposed rules, treat communications that include express electoral advocacy as express advocacy, despite the fact that the communications happen to include issue advocacy, as well. Several comments pointed out that the legislative process continues during election periods, and argued that if a legislative issue becomes a campaign issue, the imposition of unduly burdensome requirements on those groups seeking to continue their legislative efforts and communicate with their supporters is unconstitutional. These concerns are misplaced, however, because the revised rules in section 100.22(b) do not affect pure issue advocacy, such as attempts to create support for specific legislation, or purely educational messages. As noted in *Buckley*, the FECA applies only to candidate elections. See, e.g., 424 U.S. at 42–44, 80. For example, the rules do not preclude a message made in close proximity to a Presidential election that only asked the audience to call the President and urge him to veto a particular bill that has just been passed, if the message did not refer to the upcoming election or encourage election-related actions. In contrast, under these rules, it is express advocacy if the communication described above urged the audience to vote against the President if the President does not veto the bill in question.

Nevertheless, to alleviate the commenters' concerns, the definition of express advocacy in new section 100.22(b) has been revised to incorporate more of the *Furgatch* interpretation by emphasizing that the electoral portion of the communication must be unmistakable, unambiguous, and suggestive of only one meaning, and reasonable minds could not differ as to whether it encourages election or defeat of candidates or some other type of non-election action.

Both alternative definitions of express advocacy included consideration of the context and timing of the communication, and indicated that communications consisting of several pieces of paper will be read together. Several commenters and witnesses were troubled by the perceived vagueness and uncertainty inherent in the use of the phrases "taken as a whole," "in light of the circumstances under which they were made," and "with limited reference to external events." They argued that they would not be able to ascertain in advance which facts and circumstances would be considered by the Commission. Some of the commenters and witnesses acknowledged the difficulty of crafting a clear and precise standard in the First Amendment context.

The final rules in section 100.22 retain the requirement that the communication be read "as a whole and with limited reference to external events" because *MCFL* makes clear that isolated portions of a communication are not to be read separately in determining whether a communication constituted express advocacy. See 479 U.S. at 249–50. Further, the *Furgatch* opinion evaluated the contents of the communication in question "as a whole, and with limited reference to external events." 807 F.2d at 864. The external events of significance in *Furgatch* included the existence of an upcoming presidential election and the timing of the advertisement a week before the general election. However, please note that the subjective intent of the speaker is not a relevant consideration because *Furgatch* focuses the inquiry on the audience's reasonable interpretation of the message. *Furgatch*, 807 F.2d at 864–65.

### 5. "Vote Democratic" or "Vote Republican"

In the NPRM, Alternative A-2 treated as express advocacy messages such as "Vote Republican" or "Vote Democratic" if made within a specified period prior to a special or general election or an open primary. Again, comments were sought on time periods ranging from 14 days to 6 months prior to an election, or any other time period considered reasonable. Alternatively, the period between the primary and general elections was suggested as the time when such messages refer to clearly identified candidates. In contrast, Alternative A-1 treated these phrases as express advocacy if made at any time after specific individuals have become Republican or Democratic candidates within the meaning of the FECA in the geographic area in which the communication is made. The NPRM also sought comments on when a message such as "Vote Democratic" or "Vote Republican" refers to one or more clearly identified candidates, rather than being just a message of support for a party.

The views of the commenters and witnesses reflected little consensus regarding these messages. Several were supportive of Alternative A-2, and suggested that a 90 day time frame would be appropriate. Others felt that such messages are always express advocacy because they aim at influencing the outcome of elections. Conversely, some commenters argued that these messages cannot be express advocacy if there are no declared candidates yet running for the party's

exemption from the independent expenditure prohibition. The *MCFL* Court described these three features as "essential to [its] holding that [MCFL] may not constitutionally be bound by § 441b's restriction on independent spending." 479 U.S. at 263–64. The clear implication is that a corporation that does not have all three of these features can be subject to this restriction.

The U.S. Court of Appeals decision in *Day v. Holahan,* 34 F.3d 1356 (8th Cir. 1994), does not affect this conclusion. In that case, the Eighth Circuit decided that a Minnesota statute that closely tracked the Supreme Court's three essential features was unconstitutional as applied to a Minnesota nonprofit corporation. The Commission believes the Eighth Circuit's decision, which is controlling law in only one circuit, is contrary to the plain language used by the Supreme Court in *MCFL,* and therefore is of limited authority.

The Notice sought comments on two versions of section 114.10 that represent contrasting approaches for defining the *MCFL* exemption. The first version set out the essential features listed in the *MCFL* opinion as threshold requirements for an exemption from the independent expenditure prohibition. By following the long-standing presumption that all incorporated entities are subject to the independent expenditure prohibition in section 441b, and requiring corporations that claim to be exempt from that prohibition to demonstrate that they are entitled to an exemption, this version sought to fit the *MCFL* decision into the existing statutory framework.

The second version took the opposite approach. It presumed a broad class of corporations would be exempt from section 441b's independent expenditure prohibition, unless they have a characteristic that would bring them within the Commission's jurisdiction.

The Commission has decided to follow the first approach and incorporate the rules into the existing framework for section 441b. The Supreme Court did not conclude that all of section 441b is unconstitutional on its face. Rather, it held that one portion of section 441b, the prohibition on independent expenditures, is unconstitutional as applied to a narrow class of incorporated issue advocacy organizations. The Court explicitly reaffirmed the validity of section 441b's prohibition on corporate contributions. 479 U.S. at 259–60. Thus, the broad prohibition on the use of corporate treasury funds contained in section 441b still exists, and the Commission's responsibility for enforcing that provision remains in place.

The Commission is aware that most of the comments were in accord with the second version. These commenters argued that all organizations are entitled to unlimited First Amendment rights regardless of whether they are incorporated, and that any Commission action that has the effect of limiting those rights is unconstitutional. They felt that the first version would define the category of exempt corporations too narrowly, and would burden the speech activity of corporations that are entitled to an exemption.

However, there is a long history of regulating the political activity of corporations, and the Supreme Court has recognized the compelling governmental interest in regulating this activity on numerous occasions. "The overriding concern behind the enactment of the [statutory predecessor to section 441b] was the problem of corruption of elected representatives through the creation of political debts. * * * The importance of the governmental interest in preventing this occurrence has never been doubted." *First National Bank of Boston v. Belotti,* 435 U.S. 765, 788, n.26 (1978). "This careful legislative adjustment of the federal electoral laws . . . to account for the particular legal and economic attributes of corporations and labor organizations warrants considerable deference. . . . [I]t also reflects a permissible assessment of the dangers posed by those entities to the electoral process." *FEC v. National Right to Work Committee,* 459 U.S. 197, 209 (1982).

The *MCFL* decision reaffirms, rather than casts doubt upon, the validity of Congressional regulation of corporate political activity. In its opinion, the *MCFL* Court said "[w]e acknowledge the legitimacy of Congress' concern that organizations that amass great wealth in the economic marketplace not gain unfair advantage in the political marketplace." *MCFL,* 479 U.S. at 263. The Court found the application of section 441b to MCFL unconstitutional not because this governmental interest was not compelling in general, but because MCFL was different from the majority of entities addressed by section 441b. Consequently, this governmental interest was not implicated by MCFL's activity. *Id.* The Court also acknowledged that MCFL-type corporations are the exception rather than the rule, saying that "[i]t may be that the class of organizations affected by our holding today will be small." *Id.* at 264. Thus, the Commission's task is to incorporate this narrow exception to the independent expenditure prohibition into the regulations so that they protect the interests of organizations that are like MCFL without undermining the FECA's legitimate legislative purposes. The Commission has concluded that the first approach is better suited to this task.

### 2. Scope and Definitions

Paragraph (a) is a scope provision that explains, in general terms, the purposes of section 114.10. Paragraph (b) defines four terms for the purposes of this section.

*a. The promotion of political ideas.* The first term is the phrase "the promotion of political ideas." The *MCFL* Court said one of MCFL's essential features was that "it was formed for the express purpose of promoting political ideas, and cannot engage in business activities." 479 U.S. at 264. Paragraph (b)(1) clarifies what this phrase means for the purposes of section 114.10. Under paragraph (b)(1), the promotion of political ideas includes issue advocacy, election influencing activity, and research, training or educational activity that is expressly tied to the organization's political goals.

The Commission added the last phrase, which is based on language in the *Austin* decision, in response to several commenters who felt that the proposed definition was too narrow. These commenters said that many organizations engage in certain activities that are not pure advocacy but are directly related to their advocacy activities. They argued that organizations should be allowed to conduct these activities without losing their exemption from the independent expenditure prohibition. The Commission agrees, and has added the last phrase to the final rules to serve this purpose.

*b. Express purpose.* Paragraph (b)(2) defines the term "express purpose," as that term is used in section 114.10. As indicated above, the Supreme Court said that MCFL was formed for the express purpose of promoting political ideas and cannot engage in business activities. *Id.* Paragraph (b)(2) states that a qualified nonprofit corporation's express purpose is evidenced by the purpose stated in the corporation's charter, articles of incorporation, or bylaws. It also may be evidenced by any purpose publicly stated by the corporation or its agents, and any activities in which the corporation actually engages.

Generally, if an organization's organic documents set out a purpose that cannot be characterized as issue advocacy, election influencing activity, or research, training or educational activity

organizations that train people in advocacy techniques, an important part of the activities of many nonprofit corporations. The Commission has addressed these concerns by broadening the definition of the phrase "the promotion of political ideas" in paragraph (b)(1) to include these activities. This definition is discussed in detail above.

b. *Business activities.* Under paragraph (c)(2), a corporation must be unable to engage in business activities in order to be a qualified nonprofit corporation. Paragraph (c)(2) tracks the language of the *MCFL* decision in that it limits the exemption to corporations that cannot engage in business activities. Thus, in order to be exempt, business activities must be proscribed by the corporation's organic documents or other internal rules.

However, as indicated above, fundraising activities that are expressly described as requests for donations to be used for political purposes are not business activities. Consequently, a qualified nonprofit corporation can engage in fundraising activities without losing its exemption, so long as it makes the appropriate disclosure.

Most of the commenters objected to a complete prohibition on business activities. One commenter argued that the presence of minimal business activities would not have changed the result in *MCFL*. This commenter said that, despite the Supreme Court's reliance on the absence of business activities, a prohibition should not be read into the opinion, since it would unreasonably limit the activities of these organizations.

However, the plain language of the *MCFL* opinion endorses a complete prohibition on business activities. The Court said "MCFL has three features *essential* to our holding that it cannot constitutionally be bound by § 441b's restriction on independent spending. First, it was formed for the express purpose of promoting political ideas, and cannot engage in business activities." *MCFL*, 479 U.S. at 264 (emphasis added). This statement clearly supports a total ban on business activities.

In addition, other parts of the opinion make it clear that the Court based its conclusion on the complete absence of any business activities, and strongly suggest that the presence of business activities would have changed the result. Earlier, the Court said that "the concerns underlying the regulation of corporate political activity are simply absent with regard to MCFL. It is not the case * * * that MCFL merely poses less of a threat of the danger that has prompted regulation. Rather, it does not pose such a threat at all." 479 U.S. at 263. In order to pose no such threat, a corporation must be free from resources obtained in the economic marketplace. Only those corporations that cannot engage in business activities are free from these kinds of resources.

This approach will not unreasonably limit the activities of a qualified nonprofit corporation. The corporation has at least two options for generating revenue under the final rules. First, the corporation can engage in unlimited fundraising activities, so long as it informs potential donors that it is seeking donations that will be used for political purposes, such as supporting or opposing candidates. Second, the corporation can establish a separate segregated fund and make its independent expenditures exclusively from that fund.

Several other commenters also felt that a limited amount of business activity should be allowed, and argued that the Commission should incorporate the tax law concepts of related and unrelated business activity into the final rules. Under this approach, income from activity that is related to the corporation's mission would not be considered business activity, and as such, would not affect its qualified nonprofit corporation status. In addition, qualified nonprofit corporations would be permitted to engage in some unrelated business activity, so long as it does not become the organization's primary purpose.

However, reliance on these tax law concepts would be inappropriate here because the tax code was drafted to serve different purposes. Section 501(c)(4) of the tax code grants tax exempt status to organizations that promote the social welfare. In exercising its administrative discretion, the Internal Revenue Service has concluded that it is appropriate to allow social welfare organizations to engage in some unrelated business activity so long as it does not become their primary purpose, apparently believing that a limited amount of business activity is not incompatible with the promotion of social welfare.

In contrast, section 441b seeks to prevent the use of resources amassed in the economic marketplace to gain an unfair advantage in the political marketplace. The *MCFL* Court concluded that a complete prohibition on the use of resources amassed in the economic marketplace is necessary to serve this purpose. Thus, the Commission has incorporated this prohibition into the final rules.

c. *Shareholders/disincentives to disassociate.* The second feature that distinguished MCFL from other corporations was that "it ha[d] no shareholders or other persons affiliated so as to have a claim on its assets or earnings." 479 U.S. at 264. The Supreme Court said this "ensures that persons connected with the organization will have no economic disincentive for disassociating with it if they disagree with its political activity." *Id.* Later, in *Austin*, the Court said that persons other than shareholders may also face disincentives to disassociate with the corporation. "Although the Chamber also lacks shareholders, many of its members may be similarly reluctant to withdraw as members even if they disagree with the Chamber's political expression, because they wish to benefit from the Chamber's nonpolitical programs. * * * The Chamber's political agenda is sufficiently distinct from its educational and outreach programs that members who disagree with the former may continue to pay dues to participate in the latter." 494 U.S. at 663.

These characteristics have been incorporated into paragraph (c)(3) of the final rules. In the interests of clarity, the rules separate these two characteristics into separate subparagraphs. Only those corporations that have the characteristics set out in both subparagraphs are exempt from the independent expenditure prohibition.

i. Shareholders. Under paragraph (c)(3)(i), a qualified nonprofit corporation is one that has no shareholders or other persons affiliated in a way that could allow them to make a claim on the organization's assets or earnings. Thus, if any of the persons affiliated with a corporation have an equitable or ownership interest in the corporation, the corporation will not be a qualified nonprofit corporation.

One commenter said the limitation on persons with claims against the corporation is unnecessary, and also said it should be coupled with an explanation that this restriction will not deprive a corporation of the right to have dues-paying members.

The Commission believes this limitation is necessary to ensure that associational decisions are based entirely on political considerations. However, this limitation will not adversely affect corporations with dues-paying members. In most cases, dues payments are not investments made with an expectation of return or repayment. They do not give members any right to the corporation's assets or earnings. Consequently, the existence of

corporation is acting as a "conduit" for business corporation and labor organization funds. One commenter suggested that the Commission engage in factual analyses to determine whether an organization is under the influence of a business corporation or labor organization or is acting as a conduit for the funds of such an organization.

However, the language of the *MCFL* opinion supports a prohibition on business corporation and labor organization donations. The *MCFL* Court said that one of the features "essential to [its] holding that [MCFL] may not constitutionally be bound by § 441b's restriction on independent spending" was that "MCFL was not established by a business corporation or a labor union, and *it is its policy not to accept contributions from such entities.*" 479 U.S. at 263–64 (emphasis added). The Court concluded that the existence of this policy "prevents [qualified nonprofit] corporations from serving as conduits for the type of direct spending that creates a threat to the political marketplace." *Id.* Thus, although the *MCFL* Court was concerned that business corporations and labor organizations could improperly influence qualified nonprofit corporations and use them as conduits to engage in political spending, the Court saw MCFL's policy of not accepting business corporation or labor organization donations as the way to address these concerns.

The *Austin* decision explains why a complete prohibition on these donations is necessary to serve the purposes of section 411b. In concluding that the Michigan Chamber of Commerce was not an MCFL-type corporation, the Court recognized that the danger of "unfair deployment of wealth for political purposes" exists whenever a business corporation or labor organization is able to funnel donations through a qualified nonprofit corporation. "Because the Chamber accepts money from for-profit corporations, it could, absent the application of [Michigan's version of section 441b], serve as a conduit for corporate political spending." *Austin,* 494 U.S. at 664. "Business corporations * * * could circumvent the [independent expenditure] restriction by funneling money through the Chamber's general treasury." *Id.*

Therefore, the Commission has limited the exemption to corporations that do not accept donations from business corporation or labor organizations. The Commission believes it would be impractical to engage in factual analyses to determine whether an organization is actually influenced by a business corporation or labor organization or is acting as a conduit for the funds of these entities. Furthermore, nothing in the Court's decisions suggests that the Commission must engage in such an inquiry. In fact, the Court has specifically said that, with regard to the application of section 441b, it will not "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *FEC v. National Right to Work Committee,* 459 U.S. 197, 210 (1982) ("*NRWC*").

Two commenters said it is impossible to screen out all such donations, and asserted that incidental or inadvertent business corporation or labor organization receipts should be permitted. One commenter suggested a *de minimis* test for a qualified nonprofit corporation's overall level of corporate or labor support, and limits on the percentage that could be accepted from a single contributor. Another commenter said the Commission should allow qualified nonprofit corporations to accept a *de minimis* amount of corporate or labor organization donations, so long as the corporation segregates these donations in a separate account and allocates expenses so that the corporate funds are not used to make independent expenditures.

In applying this rule, the Commission will distinguish inadvertent acceptance of prohibited donations from knowing acceptance of a *de minimis* amount of prohibited donations. Inadvertently accepted prohibited donations will not affect a corporation's qualification for an exemption from the independent expenditure prohibition. However, knowingly accepted prohibited donations will void a corporation's exemption, even if the corporation accepts only a *de minimis* amount. The Commission notes that political committees are required to screen their receipts for prohibited contributions. Most committees do so successfully, even though many of them are small and have limited resources. Qualified nonprofit corporations will also be expected to adopt a mechanism for screening their receipts for prohibited contributions in order to remain exempt from the independent expenditure prohibition.

Finally, the Commission notes that, in most cases, the prohibition on indirect business corporation and labor organization donations in paragraph (c)(4)(ii), discussed above, will not affect qualified nonprofit corporations that receive grants from organizations that are tax exempt under section 501(c)(3). Some qualified nonprofit corporations, all of which are section 501(c)(4) tax exempt organizations under the final rules, may receive grants from section 501(c)(3) organizations. Because section 501(c)(3) organizations can accept donations from business corporations and labor organizations, paragraph (c)(4)(ii) could be read to disqualify an otherwise qualified nonprofit corporation if it receives a grant from a section 501(c)(3) organization.

However, under IRS rules, section 501(c)(4) organizations that receive funds from a section 501(c)(3) organization are required to use those funds in a way that is consistent with the section 501(c)(3) organization's exempt purpose. Since political campaign intervention is never consistent with a section 501(c)(3) organization's exempt purpose, the recipient section 501(c)(4) organization is not supposed to use the grant for campaign activity. "[O]therwise, public funds might be spent on an activity that Congress chose not to subsidize." *Regan v. Taxation With Representation,* 461 U.S. 540, 544 (1982). So long as these safeguards exist, the Commission will not regard a grant from a section 501(c)(3) organization to a qualified nonprofit corporation as an indirect donation from a business corporation or labor organization. Consequently, the grant will not affect the organization's exemption from the independent expenditure prohibition.

*f. Section 501(c)(4) status.* Paragraph (c)(5) of the final rules limits the exemption from the independent expenditure prohibition to corporations that are described in 26 U.S.C. 501(c)(4). Section 501(c)(4) describes a class of organizations known as social welfare organizations that are exempt from certain tax obligations. Under section 501(c)(4), a social welfare organization is not organized for profit but is operated exclusively for the promotion of social welfare. A corporation must be a social welfare organization in order to be exempt from the prohibition on independent expenditures.

IRS regulations state that the promotion of social welfare does not include "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate." 26 CFR 1.501(c)(4)–1(a)(2)(ii). However, the rules also state that an organization is operated exclusively for the promotion of social welfare if it is "primarily" engaged in promoting the common good and general welfare of the people of the community. 26 CFR 1.501(c)(4)–1(a)(2)(i). Thus, the rules allow social welfare organizations to engage in a limited amount of political activity.

qualify for an exemption from the independent expenditure prohibition. In order to become a qualified nonprofit corporation, a corporation must adopt the essential characteristics set out in paragraph (c) of the final rules. In addition, the corporation must purge its accounts of corporate and labor organization donations and implement a policy to ensure that it does not accept these donations in the future. Once it adopts the essential characteristics, purges its accounts, and implements such a policy, the corporation will become a qualified nonprofit corporation.

### 7. Permitted Corporate Independent Expenditures

Paragraph (d) states that qualified nonprofit corporations can make independent expenditures, as defined in 11 CFR Part 109, without violating the prohibitions on corporate expenditures in 11 CFR Part 114. However, this paragraph also emphasizes that qualified nonprofit corporations remain subject to the other requirements and limitations in Part 114, in particular, the prohibition on corporate contributions, whether monetary or in-kind.

The Commission received no comments on this provision, and has retained it in the final rules.

### 8. Reporting Requirements

Paragraph (e) requires a corporation that makes independent expenditures to certify that it is a qualified nonprofit corporation under this section and report its independent expenditures. The procedures for certifying exempt status are set out in paragraph (e)(1). The requirements for reporting independent expenditures are set out in paragraph (e)(2).

Under paragraph (e)(1), the corporation must certify that it is eligible for an exemption from the independent expenditure prohibition. This certification must be submitted no later than the date upon which the corporation's first independent expenditure report is due under paragraph (e)(2), which will be described in detail below. However, the corporation is not required to submit this certification prior to making independent expenditures. The certification can be made as part of FEC Form 5, which the Commission will be modifying for use in this situation. Or, the corporation can submit a letter that contains the name, address, signature and printed name of the individual filing the report, and certifies that the corporation has the characteristics set out in paragraph (c).

One of the alternatives set out in the NPRM would have required qualified nonprofit corporations to submit much more detailed information in order to qualify for exempt status. The Commission decided not to include these requirements in the final rules in order to minimize the reporting burdens on qualified nonprofit corporations. Instead, the Commission has decided to require only that corporations certify that they have the characteristics of a qualified nonprofit corporation when they make independent expenditures. This will ensure that corporations claiming to be exempt are aware of the characteristics required to qualify for an exemption.

Paragraph (e)(2) states that qualified nonprofit corporations must comply with the independent expenditure reporting persons who make independent expenditures in excess of $250 in a calendar year to report those expenditures using FEC Form 5. This report must include the name and mailing address of the person to whom the expenditures was made, the amount of the expenditure, an indication as to whether the expenditure was in support of or in opposition to a candidate, and a certification as to whether the corporation made the expenditure in cooperation or consultation with the candidate. The names of persons who contributed more than $200 towards the expenditure must also be reported.

Thus, the final rules treat qualified nonprofit corporations as individuals for the purposes of the reporting requirements. This is one of the least burdensome reporting schemes contained in the FECA. The *MCFL* Court specifically endorsed this approach when it said that the disclosure provisions of 2 U.S.C. 434(c) will "provide precisely the information necessary to monitor [the corporation's] independent spending activity and its receipt of contributions." *MCFL*, 479 U.S. at 262. None of the commenters discussed the proposed independent expenditure reporting requirements.

In another part of its opinion, the *MCFL* Court also said that "should *MCFL*'s independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee." *MCFL*, 479 U.S. at 262. The proposed rules set out a test for determining a corporation's major purpose, and also contained proposed reporting requirements related to that test. These reporting requirements were set out in paragraph (e) of the proposed rules.

As will be discussed further below, the Commission has decided not to address this part of the Court's opinion in the final rules being promulgated today, preferring to do so at a later date as part of a separate rulemaking. Consequently, the reporting requirements related to the major purpose test have been deleted from paragraph (e) of the final rules. However, these rules may eventually be amended to require reporting of information related to the major purpose concept. Any such changes will be made as part of the separate rulemaking.

### 9. Solicitation Disclosure

Section 114.10(f) of the final rules states that when a qualified nonprofit corporation solicits donations, the solicitation must inform potential donors that their donations may be used for political purposes, such as supporting or opposing candidates. This rule, which has been modified slightly from the proposed rule, requires qualified nonprofit corporations to include a disclosure statement in their solicitations for donations.

One commenter called this an "unjustifiable roadblock" to the exercise of constitutional rights by small nonprofit corporations, and speculated that the people who run these organizations won't know about this requirement until after a complaint is filed against them.

However, this disclosure requirement directly serves the purposes of the *MCFL* exemption. In carving out this exemption, the Supreme Court said "[t]he rationale for regulation is not compelling with respect to independent expenditures by [MCFL]" because "[i]ndividuals who contribute to appellee are fully aware of its political purposes, and in fact contribute precisely because they support those purposes." *MCFL* at 260–61. "*Given a contributor's awareness of the political activity of [MCFL], as well as the readily available remedy of refusing further donations, the interest [of] protecting contributors is simply insufficient to support § 441b's restriction on the independent spending of MCFL.*" *Id.* at 262 (emphasis added).

The *MCFL* Court went on to endorse the disclosure requirement as a way to ensure that persons who make donations are aware of how those donations may be used. The Court said the need to make donors aware that their donations may be used to "urge support for or opposition to political candidates" can be met by "simply requiring that contributors be informed that their money may be used for such a purpose." *MCFL*, 479 U.S. at 261.

"reject the incumbent," or communications of campaign slogan(s) or individual word(s), which in context can have no other reasonable meaning than to urge the election or defeat of one or more clearly identified candidate(s), such as posters, bumper stickers, advertisements, etc. which say "Nixon's the One," "Carter '76," "Reagan/Bush" or "Mondale!"; or

(b) When taken as a whole and with limited reference to external events, such as the proximity to the election, could only be interpreted by a reasonable person as containing advocacy of the election or defeat of one or more clearly identified candidate(s) because—

(1) The electoral portion of the communication is unmistakable, unambiguous, and suggestive of only one meaning; and

(2) Reasonable minds could not differ as to whether it encourages actions to elect or defeat one or more clearly identified candidate(s) or encourages some other kind of action.

### PART 106—ALLOCATION OF CANDIDATE AND COMMITTEE ACTIVITIES

4. The authority citation for 11 CFR Part 106 continues to read as follows:

Authority: 2 U.S.C. 438(a)(8), 441a(b), 441a(g).

5. 11 CFR Part 106 is amended by revising paragraph (d) of section 106.1 to read as follows:

§ 106.1  Allocation of expenses between candidates.

* * * * *

(d) For purposes of this section, *clearly identified* shall have the same meaning as set forth at 11 CFR 100.17.

* * * * *

### PART 109—INDEPENDENT EXPENDITURES (2 U.S.C. 431(17), 434(c))

6. The authority citation for 11 CFR Part 109 continues to read as follows:

Authority: 2 U.S.C. 431(17), 434(c), 438(a)(8), 441d.

7. 11 CFR Part 109 is amended by revising paragraphs (b)(1), (b)(2) and (b)(3) of section 109.1 to read as follows:

§ 109.1  Definitions (2 U.S.C. 431(17)).

* * * * *

(b) For purposes of this definition—
(1) *Person* means an individual, partnership, committee, association, qualified nonprofit corporation under 11 CFR 114.10(c), or any organization or group of persons, including a separate segregated fund established by a labor organization, corporation, or national bank (see part 114) but does not mean a labor organization, corporation not qualified under 11 CFR 114.10(c), or national bank.

(2) *Expressly advocating* shall have the same meaning as set forth at 11 CFR 100.22.

(3) *Clearly identified* shall have the same meaning as set forth at 11 CFR 100.17.

* * * * *

### PART 114—CORPORATE AND LABOR ORGANIZATION ACTIVITY

8. The authority citation for Part 114 continues to read as follows:

Authority: 2 U.S.C. 431(8)(B), 431(9)(B), 432, 437d(a)(8), 438(a)(8), and 441b.

9. 11 CFR Part 114 is amended by revising paragraph (b) of section 114.2 to read as follows:

§ 114.2  Prohibitions on contributions and expenditures.

* * * * *

(b) Except as provided at 11 CFR 114.10, any corporation whatever or any labor organization is prohibited from making a contribution or expenditure as defined in 11 CFR 114.1(a) in connection with any Federal election.

* * * * *

10. 11 CFR Part 114 is amended by adding section 114.10 to read as follows:

§ 114.10  Nonprofit corporations exempt from the prohibition on independent expenditures.

(a) *Scope.* This section describes those nonprofit corporations that qualify for an exemption from the prohibition on independent expenditures contained in 11 CFR 114.2. It sets out the procedures for demonstrating qualified nonprofit corporation status, for reporting independent expenditures, and for disclosing the potential use of donations for political purposes.

(b) *Definitions.* For the purposes of this section—

(1) *The promotion of political ideas* includes issue advocacy, election influencing activity, and research, training or educational activity that is expressly tied to the organization's political goals.

(2) A corporation's *express purpose* includes:

(i) The corporation's purpose as stated in its charter, articles of incorporation, or bylaws, except that a statement such as "any lawful purpose," "any lawful activity," or other comparable statement will not preclude a finding under paragraph (c) of this section that the corporation's only express purpose is the promotion of political ideas;

(ii) The corporation's purpose as publicly stated by the corporation or its agents; and

(iii) Purposes evidenced by activities in which the corporation actually engages.

(3) (i) The term *business activities* includes but is not limited to:

(A) Any provision of goods or services that results in income to the corporation; and

(B) Advertising or promotional activity which results in income to the corporation, other than in the form of membership dues or donations.

(ii) The term *business activities* does not include fundraising activities that are expressly described as requests for donations that may be used for political purposes, such as supporting or opposing candidates.

(4) The term *shareholder* has the same meaning as the term *stockholder,* as defined in 11 CFR 114.1(h).

(c) *Qualified nonprofit corporations.* For the purposes of this section, a qualified nonprofit corporation is a corporation that has all the characteristics set forth in paragraphs (c)(1) through (c)(5), of this section:

(1) Its only express purpose is the promotion of political ideas, as defined in paragraph (b)(1) of this section;

(2) It cannot engage in business activities;

(3) It has:

(i) No shareholders or other persons, other than employees and creditors with no ownership interest, affiliated in any way that could allow them to make a claim on the organization's assets or earnings; and

(ii) No persons who are offered or who receive any benefit that is a disincentive for them to disassociate themselves with the corporation on the basis of the corporation's position on a political issue. Such benefits include but are not limited to:

(A) Credit cards, insurance policies or savings plans; and

(B) Training, education, or business information, other than that which is necessary to enable recipients to engage in the promotion of the group's political ideas.

(4) It:

(i) Was not established by a business corporation or labor organization;

(ii) Does not directly or indirectly accept donations of anything of value from business corporations, or labor organizations; and

(iii) If unable, for good cause, to demonstrate through accounting records that paragraph (c)(4)(ii) of this section is satisfied, has a written policy against accepting donations from business corporations or labor organizations; and