# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

HEIDI BECKER, MEDEA BENJAMIN, )
PHIL DONAHUE, MARK DUNLEA, )
ANNE GOEKE, ELIZABETH HORTON )
SCHEFF, RALPH NADER, JAMES )
O'KEEFE, SUSAN SARANDON, )
NADER 2000 PRIMARY COMMITTEE, )
INC., ASSOCIATION OF STATE )
GREEN PARTIES and GREEN )
PARTY USA, )
                   )
           Plaintiffs, )      CIVIL ACTION NO. 00-11192-PBS
                   )
     v. )
                   )
FEDERAL ELECTION COMMISSION, )
                   )
          Defendant. )
                   )

## MEMORANDUM AND ORDER

September 1, 2000

**SARIS, U.S.D.J.**

## INTRODUCTION

Plaintiff Ralph Nader is the nominee of a third party, called the Green Party, for President of the United States. Nader, together with several individuals and organizations supporting his campaign,[1] brings this action challenging twenty-year-old regulations adopted by the Federal Election Commission

---

[1] The plaintiff group also includes individual voters who have thrown their support behind Nader's candidacy.  The lead plaintiff is a registered independent voter who has not yet decided for whom she will vote, but who does not plan to vote for either Vice President Al Gore or Texas Governor George W. Bush.

DOCKETED     *38*



("FEC"), found at 11 C.F.R. §§ 110.13(a)(1) and 114.4(f)(1) and (3) ("the Debate Regulations"). Arguing that these Debate Regulations permit corporations to make contributions and expenditures to sponsor federal candidate debates in violation of the Federal Election Campaign Act ("FECA"), 2 U.S.C. § 431 et seq., they seek a preliminary injunction to enjoin the FEC from implementing the Debate Regulations. The complaint also asks the Court to order the FEC to enforce the prohibition against the use of corporate money in the staging of federal candidate debates. The first scheduled presidential debate is October 3, 2000.

The FEC has moved to dismiss the complaint for lack of jurisdiction on the following grounds: 1) that its administrative procedures, 2 U.S.C. § 437g, are the exclusive remedy for complaints about violations of the FECA, and that the judicial review section of the Administrative Procedure Act, 5 U.S.C. § 706, is inapplicable; 2) that plaintiffs failed to exhaust their administrative remedies by petitioning the Commission for a rule making on the Debate Regulations; and 3) that none of the twelve plaintiffs can demonstrate Article III standing.

The Commission on Presidential Debates ("CPD"), a nonprofit corporation which sponsored presidential and vice-presidential debates in 1988, 1992, and 1996, has filed a brief as amicus curiae. The CPD is the sponsor of the October 3 debate.

2

According to the complaint, the CPD has solicited millions of dollars from for-profit corporations to help stage the presidential debates.  On January 6, 2000, it announced that Anheuser-Busch will serve as one of the national financial sponsors for its 2000 presidential debates, as well as the sole sponsor for the debate scheduled for October 17, 2000 in St. Louis, Missouri.  The CPD argues that the Debate Regulations are necessary to protect the First Amendment rights of private debate sponsors; that plaintiffs have failed to demonstrate wide-spread "influence and corruption" by corporations in CPD decision-making that would amount to irreparable harm; and that the public has a strong interest in having the debates go forward.

After hearing, and review of the submissions, the Court **DENIES** both motions.  Although Mr. Nader and the Green Party have standing, the Court concludes that the Debate Regulations are not contrary to law.

**DISCUSSION**

## 1.  Statutory Scheme

The FECA makes it unlawful for any corporation[2] "to make a contribution or expenditure in connection with any election" for federal office.  2 U.S.C. § 441b(a).  For purposes of § 441b, the statute defines the term "contribution or expenditure" to include

---

[2]  These statutory provisions and the implementing regulations apply to labor unions as well.

"any direct or indirect payment, distribution, loan, advance,
deposit, or gift of money or any services, or anything of value .
. . to any candidate, campaign committee or political party or
organization, in connection with any election" to federal office.
Id. § 441b(2).  However, it excludes from the definition:  (1)
communications "on any subject" by a corporation to its
stockholders and executive or administrative personnel and their
families; (2) "nonpartisan registration and get-out-the-vote
campaigns by a corporation aimed at its stockholders
and executive or administrative personnel and their families";
and (3) "the establishment, administration, and solicitation of
contributions to a separate segregated fund to be utilized for
political purposes."  Id. §§ 441b(b)(2)(A)-(C).

The general definition section of the FECA contains
definitions of "contribution" and "expenditure."  Both terms
include any gift, loan, deposit, or advance of money or "anything
of value . . . for the purpose of influencing any election for
Federal office."  Id. §§ 431(8)(A)(i), 431(9)(A)(i).  These
definitions exclude "any payment made or obligation incurred by a
corporation or labor union which, under § 441b(b) of this title,
would not constitute an expenditure by such corporation or labor
organization."  Id. §§ 431(8)(B)(vi), 431(9)(B)(v).

Of great significance to this dispute, the general
definition of "expenditure" also excludes "nonpartisan activity

4

designed to encourage individuals to vote or to register to vote." Id. § 431(9)(B)(ii).

The FEC provided a helpful legislative history. Amendments to the Act in 1974 exempted "nonpartisan activity designed to encourage individuals to vote or to register to vote" from the Act's general definition of "expenditure." Id. § 431(9)(B)(ii). In 1976, Congress incorporated into the Act the long-standing prohibition of corporate contributions and expenditures that had been in 18 U.S.C. § 610. Congress included a provision exempting from the definition of "contribution or expenditure" "nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families." Id. § 441b(b)(2)(B).

Recognizing that these amendments, "which were added to the law at different times, overlap in that both make exceptions to the term 'expenditure' for internal communications and for nonpartisan registration and get-out-the-vote activity," the Conferees explained how they intended this provision to work with the exemption from the general definition of "expenditure" for "nonpartisan activity designed to encourage individuals to vote or to register to vote," id. § 431(9)(B)(ii):

> The conferees' intent with regard to the interrelationship between sections [2 U.S.C 431(9)(B)(ii)] and [2 U.S.C. 441b(b)(2)(B)] which permit such activities as assisting eligible voters to register and get to the

polls, so long as these services are made
available without regard to the voter's
political preference, is the following:
these provisions should be read together to
permit corporations both to take part in
nonpartisan registration and get-out-the-vote
activities that are not restricted to
stockholders and executive or administrative
personnel, if such activities are jointly
sponsored by the corporation and an
organization that does not endorse candidates
and are conducted by that organization; and
to permit corporations, on their own, to
engage in such activities restricted to
executive or administrative personnel and
stockholders and their families.  The same
rule, of course, applies to labor
organizations.

H.R. Rep. No. 94-1057, at 63-64 (1976), quoted in FEC,

Explanation and Justification, Funding and Sponsorship of Federal

Candidate Debates, 44 Fed. Reg. 76,734, 76,735 (1979) ("1979

Explanation").

In 1979, Congress also added exceptions to the general

statutory definitions of "contribution" and "expenditure" that

exempt "any payment made or obligation incurred by a corporation

or a labor organization which, under section 441b(b), would not

constitute an expenditure by such corporation or labor

organization."  2 U.S.C. § 431 (8)(B)(vi) and 431(9)(B)(v).

## 2.  Regulatory Scheme

In 1979, the FEC addressed the funding and sponsorship of

candidate debates in a rule making.  Pursuant to its statutory

authority to "formulate policy with respect to" the Act, id. §

437c(b)(1), the FEC determined that "[c]andidate debates

stimulate voter interest and hence encourage individuals to register to vote or to vote," and concluded that "permitting corporations and labor organizations to donate funds to nonprofit nonpartisan organizations for [debate] staging is consistent with congressional intent and policy under sections 431(f)(4)(B) and 441b(b)(2)(B)."  1979 Explanation, 44 Fed. Reg. at 76,736.

The FEC explained:

> The educational purposes of nonpartisan
> public candidate debates is similar to the
> purpose underlying nonpartisan voter
> registration and get-out-the-vote campaigns.
> Unlike single candidate appearances,
> nonpartisan debates are designed to educate
> and inform voters rather than to influence
> the nomination or election of a particular
> candidate.  Hence, funds received and
> expended [by certain nonprofit organizations]
> to defray costs incurred in sponsoring
> nonpartisan public debates are not considered
> contributions or expenditures under the Act.

Id. at 39,348.

Pursuant to a 1980 rule making,[3] the FEC issued the so-called "Safe Harbor" Debate Regulations interpreting § 441b to permit certain organizations to stage and finance political debates among candidates for federal office.  These Debate Regulations, which were revised in early 1996, set eligibility

---

[3] As the FEC explained, the agency's first draft of the Debate Regulations was sent to Congress as required by 2 U.S.C. § 438d(d), and Congress disapproved of them on September 18, 1997 for reasons which did not include the proposed regulatory provisions allowing corporations and unions to donate funds for the cost of candidate debates sponsored by nonprofit, nonpartisan organizations.  See 25 Cong. Rec. 24,957 (1979).

requirements for entities that may stage debates among candidates for any federal office, and requirements for the structure and selection of participants in candidate debates by such organizations. <u>See</u> 11 C.F.R. § 110.13.

A debate-staging organization must be a nonprofit organization that "do[es] not endorse, support or oppose political candidates or political parties[,]" <u>id.</u> § 110.13(a)(1), or a media entity "not owned or controlled by a political party, political committee or candidate." <u>Id.</u> at (a)(2). A debate must "include at least two candidates[,]" and the staging organization may not "structure the debates to promote or advance one candidate over another." <u>Id.</u> § 110.13(b). Staging organizations "must use pre-established objective criteria to determine which candidates may participate in a debate[,]" and for general election debates, they "shall not use nomination by a particular political party as the sole objective criterion to determine whether to include a candidate in a debate." <u>Id.</u> § 110.13(c).

The Debate Regulations permit corporations and labor organizations to donate funds to staging organizations that meet these various requirements for safeguarding against promoting or opposing the election of particular candidates. <u>See id.</u> § 114.4(f)(3). A complementary provision permits the staging organizations that are qualified under 26 U.S.C. §§ 501(c)(3) & (c)(4) to use corporate or labor union funds, as well as their

own funds, to defray the costs of staging debates. 11 C.F.R. § 114.4(f)(1). Donations authorized by § 114.4(f) are also expressly excluded from the Commission's general regulatory definitions of "contribution" and "expenditure." See id. §§ 100.7(b)(21) (excluding from "contribution") & 110.8(b)(23) (excluding from "expenditure").

The regulations were revised in 1995 to define the term "express advocacy" as required by FEC v. Massachusetts Citizens For Life, Inc., 479 U.S. 238 (1986) ("MCFL"), and to describe certain non-profit organizations that are exempt from the prohibition on independent expenditures. See 60 Fed. Reg. 35,292, 35,305 (1995). Certain changes were made in the Debate Regulations. For example, while the previous rules "had expressly allowed staging organizations to restrict general election debates to major party candidates," the "new rules do not allow a staging organization to ban minor party candidates or independent candidates from participating simply because they have not been nominated by a major party." 60 Fed. Reg. 64262, 64,201 (1995). As required by 2 U.S.C. § 438(d), in December 1995 the Commission submitted these revised regulations to Congress before promulgating them, and Congress took no action to disapprove them during the subsequent 30-day period the statute provides.

### 3.  Jurisdiction

#### a.   The Administrative Procedure Act

Courts may review challenges to FEC regulations under the
Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A) and
(C), to determine whether those regulations exceed the FEC's
authority.  See, e.g., Maine Right to Life Comm., Inc. v. FEC, 98
F.3d 1, 1 (1st Cir. 1996) (affirming a district court's
invalidation of an FEC regulation defining "express advocacy"
under the APA); Perot v. FEC, 97 F.3d 553, 560-61 (D.C. Cir.
1996) (instructing that an action seeking judicial review of an
FEC regulation should be brought under the APA); Faucher v. FEC,
743 F. Supp. 64, 68-69 (D. Me. 1990) (discussing the court's
basis for exercising jurisdiction in an APA case challenging an
FEC regulation), aff'd 928 F.2d 468 (1st Cir. 1991).  Parties who
are "adversely affected or aggrieved by agency action" may seek
that review.  5 U.S.C. § 702.

#### b.   Exhaustion of Administrative Remedies

The FEC argues that plaintiffs must first exhaust their
administrative remedies.  FECA specifically provides for judicial
review when a complainant is dissatisfied with an FEC decision
that no illegality has occurred.  2 U.S.C. § 437g(a)(8)(A).
Because the FECA does not address a facial attack on the validity
of a rule, the APA applies.  See Perot, 97 F.3d at 560.  Where a
plaintiff is challenging the validity of a regulation, the

10

exhaustion rule normally requires that the plaintiff petition the agency for a rule making.  See Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).  The doctrines of administrative exhaustion and primary jurisdiction are judge-made rules to be applied on a case-by-case basis, taking into account the purposes of the doctrines.  See Brown v. Secretary of HHS, 46 F.3d 102, 113-14 (1st Cir. 1995).  Courts are "equipped to settle" issues of law in cases involving challenges to an agency's power.  Id.; see Ezratty v. Puerto Rico, 648 F.2d 770, 774 (1st Cir. 1981) (finding that exhaustion is not required when "the issue [is] a pure matter of law as to which specialized administrative understanding plays little role").  As this challenge involves a question of law involving the agency's power, exhaustion is not required.

Plaintiffs also convincingly invoke cases applying the futility exception to exhaustion, since here the FEC was highly unlikely to revoke its 20-year old regulation and has, in fact, maintained that the regulation is valid.  See Skubel, 113 F.3d at 334 (finding that the district court properly applied the futility exception where an agency expressed an unwillingness to reconsider its position).

**c.   Standing**

The most difficult jurisdictional question involves standing.  Under the 3-pronged analysis for constitutional

11

standing, laid out in <u>Allen v. Wright</u> and its progeny, a
plaintiff must allege:  (1) personal injury that is; (2) fairly
traceable to the defendant's allegedly unlawful conduct; and (3)
likely to be redressed by the requested relief.  468 U.S. 737,
751-52 (1984); <u>see</u> <u>also</u> <u>Lujan v. Defenders of Wildlife</u>, 504 U.S.
555, 560-61 (1992) (holding that plaintiffs must show an "'injury
in fact' -- an invasion of a legally protected interest which is
(a) concrete and particularized and (b) actual or imminent, not
'conjectural' or 'hypothetical,' which is fairly traceable to the
challenged action, and is likely to be "redressed by a favorable
decision") (internal quotations and citations omitted).  The
<u>Allen</u> Court instructed judges to analyze whether a claimed injury
is too abstract; whether the line of causation between the
illegal conduct and injury is too attenuated; and whether the
prospect of obtaining relief from the injury as a result of a
favorable ruling is too speculative.  <u>See</u> <u>Allen</u>, 468 U.S. at 751-
52.

    In addition to the Article III standing requirements,

> Several prudential considerations also infuse
> standing determinations. These
> considerations, which militate against
> standing, principally concern whether the
> litigant (1) asserts the rights and interests
> of a third party and not his or her own, (2)
> presents a claim arguably falling outside the
> zone of interests protected by the specific
> law invoked, or (3) advances abstract
> questions of wide public significance
> essentially amounting to generalized

> grievances more appropriately addressed to
> the representative branches.

Benjamin v. Aroostook Med. Ctr., Inc., 57 F.3d 101, 104 (1st Cir.
1995) (citations omitted).

Plaintiffs Nader, the Nader 2000 Primary Committee, the
various Green Party branches and associations, and the individual
voters all assert that they will suffer an injury unless the FEC
regulations permitting corporate underwriting of debates are
declared invalid.  I'll address the plaintiffs' positions vis-a-
vis standing by category.

### i. **Nader**

Plaintiffs assert that, whether or not Nader is invited to
participate in the CPD debates, he suffers harm as a result of
the unlawful regulations.  If he does not participate, his
opponents will "directly benefit from illegal corporate-sponsored
advertising," and if he is invited to participate, he will be
forced to choose between compromising his corporate watchdog
platform, or forgoing the best opportunity to communicate his
views to the public.

It is important to point out what Nader is not asserting as
an injury.  He has not argued that the use of corporate funds in
the debates will have any impact on the substance of the debates.
And if he is excluded, he likewise has not argued that the
corporate sponsorship was the basis for that exclusion.  He does
not challenge the underlying criteria for debate eligibility,

13

only the corporate underwriting that pays, one presumes, for the microphones and debate hall stages.

The best support for Nader's position is a First Circuit case, Vote Choice, Inc. v. DeStefano, in which the court held that a gubernatorial candidate had standing to challenge a Rhode Island campaign finance law because the law forced the candidate into a "coerced choice" between public and private financing, which impacted "the strategy and conduct" of her campaign.  4 F.3d 26, 36-47 (1st Cir. 1993).  The First Circuit was persuaded that having to campaign under a law which "colored [the plaintiff's] campaign strategy from the outset" was sufficient injury.  Id.  Here, plaintiffs argue that standing arises from the coerced choice Nader must make in deciding whether to seek to participate in debates which are, in his view, unlawfully funded by corporations and contrary to his anti-corporate platform.  If having to adjust campaign strategy around an illegal financing law constituted sufficient injury in Vote Choice, Nader has alleged sufficient injury under the first prong of Allen.

Defendants emphasize case law which erects high hurdles in prevailing on "political competitor standing" where the candidate complains of unlawful regulation, or lack of regulation, of another entity -- here, the CPD.  See Lujan, 504 U.S. at 562. The recent cases on competitor do standing cut against Nader somewhat.  In Gottlieb v. FEC, 143 F.3d 618, 620 (D.C. Cir.

1998), the court took a narrow view of "competitor standing," requiring that when challenging a government benefit granted to another group or entity, the "competitor" must himself be eligible to receive the same benefits as the person or group it is challenging.  <u>Gottlieb</u> extended the stingy approach to competitor standing developed in cases involving challenges to the tax-exempt status of various organizations, and applied it to a challenge involving a campaign finance law.  <u>See</u>, <u>e.g.</u>, <u>In re United States Catholic Conference</u>, 885 F.2d 1020, 1028-29 (2d Cir. 1989) (denying competitor-advocate standing to pro-choice, non-profit, tax-exempt organizations challenging the tax-exempt status of Catholic Church because they did not compete with the church's alleged electioneering); <u>Fulani v. Brady</u>, 935 F.2d 1324, 1331 (D.C. Cir. 1991) (denying standing to a minor party candidate seeking to challenge the tax-exempt status of debate sponsors); <u>but</u> <u>see</u> <u>Fulani v. League of Women Voters Educ. Fund</u>, 882 F.2d 621, 625 (2d Cir. 1989) (finding standing to challenge the tax-exempt status of debate sponsor because plaintiff had been denied right to participate, thus losing substantial media exposure, and her injury was traceable to the League's unlawful use of a partisan participation criteria).[4]

_____

[4] Defendants cite a follow-up Second Circuit case, <u>Fulani v. Bentsen</u>, in which the court denied the same candidate competitor standing to challenge the tax-exempt status of the League of Women Voters.  35 F.3d 49, 53 (2d Cir. 1994).  However, in that case, Fulani had been excluded by both co-sponsors of the debate,

Hence, under a narrow, <u>Gottlieb</u>-type view, the FEC argues
that Nader himself is not a debate staging organization eligible
to benefit from the corporate financing regulation, and thus
lacks standing to challenge corporate funding of the CPD.
However, Nader contends that the Democratic and Republican
candidates themselves (as opposed to the CPD) receive a benefit
from the regulation, in the form of corporate-sponsored publicity
that frees those candidates and their parties from needing to use
their own funds to get out their message.  Participation in the
debates also confers an aura of legitimacy upon his opponents.
Using the analysis in <u>Gottlieb</u> and <u>United States Catholic
Conference</u>, plaintiff must show that "he personally competes in
the same arena with the same party to whom the government has
bestowed the candidates illegal benefit." <u>Gottlieb</u>, 143 F.3d at
621.  Nader maintains that, as a candidate from a minor party, he
will be personally disadvantaged by the benefit his opponents
from the major parties will receive from "illegal, corporate-
sponsored advertising."  I find that this is a sufficient
personal injury under prong one of <u>Allen</u>.

As to prongs two and three of the <u>Allen</u> test, Nader's injury

_____

the League and CNN.  CNN, of course, could have excluded her in
any event.  Fulani nonetheless argued that the incremental
advantage of having the League as a co-sponsor conferred a
benefit on her adversaries.  The court rejected her contention
that voters watching a debate sponsored by both CNN and the
League would come to a more negative view of Fulani than voters
watching a debate sponsored solely by CNN.  <u>See</u> <u>id.</u>

is traceable to the Debate Regulations.   However, it's not clear
that enjoining reliance on these regulations will redress all of
Nader's injuries.   The benefit flowing through the CPD to his
competitors, in terms of free media exposure, is traceable to the
regulation; however, it's worth noting that the major party
candidates could get that same economic benefit (i.e. being
relieved from using their own funds to get out their message)
even if CPD was out of the picture entirely.   If a media
organization, for example, stepped in, ran the debates, and
excluded Nader, his competitors would still be granted an
advantage.   It would not be, however, an allegedly unlawful,
corporate-sponsored advantage.

While standing is a close question, I conclude that, at the
very least, Nader is harmed under the coerced choice analysis in
Vote Choice.   I also find that Nader has made a persuasive
argument that he should qualify for "political competitor
standing," given the economic benefit flowing to his opponents in
the election.   Furthermore, the "prudential standing"
considerations weigh in Nader's favor.   Although he does advance
what one could call an abstract social interest, it is an
interest around which he personally has devoted much of his
campaign resources and which has been a key focus of his message
to the public.   As a candidate who may not, and wishes not to,
benefit from corporate debate underwriting, his interest is

17

personal.  Finally, I note that the purpose of these FECA
provisions was to prevent the potentially corrupting influence of
corporate money in the electoral arena.  See FEC v. National
Right to Work Comm., 459 U.S. 197, 209 (1982) (reasoning that §
441(b) of FECA reflects an "assessment of the dangers posed by
[corporations] to the electoral process").  As a candidate who is
trying to shed light on, as well as campaign within, a system in
which corporations are permitted to do that which he insists
violates the law, Nader falls well within the FECA's "zone of
interest."  Cf. FEC v. Akins, 524 U.S. 11, 18 (1998) (holding
that voter plaintiffs satisfied "prudential standing"
requirements because they fell within one of the "zones of
interests" FECA was designed to address).

### ii.  The Organizational Plaintiffs.

As to the Nader 2000 Primary Committee, Association of State
Green Parties, and Green Party USA, plaintiffs assert that the
FEC's unlawful regulations impair these organizations' ability to
achieve their basic political mission.  To the extent that this
is an abstract, ideological type of harm, it is insufficient.
Courts insist that an organization must assert more than damage
to its social goals and interests.  See, e.g., Common Cause v.
FEC, 108 F.3d 413, 417 (D.C. Cir. 1997) (holding that an
organization suing on its own behalf must show a "'concrete and
demonstrable injury to the organization's activities -- with a

18

consequent drain on the organization's resources'") (quoting
Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982)).
However, as with Nader, the organizational plaintiffs are on
stronger footing to the extent they cast their arguments in terms
of the disadvantage they suffer in having to spend their own
funds to get out Nader's message.  The two major parties are
relieved of that burden by virtue of the corporate money filtered
through CPD.  If Nader can raise "competitor standing," then his
organization and party should be able to do the same.

### iii.  Individual Voters.

Under any theory, however, the injury asserted by the
individual voters is too abstract, conjectural, or attenuated to
meet the Allen test.  First, to the extent that the voters seek
to connect their injury to Nader and his candidacy, courts
recognizing that harm to a candidate produces a derivative harm
to voters also require that the voters themselves suffer a
"concrete and personalized injury." Gottlieb, 143 F.3d at 622.
Such an injury has been recognized where a candidate is prevented
from appearing on a ballot altogether, see Bullock v. Carter, 405
U.S. 134, 143 (1972) (addressing high candidate filing fees) or
when, for example, eligibility requirements or term limits
impinge on the voters' ability to support their candidate, see
Thorsted v. Gregoire, 841 F. Supp. 1068, 1073 (W.D. Wash. 1994).

The argument plaintiffs make here, that Nader's relative

disadvantage works a correlative injury to voters, is similar to one rejected in <u>Buckley v. Valeo</u>, where the voters tried to argue that the denial of public financing to some presidential candidates was restrictive of voters' rights.  424 U.S. 1, 94 (1976); <u>see</u> <u>also</u> <u>Gottlieb</u>, 143 F.3d at 108 ("The extra infusion of funds into the Clinton campaign did not impede the voters from supporting the candidate of their choice.").  Even if Nader and his party have standing under a "political competitor" theory, it's too much of a stretch to sweep his voters in under that approach.

Plaintiffs also argue that the voters here suffer a direct injury.  These arguments are weak.  First, the idea that the voters' ability to influence the political process has been diminished, or that their votes have somehow been "diluted," was rejected by the <u>Gottlieb</u> court.  <u>See</u> 143 F.3d at 621.  Here, the plaintiffs' alleged injury is even more abstract:  they claim they are harmed by the grubby influence of corrupt, corporate debate-staging money that they say distorts the political process or "tilts the electoral playing field."  This is not particularized, personal, or concrete.

Second, invoking the Supreme Court's decision in <u>Akins</u>, the voters argue that they fall within the "zone of interests" that the FECA was designed to protect.  <u>See</u> 524 U.S. at 19-20.  While this may be true, it puts the cart ahead of the horse.  The APA

did open the door to those "adversely affected or aggrieved by agency action," but it does not excuse a potential plaintiff from fulfilling the Article III standing requirements at the outset. Plaintiffs must still allege injury to a legally protected interest. See, e.g., Sierra Club v. Hickel, 433 F.2d 24, 32-33 (9th Cir. 1970) (holding that the APA, in and of itself, does not confer standing on a litigant; rather, it allows judicial review of administrative action where none existed before).

It is also worth noting that the complaint hints at a "right to receive information" type of injury, such as the one recognized in Akins. But, the injury-in-fact the Court found in Akins hinged on the denial of information which the statute required be made public. 524 U.S. at 20. The D.C. Circuit has subsequently limited "informational standing" to cases in which plaintiffs are denied information that is "both useful in voting and required by Congress to be disclosed." Common Cause, 108 F.3d at 418.

### 4. Preliminary Injunction Standard

Plaintiffs, as the moving party seeking a preliminary injunction, must meet four criteria before an injunction can issue. The Court must find: (1) that plaintiffs have exhibited a likelihood of success on the merits; (2) that plaintiffs will suffer irreparable injury if the injunction is not granted; (3) that such injury outweighs any harm which granting injunctive

21

relief would inflict on the defendants; and (4) that the public interest will not be adversely affected by the granting of the injunction.  See Suarez-Cestero v. Pagan-Rosa 172 F.3d 102, 104 (1st Cir. 1999); TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544 (1st Cir. 1996).  Plaintiffs bear the burden of making each of these showings.  See International Ass'n of Machinists and Aerospace Workers v. Eastern Air Lines, Inc., 826 F.2d 1141, 1144-45 (1st Cir. 1987) (citing Planned Parenthood League of Mass. v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981)).

### 5.  Likelihood of Success

#### a.  Plain Language

Plaintiffs raise three arguments that the Debate Regulations are contrary to law.  First, they assert that the Debate Regulations are inconsistent with the plain terms of the FECA, which proscribes the use of corporate money "in connection with" federal elections and which does not provide any exception for the use of corporate funds to stage federal candidate debates under § 441b(a).  The FEC argues that the donation of corporate funds to underwrite candidate debates is permitted by the FECA because, in the general definition section, Congress exempted funds used for "nonpartisan activity designed to encourage individuals to vote or to register to vote" from the definition of expenditure.  Relying heavily on the basic principle of

statutory construction that a specific statute controls over a
general provision, see HCSC-Laundry v. United States, 450 U.S. 1,
6 (1981), plaintiffs respond that the specific prohibitions in §
441b(b)(2) trump the general exemptions in § 431(a)(B)(ii).   The
FEC retorts that the sections should be read in tandem.

     An analysis of FEC v. Massachusetts Citizens For Life, Inc.,
479 U.S. 238 (1986)("MCFL") persuades me that the FEC has the
better argument.   There, an anti-abortion organization had issued
a "special edition" newsletter which encouraged readers to vote
for certain candidates.   MCFL had argued that it did not violate
the FECA because it did not provide anything to any candidate or
organization, and § 441b(b)(2) narrowly defined "contribution or
expenditure" to include the provision of various things of value
to a candidate, campaign committee or political party in
connection with any election.   The Supreme Court rejected that
analysis by looking to the general definition section of the Act
which contained a "broader definition" of expenditure in §
431(9)(A)(i), which covers anything of value made "for the
purpose of influencing any election for Federal office."   The
Supreme Court concluded:   "Since the language of the statute does
not alone resolve the issue, we must look to the legislative
history of Section 441b to determine the scope of the term
'expenditure.'"   Id. at 246.   In order to discern legislative
intent, the Court parsed the remarks of the provision's sponsor

as well as other congressional remarks, and found no merit in the argument that "only payments to a candidate or organization fall within the scope of § 441b." Id. at 248.

Here, too, the interplay between the specific prohibitions in § 441b(b) and the general definitions in § 431 creates an ambiguity which the plain language of the statute does not resolve. Again, following the MCFL lead, I look to the legislative history to resolve the dispute. The Conference Report clarifies that the two provisions are to be read together to permit corporations to take part in nonpartisan get-out-the-vote activities if such activities are jointly sponsored by the corporation and an organization that does not endorse candidates, and are conducted by that organization.

### b. Gap-filling

This statutory construction is only one step forward in resolving this dispute because, as each party acknowledges, neither the statute nor the legislative history specifically mentions the issue of federal candidate debates. Plaintiffs stress that even if § 431 amplifies the permissible range of corporate expenditures, the FECA does not allow corporate funds to be used for candidate debates, which may be educational, but are not a get-out-the-vote activity. In its rule making, the FEC asserted that candidate debates might "stimulate voter interest and hence 'encourage individuals to register to vote or to

vote,'" 44 Fed. Reg. at 76,736, and that "[t]he educational purpose of nonpartisan public candidate debates is similar to the purpose underlying nonpartisan voter registration and get-out-the-vote campaigns." 44 Fed. Reg. at 39,348.  Plaintiffs disagree, pointing out that even the much-heralded Conference Report's example of get-out-the vote activities is "assisting eligible voters to register and to get to the polls."  H.R. Rep. No. 1057, at 63 (1976).

Judicial review of the validity of an agency's construction of a statute entails a bifurcated analysis.  See Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984).  Under Chevron, if a court determines that "Congress has directly spoken to the precise question at issue," then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  467 U.S. at 842-43.  If however, the agency's statutory interpretation "fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give [that] judgment 'controlling weight.'"  Id. at 844.  "[I]f it is a reasonable interpretation and implementation of an ambiguous statutory provision, it must be given judicial deference."  United States v. Haggar Apparel Co., 526 U.S. 380, 383 (1999) (involving a customs regulation).  Because "Congress need not, and likely cannot, anticipate all circumstances in

which a general policy must be given specific effect", Congress may authorize agencies "to issue rules so that its statutes may be applied to unforeseen situations and changing circumstances in a manner consistent with Congress' general intent." Id. at 392-93.

The Supreme Court has held that the FEC is "precisely the type of agency to which deference should presumptively be afforded." FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 37 (1981) (upholding the FEC's view that agency agreements between the National Republican Senatorial Committee and the state committees were logically consistent with legislative intent, although Congress failed to explicitly provide for such arrangements). Hence, in determining whether the FEC's action is "contrary to law," the task for the reviewing court is not to interpret the statute as it thinks best but rather to undertake the narrower inquiry into whether the FEC's construction was "sufficiently reasonable" to be accepted by the reviewing court. Id. at 39 (citing Train v. Natural Resources Defense Council, 421 U.S. 60, 75 (1975)).

Of course, judicial deference is not tantamount to judicial abdication. While the interpretation of the statute by the agency charged with administering it is entitled to deference, the courts must "reject administrative constructions of the statute, whether reached by adjudication or by rule-making, that

are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." Id. at 32.   In analyzing whether the agency's interpretation is consistent with legislative intent, the Supreme Court has looked at various factors:   when the FEC submitted the regulation to Congress, whether either house expressed disapproval;[5] whether the statute "expressly or by implication" forbids the disputed practice; whether the legislative history of the FECA "purports to disapprove" the disputed practice; whether the agency's interpretation was "logically consistent" with the FECA; whether the interpretation is inconsistent with "any discernible purpose of the Act." Id. at 34-36.

Looking at these factors, I conclude that the FEC's longstanding and consistent interpretation of the FECA is sufficiently reasonable to pass muster.   First, when the Debate Regulations were submitted to Congress, neither House expressed disapproval.   Second, nothing in the legislative history of the Act since the regulations were initially implemented twenty years ago suggests a legislative disapproval of -- or even queasiness with -- corporate funding of nonprofit, nonpartisan corporations

---

[5] It is unclear whether this factor can still be given much weight, after the 1996 passage of the Small Business Regulatory Enforcement Fairness Act.   See 5 U.S.C. § 801(g) (precluding a court from inferring any intent of Congress from any inaction by Congress after an agency's submission of a proposed rule).   This act did not go into effect until March 29, 1996.

which sponsor debates.  The presidential debates in 1988, 1992,
and 1996, which were sponsored by the CPD, were hardly a secret.
Third, the FECA neither explicitly nor by implication addresses
the funding of debates involving candidates for federal office.
Fourth, permitting a nonpartisan corporation funded by
corporations and labor unions to sponsor debates which will
educate voters and spark enough interest to motivate them to vote
or to register to vote is fully consistent with the express
legislative intent to permit nonpartisan organizations to get-
out-the-vote and encourage voter registration.  See H.R. Rep. No.
94-1057, at 63-64.  Nader himself has recognized the power of
debates to stimulate citizens to vote:

> Televised presidential debates shouldn't be a
> cure for insomniacs.  They should stimulate
> study, reflection, talk and voting among
> Americans.  These citizens might begin to
> believe that they can take charge of their
> country, just as Thomas Jefferson and our
> other distinguished forebears envisioned
> would occur some day when they signed on to
> "We the People."

Ralph Nader, A Real Debate Requires All the Candidates, Wall St.
J., Aug. 25, 2000, at A14.

Fifth, the FEC's interpretation is not inconsistent with
"the primary purpose served by the Act," which the Supreme Court
has stated is "the prevention of corruption and the appearance of
corruption spawned by the real or imagined coercive influence of
large financial contributions on candidates' positions and on

28

their actions if elected to office."  <u>Democratic Senatorial
Campaign Comm.</u>, 454 U.S. at 47.  Plaintiffs sincerely point to
the "compelling governmental interest in preventing corruption
[which] support[s] the restriction of the influence of political
war chests funneled through the corporate form."  <u>Austin v.
Michigan Chamber of Commerce</u>, 494 U.S. 652, 659 (1990).  However,
Congress took this precise interest into account by requiring
that any such corporate expenditure must be in connection with a
"nonpartisan activity designed to encourage individuals to vote
or to register to vote."  2 U.S.C. § 431(9)(B)(ii).  Accordingly,
I find that the Debate Regulations are reasonable gap-fillers.

### c.  **Nonpartisan vs. Bipartisan**

Finally, plaintiffs argue that the Debate Regulations are
contrary to law because they do not provide that the debates will
be "nonpartisan" within the meaning of the FECA, and they
disparage the FEC's assertion that by restricting staging
organizations to certain nonprofit corporations, it has provided
"sufficient safeguards to insure nonpartisanship."  44 Fed. Reg.
at 76736.  11 C.F.R. § 13 provides that staging organizations
must be nonprofit organizations described in 26 U.S.C. §§
501(c)(3) or (c)(4) which do not "endorse, support or oppose
political candidates or political parties."  The FEC also points
out that it requires "[s]taging organizations . . . to be able to
show that their objective criteria were used to pick the

participants, and that the criteria were not designed to result in the selection of certain pre-chosen participants."

Still, plaintiffs insist that the proof is in the pudding because recent presidential and vice-presidential debates have been controlled by the CPD, which they claim is a bipartisan, not a nonpartisan, organization created to promote the interests of two major political parties.  Their concern is not without some foundation because the CPD is chaired by the respective former chairmen of the Democratic and Republican National Committees, Paul G. Kirk, Jr. and Frank J. Fahrenkopf, Jr., and the CPD was created by a joint initiative of the two parties, and incorporated by them.  Nonetheless, the CPD points out that Kirk and Fahrenkopf no longer serve as the chairs of the major national party committees, that the current major party chairs do not sit on the Board of Directors, and that no CPD Board member is an officer of the Democratic or Republican National Committee.

Janet H. Brown, the Executive Director of the CPD, states that, prior to the first debate, the CPD formed an advisory panel which included individuals not affiliated with any party to provide guidance to the CPD with respect to several areas including non-major party candidate participation in CPD-sponsored debates.  As proof of nonpartisanship, she points out that Ross Perot was permitted to debate in 1992.  She states:

> In 1988, 1992 and 1996, the CPD's decisions
> regarding which candidates to invite to its

> debates were made by the CPD Board's
> unanimous adoption of the recommendations of
> independent Advisory Committees charged with
> the task of applying the CPD's pre-
> established, objective criteria.  At no time
> did any campaign or representative of any
> campaign have a role in the Advisory
> Committees' or the CPD Board's decision-
> making process.

(Brown Aff. ¶ 39.)  This year, the CPD has adopted "objective

criteria" which mandate, among other things, that candidates must

have a level of support of at least fifteen per cent as

determined by five national polling organizations.

Any complaint that a debate staging organization is in fact

acting in a bipartisan, rather than a nonpartisan, way, in

violation of the FECA, must be submitted to the FEC pursuant to 2

U.S.C. § 437g(a)(8).  However, plaintiffs have not established

that the regulations are invalid as a matter of law.

### 6.  Harm Balancing

Because I find no likelihood of success on the merits, there

is no need to spend much time balancing the harm to the

plaintiffs against the harm to the public.  Plaintiffs argue that

Ralph Nader, his supporters, and the Green Party will suffer

irreparable harm if corporations are allowed to make illegal

corporate contributions to pay for the debates.  They say:  "By

allowing corporate money to distort the electoral process, the

FEC assists corporations and the major parties in stifling the

voice of alternative parties and stunting the opportunities of

31

alternative candidates such as Mr. Nader." If the corporate
contributions to the CPD turn out to be illegal, plaintiffs are
correct that any harm to the electoral process is irreparable in
the sense that there is no remedy after the election.

On the other side of the equation, however, is the harm to
the public interest posed by this late challenge to these
regulations which were enacted a score of years ago.[6] Plaintiffs
concede that if I invalidate the regulations, they will be at
some courthouse door seeking an order to stop the CPD's scheduled
debates.[7] While plaintiffs argue that inevitably there will be
debates in some forum held by some group (like the media), the
down-to-the-wire jockeying over funding, sponsorship and format
is likely to imperil the viability of any presidential and vice-

---

[6] As amicus, the CPD argues that the First Amendment
protects its ability to stage debates and also to choose debate
participants. See Perot v. FEC, 97 F.3d 553, 559 (D.C. Cir.
1996) ("[I]f this court were to enjoin the CPD from staging the
debates or from choosing debate participants, there would be a
substantial argument that the court would itself violate the
CPD's First Amendment rights."). The Court need not resolve that
question, which was inadequately briefed by the parties.

[7] The FEC argues that a court would have no authority to
issue a preliminary injunction to stop the debates even if the
debates were illegally funded because of agency exhaustion
requirements. However, "extraordinary circumstances" may enable
a party to circumvent the explicit time restraints of the FECA.
See Perot, 97 F.3d at 558; cf. Sampson v. Murray, 415 U.S. 61, 83
(1974) (permitting injunctions against government from dismissing
a civil service employee who had not exhausted her remedies where
there was a very strong showing of irreparable injury); Skubel,
113 F.3d at 334 (holding that exhaustion is excused where it
would result in irreparable harm).

presidential debates.  As the Supreme Court stated, "in our tradition, candidate debates are of exceptional significance in the electoral process."  Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 675-76 (1998).  The balance of harms militates against a preliminary injunction.

### ORDER

The Court **DENIES** the Motion to Dismiss (Docket No. 14) and the Motion for Preliminary Injunction (Docket No. 2).  The parties shall inform the court in fifteen (15) days whether the Court should enter final judgment based on the current record.


PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

33